ORIGINAL

1  LAURENCE F. PULGRAM (CSB NO. 115163)
   *lpulgram@fenwick.com*
2  ALBERT L. SIEBER (CSB NO. 233482)
   *asieber@fenwick.com*
3  LIWEN A. MAH (CSB NO. 239033)
   *lmah@fenwick.com*
4  FENWICK & WEST LLP
   555 California Street
5  San Francisco, CA 94104
   Telephone:    (415) 875-2300
6  Facsimile:    (415) 281-1350

7  PATRICK E. PREMO (CSB NO. 184915)
   *ppremo@fenwick.com*
8  DENNIS FAIGAL (CSB NO. 252829)
   *dfaigal@fenwick.com*
9  FENWICK & WEST LLP
   Silicon Valley Center
10 801 California Street
   Mountain View, CA 94041
11 Telephone:    (650) 988-8500
   Facsimile:    (650) 938-5200

12
   Attorneys for Plaintiff
13 SUCCESSFACTORS, INC.

14                    UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16                      SAN FRANCISCO DIVISION

17

18
   SUCCESSFACTORS, INC., a Delaware          Case No. CV 08 1376 EDL
19 corporation,
                                             **EX PARTE APPLICATION FOR TEMPORARY**
20              Plaintiff,                    **RESTRAINING ORDER AND ORDER TO**
                                             **SHOW CAUSE RE PRELIMINARY**
21 v.                                         **INJUNCTION; MEMORANDUM OF POINTS**
                                             **AND AUTHORITIES IN SUPPORT THEREOF**
22 SOFTSCAPE, INC., a Delaware
   corporation; and DOES 1-10, inclusive,    Date:
23                                            Time:
                Defendant.                    Dept:
24                                            Judge:

25                                            Date of Filing:    March 11, 2008
                                             Trial Date:        No date set
26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1 **TO DEFENDANT SOFTSCAPE, INC.:**

2      Pursuant to Fed. R. Civ. P. 65 and Civil Local Rule 65-1, Plaintiff SuccessFactors, Inc.

3 ("SuccessFactors") hereby moves the Court *ex parte* for a Temporary Restraining Order and Order

4 to Show Cause Regarding Preliminary Injunction, and for issuance of such Preliminary Injunction,

5 to enjoin Defendant Softscape, Inc. ("Softscape") and its officers, agents, servants, employees and

6 attorneys and those in active concert or participation with them from circulating, publishing, or

7 marketing their products in competition with Plaintiff by means of, the false and malicious

8 Presentation emailed to Plaintiff's customers and prospective customers on or about March 4,

9 2008, on the grounds that such conduct by Defendant constitutes false advertising and trademark

10 infringement, and use of materials obtained by unauthorized access to computers and computer

11 systems. Specifically, Plaintiff seeks such relief in the form of the [Proposed] Temporary

12 Restraining Order filed with this Application.

13      This Application is made on the grounds that SuccessFactors will suffer immediate and

14 irreparably harm from the caustic and false content of the Presentation unless the activities

15 described above are enjoined for the period requested. This Application is based on the

16 Complaint, Memorandum of Points and Authorities, Declarations of Patrick Premo, Rob

17 Bernshteyn, and James Matheson and accompanying exhibits filed herewith, and such other

18 evidence and arguments as may be presented.

19

20                             Respectfully,

21 Dated: March 11, 2008              FENWICK & WEST LLP

22

23                      By:

24                           Patrick E. Premo
                          Attorneys for Plaintiff SUCCESSFACTORS, INC.

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

2

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

3    Over the last month, Defendant Softscape, Inc. ("Softscape" or "Defendant")—a

4  competitor of Plaintiff SuccessFactors, Inc. ("SuccessFactors," or "Plaintiff")—repeatedly

5  accessed a password-protected sales demo account without Plaintiff's knowledge or consent.

6  Plaintiff discovered this unauthorized access of its network only after at least 25 of its actual or

7  potential customers received an "anonymous" email on or about March 4, 2008 attaching a 43-

8  page PowerPoint presentation that viciously attacked Plaintiff's business and integrity (the

9  "Presentation"). The Presentation (1) prominently and repeatedly displayed Plaintiff's

10  trademarked logo on every page; (2) incorporated screenshots from sales demo accounts, including

11  precisely the restricted portions earlier accessed by Defendant; and (3) spewed forth scores of false

12  and/or misleading statements regarding Plaintiff's integrity, its customer base, and its products and

13  services. In short, the Presentation is a commercial hit piece—maliciously, and worse,

14  anonymously, impugning SuccessFactors and its business. There is compelling evidence that

15  Defendant created this Presentation and caused it to be disseminated to Plaintiff's customers and

16  prospects.

17    Distribution of this document has already led to immediate harm to Plaintiff's business and

18  goodwill. Even a false document can raise questions and doubts among customers and prospects,

19  taint their purchase decisions, and irreparably degrade the goodwill in the market that is

20  SuccessFactors' lifeblood. An injunction immediately halting the circulation and repetition of

21  such falsehoods is necessary to stem the hemorrhaging of goodwill resulting from distribution of

22  the Presentation. Indeed, in this case, the mere publication of the Presentation has already been

23  cited in a stock analyst's report downgrading by 20% its price target for shares of Plaintiff's stock

24  *even though that report recognized that "some of the critical claims certainly seem to be*

25  *exaggerated or unfounded."* Circulation of the Presentation has required Plaintiff to spend efforts

26  investigating its creation and responding to its false assertions upon numerous inquiries from

27  Plaintiff's actual or prospective customers. Defendant has no legitimate right to disseminate false

28  and misleading statements about Plaintiff and its business, much less through access to restricted

FENWICK & WEST LLP

*EX PARTE* APPL. FOR TRO AND ORDER TO SHOW    - 3 -    CASE NO. CV 08 1376 EDL
CAUSE, MEMO OF POINTS AND AUTHORITIES

1  portions of Plaintiff's computer systems and use of Plaintiff's trademarked logo. As discussed
2  below, Plaintiff has shown a strong probability of success on no less than three of its claims
3  against Defendant—claims under the Lanham Act for false advertising, trademark infringement
4  and a claim under the Computer Fraud and Abuse Act ("CFAA"). A temporary restraining order
5  and preliminary injunction should issue enjoining further dissemination of this contemptible and
6  malicious document.

## STATEMENT OF FACTS

### A. Plaintiff's and Defendant's Businesses

9  Plaintiff is a publicly-traded company (Nasdaq: SFSF) headquartered in San Mateo,
10  California that provides businesses of various sizes, industries, and geographies with performance
11  and talent management software that enables businesses to manage effectively their workforce and
12  maximize employee productivity. Declaration of Rob Bernshteyn in Support of Application for
13  Temporary Restraining Order ("Bernshteyn Decl.") ¶ 2. SuccessFactors' software provides many
14  benefits compared to traditional human resources systems. Unlike traditional paper-based
15  processes, custom-built systems, third-party systems, or point applications designed to address
16  specific needs, SuccessFactors' software solution is available on-demand and is accessible to
17  customers via the internet. *Id.* Since 2005, Plaintiff's customer retention rate has been at 90% or
18  greater—a clear indication of excellent customer satisfaction with its products and service. *Id.* ¶
19  15(c)-(d).

20  Defendant, a corporation headquartered in Massachusetts, also offers human resource
21  management systems and often competes with Plaintiff for the same customers. Declaration of
22  James Matheson in Support of Application for Temporary Restraining Order ("Matheson Decl.")
23  ¶ 9.

### B. Defendant's Unauthorized Access of Plaintiff's Restricted Sales Demo Account to Create the False and Misleading Presentation Emailed to Plaintiff's Current and Prospective Customers

26  Plaintiff's website includes an environment (known as ACE) that is for the exclusive use of
27  its employees (particularly sales representatives) and authorized customers, prospects and partners
28  to allow them remote access to materials that are not otherwise available to the general public.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  Matheson Decl. ¶¶ 8, 10. The ACE environment can be accessed only by entering a user name and
2  password. *Id.*

3       On or about March 4, 2008, no less than 25 of Plaintiff's actual or prospective customers—
4  and likely many more—received an email from the address hcmknowledge2008a@gmail.com.
5  Bernshteyn Decl. ¶¶ 3, 7. The sender identified himself as "John Anonymous." *Id.* ¶ 3. Attached
6  to this email was a 43-page PowerPoint presentation entitled "The Naked Truth," which was
7  printed on a SuccessFactors template and prominently featured Plaintiff's trademarked logo on the
8  front page and again in the top-left hand corner of every other page. *See id.* ¶ 3 & Ex. 1
9  ("Presentation"). The Presentation also contained screenshots from three areas of Plaintiff's
10  website and application environment, including the restricted ACE environment. Matheson Decl.
11  ¶ 5. Specifically, the screenshots found on pages 5 and 6 of the Presentation were taken from
12  SuccessFactors' publicly-available list of customers, both before and after February 28, 2008,
13  when the list was last updated; the screenshots found on pages 30 and 37-39 were taken from
14  Plaintiff's "webinars" (also publicly available); and pages 26-27, 31-36 and 40-42 were taken from
15  the access-restricted ACE environment. *Id.* ¶¶ 7, 10.

16       In the days since March 4, 2008, Plaintiff has obtained and analyzed "log" files showing
17  which IP addresses[1] had accessed each of the three areas of Plaintiff's website and application
18  environment incorporated into the Presentation during the relevant time period. *Id.* ¶ 8. There
19  was only one IP address that accessed all three sources and that did not appear to be a website
20  associated with Plaintiff's own offices or employees: **68.236.68.19**. *Id.* Plaintiff has determined
21  that this IP address belongs to Softscape. *Id.* ¶ 9.

22       Plaintiff also was able to determine which specific account within the ACE
23  environment—specifically, ACE 275—had been accessed and included in the Presentation, by
24  examining certain unique and idiosyncratic characteristics identifiable from the screenshots in the
25  Presentation. *Id.* ¶ 11. Of the small number of IP addresses to have accessed all three sections of
26  Plaintiff's website and the ACE sales demo account copied into the Presentation, 68.236.68.19

27
---
[1]  *See Register.com v. Verio, Inc.*, 356 F.3d 393, 407 (2d Cir. 2004) (an IP address is "a unique
28  identification of the location of an end-user's computer").

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    was the only one to access the specific ACE 275 account. *Id.* ¶ 12-13. Moreover, there is also
2    evidence that ACE 275 was accessed, again, without authorization, by three additional IP
3    addresses, two assigned to DSL residential users around Defendant's Massachusetts headquarters,
4    and the third an IP address specifically assigned to Softscape's London office. *Id.* ¶¶ 14-16.

5        Plaintiff also searched its Customer Relationship Management (CRM) database, which
6    collects information entered by users of its website who want to access webinars, white papers,
7    and data sheets located there. *Id.* ¶ 17. The list of names in the CRM database associated with
8    IP 68.236.68.19 included two who appear to have an affiliation with Softscape. *Id.* ¶ 18.

9        The implication is clear and damning: Softscape—as the owner of the only IP address to
10   access all three of Plaintiff's web pages incorporated into the Presentation, and of another IP
11   address in London that also accessed ACE 275—created the Presentation by repeatedly accessing
12   Plaintiff's systems, including a restricted sales demo account, and then directly or indirectly
13   caused the Presentation to be sent to numerous customers and prospects of Plaintiff.

14       The Presentation itself contains an array of false or misleading information plainly designed
15   to damage Plaintiff's reputation and goodwill and to dislodge its customer base and disrupt pending
16   opportunities. The entire document is based on a false and misleading premise—that the document
17   is authored by a former customer and represents facts provided by dissatisfied customers, rather
18   than assertions manufactured by a competitor. *See* Presentation at 2 (claiming to be "a compilation
19   of the facts from Successfactors [sic] customers" and that "[t]he facts represent the measure of
20   Successfactors' lack of corporate integrity and why many of *us* [customers] have left them").[2] As
21   described below and in the Declaration of Rob Bernshteyn, the Presentation then makes a series of
22   flatly false statements regarding Plaintiff's customer relationships in an elaborate, but
23   fundamentally deceptive, effort to portray Plaintiff's customers as widely dissatisfied with its
24   products and services—including, for example, claims that many customers were unhappy with
25   Plaintiff's products and would not provide references or were no longer customers. The
26   Presentation continues with a series of false or misleading claims about Plaintiff's products and
27   services, striking at the heart of its business. *See generally* Section IV.A, *infra*.

28   ____
     [2]   Defendant does not identify itself as the creator or contributor to the Presentation.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

2

**C.  Plaintiff Already Has Been Seriously Harmed, and Absent an Immediate Injunction, Will be Irreparably Injured.**

3       The Presentation was sent to at least 25 of Plaintiff's current or prospective customers on

4   or about March 4, 2008. Bernshteyn Decl. ¶ 3, 7. In the three business days thereafter prior to the

5   filing of this action and motion, SuccessFactors has received numerous inquiries from current or

6   prospective customers about the Presentation. This included, as just one example, a prospective

7   customer who emailed Plaintiff on March 5 indicating that the Presentation was reducing

8   Plaintiff's chance of winning their business, because, whatever the truth of the Presentation, "it

9   may be far too much negativity to overcome." *Id.* ¶ 18 & Ex. 2. On March 7, 2008, JMP

10  Securities—an investment bank that provides market analysis on SuccessFactors' stock—reduced

11  its price target for Plaintiff's stock from $15 to $12 as part of a discussion about the Presentation,

12  even though the report recognized that "some of the critical claims certainly seem to be

13  exaggerated or unfounded." *See id.* ¶ 19 & Ex. 3. On March 10, 2008, Plaintiff received an

14  inquiry from another prospective customer, who called the Presentation "disturbing" and asking

15  Plaintiff to respond to the issues raised therein. *Id.* ¶ 22 & Ex. 6. The Presentation has also been

16  the subject of negative discussion on internet message boards. *Id.* ¶ 21 & Ex. 5. This is just the

17  most available evidence of the immediate and irreparable effect on SuccessFactors' business and

18  goodwill occasioned by the false and misleading attack in the Presentation. Given the

19  impossibility of fully detecting and measuring the loss of prospects and goodwill, the full impact

20  might never be known, and cannot be remedied later by an award of damages.

21                                                  **ARGUMENT**

22  **I.  STANDARD FOR PRELIMINARY RELIEF**

23      Plaintiff is entitled to injunctive relief if it can demonstrate either: (1) a combination of

24  probable success on the merits and the possibility of irreparable harm; or (2) serious questions

25  regarding the merits and that the balance of hardships tips sharply in its favor. *GoTo.com v. Walt*

26  *Disney Co.*, 202 F.3d 1199, 1204-05 (9th Cir. 2000). Generally speaking, "[t]hese are not two

27  distinct tests, but rather the opposite ends of a single continuum in which the required showing of

28  ///

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    harm varies inversely with the required showing of meritoriousness." *Rodeo Collection, Ltd. v.*

2    *West Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987) (internal citations omitted).

3          In Lanham Act cases, the inquiry is even more straightforward: "irreparable injury may

4    be presumed from a showing of likelihood of success on the merits." *GoTo.com*, 202 F.3d at

5    1205 n.4; *see also Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992)

6    (collecting cases arising under various prongs of the Lanham Act in support of "the well-

7    established presumption that injuries arising from Lanham Act are irreparable"); *Valu Eng'g, Inc.*

8    *v. Nolu Plastics, Inc.*, 732 F. Supp. 1024, 1025-26 (N.D. Cal. 1990) (applying presumption of

9    irreparable harm in granting injunction against defendant who had made false or misleading

10   statements about its competitor's product). This presumption "is based upon the judgment that it

11   is virtually impossible to ascertain the precise economic consequences of intangible harms, such

12   as damage to reputation and loss of goodwill, caused by such violations," and reduces the dual

13   inquiry of the first prong into the single inquiry: whether SuccessFactors has shown a likelihood

14   of success on the merits of its false advertising claim. *Abbott Labs.*, 971 F.2d at 16; *GoTo.com*,

15   202 F.3d at 1204-05 & nn.3-4.[3]

16          To the extent there are any doubts about Plaintiff's probability of success on the merits of

17   its claims, the balance of hardships tips sharply in its favor. Plaintiff would continue to suffer

18   immeasurable loss to its relationships with actual and prospective customers caused by the

19   distribution of the Presentation if an injunction does not issue. Defendant, on the other hand,

---

[3]   The impact of *eBay v. MercExchange, LLC*, 547 U.S. 388 (2006), a United States Supreme Court case involving a *permanent* injunction in a patent case, on *preliminary* injunctions in IP cases has not been conclusively determined. *See, e.g., Nat'l League of Junior Cotillions, Inc. v. Porter*, Copy. L. Rep. (CCH) P29,433, at *17-*21 & nn.14-15 (W.D.N.C. Aug. 9, 2007) (collecting cases addressing the issue and determining that *eBay* does not dislodge the presumption against irreparable harm at preliminary harm stages). In *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197 (C.D. Cal. 2007), the court noted a "sensible policy rationale for permitting a presumption of irreparable harm in preliminary injunction, but not permanent injunction, motions"—namely, that "[u]nlike a permanent injunction, which resolves the merits of a claim and imposes an equitable remedy because a legal one is inadequate, a preliminary injunction maintains a particular relationship between the parties in anticipation of a decision on the merits." *Id.* at 1212. In any event, Plaintiff has established the irreparable harm to its business and goodwill, even without resort to any presumption. *See* Section IV.C, *infra*.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   would suffer no hardship at all if it were enjoined from making false claims about its competitor,

2   from misusing its competitor's trademarks, or from accessing Plaintiff's computerized systems

3   which it is not authorized to access. Nor would Defendant be deprived of any rights under the

4   First Amendment. *J.K. Harris & Co., Ltd. v. Kassel*, 253 F. Supp. 2d 1120, 1130 (N.D. Cal. 2003)

5   (defendant suffers no hardship from injunction that enjoined statements about plaintiff's product

6   that had no factual basis; First Amendment offers no protection to false commercial speech).

7   **II.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM**
        **UNDER THE COMPUTER FRAUD AND ABUSE ACT**

8

9           The federal Computer Fraud and Abuse Act (the "CFAA") prohibits five categories of

10  conduct related to the fraudulent or damaging use of computers, including liability against anyone

11  who "intentionally accesses a computer without authorization or exceeds authorized access, and

12  thereby obtains . . . information from any protected computer if the conduct involved an interstate

13  or foreign communication." 18 U.S.C. § 1030(a)(2)(C); *see generally id.* § 1030(a)(1)-(5) (listing

14  categories of prohibited conduct under the Act). The CFAA allows anyone "who suffers damage

15  or loss by reason of a violation" of any one of the five prohibited acts to maintain a civil action,

16  provided that the conduct involves one of the factors listed in Section 1030(a)(5)(b). *Id.* § 1030(g);

17  *see also Fiber Sys. Int'l v. Roehrs*, 470 F.3d 1150, 1156-57 (5th Cir. 2006) (reviewing structure of

18  CFAA). Section 1030(a)(5)(B), in turn, provides that a civil action may be triggered, *inter alia*, by

19  a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." *Id.*

20  § 1030(a)(5)(B)(i). The CFAA provides for injunctive and other equitable relief in addition to

21  compensatory damages. *Id.* § 1030(g).

22          "Loss" for purposes of this statute includes "any reasonable cost to any victim, including

23  the cost of responding to an offense, conducting a damage assessment, and restoring the data,

24  program, system, or information to its condition prior to the offense, and any revenue lost, cost

25  incurred, or other consequential damages incurred because of interruption of service."

26  *Id.* §§ 1030(e)(11), 1030(g). Courts have construed "loss" to include damages lost from time spent

27  by the plaintiff's employees in investigating and remedying the unauthorized access.

28  *See Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 647

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1     (E.D. Pa. 2007) (hours spent by plaintiff's president investigating unauthorized access of protected

2     computer constitute loss because "the statute allows the costs of time spent assessing computer

3     systems to be counted towards the loss requirement").

4           Here Plaintiff has provided compelling evidence that Defendant violated the CFAA by

5     intentionally accessing and obtaining information from password-protected portions of Plaintiff's

6     computer systems through an interstate communication, and that Plaintiff suffered a cognizable

7     loss in excess of $5,000 as a result of Defendants' conduct. Matheson Decl. ¶¶ 4-18. That is all

8     this is necessary to state a valid claim under the CFAA.

9           The evidence shows that Defendant repeatedly accessed Plaintiff's restricted ACE

10    environment from its offices in Massachusetts and London. Matheson Decl. ¶¶ 12-16. Because

11    this portion of the website can only be accessed by entering a password, Defendants must have

12    either disabled the password function or (much more likely) obtained a password from another

13    source in order to enter it. *Id.* ¶¶ 5-6, 10, 12

14          Plaintiff also seeks expedited discovery regarding how Defendant and its accomplices

15    accessed the ACE environment, and but the precise manner of access is irrelevant for purposes of

16    this application: under any conceivable scenario, Defendant's accessing of Plaintiff's access-

17    restricted web application is "unauthorized" under the CFAA. As explained in *United States v.*

18    *Phillips*, 477 F.3d 215 (5th Cir. 2007), "[c]ourts have therefore typically analyzed the scope of a

19    user's authorization to access a protected computer on the basis of the expected norms of intended

20    use or the nature of the relationship established between the computer owner and the user." *Id.* at

21    219-20. Under this approach, courts have repeatedly found that accessing a password-protected

22    sales demo account by an unauthorized third-party constitutes "unauthorized access." *See id.*

23    (collecting cases). Most significantly, in *Creative Computing v. Getloaded.com, LLC*, 386 F.3d

24    930 (9th Cir. 2004), the Ninth Circuit affirmed the judgment against defendants—competitors of

25    the plaintiff—who gained "unauthorized access" to plaintiff's password-protected website in

26    myriad ways, including (1) using the login name and password of one of Plaintiff's customers, "in

27    effect impersonating" the customer; (2) by registered a defunct company as a subscriber to

28    Plaintiff's website; (3) hacking into the website; and (4) hiring away one of the Plaintiff's

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1 employees and having that employee access and download information from the restricted

2 website. *Id.* As in *Creative Computing*, Softscape was not entitled—and could not reasonably

3 believe that it was entitled—to access the ACE environment used by its competitor to provide

4 information to its employees and bona fide customers, no matter the manner in which Softscape

5 achieved this end.

6 Furthermore, Defendants' unauthorized access has already forced SuccessFactors to

7 expend enormous resources investigating the intrusion into its restricted sales demo accounts,

8 including the extent of the breach, the identity of the breaching party, and possible damage caused

9 to its computers. Matheson Decl. ¶ 4; Bernshteyn Decl. ¶ 4. The cost of this investigation, which

10 is still ongoing, is substantial and will result in losses far in excess of $5,000. *Id.*; *see Healthcare*

11 *Advocates*, 497 F. Supp. 2d at 647 (investigation into source and extent of intrusion sufficient to

12 establish loss, even where investigation occurred after complaint filed).

13 **III. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS LANHAM**
**ACT CLAIM FOR TRADEMARK INFRINGEMENT**
14

15 Plaintiff is likely to succeed on its trademark infringement claim. Plaintiff uses, and has

16 used its word mark, SUCCESSFACTORS, its distinctive SuccessFactors logo, and other

17 SUCCESSFACTORS-based marks to promote, advertise, and otherwise market its products and

18 services. Bernshteyn Decl. ¶ 2. As a consequence of Plaintiff's extensive sales, marketing, and

19 advertising in interstate commerce, the SUCCESSFACTORS Marks have become well known

20 among consumers as an identifier of Plaintiff's products and services. *Id.* Plaintiff is the owner

21 of a federally registered trademark registration in its SUCCESSFACTORS mark, and has two

22 additional pending registrations in SUCCESSFACTORS-based marks. *See* Declaration of Patrick

23 E. Premo in Support of Motion for Temporary Restraining Order ¶¶ 2-3 & Ex. A-C.

24 Plaintiff's trademarked name and logo appear along with its name on every single page of

25 the Presentation. Although the reader of the Presentation soon realizes that it is a hit piece that

26 targets and impugns SuccessFactors, the use of SuccessFactors' distinctive logo nonetheless

27 initially promotes the image that this is a document promulgated by the owner of the logo.

28 Further, by prominently featuring the logo at the top left of every page, the Presentation attempts

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   to garner the credibility and patina of legitimacy for statements about SuccessFactors that is

2   attendant to association with the company's well-known symbol.

3        Where, as here, a defendant uses a mark to identify the *plaintiff's* products and services,

4   not its own, the likelihood of success on a trademark infringement claim is determined not under

5   traditional confusion analysis but rather by the three factor-test articulated by the Ninth Circuit in

6   *New Kids on the Block v. News Am. Publ'g Inc.,* 971 F.2d 302 (9th Cir. 1992). *See id.* at 308

7   (explaining that in circumstances in which a defendant has made use of plaintiff's mark to

8   criticize or otherwise refer to the *plaintiff,* the likelihood of consumer confusion analysis set forth

9   in *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir. 1979), does not apply). The law

10  recognizes that, on such occasions, a different rule applies because "the use of the trademark does

11  not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a

12  different one. Such *nominative use* of a mark—where the only word reasonably available to

13  describe a particular thing is pressed into service—lies outside the strictures of trademark law."

14  *Id.*; *see also Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003)

15  ("The nominative fair use test replaces the traditional [*Sleekcraft*] analysis"); *Cairns v. Franklin*

16  *Mint Co.*, 292 F.3d 1139, 1151-52 (9th Cir. 2002) (same).

17       In turn, trademark infringement in these cases is determined by whether a defendant can

18  satisfy three factors necessary to render its use fair: (1) the plaintiff's product or service in

19  question must be one not readily identifiable without use of the trademark; (2) the defendant uses

20  "only so much of the mark or marks may be used as is reasonably necessary to identify the

21  plaintiff's product or service"; and (3) "the user must do nothing that would, in conjunction with

22  the mark, suggest sponsorship or endorsement by the trademark holder." *See Walking Mountain*,

23  353 F.3d at 809 (citing *Cairns*, 292 F.3d at 1151). Failure by defendant to satisfy any prong

24  results in a finding of infringement. *See, e.g., Brother Records v. Jardine*, 318 F. 3d 900, 909 n.5

25  (9th Cir. 2003).

26       Where a defendant uses only the trade name of plaintiff in criticizing plaintiff or its

27  products, but not plaintiff's whole mark or logo, it might be conceivable that the nominative fair

28  use defense is not foreclosed. For example, in *J.K. Harris & Co., LLC v. Kassel*, 253 F.Supp.2d

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1 | 1120 (N.D. Cal. 2003), both plaintiff and defendant were competitors and defendant used
2 | plaintiff's trade *name* in internet advertising to criticize plaintiff's tax services. The court denied
3 | a preliminary injunction because defendant was able to demonstrate that its use of plaintiff's trade
4 | name was not more than was reasonably necessary to identify plaintiff's product or service and
5 | thus it satisfied all prongs of the *New Kids* test. *Id.* at 1125-26

6 | But where, as here, a Defendant uses more of a Plaintiff's name than is necessary to refer
7 | to or make its point about Plaintiff, Defendant cannot satisfy the second *New Kids* factor and a
8 | finding of infringement results. As the Court explained in *New Kids*, "a soft drink competitor
9 | would be entitled to compare its product to Coca-Cola or Coke, but would not be entitled to use
10 | Coca-Cola's distinctive lettering." 971 F. 2d at 308 n.7 (citing *Volkswagenwerk*
11 | *Aktiengesellschaft v. Church,* 411 F.2d 350, 352 (9th Cir. 1969)).

12 | Here, the Presentation does not simply recite Plaintiff's name to legitimately criticize
13 | Plaintiff or its products and services. Rather, Plaintiff's trademarked logo and name together
14 | appear in their entirety on every single page of the Presentation—*on 43 of 43 slides. See*
15 | *generally* Presentation. Defendant as a competitor of Plaintiff has no license or other right by
16 | which to make reproductions of Plaintiff's registered mark for distribution to Defendant's
17 | potential customers or the consuming public. Its use of Plaintiff's trademarks repeatedly, boldly,
18 | and in whole form on its marketing materials exceeds the permissible scope of nominative fair
19 | use, precluding defendant from satisfying the second prong of the *New Kids* test, and resulting in
20 | a likely finding of infringement.

21 | **IV. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS LANHAM ACT CLAIM FOR FALSE ADVERTISING**

22 | Section 43(a)(1) of the Lanham Act provides that

24 | > [a]ny person who, on or in connection with any goods or services . . .
25 | > makes a false or misleading description of fact, or false or misleading representation of fact, which—

26 | > [. . .]

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of . . . another person's goods, services, or commercial activities,

2

3

4

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

5

15 U.S.C. § 1125(a)(1). As summarized by the Ninth Circuit, a cause of action under this section

6

consists of the following elements:

7

8

9

10

11

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

12

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (internal footnote

13

omitted); *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1348 (Fed. Cir. 1999) (citing

14

*Southland Sod* among cases showing substantial agreement among the courts on elements of a

15

federal false advertising claim).

16

17

**A.    The Presentation Sent to Plaintiff's Customers Is False or Misleading in Several Highly Material Respects**

18

There is compelling evidence that this Presentation was, in fact, created by Defendant in

19

the course of its repeated visits to Plaintiff's website. *See supra.* As a result, the Presentation—a

20

direct, largely false attack on Plaintiff's products and services, going so far as to call its products

21

a "SCAM," *see* Presentation at 31—ended up in the hands of many of Plaintiff's actual and

22

potential customers across the country.[4]

23

/ / /

24

25

26

27

28

---

[4]   Whether the document was directly emailed by Defendant or through a proxy is irrelevant. An otherwise guilty Defendant cannot escape liability by preparing a false advertisement and then hiding its involvement in its preparation by distributing it through another source. *See, e.g., Arrow Rock Int'l v. Dex Media Inc.*, Case No. CV-05-339-S-EJL, 2006 U.S. Dist. LEXIS 44609, at *13-*14 (D. Idaho June 28, 2006) (false statements prepared by one party and distributed by another constitute a cause of action for false advertising against both).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1      "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that

2    the statement was literally false, either on its face or by necessary implication, or that the

3    statement was literally true but likely to mislead or confuse consumers." *Southland Sod*, 108 F.3d

4    at 1139. Falsity must be determined by looking at the challenged statements in context. *Id.*

5    Under this standard, the Presentation is false and misleading in its entirety. The Presentation

6    claims to be "a compilation of the *facts* from Successfactors [sic] customers" and that "[t]hese

7    *facts* represent the measure of Successfactors' [sic] lack of corporate integrity and why many of

8    *us* [customers] have left them." *See* Presentation at 2 (emphases added). Defendant, however,

9    nowhere identifies itself as the creator of this document. What recipients are left with is the

10   impression that this is a document authored by a former customer containing an objective

11   collection of facts about Plaintiff and collected from Plaintiff's customers and former customers,

12   when it is actually a hit piece created by Defendant to tarnish Plaintiff's reputation in the market

13   and disrupt its current and potential customer relationships.[5]

14      Beyond this overarching deception that renders the entire Presentation misleading, the

15   false or misleading statements that follow fall into two broad categories relating to customer

16   satisfaction and the functionality of its product.

17          **1.      False Statements Related to SuccessFactors' Retention of Customers**

18      The Presentation purports to list a number of failed implementations of SuccessFactors'

19   product and customers who purportedly "are [d]issatisfied, have left them and are not listed on

20   the website anymore," apparently to challenge SuccessFactors' public statements regarding its

21   customer retention rate higher than 90%. For example:

22   / / /

23   / / /

24   / / /

25

---

26   [5]   To the extent any of the actionable statements were provided by Plaintiff's customers, rather
     than made up from whole cloth, and the Defendant itself has no independent knowledge of
27   their veracity, the injunction must still issue. *See J.K. Harris & Co., Ltd. v. Kassel*, 253 F.
     Supp. 2d 1130 (N.D. Cal. 2003) ("Those statements that Plaintiff has declared to be false that
28   were submitted to Defendants by third parties are enjoined.").

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

| False or Misleading Statement of Fact in Presentation | Actual Fact |
|---|---|
| 1. The Presentation states that Merrill Lynch, and Apple Computer are "Customers [who] are dissatisfied, have left [SuccessFactors] and are not listed on their Website." Presentation at 20, 22. | 1. One of these customers purchased Plaintiff's "Employee Appraiser" CD-based software product in 2000 (which product has been superseded by Plaintiff's hosted solutions) and the other purchased Plaintiff's Manager's Edition product in 2007 (which is intended for an individual user), and are not listed on Plaintiff's website only because Plaintiff has chosen to no longer list customers of these lower-end products on its website. Bernshteyn Decl. ¶ 10. |
| 2. The Presentation states that MasterCard is not a referencable customer. Presentation at 16. | 2. MasterCard is a highly referenceable company. Bernshteyn Decl. ¶ 13. |
| 3. Defendant's presentation asserts that "[a]fter six months Sears Pulled the Plug on the entire project." Presentation at 8. | 3. Sears remains a valued and important customer. Bernshteyn Decl. ¶ 15(f). |
| 4. The Presentation states that Bank of America, Reebok, Symbol Technologies, Peregrine Systems, and Portal Software are customers who left SuccessFactors because they were dissatisfied. Presentation at 14, 17, 22. | 4. These companies did not leave SuccessFactors as a result of a failed implementation of its products or other dissatisfaction with the company. They left because they merged with, or where acquired by, another company, and in many cases, continue to provide excellent references about SuccessFactors. Bernshteyn Decl. ¶¶ 11(a), 12. Other purportedly "dissatisfied" customers are no longer listed on the website for reasons unrelated to product performance, such a company policy that precludes reference or endorsement of vendors. *Id.* ¶ 11(c). |
| 5. The Presentation falsely claims that "63% of Their [SuccessFactors] Customers Left Them by 2008" and further asserts that "[b]ased on this, 1 out of 2 customers leaves Successfactors [sic] within 2-3 years." | 5. Plaintiff's customer retention rate is at or exceeds 90%. Bernshteyn Decl.¶ 15(c)-(d). |

/ / /

/ / /

/ / /

/ / /

- 16 - CASE NO. CV 08 1376 EDL

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

### 2. False Statements Related to the Capabilities of Plaintiff's Products

The Presentation also makes a series of false or misleading statements regarding

Plaintiff's products, including the security features of its products:

| False or Misleading Statement of Fact in Presentation | Actual Fact |
|---|---|
| 1. The Presentation claims that SuccessFactors "can't handle situations where an employee changes their positions and manager during the year." Presentation at 11. | 1. SuccessFactors has a tool—the Manager Change Engine—that provides a solution for this exact situation. Bernshteyn Decl. ¶ 16(a). |
| 2. In an apparent attempt to create the impression that implementation of its product requires extensive consulting efforts, the PowerPoint asserts that SuccessFactors employs 440 consultants, "which implies 1,650 hours of effort for each of its customers." Presentation at 23. | 2. SuccessFactors employs less than half that claimed in the Presentation. Bernshteyn Decl. ¶ 16(b). |
| 3. The Presentation claims that because "[a]ll Customers are in a Single Database," each customer's data is mixed with other customers' data, creating a security risk. Presentation at 24. | 3. All customer data stored by SuccessFactors is stored in separate and secure database table schema and its approach has been validated by top banks and security specialists. Bernshteyn Decl. ¶ 16(c). |
| 4. The Presentation claims that SuccessFactors "will add any feature or change they want without asking you if you want it" on a monthly basis, and will "install the change without telling" customers. Presentation at 28. | 4. Approximately 95% of enhancements are delivered on an "opt-in" basis. Bernshteyn Decl. ¶ 16(d). |
| 5. The Presentation misleadingly implies that users will be required to scroll though long forms in SuccessFactors' product. Presentation at 41. | 5. SuccessFactors' product gives customers the option of tabbing through forms rather than scrolling. Bernshteyn Decl. ¶ 16(e). |

### B. The Statements Are Material

A false statement is "material" under the Lanham Act when the defendant's deception "is

likely to influence the purchasing decision," such as when the false or misleading statement

"relates to an inherent quality or characteristic of the product." *Cashmere & Camel Hair Mfrs.*

*Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311-12 (1st Cir. 2002) (internal quotation marks omitted).

Defendants' false and misleading statements—which go to the heart of the functionality of

Plaintiff's product and customer satisfaction with its product—are plainly material under this

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   standard. Indeed, the materiality of the misstatements has already been demonstrated: actual or

2   potential customers have reacted immediately to the Presentation, and to Plaintiff's detriment, as

3   explained in the section below.

### C.   The Statements Have Actually Deceived Plaintiff's Customers and Has Resulted in Injury, and Would Result in Further Irreparable Injury

6   The Presentation was sent on or about March 4, 2008 and received by at least 25 of

7   Plaintiff's current or prospective customers. Bernshteyn Decl. ¶¶ 3, 7. The Presentation had an

8   immediate and irreparable effect on Plaintiff's business prospects and its reputation in the relevant

9   industry. On March 5, *the morning after the Presentation was sent*, one prospective customer

10  emailed Plaintiff indicating that the Presentation "may be far too much negativity to overcome."

11  Bernshteyn Decl. ¶ 18 & Ex. 2. On March 10, 2008, Plaintiff received an inquiry from another

12  prospective customer, calling the Presentation "disturbing" and asking Plaintiff to respond to the

13  issues raised therein. *Id.* ¶ 22 & Ex. 6. The Presentation has also been the subject of negative

14  discussion of internet message boards. *Id.* ¶ 21 & Ex. 5. Such an impact is not unexpected—

15  indeed, it was the precise intent of the Presentation. There is little more persuasive to one potential

16  customer than existing customers' satisfaction. The false depiction of SuccessFactors' customer

17  base as discontent or abandoning ship thus presents a particularly virulent risk of injury.

18  In addition, the potential impact on SuccessFactors' reputation and market value is

19  demonstrated by reactions to date. On March 7, 2008 investment analysts at JMP Securities

20  reduced its price target for Plaintiff's stock some 20%, from $15 to $12, as part of a discussion

21  about the Presentation, *even though the report recognized that "some of the critical claims*

22  *certainly seem to be exaggerated or unfounded." See id.* ¶ 19 & Ex. 3.[6] Such degradation of

23  reputation, once incurred is difficult if not impossible to recover. Indeed, reputational damage

24  establishes not only harm but *irreparable* harm. *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F.

25  Supp. 2d 1197 (C.D. Cal. 2007) (evidence of harm to reputation sufficient to establish irreparable

26

27  [6] By March 10, JMP had issued an update that, after its interview with one of the companies that was cited as a case studies for the claims in the Presentation, "suffice it to say, the claims appear

28  to be unfounded." *See* Bernshteyn Decl. ¶¶ 20 & 4.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  harm); *Beltronics USA, Inc. v. Midwest Inventory Distrib. LLC*, 522 F. Supp. 2d 1318 (D. Kan.

2  2007) (same); *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1016 (9th Cir. 2001) (lost sales

3  evidence of irreparable harm).

4  These are just the effects known to Plaintiff one week after the Presentation was sent.

5  Plaintiff will likely never know the full extent of the loss of goodwill related to its products—in a

6  competitive market, even a modest recalibration of customers' perception of a seller, is

7  potentially unrecoverable.

8  ## V.  DEFENDANT WOULD NOT BE HARMED BY ENTRY OF THE INJUNCTION AND THEREFORE NO BOND SHOULD BE REQUIRED

9

10  Where, as in this case, damage will not result from the issuance of a TRO or preliminary

injunction, a court has discretion to determine that a bond is unnecessary. *See, e.g.*, *Jorgensen v.

11  Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (affirming decision of trial court where no

12  meaningful harm would result from issuance of injunction).  There is no conceivable legitimate

13  harm that could result from the injunction sought by Plaintiff, which merely seeks to enjoin

14  Defendant's unauthorized access of Plaintiff's computer systems and to enjoin its dissemination

15  of a document that unquestionably infringes Plaintiff's trademarks and contains numerous

16  material false and misleading facts about Plaintiff's products and services.  *See also Scherr v.

17  Volpe*, 466 F.2d 1027, 1035 (1972) (strong showing on likelihood of success on the merits basis

18  for denying bond entirely).  On the other hand, Plaintiff's relief requested would do nothing to

19  prevent Defendant from *legitimately* competing with Plaintiff.  No bond should be required, or a

20  nominal bond, at most.

21

22  ## CONCLUSION

23  For the foregoing reasons, the Court should grant Plaintiff SuccessFactors, Inc.'s

Application for a Temporary Restraining Order against Defendant Softscape, Inc. The Court

24  should order Softscape to cease and desist from further publication, circulation, or utterance of

25  the materials contained in the Presentation as a whole.  In the alternative, the Court should order

26  Softscape to cease and desist from making the particular statements proven herein to be false and

27  misleading.  The Court should also grant the contemporaneously filed motion for expedited

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    discovery, and set this matter for a preliminary injunction hearing immediately after completion

2    of such discovery.

3                                              Respectfully,

4    Dated: March 11, 2008                     FENWICK & WEST LLP

5

6

7                                      By: _____
                                           Patrick E. Premo
8                                          Attorneys for Plaintiff SUCCESSFACTORS, INC.

9                                                                              *1281601*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW