1  LAURENCE F. PULGRAM (CSB NO. 115163)
   *lpulgram@fenwick.com*
2  ALBERT L. SIEBER (CSB NO. 233482)
   *asieber@fenwick.com*
3  LIWEN A. MAH (CSB NO. 239033)
   *lmah@fenwick.com*
4  FENWICK & WEST LLP
   555 California Street, 12th Floor
5  San Francisco, CA 94104
   Telephone: (415) 875-2300
6  Facsimile: (415) 281-1350

7  PATRICK E. PREMO (CSB NO. 184915)
   *ppremo@fenwick.com*
8  DENNIS M. FAIGAL (CSB NO. 252829)
   *dfaigal@fenwick.com*
9  FENWICK & WEST LLP
   Silicon Valley Center
10 801 California Street
   Mountain View, CA 94041
11 Telephone:    (650) 988-8500
   Facsimile:    (650) 938-5200

12
   Attorneys for Plaintiff
13 SUCCESSFACTORS, INC.

14
                  UNITED STATES DISTRICT COURT
15
                 NORTHERN DISTRICT OF CALIFORNIA
16
                        OAKLAND DIVISION
17

18 SUCCESSFACTORS, INC., a Delaware          Case No. CV 08 1376 CW
   corporation,
19                                           **PLAINTIFF'S REPLY MEMORANDUM IN
                    Plaintiff,               SUPPORT OF PRELIMINARY INJUNCTION**
20
   v.                                        Date:          March 27, 2008
21                                           Time:          2:00 p.m.
   SOFTSCAPE, INC., a Delaware               Courtroom:     2
22 corporation; and DOES 1-10, inclusive,    Judge:         Hon. Claudia Wilken

23                  Defendants.              Date of Filing: March 11, 2008
                                             Trial Date:     No date set
24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

THE FACTUAL RECORD .............................................................................................. 2

ARGUMENT .................................................................................................................... 5

I.  WITHOUT INJUNCTIVE RELIEF, PLAINTIFF CONTINUES TO FACE A
    SIGNIFICANT THREAT OF IRREPARABLE HARM .................................... 5

    A.  Loss Of Goodwill From False Advertising Constitutes Irreparable Harm ............ 5

    B.  Continued False Advertising Is Likely, From Repetition of the Information
        In the Presentation, And From Circulation of the Presentation Itself ................... 6

        1.  Repetition of False Information Contained In the Presentation ................. 6

        2.  Risk of Further Circulation of the Presentation ........................................ 7

    C.  The Need for an Injunction Is Not Mooted by Defendant's Supposed
        Voluntary Cessation ................................................................................................ 7

II. PLAINTIFF HAS DEMONSTRATED A STRONG LIKELIHOOD OF
    SUCCESS ON THE MERITS ........................................................................... 8

    A.  The Lanham Act Claims Will Succeed .................................................................. 8

        1.  The Falsity of the Statements Is Undisputed ............................................ 8

        2.  Defendant Is Continuing Actively to Propagate These Falsehoods in
            Commerce ................................................................................................. 9

        3.  The Suggestion That Defendant Did Not Distribute the
            Presentation, and Is Not Responsible for Distribution by Its
            Employees, Is Baseless .............................................................................. 9

    B.  The Trademark Infringement Claim Is Likely to Prevail ..................................... 11

    C.  The Computer Fraud and Abuse Act Claim Is Likely to Prevail ......................... 11

III. THE SCOPE OF THE TRO IS READILY CONVERTED INTO A
     PRELIMINARY INJUNCTION ..................................................................... 15

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

4     **CASES**

5     *Coca-Cola Co. v. Tropicana Prods., Inc.*,
        690 F.2d 312 (2d Cir. 1982)................................................................................................. 5

6

7     *Creative Computing v. Getloaded.com, LLC*,
        386 F.3d 930 (9th Cir. 2004)............................................................................................. 12

8     *FTC v. Affordable Media, LLC*,
        179 F.3d 1228 (9th Cir. 1999)............................................................................................. 8

9     *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*,
        497 F. Supp. 2d 627 (E.D. Pa. 2007).............................................................................. 12

10    *Hearst Bus. Publ'g, Inc. v. W.G. Nichols, Inc.*,
        76 F. Supp. 2d 459 (S.D.N.Y. 1999)................................................................................. 9

11    *Lisa M. v. Henry Mayo Newhall Hosp.*,
        12 Cal. 4th 291 (1995) ...................................................................................................... 11

12

13    *McNeilab, Inc. v. Am. Home Prods. Corp.*,
        848 F.2d 34 (2d Cir. 1988).................................................................................................. 6

14    *Nexans Wires S.A. v. Sark-USA, Inc.*,
        319 F. Supp. 2d 468 (S.D.N.Y. 2004)........................................................................ 13, 14

15    *P.C. of Yonkers, Inc. v. Celebrations! The Party & Seasonal Superstore*,
        2007 U.S. Dist. LEXIS 15216 (D.N.J. Mar. 2, 2007) ................................................... 12

16

17    *Spectravest, Inc. v. Fleet Street, Ltd.*,
        13 U.S.P.Q.2d (BNA) 1457 (N.D. Cal. 1989) .............................................................. 10

18    *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
        240 F.3d 832 (9th Cir. 2001)............................................................................................... 5

19    *Therapeutic Research Faculty v. NBTY, Inc.*,
        488 F. Supp. 2d 991 (N.D. Cal. 2007) ............................................................................ 14

20    *Thurmond v. Compaq Computer Corp.*,
        171 F. Supp. 2d 667 (E.D. Tex. 2001) ...................................................................... 13, 14

21

22    *Tyco Int'l (US) v. Does*,
        2003 U.S. Dist. LEXIS 25136 (S.D.N.Y. Aug. 29, 2003) ............................................ 13

23    *United States v. Middleton*,
        231 F.3d 1207 (9th Cir. 2000)..................................................................................... 12, 13

24    *United States v. Schuster*,
        476 F. 3d 614 (7th Cir. 2006)........................................................................................... 14

25    *Valu Eng'g, Inc. v. Nolu Plastics, Inc.*,
        732 F. Supp. 1024 (N.D. Cal. 1990) ............................................................................. 6, 7

26

27

28

Fenwick & West LLP
Attorneys At Law
Mountain View

# TABLE OF AUTHORITIES
## (continued)

Page(s)

**STATUTES**

Cal. Pen. Code § 501(e)(1)............................................................................................. 14

Cal. Pen. Code § 502 ..................................................................................................... 14

Cal. Pen. Code § 502(c)(2)............................................................................................ 14

Cal. Pen. Code § 502(c)(7)............................................................................................ 14

Cal. Pen. Code § 502(e)(2)............................................................................................ 14

18 U.S.C. § 1030(e)(11)................................................................................................ 12

U.S.S.G. § 2B1.1 .......................................................................................................... 14

**RULES**

Fed. R. Civ. P. 65(d) ....................................................................................................... 7

**OTHER AUTHORITIES**

Rest. (3d) Agency, Introduction.................................................................................... 10

Rest. (3d) Agency § 2.04 .............................................................................................. 10

Rest. (3d) Agency § 7.07 cmt. c ................................................................................... 10

Rest. (3d) Agency § 7.07(2).......................................................................................... 11

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

**INTRODUCTION**

2    The record is undisputed that Defendant's "Naked Truth" Presentation is, in reality, filled

3    with lies and deception.  In a stunning concession of unfair business practices, Defendant's

4    Opposition now abandons any attempt to dispute the false and misleading nature of its slurs

5    against SuccessFactors' product and integrity.  *See* Opp. at 12:19-21.

6    No less amazing is the fact that, even while Defendant told this Court there is no threat of

7    ongoing harm, its CEO has affirmatively directed his Sales Group to continue using any and all of

8    the false information within the Presentation in ongoing sales efforts.  In an email not provided

9    the Court before the TRO, Mr. Watkins stated that the Presentation *document* "should only be

10   used only for internal use by sales," but that "***Information contained in the document should be***

11   ***used judiciously in competitive situation as required*.**"  Mohr Decl. Exh. B (CEO Watkins' email

12   of March 12, 2008) (emphasis added).  Repeating this false information in sales calls is no less

13   damaging, and no less actionable, than transmitting the document in writing.  Continued false

14   advertising is not only likely, but virtually certain, given Mr. Watkins' orders.

15   Most remarkable, however, are the facts discovered since the TRO reflecting not only a

16   fraudulent scheme to obtain information to include in the Presentation, but CEO Watkins'

17   apparent personal involvement.  Beyond its repeated, unauthorized incursions into

18   SuccessFactors' password-protected demo site (facts the Opposition does not dispute), Defendant

19   also engaged in an elaborate ruse to obtain access to SuccessFactors' private client environments

20   and confidential customer proposals.  Defendant created a phony customer called "New

21   Millenium [sic] Shoe," through which an individual named Ely Valls posed as a potential

22   purchaser.  Because she "loved the product," she brought in her remote "consultant" to view a

23   private SuccessFactors demonstration over the internet and obtained a written sales proposal.  The

24   attendance records obtained for the demonstration now reveal that Ms. Valls and her consultant

25   logged in *from Defendant's IP address in Wayland, Massachusetts*.  The sales proposal Ms. Valls

26   procured, clearly designated "SuccessFactors, Confidential," was excerpted and pasted into what

27   Mr. Watkins has called "our" Naked Truth document.  Mohr Decl. Exh. B.  Ms. Valls, it turns

28   out, is connected directly to CEO Watkins, listed as one of his six "friends" on Facebook.com.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*See* Matheson Reply Decl. ¶¶ 2-12, Corrales Reply Decl. ¶¶ 2-16 & Exhs. 1-4; Premo Decl. ¶¶ 5-11 & Exhs. 3-6.

With its head buried firmly in the sand, Defendant contends that the Court can trust that no future harm could possibly occur, because *after* the lawsuit was filed, the same Mr. Watkins advised his sales group that the Presentation "is a Softscape confidential document and should be used only for internal use by sales." Mohr Decl. Exh. B. This is the same Mr. Watkins who directed his employees to use the Presentation's "information" (*id.*), and who, after the TRO, issued a press release, followed up with a personal email to customers, falsely stating that the Presentation was "based on substantiated facts." Bernshteyn Reply Decl. ¶¶ 10, 12 & Exhs. 3-4.

On its face, the Presentation appears intended for distribution to SuccessFactors' sales prospects. But even assuming that management ever intended it not to be made public, Defendant has offered no explanation for its circulation *other* than by its own employees. Defendant is thus fully liable in *respondeat superior*. When a salesperson distributes a sales document to sales prospects, he engages in his sales function—whether or not the particular mailing was authorized.

The fact that Defendant still has not reported to the Court how the initial gmail occurred underscores the necessity of an injunction. General Counsel Mohr states that Defendant "remains unaware" of who circulated the mass email the first time, in purported violation of company policy. Mohr Decl. ¶ 9. But if the "policy" did not work the first time, Defendant cannot possibly ensure that no further recirculation will occur in the months before trial. By contrast, this Court's injunction *can* reach not only Defendant's management, but all its employees and others acting in concert, and not only the Presentation, but all false statements within it.

Indeed, if Defendant were genuine in its stated desire to prevent further dissemination, an injunction binding all persons to stop this deceptive conduct would impose no hardship whatsoever. The Court's preliminary injunction should issue.

### THE FACTUAL RECORD

Defendant has still provided the Court with no information about the Presentation's creation or distribution. We still are not told who created the document; to whom it was distributed; and what contemporaneous instructions were given about its use internally or with customers. While

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  Ms. Mohr submits a declaration that lacks foundation (*see* Plaintiff's Objections to Evidence), there

2  is no declaration from Mr. Watkins or anyone else with personal knowledge of, or authority over,

3  the sales function.  Despite the TRO and Order to Show Cause, Defendant has submitted to the

4  Court *no additional facts* beyond those opposing the TRO.

5       The single exception is Mr. Watkins' email.  Ironically, it confirms his instructions to the

6  Sales Group—the day after this lawsuit was filed—to continue to use the information from the

7  Presentation "judiciously" in competitive situations.  *Id.* Exh. B.  Mr. Watkins does not exclude

8  from continuing use any of the virulently false statements.  Nor does he exclude the information

9  snatched from the password-protected website, the fraudulently attended private demonstration, or

10 the misappropriated customer proposal.  To the contrary, the next sentence of his email tells the

11 sales force (falsely) that "[t]he Naked truth [sic] is based on publicly available information," *id.*—

12 reinforcing that all its contents are fair game.  Moreover, his email puts no limit on use of

13 statements from the Presentation that are falsely attributed to SuccessFactors' customers—directly

14 contrary to clause 3 of the TRO.  Defendant has submitted nothing suggesting any effort to comply

15 with the existing TRO's prohibition on false attributions.

16      Mr. Watkins' instruction to continue to using information from the Presentation exposes

17 the real meaning of Mohr's carefully phrased declaration.  She states that, "to the best of my

18 knowledge," Defendant "has never used . . . and will not use the Presentation in any *external*

19 *sales meeting* or *marketing effort*."  Mohr Decl. ¶ 5 (emphases added).  Apparently sales *calls*—in

20 which salespersons "judiciously" convey "information" from the Presentation in a "competitive

21 situation"—don't qualify as use of the Presentation in "meetings" or "marketing efforts."

22      In Opposition to the TRO, Defendant suggested to the Court that Softscape acted

23 responsibly to curtail dissemination:  "when this matter was brought to our attention, our CEO

24 sent an email to all sales staff reaffirming the confidentiality of this document and that it was not

25 to be released outside the company."  Mohr TRO Decl. ¶5.  In fact, the circulation of the

26 Presentation was widely and publicly known by March 5, and connected with SuccessFactors'

27 stock downgrade on March 7.  *See* Bernshteyn Opening Decl. ¶¶ 3, 18-19 & Exhs. 1-3.  No one

28 selling in this industry could have missed this explosive event.  Yet Mr. Watkins waited a week to

Fenwick & West LLP
Attorneys At Law
Mountain View

1  send out his email, until March 12 at 5:45 p.m., just before the Opposition to the TRO was filed.

2  Mohr Decl., Exh. B.

3         Meanwhile, on March 10, with the Presentation having just falsely trumpeted that

4  SuccessFactors had lost 63% of its customers, Softscape found it an opportune time to issue its

5  own press release proclaiming 98% customer retention.  *See* "Softscape Exceeds 3.4 Million

6  Users," http://softscape.com/us/pr2008/pr_08_0310_dominates.htm.  What was the precipitating

7  "news" giving rise to this release just three days after the gmail blast?  Softscape's achievement

8  of the very odd number of *3.4* million users.  Defendant also orchestrated a March 14, 2008 press

9  release falsely reiterating that the Presentation was "based on substantiated facts," and, to make

10  sure no one missed it, Mr. Watkins' mass email the same day to customers linking to the very

11  same press release.  Bernshteyn Reply Decl. ¶¶ 9-12 & Exhs. 3-4.

12         When Mr. Watkins finally sent out his email to sales, rather than forcefully insisting that

13  no further circulation would be tolerated, he cautioned that the Presentation document "*should* be

14  used only for internal use by sales."  Mohr Decl. Exh. B. (emphasis added).  He asks for

15  volunteers to "let me or Susan know" if they had information about dissemination, without even

16  mentioning the gmail account, and while promising that "[a]ll discussions will be kept

17  confidential."  *Id.*  Defendant claims that Ms. Mohr "continues to investigate," but it provides no

18  information to the Court.  For example, have all sales staff been interrogated about their use of the

19  gmail account?  Have the obvious searches of Defendant's computer systems for that email

20  address been performed?  Defendant's investigation is reminiscent of Louie's decision in

21  *Casablanca* to "round up the usual suspects."  Nothing in the record would convince an employee

22  that he would be caught, or punished, if, weeks or months from now, he slipped a copy of the

23  Presentation to a wavering or curious customer.

24         Ms. Mohr describes Mr. Watkins' email as "reaffirming the confidentiality of the

25  document to the Sales Group."  *Id.* ¶ 6.  One can only ask, where is the original affirmation?

26  There is no legend designating the Presentation as "confidential" or for Softscape's internal use.

27  Indeed, the name Softscape never appears in the entire document.  Defendant has produced no

28  enclosure email, memo, or instructions for use—nothing corroborating or communicating any

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    contemporaneous intent of confidentiality, only statements after the lawsuit was filed.

2        By contrast, the contents of the Presentation—complete with slick graphics and screenshots

3    that need to be seen to persuade—appear designed to be circulated to customers, preferably with

4    anonymity.  Other than for anonymous distribution, why else use the SuccessFactors template,

5    name, and logo on every page, without mentioning Softscape once?  Wouldn't an internal

6    Softscape sales piece include some comparison points describing Softscape's advantages?

7    Moreover, the Presentation is framed as a statement *by* a customer *to* a prospect—not a statement

8    by a company to it sales force.  Thus, Page 2 falsely states that "This presentation is a compilation

9    of the facts from SuccessFactors' customers," and that "These facts represent the measure of

10   SuccessFactors' lack of corporate integrity and why ***many of us*** have left them" (emphasis added).

11   Pages 23, 24, 25, 28, 29, 34, 37 and 43 all use the second person, "you" or "yours," to refer to

12   prospects, not salespersons, as the intended audience.  The Presentation compiles lists of dozens of

13   companies falsely described as being lost or dissatisfied customers (*e.g.*, pp.13-22), a quantity of

14   information that salespersons would not transmit over the phone.  Every inference is that this false

15   information was originally compiled to be *seen* by customers, not merely to be delivered orally and

16   "judiciously," as Mr. Watkins has now instructed.

17                            **ARGUMENT**

18   **I.    WITHOUT INJUNCTIVE RELIEF, PLAINTIFF CONTINUES TO FACE A**
         **SIGNIFICANT THREAT OF IRREPARABLE HARM.**
19

20        **A.    Loss Of Goodwill From False Advertising Constitutes Irreparable Harm.**

21        It is well settled that destruction of goodwill with current and prospective customers

22   constitutes irreparable harm that cannot be remedied in simple dollars and cents.  *See, e.g.*,

23   *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001)

24   (affirming preliminary injunction where plaintiff would otherwise lose goodwill because of

25   defendant's interference with ability to consummate sales); *Coca-Cola Co. v. Tropicana Prods.,*

26   *Inc.*, 690 F.2d 312, 317 (2d Cir. 1982) (reversing denial of preliminary injunction where false

27   advertising could cause plaintiff, a direct competitor, to lose market share and thus be irreparably

28   harmed).  False advertising directed at a competing product is particularly pernicious because it

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   "necessarily diminishes that product's value in the minds of the consumer" and deprives the

2   competitor of a "legitimate competitive advantage."  *See McNeilab, Inc. v. Am. Home Prods.*

3   *Corp.*, 848 F.2d 34, 38 (2d Cir. 1988) (affirming preliminary injunction).

4          As well substantiated by the comments from prospective customers, the vicious

5   statements in the Presentation are "alarming" and "disturbing" to customers; engender "too much

6   negativity to overcome"; cause buyers to believe that purchasing SuccessFactors products will

7   "make me look bad"; and lead readers to believe that "if a tenth of it is true . . . SF is not a

8   product to consider purchasing."  Bernshteyn Opening Decl. ¶¶ 17-22 & Exhs. 2-6; Bernshteyn

9   Reply Decl., Exh. 1.  Defendant does not and cannot dispute this devastating evidence of injury to

10  goodwill.

11         This injury is irreparable regardless of whether the false advertising takes the form of a

12  further tangible transmission of the Presentation, or continuing efforts by Defendant's salespeople

13  to tell customers misleading information from it.  *See Valu Eng'g, Inc. v. Nolu Plastics, Inc.*, 732

14  F. Supp. 1024, 1026 (N.D. Cal. 1990) (preliminarily enjoining defendant's salespeople from

15  using or even referring to the false representations and deceptive demonstrations of plaintiff's

16  product).  An injunction should prevent irreparable injury from all forms of communication,

17  whether spoken or printed.  *Id.*; *see J.K. Harris*, 253 F. Supp. 2d at 1130 (preliminarily enjoining

18  making of false statements "in any manner whatever" as "harmful to the business reputation and

19  goodwill of Plaintiff").[1]

20      **B.      Continued False Advertising Is Likely, From Repetition of the Information In
                 the Presentation, And From Circulation of the Presentation Itself.**

21

22          **1.      Repetition of False Information Contained In the Presentation.**

23         Regardless of whether the Presentation itself is further circulated, Mr. Watkins' email has

24  specifically directed further use of the information it contains.  Mohr Decl., Exh. B.  There is no

25  limitation preventing use of false information, pilfered information, or statements misattributed to

26  _____

27  [1]    The cases cited by Defendant are inapposite.  Quite simply, none of the cases relied on by
        Defendant involve a situation in which the defendant specifically directed its employees to
        continue its campaign of false advertising, and allowed its sales force to hold onto, and continue

28  to rely upon, infringing materials.

Fenwick & West LLP
Attorneys At Law
Mountain View

third parties.  Just as in *J.K. Harris* and *Valu Engineering*, the injunction here should prohibit all further repetition of each of the statements shown to be false in the moving papers, as spelled out in the accompanying Proposed Preliminary Injunction Order.

Moreover, while Defendants' proclamations of the accuracy of the Presentation in press releases and emails may seem to some like a clever away around the TRO, they are every bit as false as the original.   These reaffirmations should be included within the Court's injunction.  *See Valu Engineering*, 732 F. Supp. at 1026 (enjoining reference to false statements).

### 2.    Risk of Further Circulation of the Presentation.

Ms. Mohr states that, to the best of her knowledge, Defendant did not "authorize, allow, permit, condone or ratify" the original dissemination.  Mohr Decl. ¶ 5.[2]  Given Defendant's inability to control the initial dissemination—when Defendant at least had a motivation to keep the defamatory script a secret—there is no reason to believe that its continuing non-authorization will prevent recurrence.  A statement by Mr. Watkins that the Presentation "*should* only be used internally"—when he appears himself to be directly involved in the fraudulent practices that led to its creation—cannot ensure that further distribution will not recur.

Indeed, Mr. Watkins' involvement may well explain why Defendant has been lackadaisical in its investigation and/or unwilling to share the results.  Only this Court's intervention can reach all involved.  This is precisely why Federal Rule 65(d) allows injunction not only of "the parties to the action, their officers, agents, servants, employees, and attorneys," but also "those persons in active concert or participation with them who receive actual notice of the order."[3]

### C.    The Need for an Injunction Is Not Mooted by Defendant's Supposed Voluntary Cessation.

Defendant's argument that management's pledge not to distribute the Presentation makes

---

[2]    In fact, Defendant did nothing to address circulation of its "confidential" Presentation for a full week after the gmail, and meanwhile issued its own press release touting its customer retention.

[3]    According to Softscape's website, Softscape has channel partners, consulting partners, technical partners, and referral partners, none of which are under Mr. Watkins' direct control.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    an injunction superfluous has no legal support.  Opp. at 7:10-27.  "[I]t is actually well-settled 'that

2    an action for an injunction does not become moot merely because the conduct complained of was

3    terminated, if there is a possibility of recurrence, since otherwise the defendants would be free to

4    return to [their] old ways.'" *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1237 (9th Cir. 1999)

5    (cites omitted) (affirming the prohibitory components of preliminary injunction).  Accordingly,

6    the voluntary cessation standard "is a stringent one."  *Id.*  The party opposing the injunction has a

7    burden to "show that subsequent events [have] made it **absolutely clear** that the allegedly

8    wrongful behavior cannot reasonably be expected to recur."  *Id.* at 1232, 1238 (emphasis added;

9    cites omitted) (discounting defendant's pledge to cease making false and misleading statements).

10          Here, where Mr. Watkins himself appears to be involved (and has not testified otherwise),

11   his email does not proscribe Defendant's salespeople from exploiting the falsehoods in the

12   Presentation, Defendant's control has been historically ineffective, and non-parties are not bound

13   by Defendant's promises, Defendant has not approached its burden to prove that the wrongful

14   behavior will not recur.

15   **II.    PLAINTIFF HAS DEMONSTRATED A STRONG LIKELIHOOD OF SUCCESS
         ON THE MERITS.**

16

17          **A.    The Lanham Act Claims Will Succeed.**

18                **1.    The Falsity of the Statements Is Undisputed.**

19          As discussed in SuccessFactors' opening brief, the Presentation is false in its entirety

20   because it is premised on a false notion that it was created by customers and based on information

21   received from them.  *See* Application for TRO at 15:1-13.  Plaintiff also identified at least a dozen

22   specific, material, verifiably false statements contained in the Presentation, including statements

23   that some of Plaintiff's best and biggest customers are dissatisfied, and that it has lost 63% of its

24   customers.  *See id.* at 15:18-18:3.  Defendant does not dispute the falsity of any of these

25   statements.[4]  Under *J.K. Harris*—a case decided by this Court, arising under similar facts, cited

26   in Plaintiff's opening brief, but conspicuously ignored by Defendant—these statements should be

27

28   [4]    Ms. Mohr initially stated that the Presentation "contained what I believed [past tense] to be
     accurate information."  First Mohr Decl. ¶ 4.  Her second declaration goes silent on the subject.

1   enjoined.  253 F. Supp. 2d. at 1129-30 (preliminarily enjoining each statement that plaintiff

2   attested to be false, where defendant did not produce competent evidence of their truth).

### 2.    Defendant Is Continuing Actively to Propagate These Falsehoods in Commerce.

5           Rather than defend the substance of the Presentation, Defendant rests its Lanham Act

6   defense entirely on the proposition that it has not authorized its distribution.  *See, e.g.*, Opp. at

7   11:7-9, 13:15-19.  Yet it is undisputed that Defendant's CEO has instructed his sales group to

8   continue using the information contained in the document for competitive purposes.  *See* Mohr

9   Decl. ¶ 6 & Exh. B.  Defendant has also continued to falsely advertise, in press releases and

10  emails, that the Presentation was "based on substantiated facts."  Bernshteyn Decl. ¶¶ 10-12 &

11  Exhs. 3-4.

12          Defendant misses the bigger picture: it has no right to disseminate the false and

13  misleading statements *in any form* and certainly cannot, as it now proposes, use the false

14  document as a script for its sales force "judiciously" to deploy.  *See, e.g.*, *J.K. Harris*, 253 F.

15  Supp. 2d at 1131 (preliminarily enjoining "Defendants, and their agents, servants, employees,

16  successors and assigns, and all other persons acting in concert with or in conspiracy with or

17  affiliated with Defendants," from "making, disseminating, or causing to be made or disseminated

18  to the public . . . *in any manner* . . . the allegedly false statements" identified by the defendant)

19  (emphasis added); *see also, e.g.*, *Hearst Bus. Publ'g, Inc. v. W.G. Nichols, Inc.*, 76 F. Supp. 2d

20  459, 464-65 (S.D.N.Y. 1999) (preliminarily enjoining defendant from using script for

21  telemarketers that was false and misleading).

### 3.    The Suggestion That Defendant Did Not Distribute the Presentation, and Is Not Responsible for Distribution by Its Employees, Is Baseless.

24          As to distribution of the Presentation itself, the argument that Defendant is not responsible

25  for its distribution is both unsupported by competent evidence and defeated by the principles of

26  *respondeat superior*.  On the first point, the only evidence is Ms. Mohr's declarations.  She does

27  not claim to have been involved in the creation of the Presentation, present when Defendant

28  provided it to employees, or monitoring employees' use of it.  Nor does she offer a shred of

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   information about Defendant's investigation regarding its distribution. *See* Mohr Decl. ¶ 9. The

2   Court could not reasonably determine that Ms. Mohr's conclusion that Defendant did not

3   distribute the Presentation rests on an adequate factual foundation. *See* Objections to Evidence.

4       Indeed, while Ms. Mohr states that "Softscape did not distribute the Presentation," *two*

5   *paragraphs later*, in the same declaration, she states that "Softscape does not know how *or by*

6   *whom* the Presentation was released" and acknowledges that it may have been distributed by a

7   Softscape employee. Mohr Decl. ¶ 7 (emphasis added). She simply doesn't know.

8       Defendant has offered no explanation for release of the Presentation, other than potential

9   distribution by a Softscape employee. *Id.*; Opp. at 11 n.2. The facts of record strongly support

10  this inference. The gmail was targeted to email addresses for individuals who had personal

11  responsibility for purchase decisions for specialized, human resources software at some 33 known

12  (and countless unknown) enterprises, most of whom were live sales prospects. Bernshteyn Reply

13  Decl. ¶ 6; Webb Reply Decl. ¶¶ 2-12. Defendant's sales force uniquely had access to the

14  Presentation and to these specialized addresses, as well as a motive to sell Defendant's products

15  to these prospects.

16      Defendant's liability for the tortious acts of its employees is determined under the doctrine

17  of *respondeat superior*. Rest. (3d) Agency § 2.04 ("An employer is subject to liability for torts

18  committed by employees while acting within the scope of their employment."); *Spectravest, Inc.*

19  *v. Fleet Street, Ltd.*, 13 U.S.P.Q.2d (BNA) 1457, at *11 (N.D. Cal. 1989) ("[T]he normal rule of

20  *respondeat superior* applies to copyright infringement by an employee who is acting within the

21  scope of her employment."). A sales person, sending to sales prospects, a document her employer

22  developed for use in sales, in the hope of selling her employer's product, is plainly acting within

23  the scope of employment. In fact, there is no competent evidence of any instruction to the sales

24  team *not* to distribute this document before it was sent.[5]

25      Of course, Defendant would still be liable even if it proved that it *had* instructed its sales

26  group not to distribute the document. Rest. (3d) Agency § 7.07 cmt. c ("Conduct is not outside

---

[5]   Defendant's anticipatory defense, based on notions of authority and apparent authority, is misplaced. *See* Opp. at 11 n.2; Rest. (3d) Agency, Intro. ("The doctrine of authority and apparent authority . . . do not govern or explain the application of respondeat superior.").

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   the scope of employment merely because an employee disregards the employer's instructions.");

2   *Lisa M. v. Henry Mayo Newhall Hosp.*, 12 Cal. 4th 291, 296-97 (1995) (torts committed without

3   authorization may still be within scope of employment).  Collaborating in deception with

4   Mr. Watkins' friend Ely Valls, Defendant created and provided to its sales force a competitive

5   sales document, not marked confidential, filled with false and misleading statements, containing

6   information affirmatively intended to be communicated to Plaintiff's customers and prospects,

7   and which lent itself to anonymous distribution.  The idea that Defendant would now be shielded

8   from liability for the natural consequence of its actions (*i.e.*, an employee ended up distributing

9   the Presentation) is contrary to law.  *See, e.g.*, *Lisa M.*, 12 Cal. 4th at 300 (test of whether an

10  employee's act is within the scope is whether it is "generally foreseeable"); Rest. (3d) Agency

11  § 7.07(2) (an employee's act is not within the scope of employment only "when it occurs within

12  an independent course of conduct not intended by the employee to serve *any* purpose of the

13  employer") (emphasis added).

14       To summarize:  (1) Defendant has reaffirmed and directed its employees to continue

15  disseminating concededly false information; and, (2) Defendant has provided no competent

16  evidence that it was not the source of the original dissemination, nor a basis to escape liability for

17  dissemination by its employees.  These facts demonstrate a strong likelihood of success on the

18  only elements of the Lanham Act claims challenged by Defendant: (1) use in commerce;

19  (2) commercial speech attributable to the Defendant; and (3) that Defendant "caused" the false

20  and misleading statements to enter interstate commerce.  *See* Opp. at 11:3-13:21.

21       **B.    The Trademark Infringement Claim Is Likely to Prevail.**

22       Defendant does not dispute that external circulation of the Presentation constitutes

23  trademark infringement, responding only that Defendant allegedly has not authorized external

24  circulation.  For the reasons just demonstrated for false advertising, Defendant *is* likely liable for

25  distribution of the Presentation to date, and there is real risk that further distribution will persist.

26       **C.    The Computer Fraud and Abuse Act Claim Is Likely to Prevail.**

27       Defendant also does not dispute the conclusions reached as a result of Mr. Matheson's

28  careful investigation:  that it accessed without authorization Plaintiff's password-protected

Fenwick & West LLP
Attorneys At Law
Mountain View

1    computer network from multiple locations.  Defendant admits it created a Presentation that

2    incorporates elements of Defendant's protected computer environment, as well as the

3    demonstration material and sales proposal obtained by false pretenses through Ely Valls.  *See*

4    First Mohr Decl. ¶ 4; Second Mohr Decl. ¶ 2 (reaffirming earlier declaration); Application for

5    TRO at 4:26-5:15; Matheson Decl. ¶¶ 5, 7, 10; Matheson Reply Decl. ¶¶ 2-12; Corrales Reply

6    Decl ¶¶ 2-16 & Exhs. 1-4; Premo Reply Decl. ¶ 5-11 & Exhs. 3-6.

7         Plaintiff has the chutzpah to defend its unauthorized access of Defendant's computer system

8    on the ground that it did not cause sufficient "loss" to Plaintiff under the CFAA.  *See* Opp. at 9:16-

9    10:24.[6]  To get there, Defendant presents a truncated and misleading statement of the statutory

10   definition of loss, claiming that it covers only "'damage assessment' and restoration of the

11   computer system, and lost revenue because of the interruption of service."  *Id.* at 9:24-26.  The

12   language of the statute itself is much broader, however.  Cognizable loss includes

13         *any reasonable cost to any victim, including the cost of responding to an offense*,
        conducting a damage assessment, *and* restoring the data, program, system, or
14      information to its condition prior to the offense, and any revenue lost, cost
        incurred, or consequential damages incurred because of interruption of service.

15

16   18 U.S.C. § 1030(e)(11) (emphases added).

17         On its face the statute includes "the cost of responding to an offense" as part of the loss

18   calculation.  *See id.*  This standard has been understood overwhelmingly as including costs spent

19   investigating the unauthorized intrusion into a computer, even under cases cited by Plaintiff.  *See,*

20   *e.g.*, *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 647

21   (E.D. Pa. 2007) (hours spent by plaintiff's president investigating unauthorized access of protected

22   computer constitute loss because "the statute allows the costs of time spent assessing computer

23   systems to be counted towards the loss requirement"); *P.C. of Yonkers, Inc. v. Celebrations! The*

24   *Party & Seasonal Superstore*, 2007 U.S. Dist. LEXIS 15216, at *13-*17 (D.N.J. Mar. 2, 2007)

25   (cognizable losses include "losses sustained in responding to defendants' actions, investigating

26   _____

     [6]   Earlier, Defendant's original counsel suggested that access to a password-protected computer
27   environment without the permission of the computer's owner was not "unauthorized" within the
     meaning of the CFAA.  In light of clear Ninth Circuit authority to the contrary, this argument was
28   sensibly withdrawn.  *See Creative Computing v. Getloaded.com, LLC*, 386 F.3d 930, 932 (9th
     Cir. 2004); *United States v. Middleton*, 231 F.3d 1027, 1212 (9th Cir. 2000).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   defendants' actions and taking remedial steps to prevent defendants' further actions"); *Nexans*

2   *Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 474 (S.D.N.Y. 2004) (plaintiff did not meet

3   $5,000 threshold because "no computers are said to have been examined, and no computer

4   consultant [was] said to have been present" at meetings discussing the unauthorized access).

5        Defendant tries to carve out of the statutory definition of loss "[t]he cost of investigating

6   and trying to locate the perpetrator," and for this proposition cites *Tyco Int'l (US) v. Does*, 2003

7   U.S. Dist. LEXIS 25136, at *8-*9 (S.D.N.Y. Aug. 29, 2003). *Tyco*, in turn, cites *United States v.*

8   *Middleton*, 231 F.3d 1207, 1213-14 (9th Cir. 2000), for the proposition that the CFAA does not

9   permit recovery for costs incurred "locating and collecting information about the hacker." *Id.*

10  With due respect to the *Tyco* court, *Middleton* says no such thing. Rather, *Middleton* endorsed an

11  expansive interpretation of the $5,000 loss requirement and affirmed the sufficiency of the

12  evidence to support a finding of the loss. In particular, the Ninth Circuit specifically accepted as

13  evidence of loss the time spent "investigating the break-in." *Middleton*, 231 F.3d at 1212-14;[7] *see*

14  *also Thurmond v. Compaq Computer Corp.*, 171 F. Supp. 2d 667, 682 (E.D. Tex. 2001) ("[T]he

15  holding in *Middleton* addressed loss that was a 'natural and foreseeable result' of any damage.")

16       Here, following a breach of its network by unidentified persons, Plaintiff's Director of

17  Web Development undertook analysis of which restricted environments had been accessed (to

18  determine the extent of breach); collection and analysis of IP addresses accessing Plaintiff's

19  network, to determine whether access was internal or hostile (to determine the appropriate

20  response); and review of logs of documented users to confirm conclusions. Matheson Opening

21  Decl. ¶¶ 5-18. These reasonable responses took many hours of valuable time away from day-to-

22  day responsibilities, causing losses well in excess of $5,000. *Id.* ¶ 4; Bernshteyn Opening Decl.

23  ¶ 4; *see also* Matheson Reply Decl. ¶ 13 (additional investigative time spent upon discovery of

24  further unauthorized access). The statutory requirement is met. Because this is the only element

---

25  [7]   *Middleton* found such loss to fall within the required category of "measures . . . reasonably necessary to restore the data, program, system, or information that you find was damaged or what

26  measures were reasonably necessary to resecure the data, program, system, or information from further damage." *See id.* at 1213. The Court did not—either explicitly or by implication—

27  exclude from its calculation investigation focused on identifying the source of the break-in. *See id.* at 1214. To do so would make no sense: it would be impossible to determine how best to

28  resecure a compromised computer without figuring out who gained access and in what manner.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    of the statute disputed by Defendant, it follows that Plaintiff has shown a strong likelihood of

2    success on the merits and therefore the injunction should issue.[8]

3            Furthermore, Plaintiff is also entitled to relief under California's Comprehensive

4    Computer Data Access and Fraud Act (CCDAFA).  *See* Cal. Pen. Code § 502; Docket No. 19

5    [Proposed Order re Application for Temporary Restraining Order; Complaint ¶¶ 58-67 (invoking

6    CCDAFA).  CCDAFA provides a civil remedy, including injunction, against any person who:

7
     (2) [k]nowingly accesses and without permission takes, copies, or makes use of
8    any data from a computer, computer system, or computer network, or takes or
     copies any supporting documentation, whether existing or residing internal or
9    external a computer, computer system, or computer network, [or]. . . (7)
     [k]nowingly and without permission accesses or causes to be accessed any
10   computer, computer system, or computer network.

11   Cal. Pen. Code § 502(c)(2), (7); *id.* § 501(e)(1)-(2) (providing for civil action, including

12   injunction).  While the state statute prohibits essentially the same conduct as the CFAA, *see, e.g.*,

13   *Therapeutic Research Faculty v. NBTY, Inc.*, 488 F. Supp. 2d 991, 996-99 (N.D. Cal. 2007)

14   (denying motion to dismiss both CFAA and CCDAFA claims on same facts), it does not contain

15   a minimum-loss provision.  Because Defendant has conceded unauthorized access of Plaintiff's

16   computer network, *see* Opp. at 9:16-24, an injunction prohibiting future unauthorized access is

17   available under the federal and state statutes.

18

19

20
_____
21   [8]    The remaining cases cited by Defendant are equally unavailing.  For example, Defendant cites
     *Nexans Wires*, 319 F. Supp. 2d 468, for the proposition that "costs of misappropriation of trade
22   secrets" are excluded from the analysis.  Whether or not that statement is correct is irrelevant,
     because Plaintiff here has not claimed such damages in support of the loss requirement.  *See*
23   Matheson Opening Decl. ¶ 4; Bernshteyn Opening Decl. ¶ 4.  This statement also ignores the
     remainder of the opinion, which, as noted above, makes clear that investigation by technical
24   employees *would* constitute loss.  319 F. Supp. 2d at 477.  *Thurmond v. Compaq Computer
     Corp.*, 171 F. Supp. 2d 667 (E.D. Tex. 2001), was a class action lawsuit in which the court
25   refused to consider as a "loss" the fees incurred by an expert witness "retained solely for
     litigation" and where it appeared that the fees were in fact paid by class-action counsel, not the
26   named plaintiffs.  *Id.* at 682-83.  Finally, in *United States v. Schuster*, 476 F.3d 614 (7th Cir.
     2006), the Seventh Circuit held that the costs asserted by the government with respect to victims
27   of the defendant's violation of the CFAA were barred under *federal sentencing guidelines,* not the
     CFAA loss requirements.  *See id.* at 618-20 (analyzing U.S.S.G. § 2B1.1, which "expressly
28   excludes from loss calculations '[c]osts to the government of, and costs incurred by victims
     primarily to aid the government in, the prosecution and criminal investigation of an offense'").

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**III.    THE SCOPE OF THE TRO IS READILY CONVERTED INTO A PRELIMINARY INJUNCTION.**

Defendant raises two concerns about the scope of the TRO, relating to (1) the scope of trademark use, and (2) statements attributed to others.  Both concerns are easily addressed.

*First*, Defendant does not seriously dispute that external use of the Presentation would constitute trademark infringement. Plaintiff, conversely, does not dispute a right to make limited, nominative fair use.  SuccessFactors therefore requests an injunction against "disseminating, or causing to be made or disseminated, or making any other public use of Plaintiff's trade name, trademark or logo beyond that amount of the name reasonably necessary to identify Plaintiff or its products and services."  Proposed Preliminary Injunction Order, at 5.

*Second*, Defendant's concern about overbreadth in TRO clause (3) may be resolved by enjoining all necessary persons from "representing or implying that another person or entity actually authored any statement regarding Plaintiff (including without limitation the Presentation or any statement therein) which such person or entity did not explicitly so author."  *Id.*

Finally, Plaintiff requests that the TRO be expanded expressly to enjoin dissemination of all false information in the Presentation, as well as the Presentation itself.  *Id.* at 4-5.

## CONCLUSION

For the foregoing reasons, Plaintiff SuccessFactors, Inc. respectfully requests that the Court enter a preliminary injunction enjoining Defendant Softscape, Inc. from false advertising, trademark infringement, and computer fraud and abuse, on the terms set forth in the accompanying Proposed Preliminary Injunction Order.

Dated: March 21, 2008                      Respectfully,

                                           FENWICK & WEST LLP

                                           By: _____/s/ Laurence F. Pulgram_____
                                                        Laurence F. Pulgram

                                           Attorneys for Plaintiff
                                           SUCCESSFACTORS, INC.

1  LAURENCE F. PULGRAM (CSB NO. 115163)
   *lpulgram@fenwick.com*
2  ALBERT L. SIEBER (CSB NO. 233482)
   *asieber@fewick.com*
3  LIWEN A. MAH (CSB NO. 239033)
   *lmah@fenwick.com*
4  FENWICK & WEST LLP
   555 California Street, 12th Floor
5  San Francisco, CA  94104
   Telephone: (415) 875-2300
6  Facsimile:  (415) 281-1350

7  PATRICK E. PREMO (CSB NO. 184915)
   *ppremo@fenwick.com*
8  DENNIS M. FAIGAL (CSB NO. 252829)
   *dfaigal@fenwick.com*
9  FENWICK & WEST LLP
   Silicon Valley Center
10 801 California Street
   Mountain View, CA  94041
11 Telephone:     (650) 988-8500
   Facsimile:      (650) 938-5200

12

13 Attorneys for Plaintiff
   SUCCESSFACTORS, INC.

14

15

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SUCCESSFACTORS, INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br>v.<br><br>SOFTSCAPE, INC., a Delaware corporation; and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No. CV 08 1376 CW<br><br>**[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION**<br><br>Date:           March 27, 2008<br>Time:           2:00 p.m.<br>Courtroom:   2<br>Judge:          Hon. Claudia Wilken<br><br>Date of Filing:   March 11, 2008<br>Trial Date:       No date set |

Plaintiff SuccessFactors, Inc.'s ("SuccessFactors" or "Plaintiff") motion for issuance of a

preliminary injunction against Defendant Softscape, Inc. ("Softscape" or "Defendant") came on

regularly scheduled hearing before this Court.  Laurence F. Pulgram and Patrick E. Premo of

Fenwick West LLP, appeared on behalf of SuccessFactors.  Jessica L. Grant and Jonathan A.

*(left margin, vertical)* FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   Patchen of Taylor & Company Law Offices, LLP, appeared on behalf of Defendant Softscape,

2   Inc. ("Softscape" or "Defendant").

3       Based upon Plaintiff's Application for Temporary Restraining Order and Memorandum in

4   Support thereof, its Reply Memorandum in Support of Preliminary Injunction, the accompanying

5   supporting declarations, the remaining papers filed with the Court in this matter by each side, and

6   upon hearing of this matter, for the reasons detailed below, the Court finds that Plaintiff has

7   demonstrated:  (1) a combination of probable success on the merits and the possibility of

8   irreparable harm, and/or (2) that there exists serious questions regarding the merits and the

9   balance of hardship tips sharply in Plaintiff's favor.  *GoTo.com v. Walt Disney*, 202 F.3d 1199,

10  1204-05 (9th Cir. 2000); *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.

11  1987).

12      1.      Defendant does not dispute that it authored the 43-page PowerPoint presentation

13  entitled "SuccesssFactors:  Workforce Performance Management / The Naked Truth"

14  ("the Presentation").

15      2.      Defendant does not dispute that the Presentation used SuccessFactors' PowerPoint

16  template and includes SuccessFactors' name and logo on each page; the SuccessFactors' name

17  and logo are the subject of federal trademark registration and pending applications.

18      3.      Defendant does not dispute that its employees, consultants or agents accessed and

19  obtained content from:  (a) SuccessFactors' webinar at

20  http://www.successfactors.com/media/webinars/introduction-to-ultra/, which was launched on

21  January 18, 2008; (b) SuccessFactors' customers' page at

22  http://www.successfactors.com/customers/list/, which was last updated on or about February 28,

23  2008; and (c) a password-protected "ACE" sales demo environment, ACE275 specifically, for

24  demonstrating the SuccessFactors' solution to customers and prospects.

25      4.      Plaintiff has established that ACE275 is a password-protected sales demo account

26  that was improperly accessed by Softscape in February 2008 for the purpose of obtaining

27  competitively sensitive information.

28  / / /

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1   5.   Plaintiff has offered sworn, verified statements attesting to the falsity of specific

2   statements contained throughout the Softscape Presentation as described more particularly below.

3   6.   Softscape has not offered any competent, admissible evidence to contradict or

4   establish the truthfulness of such statements.

5   7.   Softscape's CEO, Dave Watkins, has admitted that information contained within

6   the Softscape Presentation was meant to be used by its sales representatives "in competitive

7   situations as required" and specifically so instructed his Sales Group on March 12, 2008.

8   8.   After the temporary restraining order in this action issued on March 13, 2008,

9   Softscape issued a press release on March 14, 2008, asserting that the Presentation is "based on

10  substantiated fact" and its CEO sent an e-mail thereafter to customers linking to this press release.

11  9.   Defendant asserts that it still does not know how or by whom the Presentation was

12  released, even after Plaintiff provided notice of this action on March 11, 2008, creating a

13  significant risk of republication of the Presentation and its contents.

14  10.   Defendant Softscape has threatened, or is about to do, or is procuring or suffering

15  to be done, acts in violation of the rights of Plaintiff respecting the subject of this action, and

16  tending to render the remedies Plaintiff seeks ineffectual.

17  11.   Plaintiff is likely to suffer great or irreparable injury before the trial of this action.

18  12.   Pecuniary compensation would not afford Plaintiff adequate relief.

19  13.   The Court previously found that "Plaintiff has made a sufficient showing that

20  serious questions regarding the merits exist and the balance of hardship tips sharply in its favor to

21  justify issuing a temporary restraining order.  (Dkt. No. 26.)

22  14.   Based on further submissions presented by Plaintiff and Defendant, Plaintiff is

23  likely to succeed on the merits of its claims of:  (a) false and misleading statements under

24  15 U.S.C. § 1125 and Cal. Bus. & Prof. Code §§ 17500, *et seq.*, (b) trademark infringement under

25  15 U.S.C. §§ 1114 and 1125, (c) violation of the Computer Fraud and Abuse Act (CFAA)

26  18 U.S.C. § 1030, and unauthorized access to computers, computer systems and computer data

27  under Cal. Penal Code § 502.

28  15.   The balance of hardship tips sharply in Plaintiff's favor.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    16.    Plaintiff has demonstrated a possibility of irreparable harm.

2    17.    Plaintiff has already posted $10,000 in connection with the temporary restraining

3    order, which amount shall serve as deposit in lieu of bond for this preliminary injunction, as it is

4    not likely that Defendant will suffer any damage as a result of this preliminary injunction.

5    **GOOD CAUSE HAVING BEEN SHOWN THEREFOR, IT IS ORDERED THAT:**

6    Defendant Softscape and its officers, agents, servants, employees, successors and assigns,

7    and all other persons acting in concert with, or in conspiracy with, or affiliated with Defendant,

8    are hereby enjoined and restrained during the pendency of this action from doing, causing, aiding

9    or abetting any other person in doing any of the following acts, directly or indirectly:

10    1.    Disseminating, publishing, causing to be made available to the public, directing

11    any person to, or affirming the purported truth or accuracy of the "Presentation," attached as

12    <u>Exhibit 1</u> to Declaration of Robert Bernshteyn in Support of Application for Temporary

13    Restraining Order ("Bernshteyn Decl.") (Dkt. No. 17);

14    2.    Disseminating, publishing, causing to be made available to the public, repeating,

15    uttering, or affirming, by any writing, advertising, press release, e-mail, other publication,

16    electronic communication, or oral statement, or in any other manner whatever, the allegedly false

17    or misleading statements set forth within the Presentation which were identified in Plaintiff's

18    Application for Temporary Restraining and the Bernshteyn Decl. ¶¶ 8-16, specifically, including

19    the following statements:

20    a.    That the Softscape Presentation is "a compilation of the facts from

21    Successfactors customers;"

22    b.    That "facts" contained within the Softscape Presentation "represent the

23    measure of Successfactors' lack of corporate integrity and why many of us have left them;"

24    c.    That "63% of Their [SuccessFactors'] Customers Left Them by 2008" and

25    that "1 out of 2 customers leaves Successfactors [sic] within 2-3 years," or any other false

26    statements about SuccessFactors' customer retention rate;

27    d.    That "[a]fter six months Sears Pulled the Plug on the entire project," or any

28    other statement stating that that Sears is not a current customer;

Fenwick & West LLP
Attorneys At Law
Mountain View

1          e.      That Merrill Lynch and Apple Computer are "Customers [who] are

2  dissatisfied, have left [SuccessFactors] and are not listed on their Website;"

3          f.      That MasterCard is not a referenceable customer;

4          g.      That Bank of America, Reebok, Symbol Technologies, Peregrine Systems,

5  and Portal Software are customers who left SuccessFactors because they were dissatisfied;

6          h.      That SuccessFactors "can't handle situations where an employee changes

7  their positions and manager during the year;"

8          i.      That SuccessFactors employs 440 consultants, or spends "1,650 hours of

9  effort for each of its customers;"

10          j.      That SuccessFactors' database structure creates a security risk;

11          k.      That SuccessFactors "will add any feature or change they want without

12  asking you if you want it," and will "install the change without telling" customers;

13          l.      That SuccessFactors' customers are required to scroll though long forms in

14  SuccessFactors' product; and

15          m.      That customers who were formerly identified on Plaintiff's website

16  (http://www.successfactors.com) but are no longer identified therein are, by virtue of not being

17  listed, necessarily former customers or presumptively dissatisfied;

18      3.      Representing or implying that another person or entity actually authored any

19  statement regarding Plaintiff (including without limitation the Presentation or any statement

20  therein) which such person or entity did not explicitly so author.

21      4.      Disseminating, or causing to be made or disseminated, or making any other public

22  use of Plaintiff's trade name, trademark or logo beyond that amount of the name reasonably

23  necessary to identify Plaintiff or its products and services;

24      5.      Accessing for any reason or obtaining data from any computer system or computer

25  owned, operated, or licensed by SuccessFactors and subject to restrictions on access without

26  SuccessFactors' express written authorization, and, further, disclosing, publishing, reproducing,

27  or communicating any information or data heretofore received from any such computer or

28  computer system accessed without such authorization.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    Defendant shall further deliver by mail or email a copy of this Order to its agents,

2  servants, employees, and all other persons acting in concert with or in conspiracy with or

3  affiliated with Defendant, as well as all third parties known to have, or subsequently found to

4  have, received the Presentation from Defendant or its agents, servants, employees, successors or

5  assigns or any other persons acting in concert with, or in conspiracy with, or affiliated with

6  Defendant or from any other source, within five (5) business days from the date of this Order.

7    In addition, Defendant shall provide a copy of this Order to third parties found, after the

8  date of the Order and during the pendency of this action, to have received the Presentation from

9  Defendant or its agents, servants, employees, successors or assigns, or any other persons acting in

10  concert with, or in conspiracy with, or affiliated with Defendant or from any other source, within

11  five (5) business days of having made such discovery.

12    Because Plaintiff has already posted the $10,000 bond in connection with the temporary

13  restraining order, the Preliminary Injunction is immediately effective and shall remain in effect

14  during the pendency of this action.

15    **IT IS SO ORDERED**.

16

17  Dated: _____, 2008          _____

18                                              The Honorable Claudia Wilken
                                              United States District Court Judge

19  24024/00403/LIT/1282287.4

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW