1   LAURENCE F. PULGRAM (CSB No. 115163)
    lpulgram@fenwick.com
2   ALBERT L. SIEBER (CSB No. 233482)
    asieber@fenwick.com
3   LIWEN A. MAH (CSB No. 239033)
    lmah@fenwick.com
4   FENWICK & WEST LLP
    555 California Street, 12th Floor
5   San Francisco, CA  94104
    Telephone: (415) 875-2300
6   Facsimile:  (415) 281-1350

7   PATRICK E. PREMO (CSB NO. 184915)
    ppremo@fenwick.com
8   DENNIS M. FAIGAL (CSB No. 252829)
    dfaigal@fenwick.com
9   FENWICK & WEST LLP
    Silicon Valley Center
10  801 California Street
    Mountain View, CA  94041
11  Telephone:     (650) 988-8500
    Facsimile:     (650) 938-5200

12
    Attorneys for Plaintiff
13  SuccessFactors, Inc.

14

15                  UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                        OAKLAND DIVISION

18  SUCCESSFACTORS, INC., a Delaware          Case No.  CV 08 1376 CW
    corporation,
19                                            **DECLARATION OF PATRICK E. PREMO IN
                    Plaintiff,                SUPPORT OF SUCCESSFACTORS, INC.'S
20                                            SUPPLEMENTAL BRIEF RE: DOCUMENT
    v.                                        PRESERVATION, EXPEDITED DISCOVERY
21                                            AND ENTRY OF PROTECTIVE ORDER**
    SOFTSCAPE, INC., a Delaware corporation,
22  and DOES 1-10, inclusive,                 Date of Filing:   March 11, 2008
                                              Trial Date:       No date set
23                  Defendants.

24

25  / / /

26  / / /

27  / / /

28  / / /

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    I, Patrick E. Premo, declare as follows:

2    1.    I am a partner with the law firm of Fenwick & West LLP, counsel to Plaintiff

3    SuccessFactors, Inc.  I am an attorney admitted to practice before this Court.  I submit this

4    declaration in support of Plaintiff's Supplemental Brief Re: Document Preservation, Expedited

5    Discovery and Entry of Protective Order, and, if called upon, could and would testify competently

6    thereto.

7    <u>**DOCUMENT PRESERVATION**</u>

8    2.    On March 11, 2008, I first provided notice to Susan Mohr, General Counsel of

9    Defendant Softscape, Inc., of my client's complaint and application for temporary restraining

10   order in response to an anonymous email distribution of a 43-page presentation.

11   3.    Since we first learned of the "anonymous" email dated March 4, 2008, we have

12   been concerned Softscape has not been preserving all necessary evidence, particularly electronic

13   information that would assist in identifying who sent out the Softscape presentation to over 766

14   separate email addresses.

15   4.    We have become more concerned in light of facts showing Softscape's CEO was

16   personally involved and because we have not received answers to numerous questions regarding

17   Softscape's investigation and document retention efforts.

18   **(a)    Preservation of Senior Executives' Personal Computers**

19   5.    Soon after we learned that Softscape's CEO, Dave Watkins, was one of the

20   authors of the Presentation, we contacted Softscape's counsel to confirm that Mr. Watkins'

21   computer hard drives, including home computers, had been preserved.  Attached as <u>Exhibit 1</u> is a

22   true and correct copy of a letter dated March 21, 2008, from my colleague, Laurence Pulgram, to

23   Softscape's lead counsel, Jessica Grant of Taylor & Company Law Offices.  She responded three

24   days later by letter simply saying "Softscape, Inc. is taking all appropriate measures to preserve

25   evidence that may be relevant to the matter at issue in this litigation."  Attached as <u>Exhibit 2</u> is a

26   true and correct copy of Ms. Grant's letter dated March 24, 2008.

27   6.    Mr. Pulgram followed up with a second letter on March 24, 2008, again asking for

28   specific information about Mr. Watkins' computers.  Ms. Grant responded providing the same

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

assurances, but added that "Mr. David Watkins' computers are among those being imaged." No other persons were identified. Attached as <u>Exhibit 3</u> is a true and correct copy of her letter to Mr. Pulgram dated March 24, 2008.

7.      The Court held a hearing on the order to show cause why a preliminary injunction should not be entered and on SuccessFactors' motion for expedited discovery and preservation of evidence. At the March 27 hearing, Mr. Pulgram explained why an order directing Softscape to preserve documents, including electronic information, was necessary. Attached as <u>Exhibit 4</u> is a true and correct copy of the hearing transcript. (03.27.08 Hearing Tr. at 14:4-16:8 (Dkt. No. 71).)

8.      During the hearing, counsel for Defendant informed the Court that "the computers that are at issue have all been mirror-imaged." (*Id.* at 13:10-12.) However, there was a concern that neither Plaintiff nor the Court knew what "at issue" meant. Defense counsel informed the Court that Dave Watkins' "home computer and his business computer have – that's all under lock and key, and those images are being preserved." (*Id.* at 13:20-22.) It is still unclear how Defendant determined which computers were at issue; rather, Softscape counsel has stated that the "known" computers have been preserved.

9.      The day after the hearing during the meet-and-confer call with opposing counsel, I learned for the first time that only the company-issued laptop computer for Dave Watkins had been imaged. Despite the impression given that Mr. Watkins' *home* computer was under "lock and key," none of Dave Watkins' home computer(s) or other storage media appears to have been searched or preserved.

10.     Comcast has now responded to our client's subpoena and confirmed that someone at Dave Watkins' home (IP 98.216.168.122) was accessing SuccessFactors' password-protected sales demo account on February 18, 19, 20, 21 and 22, 2008, usually after normal business hours. The person was accessing the demo after-hours for some of these dates, rendering search and preservation of any home computers to be critical. *See* Declaration of James Matheson in Support of Preliminary Injunction and Expedited Discovery, 03.21.08 (Dkt. No. 41) ("Matheson Decl. II") ¶ 11.

11.     Comcast also confirmed that the other individual Comcast subscriber implicated in

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   our investigation (IP 24.34.56.79) is Rick Watkins, Softscape's Chief Technology Officer, and

2   Dave Watkins' brother.  SuccessFactors' access logs submitted in support of its Motion for TRO

3   show someone at Rick Watkins' home was accessing SuccessFactors' confidential demo account

4   also well past normal business hours on February 18 and 20, 2008.  Declaration of James

5   Matheson in Support of Plaintiff's Motion for Temporary Restraining Order and Order to Show

6   Cause Re Preliminary Injunction, 03.11.08 (Dkt. No. 18) ("Matheson Decl. I"), ¶ 15.

7       12.    Softscape's General Counsel, Susan Mohr, appears to have known that the

8   Massachusetts Comcast users were the Watkins' brothers during the week of March 31 and

9   perhaps earlier, as she contacted Comcast on their behalf about responding to the subpoena.

10      13.    On April 10, I told Softscape's counsel that we wanted to depose Rick Watkins

11  during the week of April 28 or May 5, 2008.  I was told for the first time that Rick Watkins was

12  unavailable for at least the next thirty days because he needed to care for his infant son, who had

13  recently been hospitalized.  I said that Rick Watkins' first priority should obviously be with his

14  child.  I asked counsel to confirm that Rick Watkins' home computer had been searched and

15  preserved.  They refused to answer.  Based on a letter sent on April 8 by Ms. Grant, it appears

16  that only the business computer used by Rick Watkins has been searched.

17          **(b)    Preservation of Meta Data Showing Those Accessing the Presentation**

18      14.    Immediately following the March 27 hearing, counsel for the parties met to begin

19  discussing document preservation and early discovery.  Ms. Grant requested that no one from

20  SuccessFactors participate in the call set for the next day.  She also asked that any information

21  discussed during the call be treated as "Attorney's Eyes Only," thereby precluding us from

22  sharing certain information with our client.

23      15.    On March 28, 2008, as agreed by counsel, I sent a letter identifying the questions

24  for Softscape's attorney and chief IT person, Joe Fougere, VP of Engineering Solutions.

25  Attached as Exhibit 5 is a true and correct copy of my letter to Softscape's counsel.  Softscape's

26  chief IT person and counsel were unable to answer many questions identified.

27      16.    At counsel's request, I followed up with two letters dated April 2, seeking

28  adequate assurances on document preservation.  Attached as Exhibit 6 is a true and correct copy

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  of my first letter, which was re-sent several days later with unanswered questions highlighted at

2  opposing counsel's request.  I have redacted any potentially confidential information and left only

3  the unanswered questions are visible for the Court.  Attached as <u>Exhibit 7</u> is a true and correct

4  copy of my second letter sent on April 2, again asking for confirmation.

5         17.    During the March 28 call, I learned that there were two versions of the

6  Presentation in PowerPoint files and one saved as a PDF on a Softscape Intranet Server.  Counsel

7  has refused to provide any other information about the creation, distribution or use of the

8  Presentation.

9         18.    Mr. Fougere and his counsel informed me that anyone who obtained the user name

10  and password could access the Presentation, download and/or print it.  This is contrary to

11  Softscape counsel's repeated statements to the Court that the Presentation could not be

12  downloaded from the Softscape server.  *See* 03.27.08 Hearing Tr. at 22:8-10, 22:17-18, 23:11-13,

13  24:2-25:6. Mr. Fougere also noted that the intranet user name and password is the same for all

14  employees.

15         19.    On April 4, Defendant's counsel, Jonathan Patchen, sent an email in response to

16  questions about web server access logs.  These are the types of logs that SuccessFactors' Director

17  of Web Operations, Jim Matheson, had used to successfully uncover the author of the

18  "anonymous" Presentation emailed on March 4, 2008.  Softscape's IT personnel claim that

19  similar access logs do not exist for Softscape's Intranet Server that stored the Presentation.

20  Attached as <u>Exhibit 8</u> is a true and correct copy of an email string exchanged with Jonathan

21  Patchen and myself from March 28 through April 4, 2008, confirming this information.

22         20.    According to Fenwick & West's IT Director, Kevin Moore, who participated in

23  the March 28 conference call, such logs should exist automatically, unless the default feature is

24  disengaged.  Mr. Fougere confirmed that if they did exist, they would be retained for between

25  7-30 days.  Softscape's IT chief, Mr. Fougere, also confirmed that he was not aware of anyone in

26  the past nine years that might have disengaged this feature.  Softscape still maintains that there

27  are no access logs for the Intranet Server.

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(c)    **Scope of Softscape's Preservation Efforts**

21.    Softscape's lead counsel initially refused to identify the persons whose computers had been imaged other than Dave Watkins' company-issued laptop.  After making several requests, on April 8, Softscape's lead counsel ultimately identified the following eight Softscape employees that were involved in the "creation/modification of the Presentation, or accessed SuccessFactors' ACE Demo:"  Dave Watkins, Alex Bartfeld, Matt Park, Mike Brandt, Christopher Faust, Dennis Martinek, Rick Watkins and Michelle Davis.  Attached as <u>Exhibit 9</u> is a true and correct copy of Ms. Grant's letter dated April 8, 2008 to me.

22.    According to Softscape's website, many of these folks appear to be officers or senior managers:

    a.    **David Watkins**, Chief Executive Officer
    b.    **Richard Watkins**, Chief Technology Officer
    c.    **Christopher Faust**, EVP Global Strategy & Marketing
    d.    **Matthew Park**, EVP Global Sales
    e.    **Alex Bartfeld,** Director, Softscape EMEA [Europe Middle East Africa]
    f.    **Michael Brandt,** Director, Softscape Asia Pacific Pty Ltd

**Dennis Martinek** is a Regional Sales Manager at Softscape, according to his LinkedIn profile.  His name appeared in my client's CRM database.  *See* Paragraph 18 and Exhibit 10 to the Declaration of James Matheson in Support of Plaintiff's Motion for a Temporary Restraining Order, 03.11.08 (Dkt. No. 18).

23.    Through our own investigation, we learned that **Ely Valls**, the purported owner of New Millenium Shoe Company, may be the niece of Dave Watkins and his wife, Lillian Valls Watkins.  Ely Valls appears to have used the home address of Dave Watkins and his wife, as shown in the attached Accurint Report, which is an electronic online service that compiles information from public records.  Attached as <u>Exhibit 10</u> is a true and correct copy of the Accurint Report for Dave Watkins that I had our librarian run for me.  We have requested, but not received from Softscape's counsel Ely Valls' address.  Softscape's attorneys have informed me that they have not searched for her records or made any attempts to ensure her records have been preserved because they do not have her address.

24.    **Javier Cruz** claimed to be a consultant of New Millenium Shoe Company, thereby making him a consultant of Dave Watkins.  It is my understanding that he participated in

the February 21, 2008, online meeting with SuccessFactors' sales representatives. Softscape's

counsel said that Mr. Cruz is not an employee or consultant of Softscape and their client does not

know who he is. I am not aware of any attempt by Softscape to preserve his evidence, whether

under the name Javier Cruz or any other name he might use.

25.    Records subpoenaed from Google show that the anonymous email and

presentation was sent to sales@softscape.com. I asked counsel on March 28, 2008, to confirm

that this is an email distribution list for Softscape's entire sales department. They refused to

answer, and further refused to confirm preservation of Softscape's various email distribution lists.

This information may help discover who sent the Presentation on March 4. It would at least show

what Softscape sales representatives received the anonymous e-mail, and by allowing

preservation of their records, preserve evidence of what they were saying about the Presentation

to prospects and customers, and would show whether there was a further distribution. It does not

appear that individual hard drives have been adequately searched for or preserved.

26.    We have repeatedly requested that the hard drives of persons at Softscape who

received copies of the Presentation at any time be preserved (especially in light of the assertion

that no internal log of access exists), but Softscape's counsel has refused to identify who received

the e-mail or to preserve any records other than of the eight persons identified as having

participated in its preparation.

27.    Softscape has refused to confirm preservation of email boxes, repositories,

archives, profiles and calendars for members of the sales team and other persons who accessed or

received the Presentation.

28.    The Google records also show that someone using the email

wildgracks@yahoo.com communicated with "John Anonymous" on March 5, the day after the

Presentation was sent. wildgracks@yahoo.com appears to be a personal email address for

Softscape Regional Sales Manager, **Dennis Martinek**. Since Mr. Martinek has been identified as

someone who was involved in the authorship of the Presentation and was communicating with

John Anonymous using his personal email address, it is essential that his records have also been

searched and preserved, including all records of home computer use and use of the wildgrack's

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

account.

29.     Another person using the email address, mwest@softscape.com, appears in the Google records as an addressee of communications with John Anonymous.  I have asked for information about this person and confirmation that his or her records were searched and preserved.  Softscape denies knowing any employee by that name, mwest.

30.     If the access logs truly do not exist, then copies of computer hard drives and other storage media become even more important because that will be the only place where the critical meta data can be found.

31.     After a series of calls, emails and letters, I have learned from Softscape's counsel that (a) Softscape at some point stopped the rotation on weekly backup tapes and has tapes dating back to February 12, 2008, but not earlier; (b) company-issued computers for the eight Softscape employees were mirror imaged, but apparently no others; I have not been informed if any home computers of the eight employees (or any other employees or consultants) were searched or preserved; (c) the Presentation was found on a Microsoft Internet Information Server; it is counsel's understanding that mirror images have been made of this server and three others (Exchange server, Exchange Front end server, and Business Intelligence server); (d) Softscape's outside counsel at some point retained a forensic firm, FTI Consulting, but asserted a work product and attorney-client privilege to all communications and work associated with the consultant's investigation.

32.     In her letter dated April 8, 2008, opposing counsel said that the information requested is privileged, still being investigated, or is discoverable information "that is appropriate for interrogatories or depositions."  *See* Exhibit 9.  Other than the identity of the eight employees, the letter did not contain meaningful information.

### (d)     Proposed Preservation Order

33.     On April 2, 2008, my associate Liwen Mah sent counsel for Softscape a draft stipulation and proposed order to preserve documents.

34.     Although Softscape had not previously identified any concern for preservation of SuccessFactors' records, Counsel responded by asking that the order be mutual, which I agreed

Fenwick & West LLP
Attorneys At Law
San Francisco

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

to.

35.    On April 4, 2008, Defendant's counsel sent an alternative preservation order, removing the specific information included by us and *excluding* any confirmation that the preservation had actually occurred.

36.    Ms. Grant has confirmed on several occasions that she will only confirm that she has directed her client to preserve documents.  She refuses to sign an order confirming that her client has actually followed her instructions.  She indicated during our call that she did not want to set up a "Qualcomm" situation, which I interpreted to mean the discovery sanctions faced by Qualcomm and its counsel in the recent order issued in January 2008 in *Qualcomm v. Broadcom.* If the Court is not inclined to order the attorneys to confirm, then an alternative would be for Softscape's CEO or its independent forensics specialist to certify.

37.    SuccessFactors' proposed order accompanying this declaration includes confirmation by both counsel that preservation efforts have been performed.  Defendant's counsel has objected to paragraphs 4-7 of the proposed order, but has agreed to paragraphs 1-3.

### EARLY PRODUCTION OF DOCUMENTS & DEPOSITIONS

38.    SuccessFactors moved for an order compelling early production of documents, initially requesting that the documents it requested be due within a week of SuccessFactors' requests served March 11, 2008.  At the March 27 hearing, the Court allowed both parties to initiate discovery.  She also directed "[c]ounsel to meet and confer on 4/10 to come up with a discovery plan re early document production and 30(b)(6) depositions…"  *See* Minute Order entered on March 27, 2008 (Dkt. No. 67).

39.    On March 28, 2008, I caused to be served SuccessFactors' First Set of Document Requests, which was based on the requests included in our Motion for Expedited Discovery filed on March 11, 2008.

40.    On April 3, 2008, I sent a letter to counsel to initiate the meet-and-confer process.  I identified ten categories of documents for early production.  I asked for an early production of April 11, so that the parties could then begin depositions two weeks later.

41.    On April 10, 2008, I participated in the Rule 26(f) conference with Jessica Grant

1    and Jonathan Patchen.  We discussed the following:

2         **a.  Early Document Production**.  I asked to have the documents regarding

3         creation, distribution and use of the Presentation and related categories by

4         April 18 to ensure that the parties could review in preparation for depositions.

5         Ms. Grant offered to respond and produce documents by May 1, 2008, which

6         is not expedited, but rather is more than 30 days after the March 28 reservice

7         date, and some 50 days after the initial service.  Ms. Grant offered to produce

8         documents in advance of that date if that were "possible."  However, no earlier

9         deadlines have been offered.

10        **b.  Initial Disclosures.**  I proposed exchanging initial disclosures as soon as

11        possible and proposed April 18 in a follow up email.  If the parties were

12        agreeable to include exchange of the documents described, I offered to produce

13        those by April 28.  Softscape's counsel proposed initial disclosure of witnesses

14        by May 9, and disclosure and production of documents by May 16.

15        **c.  Depositions.**  We included SuccessFactors' original 30(b)(6) deposition

16        notices for Softscape witnesses in the Motion for Expedited Discovery filed

17        and served on March 11, 2008.  Counsel for Softscape sent two notices of

18        depositions for SuccessFactors' witnesses during the Rule 26(f) conference on

19        April 10.  On April 11, 2008, I indicated that some categories Softscape

20        requested were too broad in subject matter and time period, but that

21        SuccessFactors would present a corporate designee, and that a likely witness

22        was Robert Bernshteyn.  I proposed having SuccessFactors' depositions of

23        Softscape's designees start two weeks after document production, and would

24        be prepared to start the depositions during the weeks of May 19 and 26, to

25        allow for the document productions.  Softscape asked for depositions of

26        SuccessFactors' witnesses on May 13 and 14, 2008.

27       42.    Softscape has not produced documents in this litigation other than the two emails

28   attached to its declarations in opposition to temporary injunctive relief.  We have encountered

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    significant resistance with regard to document preservation and early document production.

2    Softscape's counsel has repeatedly told me that my client was *denied* its request for early

3    production of documents, despite the explicit reference in the Court's Minute Order (*see* Dkt. No.

4    67), and despite the Court's instructions that the parties reach agreement on early document

5    production.

6          43.    I have expressed my concern that, given Softscape's refusal to agree to produce

7    any category of documents, under Softscape's proposal we are not guaranteed of receiving

8    anything other than a written response on May 1, which will contain lengthy objections and a

9    limited document production, if any. This will require another round of meet-and-confer

10   discussions followed by motion practice. Softscape could effectively delay its production until

11   late-June 2008 or later, with depositions moving out even later.

12         44.    Counsel for Softscape would like to set a "drop dead" date of June 1 to complete

13   initial depositions. We would like to do the depositions as soon as possible, preferably well

14   before June 1, but we need the documents and sufficient time to prepare. I am concerned that

15   Softscape is forcing a deposition schedule that would either deprive us of sufficient time to

16   prepare and/or exclude important documents.

17         45.    We would also like to depose Ely Valls. Softscape counsel has indicated that they

18   do not represent Ms. Valls and do not know where she lives. Since Dave Watkins appears to be

19   her uncle and employer, I asked counsel if they would obtain the address from Mr. Watkins. To

20   date, I have not received any response.

21                         **Stipulated Protective Order**

22         46.    On April 2, 2008, I prepared and sent the draft stipulated protective order to

23   counsel for their review and approval. It is based on the Northern District of California's Model

24   Protective Order.

25         47.    Counsel for the parties initially agreed on the form. On April 8, Mr. Patchen

26   informed me that his client was requesting additional changes. Attached as Exhibit 11 is a true

27   and correct copy of Mr. Patchen's email to me dated April 8, 2008.

28         48.    Softscape wants to preclude SuccessFactors from using one of its employees as a

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  "consultant" (or a non-testifying expert. Its articulated concern is that it would allow an

2  employee to view "Attorney's Eyes Only" or "AEO" materials. To address this concern, I

3  offered to (a) disclose the consultant employee in advance, (b) require him or her to sign the

4  Protective Order Acknowledgment, and (c) allow the other party an opportunity to object.

5  Softscape rejected this compromise.

6       49.    The second issue in dispute is disclosure of certain IP log records and similar

7  documents to SuccessFactors' Director of Web Operations, Jim Matheson. Previously, counsel

8  for the parties negotiated a detailed preliminary confidentiality agreement in connection with

9  SuccessFactors' subpoena to Verizon for information about use of the main Softscape IP address

10 used to access SuccessFactors' password protected materials. Counsel for Softscape at that time

11 agreed to the very terms which are now at issue. Softscape now refuses to allow Mr. Matheson

12 access to "Attorney's Eyes Only" material.

13      50.    Mr. Matheson has been key to uncovering the identity of the authors of the

14 Presentation and a key person assisting us in this investigation. We are not asking to give him

15 unfettered access to "AEO" materials. He will not be reviewing highly confidential financial

16 documents or even the content of confidential emails. Because of Mr. Matheson's unique

17 familiarity with SuccessFactors' servers, SuccessFactors needs to have Mr. Matheson review a

18 very limited universe of information showing IP addresses, dates and times that certain

19 environments were accessed by Softscape employees and consultants. Softscape seems to be

20 trying to unfairly exclude Mr. Matheson from any effort to uncover the identity of the anonymous

21 emailer.

22      I declare under penalty of perjury under the laws of the United States of America and the

23 State of California that the foregoing is true and correct, and that this declaration was executed

24 this 14th day of April, 2008, in Mountain View, California.

25

26                      /s/ Patrick Premo

27                   Patrick Premo

28 1283341

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# EXHIBIT 1

# FENWICK & WEST LLP

555 CALIFORNIA STREET, 12TH FLOOR   SAN FRANCISCO, CA 94104
TEL 415.875.2300   FAX 415.281.1350   WWW.FENWICK.COM

March 21, 2008

LAURENCE F. PULGRAM

EMAIL LPULGRAM@FENWICK.COM
DIRECT DIAL (415) 875-2390

## VIA EMAIL AND FACSIMILE (415) 788-8208

Jessica L. Grant, Esq.
Taylor & Company Law Offices, Inc.
One Ferry Building, Suite 355
San Francisco, CA  94111

Re:    *SuccessFactors, Inc. v. Softscape, Inc.*
       U.S.D.C., N.D. Cal., Oakland Division
       Case No. CV 08-1376 CW

Dear Jessica:

This letter is to follow up on our call of early this afternoon.  During the call, I asked you to confirm that a bit-for-bit, mirror image copy of Mr. Watkins' computer drives was made at the filing of this lawsuit.  I stressed that such an exact, unaltered copy needed to be preserved for all computers that Mr. Watkins used in connection with any Softscape work or the SuccessFactors' dispute.  This would include home, work, or other locations, and include all storage media of any kind.  I requested that you confirm that such copies have been made, with the alternative being that we would raise this issue with the Court.  You agreed to get back to me on this issue.  Please let me know by noon on Monday, March 24, 2008.

At this point, other than Mr. Watkins, you know better than we the identity of the various other individuals at Softscape whose drives and data should be preserved by mirror copies.  I would note, however, that given that this case will involve substantial forensic investigation of individual communications apparently among many people trying to hide their identities, it is critically important that complete and exact data be preserved for all the possible participants at Softscape, in particular, all of its sales group.  This is also true for all system logs, email, Instant Messages, and other means of communications, as well as backup for same.

I look forward to your confirmation that all these materials are being exactly preserved.

Sincerely,

FENWICK & WEST LLP

Laurence F. Pulgram

LFP/pv

cc:    Jonathan A. Patchen, Esq.

# EXHIBIT 2

JESSICA L. GRANT
PARTNER
jgrant@tcolaw.com

TAYLOR & COMPANY
LAW OFFICES, LLP

March 24, 2008

**VIA FACSIMILE**

Laurence F. Pulgram
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104

Re: *SucessFactors, Inc. v. Softscape, Inc.*
     Case No. C-08-1376 (CW)

Dear Laurence:

We are in receipt of your March 21, 2008 letter regarding evidence preservation issues. This will confirm that Softscape, Inc. is taking all appropriate measures to preserve evidence that may be relevant to the matters at issue in this litigation. Please confirm that SuccessFactors, Inc. is doing the same.

Very truly yours,

Jessica L. Grant

# EXHIBIT 3

JESSICA L. GRANT
PARTNER
jgrant@tcolaw.com

TAYLOR & COMPANY
LAW OFFICES, LLP

March 24, 2008

**VIA E-MAIL**

Laurence F. Pulgram
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104

Re: *SuccessFactors, Inc. v. Softscape, Inc.*,
   United States District Court, Northern District
   of California, Case No. CV-08-1376 (CW)

Dear Laurence:

Thank you for your letter this afternoon following up on the issue of Softscape's preservation of evidence in this case. As I indicated in my letter to you earlier today, all steps necessary to preserve the information and data that is the subject of the pending litigation are being taken. To answer your question directly, Mr. David Watkins' computers are among those being imaged.

As I have also previously and repeatedly advised you, Softscape is as motivated as plaintiff to discover the identity of the individual(s) who caused the PowerPoint presentation to be disseminated outside Softscape in an unauthorized and unsanctioned manner. We also remain willing to discuss with you what steps should be taken – by both parties in this case – to continue to preserve relevant documents and electronic evidence, given that the obligation to do so runs both ways. If you would like to engage in a constructive dialogue on this point, we would be happy to do so. I will be in depositions in another matter on Tuesday and Wednesday of this week, but could try to schedule a time to confer on this issue if you provide me with some suggested times for our discussion.

Very truly yours,

Jessica L. Grant

# EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CLAUDIA WILKEN, JUDGE

| | |
|---|---|
| SUCCESSFACTORS, INC., A DELAWARE CORPORATION, )<br><br>PLAINTIFF, )<br><br>VS. )<br><br>SOFTSCAPE, INC., A DELAWARE CORPORATION, AND DOES 1-10, INCLUSIVE, )<br><br>DEFENDANTS. ) | Certified Copy<br><br>NO. C 08-1376CW<br><br>PAGES 1 - 50<br><br>OAKLAND, CALIFORNIA<br>THURSDAY, MARCH 31, 2008 |

**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

FOR PLAINTIFF:            FENWICK & WEST
                         555 CALIFORNIA STREET, 12TH FLOOR
                         SAN FRANCISCO, CALIFORNIA  94104
                  BY:    PATRICK E. PREMO
                         LAURENCE F. PULGRAM, ATTORNEYS AT LAW


FOR DEFENDANTS.          TAYLOR & CO. LAW OFFICES
                         1050 MARINA VILLAGE PARKWAY, SUITE 101
                         ALAMEDA, CALIFORNIA  94501
                  BY:    JESSICA L. GRANT
                         JONATHAN A. PATCHEN, ATTORNEYS AT LAW


REPORTED BY:             RAYNEE H. MERCADO, CSR NO. 8258

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-8404

```
 1   THURSDAY, MARCH 27, 2008                          2:14 P.M.

 2                     P R O C E E D I N G S

 3           THE CLERK:  CALLING THE MATTER OF THE SUCCESSFACTORS

 4   VERSUS SOFTSCAPE, CIVIL ACTION NO. C08-1376.

 5           COUNSEL, PLEASE COME FORWARD, STATE YOUR APPEARANCE

 6   FOR THE RECORD.

 7           MR. PULGRAM:  GOOD AFTERNOON, YOUR HONOR.  LAURENCE

 8   PULGRAM, FENWICK & WEST, FOR PLAINTIFF SUCCESSFACTORS.

 9           WITH ME IS PATRICK PREMO.

10           THE COURT:  WHY DON'T YOU TAKE THAT PODIUM THERE.

11           MS. GRANT:  GOOD MORNING -- GOOD AFTERNOON.

12           JESSICA GRANT FROM TAYLOR & COMPANY ON BEHALF OF

13   SOFTSCAPE.  AND I ALSO HAVE JONATHAN PATCHEN WITH ME.

14           THE COURT:  ALL RIGHT.  WELL, THIS IS ON FOR

15   PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION SUBSEQUENT TO

16   THE T.R.O. THAT WAS ENTERED PREVIOUSLY AND ALSO PLAINTIFF'S

17   MOTION FOR EXPEDITED DISCOVERY.  I'M INCLINED TO CONTINUE THE

18   T.R.O. IN EFFECT AND CONVERT IT TO A PRELIMINARY INJUNCTION.

19           YOU MAKE TWO GOOD POINTS ABOUT THE LANGUAGE OF IT,

20   BOTH OF WHICH HAVE BEEN RESPONDED TO ADEQUATELY BY THE PLAINTIFF

21   IN TERMS OF THE DISTRIBUTING THE TRADEMARK INTERNALLY VERSUS

22   EXTERNALLY AND ALSO FALSELY REPRESENTING TO BE A THIRD PARTY

23   WHEN YOU SAY THINGS, WHICH WAS THE ACTIVITY THAT YOUR CLIENT

24   ENGAGED IN THAT I FOUND ENJOINABLE.

25           AND THE WAY I PHRASED IT, I SUPPOSE, COULD BE
```

1    INTERPRETED SOME OTHER WAY, BUT IT WAS INTENDED TO BE NOT

2    MASQUERADING AS SOMEONE ELSE WHEN YOU SAY THINGS.

3         **MS. GRANT:**  RIGHT.  I THINK WE UNDERSTOOD THAT THAT

4    WAS THE COURT'S INTENTION.  IT'S JUST THE WAY THAT THE LANGUAGE

5    READS RIGHT NOW, IT DOESN'T CONVEY THAT.  AND IT WOULD ARGUABLY

6    PROHIBIT ENTIRELY LAWFUL TESTIMONIALS FROM CUSTOMERS, INDUSTRY

7    ANALYSTS.

8         **THE COURT:**  YEAH.  IF YOU GET SOME TESTIMONIALS FROM

9    THEIR CUSTOMERS AND YOU CAN GIVE A NAME OF SOMEBODY WHO'S GOING

10   TO VERIFY THAT THEY SAID THAT, NO PROBLEM.

11        **MS. GRANT:**  RIGHT, NO --

12        **THE COURT:**  BUT IF YOU'RE GOING TO PRETEND TO BE

13   SOMEBODY AND SAY THINGS THAT NOBODY EVER SAID, THAT'S A PROBLEM.

14        **MS. GRANT:**  WHAT I MEANT TO SAY IS I THINK THE WAY

15   THAT THE -- PRONG 3 OF THE T.R.O. IS WRITTEN RIGHT NOW, IT WOULD

16   ACTUALLY -- IF WE GOT A CUSTOMER --

17        **THE COURT:**  RIGHT, I UNDERSTAND.

18                    (SIMULTANEOUS COLLOQUY.)

19        **MS. GRANT:**  -- ANALYST WAS COMPLIMENTING US, WE STILL

20   COULD NOT UNDER THE CURRENT T.R.O. PUT THAT ON OUR WEBSITE --

21        **THE COURT:**  YEAH, I UNDERSTAND YOUR POINT, AND I WILL

22   CHANGE THE LANGUAGE AS THE PLAINTIFF SUGGESTS.

23        I'M INCLINED TO ADD TO THE T.R.O. AN INJUNCTION WITH

24   RESPECT TO CERTAIN OF THE STATEMENTS.  I RECOGNIZE THAT

25   STATEMENTS OF OPINION, STATEMENTS THAT CAN'T REALLY BE PROVED

1  TRUE OR FALSE CAN'T BE ENJOINED BECAUSE IT WOULD BE A FIRST

2  AMENDMENT VIOLATION AND SO ON, BUT STATEMENTS THAT ARE CLEARLY

3  PROVABLE EASILY AS FACTS, BE THEY TRUE OR FALSE, THAT YOU

4  HAVEN'T PROVED ARE TRUE, THEN THERE'S NO REASON NOT TO ENJOIN

5  YOUR FURTHER STATEMENT OF THEM.

6         AND I MUST SAY I'M NOT AT ALL IMPRESSED BY A PRESS

7  RELEASE THAT SEEMS TO REAFFIRM THE TRUTH OF STATEMENTS THAT YOU

8  DON'T HAVE ANY REASON TO BELIEVE ARE TRUE.  SO I THINK YOU NEED

9  TO HAVE SOME TALKS WITH YOUR CLIENT ABOUT BUSINESS PRACTICES

10 HERE.

11         **MS. GRANT:**  OKAY, YOUR HONOR.

12         **THE COURT:**  BUT -- SO ANYWAY, OF THE STATEMENTS THAT

13 YOU SUGGEST SHOULD BE IN THERE, SOME I THINK COULD BE ENJOINED

14 AND OTHERS COULD NOT BE.  AND I DON'T WANT TO GO THROUGH THEM

15 ONE BY ONE.  I'LL JUST USE MY JUDGMENT WHEN I'VE PUT OUT THE

16 ORDER.

17         WITH RESPECT TO DISCOVERY, I'M INCLINED TO -- WELL,

18 WHAT I'M REALLY GOING TO DO IS JUST OPEN UP DISCOVERY, PERIOD.

19 YOU CAN MAKE YOUR INITIAL DISCLOSURES MAYBE NEXT WEEK.  YOU CAN

20 HAVE YOUR DISCOVERY CONFERENCE NEXT WEEK.  WE CAN JUST MOVE UP

21 THE WHOLE REGULAR FORMAL DISCOVERY.  AND IN TERMS OF ANYTHING --

22 I THINK IF DISCOVERY IS OPENED, YOU CAN JUST TAKE WHAT YOU NEED

23 THAT WAY RATHER THAN --

24         **MR. PULGRAM:**  WHEN YOU NEED IT.

25         **THE COURT:**  -- NECESSARILY NEEDING ANYTHING

```
 1   PARTICULAR EXPEDITED.
 2            MR. PULGRAM:  I BELIEVE THAT'S A GOOD APPROACH, YOUR
 3   HONOR, BECAUSE THE MORE INFORMATION THAT WE GET, THE MORE WE
 4   FIND THERE ARE LEADS TO FOLLOW THAT AREN'T NECESSARILY SPELLED
 5   OUT EXPLICITLY IN THIS REQUEST OR THAT.
 6            THE COURT:  I MEAN, I THINK THE THINGS THAT NEED TO
 7   BE GOTTEN QUICKLY ARE INFORMATION ABOUT WHO DID ACCESS THEIR --
 8   THE PROTECTED PORTIONS OF THEIR WEBSITE AND USE THAT INFORMATION
 9   TO CREATE THIS PRESENTATION.
10            MS. GRANT:  MAY I --
11            THE COURT:  SOMEBODY CREATED IT, AND WE DON'T KNOW
12   WHO THAT WAS OR HOW THEY GOT THEIR ACCESS.
13            MS. GRANT:  MAY I BE HEARD ON THAT ACTUALLY?  I THINK
14   THAT INFORMATION IS BEFORE YOU.  THE C.E.O., DAVE WATKINS,
15   ACCESSED THE DEMONSTRATION, AND I JUST REALLY WANT TO STRESS
16   SOMETHING.  THIS IS NOT A PROTECTED WEBSITE.
17            THE COURT:  NO, I KNOW THERE'S CERTAIN PARTS OF IT,
18   THOUGH, THAT ARE --
19            MS. GRANT:  NO.
20            THE COURT:  -- PASSWORD PROTECTED.
21            MS. GRANT:  HE ONLY ACCESSED ONE THING, WHICH WAS A
22   DEMO, LIKE A MARKETING DEMONSTRATION, A LITTLE SLIVER OF HOW
23   THEIR PRODUCT WORKS.  HE HAD A USER I.D, AND HE HAD A PASSWORD
24   THAT WAS PROVIDED.  HE'S A C.E.O. FROM ANOTHER COMPANY.  AND
25   THAT PASSWORD WAS PROVIDED TO THE OTHER COMPANY.
```

1        IMPORTANTLY, SUCCESSFACTORS PUT NO RESTRICTIONS, NONE

2    WHATSOEVER, ON THE USE OR DISCLOSURE OF THAT PASSWORD.  HE

3    SIMPLY ENTERED IN THE USER NAME, ENTERED IN THE PASSWORD, DID

4    THE DEMONSTRATION.

5        HE TOOK A FEW SCREEN SHOTS, THAT'S IT, A FEW OF THE

6    SCREEN SHOTS THAT ARE IN THE PRESENTATION, BUT THERE IS NOTHING

7    ON THE SUCCESSFACTORS DEMONSTRATION, WHICH IS ACCESSIBLE TO THE

8    PUBLIC, IT'S THE SAME ONE THEY USE AT A TRADE SHOW.  THERE'S NO

9    NDA.  THERE'S NOTHING LIKE WHEN YOU GO ON THE WEBSITE, AND YOU

10   CLICK "I AGREE TO THESE TERMS AND CONDITIONS."  THERE'S NOTHING,

11   THERE'S NO RESTRICTIONS WHATEVER ON THE USE AND DISCLOSURE OF

12   THAT INFORMATION.

13       SO THIS ISN'T A SITUATION -- THEY PUT A LOT OF

14   HYPERBOLE IN THE BRIEF TO MAKE IT SOUND LIKE IT'S SOMETHING

15   VICIOUS AND SINISTER THAT WE DID HERE.  TO BE CLEAR, HE SIMPLY

16   ACCESSED A MARKETING DEMO.  HE DID NOT SNEAK IN THE BACK DOOR

17   AND HACK THROUGH THEIR COMPUTER.  HE DIDN'T CHANGE OR ALTER

18   ANYTHING.  HE SIMPLY USED THE DEMONSTRATION IN EXACTLY THE WAY

19   IT WAS DESIGNED, MUCH LIKE A RESTAURANT CRITIC WHO CONCEALS HIS

20   IDENTITY, USES THE RESTAURANT, EXACTLY THE WAY -- IN THE MANNER

21   IT WAS INTENDED.

22       **THE COURT:**  WELL, I GUESS THE PLAINTIFF CAN SPEAK TO

23   THIS, BUT MY IMPRESSION FROM THE PAPERS WERE THAT THERE WERE

24   THREE PARTICULAR AREAS THAT THEY COULD SEE HAD BEEN ACCESSED,

25   NOT JUST ONE.

1    AND I DON'T KNOW IF YOU'RE SAYING YOUR C.E.O. GOT

2    THIS LOG-IN AND PASSWORD FROM THE C.E.O. OF ANOTHER COMPANY WHO

3    IS A CUSTOMER OF THEIRS OR GOT IT FROM THIS L.A. PERSON WHO

4    MASQUERADED AS A CUSTOMER.

5        **MS. GRANT:**  DAVE WATKINS IS THE C.E.O. OF SOFTSCAPE.

6    HE'S ALSO THE C.E.O. OF NEW MILLENNIUM SHOE COMPANY.

7        **MR. PULGRAM:**  OH, MY GOD.

8        I'M SORRY.

9        **MS. GRANT:**  EXCUSE ME.

10        **THE COURT:**  THERE IS SUCH A THING?

11        **MS. GRANT:**  YES, THAT'S A REAL COMPANY.

12        SO THEY ASKED FOR THE PASSWORD.  THEY GAVE IT TO HIM.

13        **THE COURT:**  WAIT.  THEY WHO?

14        **MS. GRANT:**  NEW MILLENNIUM SHOE COMPANY.  ELY.

15        **THE COURT:**  THIS ELY.

16        **MS. GRANT:**  ELY, WHO IS A REAL PERSON, WHO IS A REAL

17    EMPLOYEE THERE.

18        **THE COURT:**  OF THE SHOE COMPANY.

19        **MS. GRANT:**  OF THE COMPANY.

20        **THE COURT:**  BUT NOT OF SOFTSCAPE.

21        **MS. GRANT:**  NO, BUT THERE IS -- IT'S VERY IMPORTANT.

22    THERE'S NO RESTRICTION WHATSOEVER ON THE USE OF THAT PASSWORD.

23    FOR INSTANCE, SOMETIMES WHEN YOU GET A PASSWORD --

24        **THE COURT:**  I'M SORRY.  I STILL HAVEN'T GOTTEN THE

25    FACTS DOWN.  SO THIS PERSON ELLIE (PHONETIC) OR ELI (PHONETIC).

```
 1              MS. GRANT:  ELY.

 2              THE COURT:  ELY.

 3              OKAY.  SO ELY IS THE C.E.O. OF NEW MILLENNIUM SHOES?

 4                    (SIMULTANEOUS COLLOQUY.)

 5              THE COURT:  NO, WATKINS IS THE C --

 6              MS. GRANT:  AND ELY IS AN EMPLOYEE --

 7                    (SIMULTANEOUS COLLOQUY.)

 8              THE COURT:  OF NEW MILLENNIUM, NOT OF SOFTSCAPE.

 9              MS. GRANT:  CORRECT.  SO --

10              THE COURT:  SO ELY WENT AND POSED AS A PERSON

11      INTERESTED IN PURCHASING THIS SOFTWARE FOR NEW MILLENNIUM?

12              MS. GRANT:  CORRECT.

13              THE COURT:  IN THE COURSE OF THAT GOT THE LOG-IN AND

14      PASSWORD.

15              MS. GRANT:  CORRECT.

16              THE COURT:  AND THEN GAVE IT TO WATKINS.

17              MS. GRANT:  CORRECT.

18              THE COURT:  FOR THE PURPOSE OF ACCESSING INFORMATION

19      THAT COULD BE ACCESSED ONLY BY SOMEONE WHO THE PLAINTIFF THOUGHT

20      WAS A CUSTOMER.

21              MS. GRANT:  A PROSPECTIVE CUSTOMER.

22              THE COURT:  PROSPECTIVE CUSTOMER.

23              MS. GRANT:  BUT IMPORTANTLY, YOUR HONOR, IF THEY

24      REALLY WANTED TO RESTRICT THE USE TO PROSPECTIVE CUSTOMERS, THEY

25      COULD PUT -- WHEN THEY SEND YOU THE EMAIL WITH THE USER NAME AND
```

1  PASSWORD, THEY COULD SAY THIS IS ONLY FOR THIS PARTICULAR

2  PERSON, CANNOT BE SHARED OR DISCLOSED TO ANYONE ELSE, AS OTHER

3  COMPANIES DO.

4          AND, IN FACT, ON OUR DEMO, WE HAVE A NONDISCLOSURE

5  AGREEMENT.  WE SPECIFICALLY RESTRICT USE TO THAT PARTICULAR

6  PERSON.  IT CANNOT BE SHARED WITH ANYONE ELSE.  CANNOT BE

7  DISCLOSED.

8          **THE COURT:**  RIGHT.  I'M SURE THEY'LL DO SO NOW THAT

9  THEY'VE SEEN WHAT YOU CAN DO WITHOUT THAT.

10          **MS. GRANT:**  BUT, YOUR HONOR, THERE'S NOTHING WRONGFUL

11  ABOUT -- THIS WAS COMPLETELY AUTHORIZED ACCESS.  IT'S NO

12  DIFFERENT THAN THE RESTAURANT CRITIC, WHO DOES CONCEAL HIS TRUE

13  IDENTITY SO HE'S NOT DISCOVERED AND CAN WRITE AN OPINION, AND

14  IT'S NOT A TRESPASS BECAUSE HE'S USING THE RESTAURANT IN EXACTLY

15  THE MANNER IN WHICH IT WAS INTENDED.

16          HERE, THE DEMONSTRATION -- HE JUST SIMPLY DID A

17  DEMONSTRATION.  THAT'S ALL HE DID.  HE DID NOT CAUSE ANY DAMAGE

18  TO THE SYSTEM.  HE DID NOT CHANGE ANY DATA.  THERE WAS NO

19  CORRUPTION OR INTERRUPTION OF SERVICE LIKE THESE CASES UNDER THE

20  CFAA YOU NORMALLY SEE.  AND ALTHOUGH --

21          **THE COURT:**  BUT THEY SAY THERE WERE THREE DIFFERENT

22  AREAS.  AND YOU'RE SEEMING TO SAY THERE WAS ONLY ONE.

23          **MS. GRANT:**  RIGHT.  HE ABSOLUTELY ONLY USED THE DEMO.

24  AND THAT'S VERY --

25          **THE COURT:**  THAT SEEMS TO BE A DISPUTED FACT.

1     **MS. GRANT:** AND IT'S VERY DIFFERENT THAN THE

2     PRESENTATION.  HE DID CREATE THE PRESENTATION AS HIS DECLARATION

3     ATTESTS TO.  THE -- BUT HE USED IT FROM ALL THESE DIFFERENT

4     PUBLIC SOURCES.  THE MAIN ONE WAS ACTUALLY THEIR WEBSITE, THEIR

5     PUBLIC WEBSITE, AND TRADE SHOWS, WHICH ARE PUBLIC, AND WEBINARS,

6     WHICH ARE PUBLIC.

7          AND HE PIECED TOGETHER, ALONG WITH OTHER PEOPLE IN

8     THE COMPANY, ALL OF THIS INFORMATION, SOME OF WHICH WERE FROM

9     CUSTOMER TESTIMONIALS.  THE POINT IS OF THE ENTIRE PRESENTATION,

10    WHICH IS 43 PAGES, THEY ONLY TALK ABOUT TEN STATEMENTS THAT THEY

11    CLAIM IS FALSE.  AND I THINK AN INJUNCTION AT THIS POINT --

12    REALLY, I DON'T SEE THE IRREPARABLE INJURY WHEN IT'S VERY CLEAR

13    THAT SOFTSCAPE HAS NEVER BEEN TIED TO THIS.  AND I JUST --

14          IF YOU'LL BEAR WITH ME FOR ONE MINUTE, YOUR HONOR.

15          **THE COURT:** I DIDN'T MEAN TO OPEN THIS UP FOR

16    BROAD --

17          (SIMULTANEOUS COLLOQUY.)

18          **THE COURT:** -- ARGUMENT FROM YOU.  I HAD A COUPLE OF

19    COMMENTS I WANTED TO MAKE ABOUT MY INCLINATION AND A COUPLE OF

20    QUESTIONS I WANT TO ASK, AND THEN I WILL TURN TO YOU FOR

21    ARGUMENT, BUT YOU'RE SORT OF JUMPING THE GUN.

22          (SIMULTANEOUS COLLOQUY.)

23          **THE COURT:** THE DISCOVERY AREAS IS WHAT I WAS GETTING

24    TO THAT I'M CONCERNED ABOUT ARE WHO GOT THE ACCESS AND HOW, AND

25    WHO WROTE IT AND HOW.  I GUESS SOME OF THAT IS NOW KNOWN.  AND

1    THEN IT'S ONE THING TO RETAIN DOCUMENTS THAT ARE ON COMPUTERS,

2    BUT I ALSO KNOW GENERALLY THAT COMPUTERS HAVE MYSTERIOUS WAYS OF

3    RETAINING INFORMATION ABOUT HOW THINGS HAPPENED AND WHAT

4    HAPPENED IN NON-TRANSPARENT WAYS.

5         AND SO RETAINING DOCUMENTS ISN'T ENOUGH TO RETAIN

6    SORT OF META DATA KINDS OF THINGS THAT MIGHT RESIDE ON COMPUTERS

7    THAT MIGHT BE EPHEMERAL.  SO I'M CONCERNED ABOUT SOME KIND OF

8    EVIDENCE PRESERVATION OR DISCOVERY THAT WOULD ADDRESS THAT

9    PROBLEM IN TERMS OF TRACKING DOWN WHO REALLY OPENED THIS GMAIL

10   ACCOUNT, WHO REALLY SENT IT OUT ON THAT ACCOUNT, AND WHO ALL GOT

11   IT, I GUESS, IS ANOTHER.

12        **MS. GRANT:**  AND WE DO HAVE THAT INFORMATION FROM

13   GOOGLE, YOUR HONOR.  THE PAPERS THAT THEY FILED LAST NIGHT --

14        **THE COURT:**  WELL, SOME HOTEL, BUT WE DON'T KNOW WHO

15   WAS IN THERE.

16        **MS. GRANT:**  THE PROBLEM IS THEY ONLY GAVE YOU HALF

17   THE STORY, AND IT WAS VERY MISLEADING, WHAT THEY FILED LAST

18   NIGHT.  THAT WASN'T ALL OF GOOGLE'S RESPONSE.

19        THE EMAIL ACCOUNT THAT WAS CREATED WAS NOT CREATED IN

20   MASSACHUSETTS.  IT WAS CREATED IN SINGAPORE.  AND IT WAS CREATED

21   IN SINGAPORE, AND THE ACTUAL TRANSMISSION OF THE PRESENTATION

22   WAS DONE FROM THE SINGAPORE IP ADDRESS.  THEY DID NOT GIVE YOU

23   THAT INFORMATION.

24        THEN A WEEK LATER, THERE WAS A LOG-IN IN

25   MASSACHUSETTS, AND A WEEK AFTER THAT, THERE WAS ANOTHER ONE IN

1  CHINA.  BUT THE CRITICAL ONE, THE CRITICAL ONE WHERE THIS

2  EMANATED FROM, WAS SINGAPORE.  WE DON'T HAVE AN OFFICE IN

3  SINGAPORE.  THEY DO.

4          THIS COULD BE A DISGRUNTLED EMPLOYEE WHO SENT IT OUT

5  TO -- TO HARM SUCCESSFACTORS.  'CAUSE IT CERTAINLY DOESN'T INURE

6  TO OUR BENEFIT, QUITE FRANKLY.

7          I JUST THINK THAT THEY DID NOT PROVIDE YOU WITH

8  GOOGLE'S RESPONSE TO THE SUBPOENA.  THEY TRIED TO MAKE IT LOOK

9  LIKE THIS CAME FROM MASSACHUSETTS, FROM US AGAIN, WHEN, IN FACT,

10  IT DIDN'T.  IT CAME FROM SINGAPORE.

11          **THE COURT:**  OKAY.

12          **MS. GRANT:**  SO I JUST THINK THAT THERE'S BEEN A LOT

13  OF HYPERBOLE AND MISLEADING INFORMATION TO THIS COURT.  WE DO

14  KNOW WHERE IT CAME FROM.  IT CAME FROM SINGAPORE.  THAT'S WHERE

15  THE IP ADDRESS -- ALL OF THIS CAME FROM SINGAPORE.

16          **THE COURT:**  WELL, SINGAPORE'S A BIG PLACE, AND

17  THERE'S A LOT OF PEOPLE.

18          **MS. GRANT:**  BUT WE DON'T --

19              (SIMULTANEOUS COLLOQUY.)

20          **MR. PULGRAM:**  WHILE WE'RE ON THIS POINT -- I'LL

21  RESPOND WHENEVER YOUR HONOR GIVES ME AN OPPORTUNITY.

22          **THE COURT:**  OKAY.

23          **MR. PULGRAM:**  BUT --

24          **THE COURT:**  LET ME JUST SEE IF I HAD ANY OTHER

25  QUESTIONS.

1      OH, THERE'S -- I FORGET WHO IT WAS.  SOMEBODY SEEMED

2  TO USE SOME FEDERAL CIRCUIT CITES.  IS THERE ANY REASON THIS

3  WOULD GO TO THE FEDERAL CIRCUIT?  IT WOULD TO THE NINTH CIRCUIT,

4  WOULDN'T IT?  IT'S NOT A PATENT.

5      **MR. PULGRAM:**  CORRECT.

6      **THE COURT:**  YOU BOTH AGREE THIS WOULD GO TO THE NINTH

7  CIRCUIT, NOT THE FEDERAL --

8      **MS. GRANT:**  I AGREE.

9      **THE COURT:**  OKAY.

10     **MS. GRANT:**  YOUR HONOR, BEFORE I FORGET, I DO WANT

11  YOU TO KNOW THAT THE COMPUTERS THAT ARE AT ISSUE HAVE ALL BEEN

12  MIRROR-IMAGED.

13     **THE COURT:**  OKAY.  GOOD.  WELL, "AT ISSUE" WE DON'T

14  KNOW WHAT THAT MEANS.

15     **MS. GRANT:**  WELL, OF ANYONE WHO HAD ACCESS TO -- WHO

16  CREATED THE PRESENTATION.  I MEAN, OBVIOUSLY, WE HAVE NO IDEA

17  WHO DISSEMINATED IT.  I MEAN, THAT'S UNDISPUTED.  NO ONE KNOWS.

18      BUT IN TERMS OF INTERNALLY WHO CREATED IT, ALL OF

19  THOSE COMPUTERS ARE UNDER LOCK AND KEY IN TERMS OF THE IMAGES.

20  AND THEN MR. WATKINS, WHO ACCESSED THE DEMO, HIS HOME COMPUTER

21  AND HIS BUSINESS COMPUTER HAVE -- THAT'S ALL UNDER LOCK AND KEY,

22  AND THOSE IMAGES ARE BEING PRESERVED.

23     **THE COURT:**  OKAY.  ALL RIGHT.

24      SO JUST STICKING WITH THE DISCOVERY FOR A MINUTE,

25  THEN, IS IT YOUR VIEW THAT IF WE SIMPLY MOVED UP THE DATE FOR

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-8404

1    THE INITIAL DISCLOSURES AND THE INITIAL CONFERENCE AND THE

2    OPENING OF FORMAL DISCOVERY, THAT THAT WOULD BE ADEQUATE FOR

3    YOUR PURPOSES?

4             **MR. PULGRAM:**  YOUR HONOR, WE WOULD LIKE TO GET A

5    SPECIFIC ORDER WITH RESPECT TO PRESERVATION OF COMPUTERS AS

6    FOLLOWS.  THEY HAVE STATED THAT THEY HAVE NO WAY -- NO

7    CENTRALIZED WAY OF DETERMINING WHO ACCESSED THE PRESENTATION ON

8    THEIR SITE.  THEY DON'T HAVE A LOG ON THE SERVER THAT CONTROLS

9    ACCESS TO THAT DOCUMENT, WHICH MEANS THAT THE ONLY PLACE TO FIND

10   OUT WHO GOT IT AND WHEN AND HOW WAS TO LOOK AT THE INDIVIDUAL

11   COMPUTERS OF THOSE PEOPLE WHO DID GET.

12            SO IT WE THINK THAT WE NEED TO PRESERVE THE EVIDENCE

13   ON THE COMPUTERS OF EVERYBODY WHO GOT A COPY OF THIS

14   PRESENTATION.  THEY'VE IDENTIFIED SOME.  I DON'T --

15            **THE COURT:**  YOU'RE TALKING ABOUT THEIR INTERNAL

16   COMPUTERS, OR THE CUT -- OR THE OUTSIDE PEOPLE --

17            **MR. PULGRAM:**  I'M TALKING ABOUT THE PEOPLE IN THE

18   DEFENDANT.

19            **THE COURT:**  OKAY.

20            **MR. PULGRAM:**  BECAUSE UNLIKE A TYPICAL SITUATION

21   WHERE YOU HAVE A DOCS OPEN OR HUMMINGBIRD OR SOME OTHER

22   WORD-PROCESSING SYSTEM WHERE YOU CAN SEE ACCESSES AND CHANGES,

23   THEY'VE ASSERTED THAT THEY DON'T HAVE THAT.

24            THEY'VE ASSERTED THAT THERE'S NO WAY TO TRACK WHO

25   LOGGED IN, MADE A COPY OF THE DOCUMENT AND TOOK IT AWAY.  THE

```
 1   WAY THAT WE HAVE TO DO THAT, IF THEY DON'T HAVE THAT CENTRALIZED

 2   DATA SOURCE, IS TO PRESERVE THE INDIVIDUAL COMPUTERS OF THE

 3   PEOPLE WHO GOT IT.

 4           SOME OF THOSE, IT SOUNDS LIKE --

 5           THE COURT:  YOU DON'T KNOW WHO GOT IT.

 6           MR. PULGRAM:  NO, THEY DO.  I'M TALKING HERE

 7   INTERNALLY.  I'M TALKING ABOUT PEOPLE INTERNAL AT SOFTSCAPE.

 8   ANYBODY WHO GOT A COPY OF THIS WILL HAVE A RECORD IN THEIR

 9   REGISTRY OR OTHER PLACES WHERE YOU CAN FIND THE META DATA, THAT

10   THEY WENT TO THIS PLACE, AND THEY COPIED THIS DOCUMENT AT THIS

11   TIME AND THE THINGS THAT THEY, THEN, DID WITH IT.

12           SO WHAT I'M SAYING IS, UNFORTUNATELY, IF THEY, AS

13   THEY SAY, DON'T HAVE A CENTRALIZED PLACE THAT TRACKS THAT, THE

14   PLACE THAT YOU HAVE TO DO IT IS AT THE INDIVIDUAL LOCATION OF

15   THE PEOPLE WHO GOT THIS DOCUMENT.

16           THE COURT:  AND HOW MANY PEOPLE WOULD WE BE TALKING

17   ABOUT?

18           MR. PULGRAM:  I DO NOT KNOW.  WE HAVEN'T BEEN TOLD

19   THAT.  IT'S ONE OF THE MANY THINGS THAT WE HAVEN'T BEEN TOLD

20   YET.  WE HAVEN'T BEEN TOLD -- IT NOW HAS BEEN ANNOUNCED

21   YESTERDAY THAT DAVE WATKINS ACTUALLY WROTE THIS PRESENTATION.

22   THAT'S THE FIRST THAT WE HEARD ABOUT IT.  SO WE DON'T KNOW HOW

23   MANY PEOPLE THERE ARE, AND I THINK THAT THEY --

24           ACTUALLY, IT'S INCUMBENT UPON THEM TO PRESERVE THIS

25   EVIDENCE SO WE CAN SEE WHO GOT IT.  THIS IS THE WAY WE'RE GOING
```

1    TO FIGURE OUT HOW IT GOT OUT.  OBVIOUSLY, IT GOT OUT OF THE

2    COMPANY.  IT WAS IN THE COMPANY AND SOMEONE LET IT OUT ON

3    PURPOSE, BY ACCIDENT -- THEY CAN MAKE WHATEVER ARGUMENTS THEY

4    WANT ABOUT THIS.  THIS WAS A SALES DOCUMENT DISTRIBUTED BY

5    SALESPEOPLE TO MAKE A SALE.

6              WE HAVE TO BE ABLE TO FIGURE THAT OUT, AND THE ONLY

7    WAY WE CAN DO THAT IS BY PRESERVING THOSE RECORDS, SO THAT IS

8    ONE POINT ON THE EVIDENCE PRESERVATION.

9              THE OTHER POINT THAT I THINK IN TERMS OF TIMING OF

10   THIS DISCOVERY IS, I DO THINK THAT IT'S APPROPRIATE TO GIVE

11   IMMEDIATE ACCESS TO THE DOCUMENTS REFLECTING THE CREATION OF THE

12   DOCUMENTS.  THEY HAVE BEEN SEQUESTERED, ACCORDING TO THE

13   DEFENDANTS.  IT WOULD BE APPROPRIATE TO HAVE THEM PRODUCED

14   WITHIN A SHORT PERIOD OF TIME WITHOUT ANY LONG-TERM FIGHTING

15   OVER WHETHER OR NOT WE'RE GOING TO GET IT, WITHOUT 30 DAYS' WAIT

16   BEFORE OBJECTIONS, BEFORE NEGOTIATIONS, BEFORE DELIVERY.  YOU

17   KNOW HOW IT WORKS.  WE ALL KNOW HOW IT WORKS.

18             **THE COURT:**  WHAT IS IT YOU'RE SAYING AGAIN THAT YOU

19   WANT?

20             **MR. PULGRAM:**  THERE, I'M TALKING ABOUT THE DOCUMENTS

21   THAT REFLECT THE CREATION, THE CHANGES, AND THE COMMUNICATIONS

22   INTERNALLY ABOUT THE PRESENTATION.

23             **THE COURT:**  WELL, I'M STILL NOT FOLLOWING.  SO

24   WATKINS GETS SOME DOCUMENTS ON HIS COMPUTER, AND HE CUTS AND

25   PASTES AND DOES THINGS WITH THEM ON HIS COMPUTER, AND THEN HE

1    CREATES A DOCUMENT.

2            WHAT IS IT THAT YOU WANT IN THAT PROCESS?

3            **MR. PULGRAM:**  SO HE ALSO WORKS WITH ELY VALLS,

4    SUPPOSEDLY SOME INDEPENDENT COMPANY WHO HAS A ONE-PAGE WEBSITE

5    TO SELL SHOES.  HE ALSO, WE BELIEVE, WORKED WITH A GUY NAMED

6    MARTIN NECK, WHOSE NAME APPEARS IN OUR LOG OF VISITORS.

7            WE HAVE FOUR DIFFERENT IP ADDRESSES ASSOCIATED WITH

8    SOFTSCAPE THAT HAVE ACCESSED THIS PASSWORD-PROTECTED ACCOUNT.

9    THAT INCLUDES ENGLAND, AND I WOULD DARE SAY THERE'S NOT A

10   SOFTSCAPE IN ENGLAND WHO WORKS FOR MILLENNIUM SHOE, TWO HOME IP

11   ADDRESSES THAT HAVE NOT YET BEEN IDENTIFIED FOR US BY COMCAST.

12   AND THE FOURTH PLACE THAT ACCESSED THE PASSWORD-PROTECTED PART

13   OF THE SITE IS SOFTSCAPE'S OWN HEADQUARTERS.

14           SO WE KNOW THAT THERE ARE A NUMBER OF PEOPLE WHO ARE

15   INVOLVED IN THE CREATION OF THIS DOCUMENT.  IT'S NOT JUST --

16   MR. WATKINS HAS SAID THAT HE WAS ONE OF THE CREATORS.

17           SECOND --

18           **THE COURT:**  SO WHAT ARE YOU -- I'M NOT STILL CLEAR ON

19   WHAT IT IS YOU WANT ABOUT THAT.

20           **MR. PULGRAM:**  WHAT I WANT ARE THE DOCUMENTS THAT

21   REFLECT THE CREATION AND AMENDMENT TO AND COMMUNICATIONS ABOUT

22   THE PRESENTATION WITHIN THE COMPANY.

23           **THE COURT:**  OKAY.

24           I MEAN -- ALL RIGHT.  I GUESS --

25           **MR. PULGRAM:**  I UNDERSTAND.

1      **THE COURT:**  -- UNDERSTAND WHAT YOU'RE SAYING.

2      **MR. PULGRAM:**  RIGHT, RIGHT, RIGHT.  SO --

3      **THE COURT:**  SO WHAT ELSE?

4      **MR. PULGRAM:**  THE -- WE DO WANT THE DOCUMENTS ABOUT

5      THE CONNECTION BETWEEN ELY VALLS AND HER PURPORTED CONSULTANT.

6      WE BELIEVE THAT'S VERY IMPORTANT TO THIS -- THE OVERALL SCHEME

7      THAT WE HAVE SEEN UNFOLDING HERE.

8            IN ADDITION TO GETTING TO THAT PASSWORD-PROTECTED

9      SITE, WHICH A COMPETITOR KNOWS DOGGONE WELL IS NOT A

10     PASSWORD-PROTECTED SITE FOR THEM TO GET INTO.  WHAT IS THE

11     PASSWORD FOR?  NOT TO LET IN YOUR COMPETITOR.

12           SO IN ADDITION TO THAT, WHAT THEY WERE ABLE TO GET,

13     BY SETTING UP THIS COMPANY MILLENNIUM SHOE, IS A CONFIDENTIAL

14     SALES PROPOSAL WHICH THEY THEN ALSO EXCERPTED AND PUT INTO THE

15     PRESENTATION, A EXACT DUPLICATE OF A CHART THAT HAD BEEN

16     PREPARED IN THE CONFIDENTIAL SALES PROPOSAL.

17           SO WE HAVE NOT JUST "I WENT INTO A CORNER OF THE

18     WEBSITE USING A PASSWORD" BUT POSING -- NEVER IDENTIFYING THAT

19     THIS WAS SOFTSCAPE, NEVER IDENTIFYING THAT IT WAS DAVE WATKINS,

20     BUT ELY VALLS SAYING "I'VE GOT TO HAVE THIS WITHIN TWO DAYS

21     BECAUSE I'M MAKING MY PURCHASE DECISION.  I NEED TO HAVE YOUR

22     PROPOSAL."  TAKE THE PROPOSAL.  SHE GETS IT.  GIVES IT TO DAVE.

23     DAVE AND/OR WHOEVER ELSE CUTS IT UP AND PUTS IT INTO THE

24     PRESENTATION.

25           SO WE NEED THE COMMUNICATIONS WITH ELY VALLS, WITH

```
 1   THE OTHERS THAT WE HAVE IDENTIFIED BY NAME, MILLENNIUM SHOE,

 2   ET CETERA, IN OUR DOCUMENT REQUEST.  WE THINK THAT THAT'S

 3   SOMETHING THAT SHOULD BE FORTHCOMING IMMEDIATELY AND WITHOUT A

 4   BUNCH OF OBJECTIONS AND NEGOTIATIONS.  IT'S VERY OBVIOUSLY

 5   RELEVANT TO WHAT'S HAPPENED HERE.

 6             THE COURT:  OKAY.

 7             YOUR HONOR, MAY I BE HEARD ON THAT?

 8             THE COURT:  WELL, YEAH, I MEAN, MAYBE WE SHOULD JUST

 9   HAVE A DEPOSITION OF WATKINS AND --

10             MR. PULGRAM:  OH, ABSOLUTELY.  WE'D LIKE TO GET THE

11   DOCUMENTS AND THEN DO THE DEPOSITION.  OBVIOUSLY, I ASSUME HE'S

12   THE 30(B)(6) WITNESS IF HE'S AT THE CENTER OF THIS.

13             THE COURT:  OKAY.  SO YOUR THIRD CATEGORY, AGAIN, IS

14   WHAT THAT'S DIFFERENT FROM YOUR SECOND CATEGORY?

15             MR. PULGRAM:  OF THE MATERIALS THAT I WANTED?  SO I

16   WANTED THE --

17             THE COURT:  JUST --

18             MR. PULGRAM:  I'M TRYING TO KEEP TRACK OF THEM IN THE

19   WAY THAT YOUR HONOR IS.

20             WE WANTED THE COMMUNICATIONS INTERNALLY ABOUT THE

21   PREPARATIONS OF THE --

22             THE COURT:  RIGHT.  THAT WAS THE SECOND CATEGORY.

23             MR. PULGRAM:  THAT'S THE SECOND.  AND THE THIRD WAS

24   THE COMMUNICATIONS WITH ELY VALLS WITH --

25             THE COURT:  WELL, THAT'S THE SAME AS THIS --
```

1      **MR. PULGRAM:** -- WITH MR. CRUZ.

2      (SIMULTANEOUS COLLOQUY.)

3      **THE COURT:** -- SECOND -- YOU'RE TALKING ABOUT WRITTEN

4  COMMUNICATIONS.

5      **MR. PULGRAM:** EXACTLY.  WITH MR. CRUZ.

6      **THE COURT:** WHO'S MR. CRUZ?

7      **MR. PULGRAM:** MR. CRUZ WAS THE PURPORTED CONSULTANT

8  WHO WAS ALLOWED --

9      **THE COURT:** OH.

10      **MR. PULGRAM:** -- TO LOG IN AND WHO PARTICIPATED IN

11  THE SALES MEETINGS, PURPORTEDLY.

12      **THE COURT:** SO THAT'S STILL IN THE CATEGORY OF

13  DOCUMENTS REGARDING THE PREPARATION OF THE PRESENTATION.

14      **MR. PULGRAM:** IT IS WITH -- IT IS ALSO WITH PEOPLE

15  OUTSIDE THE COMPANY, I GUESS, IS THE DIFFERENCE.

16      IN OTHER WORDS, THE PEOPLE INSIDE THE COMPANY WORKED

17  ON THE DOCUMENT.  I WANTED TO MAKE SURE THAT WE ALSO HAVE THE

18  PEOPLE OUTSIDE LIKE MS. VALLS AND MR. CRUZ.

19      **THE COURT:** OKAY.

20      ALL RIGHT.  WELL, MAYBE I SHOULD JUST TELL YOU

21  WHICH --

22      OKAY.  SO THAT'S MY INCLINATION.  SO EACH OF YOU MAY

23  ADDRESS BRIEFLY WHAT YOUR PROBLEM IS WITH WHAT I'VE SAID I'M

24  INCLINED TO DO.

25      **MS. GRANT:** WELL, I'LL WORK BACKWARDS FROM THE

1    EXPEDITED DISCOVERY.  FIRST OF ALL, I THINK WHAT HE JUST SAID

2    WAS ALL MERITS DISCOVERY --

3              **THE COURT:**  IT DOESN'T MATTER.

4              **MS. GRANT:**  WELL, I DON'T SEE THE BASIS FOR A --

5              **THE COURT:**  IT'S NOT --

6              **MS. GRANT:**  WELL, IT WOULD BE BECAUSE -- WE HAVEN'T

7    EVEN ANSWERED YET.  SO IT'S MOVING EVERYTHING -- YOU KNOW, I

8    THINK THE LAST DAY TO DO THE RULE 26F CONFERENCE IS MAY 27TH.

9    SO IT'S ACTUALLY --

10             IF WE DO IT NEXT WEEK, I MEAN, INITIAL DISCLOSURES

11   AND EVERYTHING, THAT'S ACTUALLY -- TO BE HONEST, IT'S A BURDEN

12   FOR US.  I MEAN, TO DO ALL OF THAT IN A WEEK.  WE HAVE A HUGE

13   COMPANY WITH OFFICES ALL OVER THE WORLD, TO TRY AND GO AND GET

14   ALL OF THESE DOCUMENTS AS I MENTIONED, MR. WATKINS CREATED THIS

15   DOCUMENT WITH OTHER PEOPLE IN THE COMPANY OVER A YEAR, LONG

16   PERIOD.

17             SO THIS IS GOING TO PAST HARM.  IT DOESN'T HAVE

18   ANYTHING TO DO WITH FUTURE IRREPARABLE INJURY, WHICH THEY

19   HAVEN'T EVEN ESTABLISHED IRREPARABLE INJURY.  BUT I JUST DON'T

20   SEE HOW THINGS GOING TO WHAT HE DID OVER THE LAST YEAR, IT IS

21   MERITS DISCOVERY.  AND I'M NOT SURE I UNDERSTAND THE BASIS FOR

22   EXPEDITING THAT AND MOVING AWAY FROM JUST THE REGULAR RULE 26

23   DISCOVERY.

24             YOU HAD MENTIONED THAT YOU WERE CONCERNED MORE IN

25   TERMS OF EXPEDITING THINGS ABOUT WHO DID THIS, SO IT'S NOT

1   REALLY LIKE WHO CREATED THE PRESENTATION, IT'S WHO DISSEMINATED

2   IT, AND AS I MENTIONED, YOU KNOW, THE SUBPOENAS FROM GOOGLE HAVE

3   SHOWN IT'S SOMEWHERE -- ORIGINATED SOMEWHERE IN SINGAPORE.  WE

4   HAVE MIRROR-IMAGED THE INFORMATION THAT -- FROM PEOPLE WHO

5   HELPED CREATE THE DOCUMENTS.

6          BUT WE HAVE DONE EVERYTHING WE CAN INTERNALLY TO TRY

7   AND FIGURE OUT WHO GOT THIS -- WHO DISSEMINATED IT.  COUNSEL'S

8   INCORRECT.  THIS ACTUALLY WAS SENT OUT ON A WEB, SO IT'S NOT

9   LIKE A BUNCH OF PEOPLE GOT IT ON THEIR COMPUTERS.  IT WAS MADE

10  ACCESSED THROUGHOUT THE COMPANY THROUGH THE WEB, SO EVEN --

11          **THE COURT:**  THE WORLDWIDE WEB OR INTERNET?

12          **MS. GRANT:**  THE INTERNET.

13          **THE COURT:**  INTRANET.

14          **MS. GRANT:**  INTRANET, YES, YOUR HONOR.

15          SO EVEN IF WE WENT AROUND AND MIRROR-IMAGED ALL OF

16  OUR -- THE SALES FORCE AROUND THE WORLD, WHICH WOULD BE

17  INCREDIBLY BURDENSOME AND COSTLY, IT WOULDN'T SHOW ANYTHING

18  BECAUSE THEY DIDN'T GET IT ON THEIR COMPUTER.  THE ONLY WAY THEY

19  WOULD HAVE BEEN ABLE TO GET IT IS TO ACTUALLY CHECK IT OUT OF

20  THE SERVER.  AND, UNFORTUNATELY, WE DON'T HAVE -- THE COMPANY

21  DOES NOT HAVE THAT TYPE OF CAPABILITY TO SEE WHO CHECKED THIS

22  PARTICULAR DOCUMENT OUT.  SO --

23          **THE COURT:**  HOW DO YOU KNOW THAT?

24          **MS. GRANT:**  BECAUSE I -- THE COMPANY TALKED TO THEIR

25  I.T. PEOPLE.  AND THAT WAS ONE OF FIRST QUESTIONS I ASKED, IS,

1    DON'T YOU HAVE SOMETHING THAT YOU CAN SEE WHO CHECKS -- YOU

2    KNOW, LIKE CHECK IT OUT LIKE A LIBRARY, AND THEY SAID WE

3    DON'T -- WE DON'T HAVE THAT CAPABILITY.  SO THAT WAS MY NUMBER

4    ONE QUESTION WHEN I FIRST STARTED WORKING ON THIS CASE.

5            **THE COURT:**  WELL, THEN HOW CAN IT BE SHOWN WHO WITHIN

6    THE COMPANY ACCESSED THAT DOCUMENT?

7            **MS. GRANT:**  BECAUSE -- IT CAN'T.  THE ONLY PEOPLE WHO

8    ACCESSED IT WERE DAVE WATKINS AND A TINY GROUP OF PEOPLE IN

9    TERMS OF THE COMPANY.  IN TERMS OF WHO GOT IT, IT WAS MADE

10   AVAILABLE GLOBALLY THROUGH OUR INTRANET ON THE INTERNET.

11           **THE COURT:**  RIGHT.  BUT HOW CAN IT BE SHOWN WHO

12   VIEWED IT OR DOWNLOADED IT?

13           **MS. GRANT:**  IT CAN'T BE.  THAT'S THE WHOLE POINT.

14           **THE COURT:**  WELL, ALL RIGHT.

15           **MS. GRANT:**  SO THE DISCOVERY THAT HE'S GOING FOR --

16   WE'RE GOING TO GO THROUGH A TREMENDOUS AMOUNT OF BURDEN AND

17   EXPENSE FOR SOMETHING THAT CANNOT EVEN BE SHOWN.

18           **THE COURT:**  WELL, IT'S -- I'M NOT SURE THAT IT CAN'T

19   BE.  WHAT, YOU'RE SAYING THAT EVEN ON THE COMPUTER OF THE PERSON

20   WHO DOWNLOADED IT, IT WOULDN'T SHOW?

21           **MS. GRANT:**  IT COULD SHOW, FOR INSTANCE,

22   MR. WATKINS --

23           **THE COURT:**  NO, NOT HIM.  LET'S SAY I'M JOE SALESMAN

24   IN MASSACHUSETTS, AND I LOOKED -- LOGGED ON THE INTRANET AND I

25   LOOKED AT IT AND I DOWNLOADED IT TO MY COMPUTER, AND I

1    DELETED --

2    **MS. GRANT:** YOU CAN'T DOWNLOAD IT.  THAT'S THE POINT.

3    IF IT HAD BEEN SOMETHING THAT YOU COULD HAVE

4    DOWNLOADED ONTO THE COMPUTER, I ABSOLUTELY AGREE WITH YOUR

5    HONOR.  THERE WOULD BE A WAY TO FORENSICALLY GO BACK AND SEE WHO

6    IT WAS.

7    BUT SIMPLY LOOKING AT IT ON THE WEB THROUGH THE

8    INTRANET, WATCHING IT, THE POWERPOINT AS IT GOES ALONG -- THEY

9    DIDN'T DOWNLOAD IT.  IT WAS SOMETHING THAT WAS, LIKE --

10    **THE COURT:** HOW WOULD THEY GET IT?

11    **MS. GRANT:** THEY DIDN'T GET IT.

12    **THE COURT:** HOW DO THEY GET IT?

13    **MS. GRANT:** THEY DID NOT GET IT.  THAT'S WHAT I'M

14    TRYING TO SAY.  THERE WAS ONLY A SMALL GROUP --

15    **THE COURT:** COULD THEY PRINT A COPY?

16    **MS. GRANT:** THEY COULD HAVE PRINTED A COPY, BUT THEY

17    DID NOT DOWNLOAD IT.

18    **THE COURT:** AND WOULDN'T IT SHOW ON THEIR COMPUTER

19    THAT THEY PRINTED IT?

20    **MS. GRANT:** I DO NOT BELIEVE SO.

21    **THE COURT:** WELL, I THINK WE DO NEED, THEN, TO FIND

22    OUT HOW THAT -- WHETHER THAT WOULD SHOW UP.

23    **MS. GRANT:** RIGHT.  AND I --

24    **THE COURT:** EVEN IF YOU CAN'T DOWNLOAD, YOU CAN,

25    LIKE, RIGHT CLICK AND PASTE IT AND COPY IT ON TO A .PDF OR

1    SOMETHING LIKE THAT.

2         **MS. GRANT:**  UNFORTUNATELY, FROM MY UNDERSTANDING FROM

3    TALKING TO THE COMPANY'S I.T., THE -- JUST DOING EXACTLY WHAT

4    YOU JUST SAID, THERE IS NO WAY WITH OUR COMPANY'S COMPUTER

5    SYSTEMS TO TRACE THAT.  IF YOU WANT TO DO A 30(B)(6) ON THAT,

6    THAT'S FINE.  I UNDERSTAND THE EXPEDITED NATURE OF THAT.

7         BUT GOING BACK IN TIME TO ALL THE WAYS THAT DAVE AND

8    HIS TEAM GOT THIS PIECE OF INFORMATION AND THAT PIECE OF

9    INFORMATION TO CREATE IT, I DON'T SEE THAT, WHICH IS TRULY

10   MERITS DISCOVERY, GOES TO PAST HARM.  I DON'T NECESSARILY SEE

11   THE EXPEDITED NATURE OF THAT, BECAUSE THAT'S GOING TO BE A HUGE

12   UNDERTAKING.  I COMPLETELY UNDERSTAND THE NATURE FOR EXPEDITED

13   DISCOVERY ON HOW DID THIS GET OUT OF THE COMPANY.

14        BELIEVE IT OR NOT, WE ARE VERY INTERESTED IN DOING

15   THIS.  THIS WAS NOT SOMETHING THAT WAS AUTHORIZED BY OUR

16   COMPANY.  IT BLEW UP IN OUR FACE.  AND, YOU KNOW, WHEN DAVE DID

17   ACCESS THEIR COMPUTER, IT'S PRETTY OBVIOUS.  IT WAS HIM.  I

18   MEAN, HE DIDN'T DO ANYTHING.  HE ACCESSED IT.  HE DIDN'T CREATE

19   A FAKE NAME OR A FAKE ADDRESS.  THIS PERSON, WHOEVER THEY DID,

20   WENT TO A LOT OF TROUBLE TO CONCEAL HIS OR HER IDENTITY.

21        AND, REALLY, IN TERMS OF THE MERITS OF THIS CASE,

22   HOLDING SOFTSCAPE RESPONSIBLE UNDER RESPONDEAT SUPERIOR, YOU

23   HAVE TO SHOW IT WAS AN EMPLOYEE AND IT WAS WITHIN THE COURSE AND

24   SCOPE.  AND I WOULD SUBMIT THAT DOING SOMETHING WITH A FAKE

25   NAME, FAKE EMAIL ADDRESS, AFTER HOURS, AND GOING TO ALL THESE --

1    SINGAPORE AND EVERYTHING ELSE IS CLEARLY NOT FORESEEABLE TO THE

2    COMPANY AND NOT WITHIN THE COURSE.  AND SO THEIR CLAIMS FAIL --

3    NOT EVEN GETTING TO THE MERITS OF THEIR CLAIM.  IT FAILS ON THAT

4    THRESHOLD QUESTION ALONE.

5            WE HAVE DONE EVERYTHING -- WE ARE DOING EVERYTHING WE

6    CAN TO TRY AND FIGURE THIS OUT BECAUSE, OBVIOUSLY, WE DON'T WANT

7    IT TO HAPPEN AGAIN.  THIS COMPANY HAS USED THESE TYPES OF

8    PRESENTATIONS IN THE PAST.  THIS HAS NEVER EVER HAPPENED, AND WE

9    DON'T KNOW HOW IT HAPPENED, AND WE'RE DOING EVERYTHING WE CAN TO

10   FIND OUT.

11           **THE COURT:**  ALL RIGHT.  DID YOU HAVE ANYTHING ELSE

12   YOU WANTED TO SAY --

13           **MS. GRANT:**  I THINK --

14           **THE COURT:**  -- ON THESE POINTS?

15           **MS. GRANT:**  -- IN TERMS OF THE T.R.O., OF COURSE, WE

16   WERE GOING TO ASK FOR IT TO BE DISSOLVED BECAUSE I DON'T THINK

17   THERE'S ANY THREAT OF IRREPARABLE INJURY.  THIS IS A SINGLE,

18   ISOLATED EVENT, WHICH THIS COURT HAS RECOGNIZED IS NOT ENOUGH TO

19   GIVE RISE TO A PRELIMINARY INJUNCTION.  IT DEALS SOLELY WITH

20   PAST HARM AND --

21           **THE COURT:**  WELL, I MIGHT HAVE HAD MORE SYMPATHY WITH

22   THAT ARGUMENT IF IT HADN'T BEEN FOR YOUR PRESS RELEASE WHICH

23   AFFIRMED THE TRUTH OF THINGS, SOME OF WHICH PRETTY CLEARLY

24   AREN'T TRUE, OR AT LEAST YOU HAVE NO REASON TO BELIEVE THEY ARE

25   TRUE.

1         SO IT SEEMS TO ME YOU KIND OF CONTINUED IT AND ARE

2    STILL CONTINUING IT SO --

3         **MS. GRANT:**  WELL, I WILL SAY, YOUR HONOR, THAT THE

4    C.E.O. FEELS VERY STRONGLY -- THESE ARE BITTER COMPETITORS, AND

5    HE FEELS VERY STRONGLY, AS IS EVIDENCED IN HIS DECLARATION, THAT

6    THESE STATEMENTS -- THE TEN -- AND, AGAIN, I THINK IT'S REALLY

7    IMPORTANT TO TALK ABOUT -- IT'S -- OF 43 PAGES, THEY'VE ONLY

8    IDENTIFIED THAT THEY CLAIM ARE FALSE OR MISLEADING.  AND OF

9    THOSE, SOME OF THEM ARE --

10        **THE COURT:**  SO TEN ISN'T SO MANY FALSE STATEMENTS TO

11   MAKE ABOUT SOMEBODY?

12        **MS. GRANT:**  BUT WHEN YOU ACTUALLY LOOK THROUGH THEM,

13   YOUR HONOR --

14        **THE COURT:**  SOUNDS LIKE A LOT TO ME.

15        **MS. GRANT:**  ONE OF THEM SAID SEARS ABANDONED A

16   PROJECT AFTER SIX MONTHS.  THEY REBUTTED IT BY SAYING SEARS IS A

17   LOYAL CUSTOMER.  THAT ACTUALLY IS NOT SAYING THAT SEARS DID NOT

18   ABANDON THAT PROJECT AFTER SIX MONTHS.  ANOTHER ONE --

19        **THE COURT:**  AND HOW DO YOU KNOW THEY DID?

20        **MS. GRANT:**  BECAUSE THAT WAS WHAT WAS REPORTED TO OUR

21   C.E.O. FROM THE CUSTOMER.

22        **THE COURT:**  BY WHO?

23        **MS. GRANT:**  FROM THE CUSTOMER.

24        **THE COURT:**  WHO?

25        **MS. GRANT:**  SOMEONE AT SEARS.

1        **THE COURT:**  WHO?

2        **MS. GRANT:**  I DON'T OFF THE TOP OF MY HEAD KNOW WHO

3  IT IS.  I APOLOGIZE, YOUR HONOR.

4        THE SECOND ONE I JUST WANT TO POINT OUT IS THEY SAY

5  THIS PAGE HAS A LOT OF DATA THAT YOU HAVE TO SCROLL THROUGH.

6  IT'S CONFUSING.  I MEAN, THAT'S AN OPINION.  I MEAN, THESE ARE

7  THINGS THAT ARE ACTUALLY NOT EVEN RISING -- THEY MADE IT SOUND

8  LIKE THIS WAS VICIOUS, SINISTER THINGS, VERY TOXIC.  BUT WHEN

9  YOU ACTUALLY JUST SIT DOWN AND READ THE PRESENTATION --

10        **THE COURT:**  I HAVE.  IT'S A LOT ABOUT THE

11  FUNCTIONALITY AND CAPABILITY, AND THAT'S WHY 98 PERCENT IS --

12  THEY DON'T EVEN CHALLENGE.

13        SO OF THE 10, I MEAN, UNDER THIS COURT'S RULING IN

14  J.K. HARRIS -- WE HAVE A DECLARATION THAT REFUTES EACH ONE OF

15  THE STATEMENTS THAT CLAIMS --

16        **THE COURT:**  NOT REALLY.  HE SAYS HE BELIEVED THEM,

17  BUT HE DOESN'T SAY WHAT HIS BASIS FOR HIS BELIEF IS.

18        **MS. GRANT:**  FOR WHICH STATEMENT?  I MEAN, I THOUGHT

19  HE ACTUALLY DID FOR EACH STATEMENT SAY --

20        **THE COURT:**  I DON'T THINK SO.

21        **MS. GRANT:**  -- WHY HE BELIEVES IT'S TRUE.

22        **THE COURT:**  THE FACT THAT THERE'S A LIST OF CUSTOMERS

23  ONE DAY AND A DIFFERENT LIST THE NEXT DAY DOESN'T NECESSARILY

24  MEAN THAT THEY LOST THOSE CUSTOMERS.

25        IT MIGHT MEAN THAT ARE THEY REVISED THEIR LIST TO PUT

1  ONES THAT THEY THOUGHT WERE MORE IMPRESSIVE OR WHATEVER ELSE, SO

2  IT'S --

3      **MS. LEVINE:**  FAIR ENOUGH.

4      **THE COURT:**  -- REASONABLE INFERENCE.

5      **MS. GRANT:**  IT'S QUANTITATIVE.  HE BASICALLY LOOKED

6  ON ONE AND THERE WAS 20, LET'S SAY AND THE NEXT DAY THERE WAS

7  18.  HE'D MADE AN OPINION THAT THAT -- THAT THEY HAD LOST

8  CUSTOMERS.  AND -- I MEAN, IT'S AN OPINION.  IT'S NOT A

9  MISLEADING -- IT'S NOT A FALSE STATEMENT OF FACT.

10     **THE COURT:**  BUT STATED AS A FACT.

11     **MS. GRANT:**  OKAY.  I ACTUALLY THINK OF IT AS AN

12  OPINION, BUT OBVIOUSLY, WE THINK ABOUT IT DIFFERENTLY.  BUT I

13  THINK THE IMPORTANT THING IS THAT THERE'S NO THREAT OF

14  IRREPARABLE INJURY.  HE'S NOT -- HE HAS SENT AN EMAIL ACTUALLY

15  BEYOND THAT.  IT'S EXHIBIT B TO HIS DECLARATION.  WHERE HE SENT

16  AN EMAIL TO ALL EMPLOYEES ON MONDAY AFFIRMING AND REEMPHASIZING

17  THAT UNDER NO CIRCUMSTANCES SHOULD THIS INTERNAL DOCUMENT BE

18  USED OUTSIDE OF SOFTSCAPE.

19     **THE COURT:**  YOU SAY AFFIRMING OR REAFFIRMING WHICH

20  IMPLIES THAT THERE WAS SOME SUCH INSTRUCTION EARLIER, BUT THAT

21  INSTRUCTION --

22               (SIMULTANEOUS COLLOQUY.)

23     **MS. GRANT:**  -- CONFIRMING THERE ARE --

24     **THE COURT:**  YOU KNOW, IT'S REAL HARD FOR THE COURT

25  REPORTER TO KEEP WRITING DOWN WHAT I'M SAYING IF YOU START

1    TALKING WHILE I'M STILL TALKING.

2                    (SIMULTANEOUS COLLOQUY.)

3           **THE COURT:**  SHE'LL TRY TO WRITE WHAT I SAY AND NOT

4    WHAT YOU SAY, BUT IT MAKES IT HARD FOR HER TO HEAR WHAT I'M

5    SAYING.

6           SO I DIDN'T SEE ANYTHING CONTEMPORANEOUS WHEN IT WAS

7    FIRST DISTRIBUTED SAYING, PLEASE DON'T DISTRIBUTE THIS OUTSIDE

8    THE COMPANY.  AND, FRANKLY, IT'S NOT THE SORT OF THING THAT

9    LOOKS LIKE AN INTERNAL DOCUMENT.

10          WHY WOULD YOU MAKE IT ON THEIR TEMPLATE?  WHY WOULD

11   YOU PUT THEIR TRADEMARK ON SOMETHING YOU WERE SHOWING TO YOUR

12   EMPLOYEES?  WHY WOULD YOU WRITE IT AS THOUGH IT WERE IN THE

13   THIRD PERSON?  WHY WOULD IT BE ALL THESE GRAPHICS TO IMPRESS

14   YOUR OWN SALESPEOPLE?  I MEAN, IT JUST LOOKS LIKE SOMETHING

15   THAT'S PREPARED TO GO OUTSIDE.  AND IF YOU'RE GOING TO WRITE

16   SOMETHING THAT WOULD BE BAD FOR YOU IF IT DID GO OUTSIDE AND

17   THEN NOT UNDERTAKE THE KINDS OF CONTROLS THAT ARE NECESSARY TO

18   STOP IT FROM GOING OUTSIDE, WHICH THEY CLEARLY DIDN'T BECAUSE

19   WHOEVER DID THIS WAS AN EMPLOYEE OF YOURS, THAT IS OF CONCERN.

20          **MS. GRANT:**  FAIR ENOUGH, YOUR HONOR.  I DON'T THINK

21   THERE'S ANY EVIDENCE THAT IT'S A SOFTSCAPE EMPLOYEE.

22          **THE COURT:**  WHO ELSE HAD ACCESS TO IT?

23          **MS. GRANT:**  SOMEONE COULD HAVE -- IT COULD HAVE BEEN

24   A FORMER SOFTSCAPE EMPLOYEE THAT LEFT THE COMPANY AND NOW WORKS

25   FOR SUCCESSFACTORS.  SOMEONE COULD --

1          **THE COURT:**  -- GOT ON TO YOUR INTRANET HOW?

2          **MS. GRANT:**  YOUR HONOR, THERE COULD BE -- I COULD

3   SPECULATE A VARIETY OF WAYS.  IT COULD HAVE BEEN ON DAVE

4   WATKINS' DESK.  A JANITOR COULD HAVE PICKED IT UP.  THERE ARE A

5   LOT OF WAYS WE COULD SPECULATE, AND I'M NOT GOING TO SIT HERE

6   AND TRY AND THINK OF THEM ALL WHEN WE DON'T ACTUALLY HAVE THE

7   EVIDENCE.

8          BUT WHAT I THINK IS IMPORTANT IS THAT THERE IS NO

9   THREAT, ABSENT THE PRESS RELEASE, WHICH YOU AND I MIGHT -- MIGHT

10  THINK THAT WASN'T A GOOD IDEA, BUT HE FEELS VERY STRONGLY ABOUT

11  HIS COMPANY.  IT'S A SMALL, PRIVATELY HELD COMPANY UP AGAINST A

12  BIG PUBLIC COMPANY.  THEY'RE SPENDING LOTS OF MONEY TO TRY AND

13  DRIVE THEM OUT OF THE MARKETPLACE.  AND HE FEELS VERY STRONGLY

14  THAT HE NEEDS TO DEFEND HIMSELF.

15         AND SO WHILE YOU AND I MIGHT DISAGREE ABOUT HIS PR

16  STRATEGY -- AND I WILL CERTAINLY PASS ALONG YOUR COMMENTS,

17  BELIEVE ME -- I DON'T THINK THAT THAT INDICATES A THREAT OF

18  CONTINUING OR ONGOING INJURY WHEN HE SPECIFICALLY TOLD THE SALES

19  FORCE "UNDER NO CIRCUMSTANCES SHOULD THIS EVER BE USED OUTSIDE

20  THE COMPANY."  WHAT HE'S REAFFIRMING IS IT'S AN INTERNAL

21  DOCUMENT, WHICH IS HOW THEY'VE ALWAYS TALKED ABOUT IT, NOT JUST

22  THIS DOCUMENT BUT OTHER ONES THAT PRECEDED THIS ABOUT ALL THEIR

23  COMPETITORS.

24         AND I KNOW, AGAIN, IT MIGHT SEEM STRANGE TO YOU OR TO

25  ME THAT THEY WOULD DO THESE TYPES OF PRESENTATIONS.  THAT IS HIS

1  WAY OF MOTIVATING HIS SALES FORCE, WHO FEEL VERY MUCH ATTACKED

2  BY THIS COMPANY.

3          AND, AGAIN, I MIGHT CHOOSE TO DO IT DIFFERENTLY, BUT

4  JUST LIKE THE 1-800-CONTACTS, THE USE OF ANOTHER COMPANY'S LOGO

5  OR TRADEMARK FOR INTERNAL DOES NOT -- IS NOT A VIOLATION OF THE

6  LAW.  AND THIS WAS A PURELY INTERNAL DOCUMENT THAT REGRETTABLY

7  WAS LEAKED OR SOMEHOW GOT OUT OF THE COMPANY.

8          SO I JUST -- YOU KNOW, I DON'T SEE THE BASIS FOR

9  IRREPARABLE HARM UNDER THIS COURT'S PRIOR RULINGS IN J.K.

10  HARRIS, AND I WOULD JUST SUBMIT THAT THE T.R.O. SHOULD ACTUALLY

11  BE DISSOLVED OR SIGNIFICANTLY NARROWED.  BECAUSE EACH TIME YOU

12  DO THE T.R.O. OR A PRELIMINARY INJUNCTION, THEY DO PRESS

13  RELEASES TRUMPETING YOUR RULINGS TO TRY AND USE IT TO A

14  COMPETITIVE ADVANTAGE.

15          SO THAT'S -- TO BE HONEST, THAT'S -- WAS THE -- I

16  THINK, THE GENESIS OF THE PRESS RELEASE WAS TO COUNTER THE ONE

17  WHERE THEY TRUMPETED, YOU KNOW, AH HA, THAT OUR CLIENT HAD

18  VIOLATED THE LAW AND ALL OF THESE THINGS THAT WERE IN THEIR

19  PRESS RELEASE.

20          **THE COURT:**  OKAY.  DID YOU WANT TO RESPOND BRIEFLY?

21          **MR. PULGRAM:**  I WILL BRIEFLY.

22          FOR OUR PERSPECTIVE, THIS ISN'T ABOUT BITTER

23  COMPETITORS OR OUR EVER HAVING ATTACKED ANYONE.  WE WERE

24  VICTIMIZED BY AN ATTACK.

25          I WANT TO TALK ABOUT DISCOVERY FIRST.  THIS IS THE

```
 1    EMAIL THAT WAS SENT OUT A FEW MINUTES BEFORE THE T.R.O. PAPER

 2    WAS FILED BUT NOT DELIVERED TO YOUR HONOR WHEN THEY OPPOSED THE

 3    T.R.O., AND THIS IS WHERE THEY TOLD THE SALESPEOPLE THE

 4    INFORMATION CONTAINED IN THE DOCUMENT SHOULD BE USED JUDICIOUSLY

 5    IN COMPETITIVE SITUATION AS REQUIRED.  THIS HAS NEVER BEEN

 6    RESCINDED.  THIS IS STANDING ORDERS AT THE COMPANY.  THEY ARE

 7    USED THIS AS A SCRIPT TO SELL.

 8             AND WHY DO I SAY IT MATTERS FOR DISCOVERY?

 9             BECAUSE THEY HAVE TO BE ABLE TO SEE THE SCRIPT?  THEY

10    HAVE TO BE ABLE TO HAVE IT IN ORDER TO BE ABLE TO SELL OFF OF IT

11    AND TO MAKE THESE FALSE STATEMENTS THAT 63 PERCENT OF OUR

12    CUSTOMERS HAVE LEFT.

13             SO MY --

14             THE COURT:  THEY DO HAVE IT.  IT'S ON THEIR INTRANET,

15    I GUESS.

16             MR. PULGRAM:  IT'S ON THEIR INTRANET, AND YET IT

17    CAN'T BE DOWNLOADED, THEY SAY.  IT CAN'T BE PRINTED, THEY SAY.

18    YOU HAVE TO BE ON THE INTRANET WHENEVER YOU'RE IN THE

19    CONVERSATION WITH THE CUSTOMER.  THIS MAY BE TRUE.

20             BUT THIS IS WHAT I ASK WITH RESPECT TO DISCOVERY:  I

21    WOULD LIKE A DIRECTION THAT THE PARTIES MEET AND CONFER AND THAT

22    THEY DISCLOSE HOW AND WHERE THESE MATERIALS ARE STORED, BY WHAT

23    SORT OF TECHNOLOGY SO THAT WE CAN LOOK AND SAY, OH, IT'S A

24    MICROSOFT SHAREPOINT.  WE CAN FIND OUT WHETHER OR NOT THERE

25    ACTUALLY IS SOME SORT OF RECORD THAT MIGHT PRESERVE WHO ACCESSED
```

1    IT AND WHY.  WHAT KIND OF RECORD WOULD BE GENERATED BY THOSE

2    ACCESSING IT.

3              SO I BELIEVE IT'S APPROPRIATE OFF THE BAT IN ORDER TO

4    PRESERVE DISCOVERY TO FIND OUT HOW YOU FIND THIS INFORMATION AND

5    USE IT TO -- TO IDENTIFY HOW THIS MATERIAL IS STORED AND HOW

6    IT'S MADE AVAILABLE.  AND THAT WOULD INCLUDE ALL PROCESSES BY

7    WHICH THIS HAS HAPPENED WITHIN THE COMPANY.

8              FROM THAT, WE SHOULD BE ABLE TO IDENTIFY WHETHER

9    THERE'S FURTHER PRESERVATION EFFORTS THAT ARE NEEDED.

10              SECOND, WE AGREE, OF COURSE, WITH THE PRESS RELEASE

11    POINT.  AND IN PARTICULAR, WHAT WAS STRIKING TO US WAS THAT

12    AFTER THE PRESS RELEASE WENT OUT, AN EMAIL WENT OUT TO THE

13    CUSTOMERS THAT ATTACHED THE REFERENCE TO THE PRESS RELEASE SO

14    THAT -- YOUR HONOR, WE NOW KNOW 776 EMAIL ADDRESSES RECEIVED

15    THIS -- THIS -- THAT'S THE NUMBER THAT WE GOT FROM GOOGLE.  776

16    DIFFERENT EMAIL ADDRESSES OF INDIVIDUAL SALESPEOPLE.

17              AND IF YOU LOOK AT EXHIBIT B TO THE SUPPLEMENTAL THAT

18    WE'VE TURNED IN WHICH WAS THE GOOGLE PRODUCTION, THAT'S WHAT YOU

19    SEE.  THERE WAS A REFERENCE THAT THE ACCOUNT WAS OPENED IN

20    SINGAPORE, AND THAT'S TRUE.  THE GOOGLE -- THE GMAIL ACCOUNT WAS

21    INITIALLY OPENED BY AN IP ADDRESS PURPORTING TO BE FROM

22    SINGAPORE.

23              BUT, AS YOU MAY KNOW, YOU CAN SPOOF OR USE PROXIES TO

24    CLAIM AN IP ADDRESS THAT YOU'RE NOT ACTUALLY USING.  WHAT WE

25    KNOW IS THAT AT 10:02 ON THE NIGHT THAT THESE EMAILS WERE SENT

1   OUT AT 9:51 AND 9:54, THE ADDRESS LIST WAS SO BIG YOU COULDN'T

2   DO IT ALL AT ONCE.

3           AT 10:02, THERE'S A LOG-IN FROM THE MARRIOTT,

4   10 MILES FROM THEIR CORPORATE HEADQUARTERS.  NOW, IT WAS -- THE

5   GMAIL WAS PURPORTEDLY SET UP -- JUST THE ACCOUNT SET UP IN

6   SINGAPORE THROUGH ONE IP.  BUT SOMEBODY AT THAT IP ADDRESS TEN

7   MINUTES LATER KNEW TO GO THERE.  AND WHETHER IT WAS THE SAME

8   PERSON HAVING SPOOFED AN IP ADDRESS IN SINGAPORE OR JUST BEING

9   COMPLICIT, THAT'S THE INFORMATION THAT WE THINK WE'RE ENTITLED

10  TO FIND OUT.

11          WITH RESPECT TO THE -- THE ASPECTS OF WHETHER OR NOT

12  HIS DECLARATION ACTUALLY HAS ANY PERSONAL KNOWLEDGE, WE DO

13  BELIEVE THAT IT LACKS PERSONAL KNOWLEDGE.  MR. WATKINS IS

14  OBVIOUSLY A SAVVY PERSON.  HE IS NOT THE C.E.O. OF

15  SUCCESSFACTORS.  HE DOES NOT KNOW WHAT SUCCESSFACTORS DOES.  HE

16  IS NOT THE C.E.O. OF, SUCCESSFACTORS' CUSTOMERS.  HE DOES NOT

17  KNOW WHAT THOSE CUSTOMERS THINK.  HE CANNOT, BY SIMPLY SAYING "I

18  HAVE PERSONAL KNOWLEDGE," SOMEHOW TAKE AWAY AND RAISE NOW AN

19  ARGUMENT ABOUT THE FALSITY OF THESE STATEMENTS.

20          AND I WOULD MAKE ONE PARTICULAR POINT ABOUT THAT.

21  HIS DECLARATION CAME IN NINE DAYS AFTER YOUR HONOR HAD ORDERED

22  THEIR RESPONSE, ALMOST A WEEK AFTER OUR REPLY BRIEF HAD BEEN

23  FILED.  WITHOUT ANY EXPLANATION WHY THE AUTHOR WHO FINALLY IS

24  PREPARED TO CONCEDE, BECAUSE HE'S BEEN CAUGHT, THAT HE'S THE

25  AUTHOR OF THIS PRESENTATION WITHOUT ANY EXPLANATION FOR WHY HE

1    COULDN'T PUT IN A DECLARATION ON TIME.

2        TO EVEN CONSIDER THAT DECLARATION WOULD BE

3    FUNDAMENTALLY UNFAIR BECAUSE WE'VE HAD NO OPPORTUNITY EITHER AS

4    A LEGAL OR AS A FACTUAL MATTER TO RESPOND TO IT.  WE PUT IN

5    EVIDENTIARY OBJECTIONS BECAUSE WE NEED TO PRESERVE -- WE THINK

6    THAT THEY'RE WELL TAKEN -- BUT THE DECLARATION SHOULDN'T BE

7    CONSIDERED AT ALL.  THAT PARTICULAR ARGUMENT WAS WAIVED

8    SPECIFICALLY IN THEIR OPPOSITION AT PAGE 12, LINE 19, WHERE THEY

9    SAID, "ALTHOUGH SUCCESSFACTORS SPEND CONSIDERABLE EFFORT TRYING

10   TO DEMONSTRATE THAT THE PRESENTATION IS FALSE, THAT ISSUE IS

11   IRRELEVANT FOR PURPOSES OF DETERMINING WHETHER A PRELIMINARY

12   INJUNCTION SHOULD ISSUE."

13       FALSITY IS NOT -- SHOULD NOT BE AT ISSUE BECAUSE IT

14   WAS RAISED AT 6:24 LAST NIGHT FOR THE FIRST TIME IN THIS CASE.

15   AND IT WOULDN'T BE FAIR TO EVEN PARSE THAT DECLARATION FOR WHAT

16   IS OR IS NOT WITHIN HIS PERSONAL KNOWLEDGE.

17       WHAT -- WHAT THIS PRESENTATION REMINDS ME OF IS THE

18   SWIFT BOATS (SIC) CAMPAIGN WHERE NEGATIVE ADVERTISING WAS

19   TARGETED AND RUN ONLY A FEW TIMES AFTER ALL IN THE ELECTION

20   CAMPAIGN FOUR YEARS AGO.  BUT IT WAS REPEATED OVER AND OVER IN

21   THE MEDIA.  IT WAS VERIFIED BY THOSE PEOPLE AGAIN AND AGAIN.  IT

22   WAS RECIRCULATED AND ORALLY TRANSMITTED CONTINUALLY --

23   CONTINUOUSLY.  AND THE ONGOING DAMAGE FROM THAT TO GOODWILL AND

24   TO YOUR PROSPECTS IS IMPOSSIBLE TO RECOVER FROM.

25       THIS IS IRREPARABLE HARM, AS HAS BEEN RECOGNIZED IN

```
 1    ALL THE CASES WHERE GOODWILL IS AT STAKE.  AND OUR GOODWILL IS

 2    DIRECTLY AT STAKE AS A RESULT OF THE SORTS OF CHALLENGES TO

 3    INTEGRITY AND CUSTOMER SATISFACTION.

 4              I WOULD -- I DON'T THINK THAT WE HAVE ANY DISPUTE

 5    ULTIMATELY AS TO WHETHER OR NOT THERE'S A COMPUTER FRAUD AND

 6    ABUSE ACT CLAIM.  THERE'S A CLAIM THAT'S PASSWORD-PROTECTED SITE

 7    BUT NOTHING IN THE RECORD HERE.

 8              THE TESTIMONY OF COUNSEL TODAY DOESN'T -- ISN'T EVEN

 9    INCLUDED IN MR. WATKINS' LATE DECLARATION AS TO HOW HE GOT THIS

10    INFORMATION, WHETHER HE'S CHAIRMAN OF SOME COMPANY CALLED

11    MILLENNIUM SHOE.  NONE OF THAT'S BEEN INTRODUCED.

12              ALL WE HAVE ON THE RECORD IS THE FACT THAT IT'S

13    UNDISPUTED THAT SUCCESSFACTORS IP ADDRESS LOGGED INTO OVER AND

14    OVER AGAIN THIS PASSWORD-PROTECTED SITE.

15              WE -- I WOULD FINALLY TALK BRIEFLY ABOUT THE SCOPE OF

16    INJUNCTION BECAUSE I THINK IT'S IMPORTANT.  I THINK THAT IT

17    NEEDS TO BE VERY EXPLICIT HERE IN REACHING COMMUNICATION OF THE

18    CONTENT BY ANY MEANS, NOT JUST REPUBLICATION OF THE

19    PRESENTATION.

20              I THINK THAT IT'S IMPORTANT --

21              THE COURT:  WELL, NOT ALL THE CONTENT, ONLY THE FALSE

22    STATEMENTS.

23              MR. PULGRAM:  THE FALSE CONTENT.  EXACTLY.

24              AND BY THE WAY, THE IDEA THAT TEN SLIDES HERE ARE

25    FALSE IS NOT TRUE.  FROM THE OUTSET, WE HAVE SAID THIS ENTIRE
```

1    PRESENTATION IS, AS A WHOLE, FALSE BECAUSE IT PURPORTS TO HAVE

2    BEEN WRITTEN BY CUSTOMERS RATHER THAN IDENTIFYING ITS TRUE

3    AUTHOR.

4              **THE COURT:**  WELL, NOT ALL OF IT DOES.

5              **MR. PULGRAM:**  WELL, THE BEGINNING SAYS THIS HAS BEEN

6    PREPARED AS STATEMENTS BY CUSTOMERS.  AND SO THE OVERALL OUTPUT

7    OF IT IS DESCRIBED AS BEING FROM CUSTOMERS.

8              I THINK THE SECOND ASPECT OF INJUNCTIVE RELIEF IS WE

9    THINK IT DOES NEED TO REACH ANY REAFFIRMATION OR ENDORSEMENT OR

10   REFERENCE TO THE PRESENTATION AS A WHOLE OR TO ANY OF THE FALSE

11   CONTENT IN IT.

12             WE THINK, AS IN J.K. HARRIS, NEEDS TO REACH ALL

13   EMPLOYEES AND PERSONS ACTING IN CONCERT.  AND WE THINK THAT IT

14   NEEDS TO BE SERVED ON EMPLOYEES BECAUSE WE DON'T WANT TO COME

15   BACK AND HEAR NEXT TIME ABOUT PEOPLE EITHER CONTINUING TO MAKE

16   THESE STATEMENTS OR ABOUT PEOPLE WHO HAVE BY MISTAKE LET IT OUT

17   AGAIN, THAT THEY DIDN'T KNOW.

18             AND, YOUR HONOR, RULE 65 PROVIDES THAT YOU HAVE THE

19   POWER, AND WE BELIEVE, AS IN J.K. HARRIS, SHOULD ENJOIN ALL

20   THOSE ACTING IN CONCERT WITH THE DEFENDANTS AS WELL AS THEIR

21   EMPLOYEES.

22             WE -- I DON'T THINK THAT IT'S NECESSARY TO BELABOR

23   THE RESPONDEAT SUPERIOR POINT WHERE THERE'S NO EXPLANATION OTHER

24   THAN THAT THIS CAME FROM AN EMPLOYEE, WHERE THE -- THE C.E.O. OF

25   THE COMPANY DELIVERED IT TO SALES EMPLOYEES WITHOUT ANY APPARENT

1    RESTRICTIONS THAT WE'VE BEEN ABLE TO GET IN THE RECORD, WHERE IT

2    IS OBVIOUSLY DESIGNED TO FACILITATE SALES.

3            THIS IS NO MORE OUTSIDE THE SCOPE OF THE DUTY OF

4    THESE SALESPEOPLE THAN WHEN A DELIVERY DRIVER DRIVES TOO FAST

5    AGAINST COMPANY POLICY.  SURE, THEY WEREN'T AUTHORIZED TO GO 60

6    IN A 40 ZONE, BUT THEY STILL ARE LIABLE IN RESPONDEAT SUPERIOR.

7            THE SAME'S TRUE WHEN A STOCK BROKER SELLS EXTRA HARD

8    EVEN THOUGH HE'S NOT AUTHORIZED TO TELL FALSEHOODS.  MERRILL

9    LYNCH IS STILL GOING TO BE RESPONSIBLE IN RESPONDEAT SUPERIOR

10   FOR HIS CONDUCT.

11           THE PURPORTED LACK OF AUTHORITY DOESN'T TAKE THIS OUT

12   OF THE SCOPE OF THE DUTY OF THOSE PEOPLE WHO WERE ACTING.

13           IF YOU HAVE ANY OTHER QUESTIONS, I'D BE HAPPY TO

14   ANSWER THEM.

15           **THE COURT:**  NO.

16           YOU MAY REPLY VERY BRIEFLY.

17           **MS. GRANT:**  THANK YOU, YOUR HONOR.

18           I JUST WANT TO TALK ABOUT THE CONSTITUTIONAL

19   IMPLICATIONS ABOUT WHAT THEY'RE SEEKING.  FIRST OF ALL, IN THE

20   T.R.O., YOU ACTUALLY, BASED ON THE DECLARATION OF SUSAN MOORE,

21   THE GENERAL COUNSEL, SAYING THAT SOFTSCAPE HAS NO INTENTION TO

22   RELEASE ON THE INTERNET OR OTHERWISE PUBLISH EXTERNALLY THE

23   PRESENTATION, YOU SAID, THEREFORE, THE COURT NEED NOT GRANT

24   PLAINTIFF'S REQUEST THAT THIS ORDER ENJOIN DEFENDANT FROM

25   PUBLISHING, CIRCULATING, EMAIL -- MAKING AVAILABLE OR OTHERWISE

1    DISTRIBUTING THE PRESENTATION.

2          AND I THINK WE ACKNOWLEDGE THAT THIS IS -- THERE'S A

3    LOT OF THINGS IN THIS PRESENTATION.  AND BASED ON THIS COURT'S

4    EARLIER HOLDING IN J.K. HARRIS VS. CASTLE, AN INJUNCTION THAT

5    PROHIBITS UNTRUE, MISLEADING, OR FALSE STATEMENTS IS TOO

6    OVERBROAD.

7          **THE COURT:**  NO, I'M GOING TO SPECIFY WHICH

8    STATEMENTS --

9          **MS. GRANT:**  OKAY.

10         **THE COURT:**  -- HAD NOT BEEN SHOWN TO BE TRUE.

11         **MS. GRANT:**  RIGHT.  AND I THINK --

12         **THE COURT:**  AND YOU MAY NOT DISTRIBUTE ANY STATEMENTS

13   THAT ARE FALSE OR THAT YOU CAN'T SHOW ARE TRUE, NO MATTER HOW

14   SINCERELY YOU BELIEVE THEM TO BE TRUE IF THEY'RE STATEMENTS OF

15   FACT.  AND YOU CAN'T SUBMIT SOMETHING THAT PURPORTS TO BE FROM

16   SOMEONE THAT IT ISN'T FROM.

17         **MS. GRANT:**  I -- UNDERSTOOD.

18         **THE COURT:**  AND IF I SAY SOMETHING IS FALSE THAT YOU

19   REALLY THINK IS TRUE, AND YOU WANT TO COME OUT AND BRING YOUR

20   GUY FROM SEARS IN AND HAVE THEM CALL HIM AND SAY, "YEAH, HERE'S

21   WHAT I THINK, AND HERE'S WHAT I SAID," YOU KNOW, WE'LL TAKE THAT

22   ONE OFF.

23         **MS. GRANT:**  OKAY.  I WAS ONLY -- MENTIONED THAT

24   'CAUSE HE -- HE REITERATED HIS REQUEST TO HAVE AN INJUNCTION

25   AGAINST ANY USE OF ANYTHING THAT'S IN THE PRESENTATION.  AND I

1  THINK UNDER J.K. --

2        **THE COURT:**  NO, I DON'T -- WELL, THAT'S NOT WHAT I

3  UNDERSTOOD HIM TO SAY AND THAT'S NOT WHAT I'LL DO.

4        **MS. GRANT:**  OKAY.

5        ALSO ABOUT THE WATKINS DECLARATION, THEY MOVED TO

6  STRIKE ALL OF OUR EVIDENCE THAT WAS ATTACHED TO THE DECLARATION

7  OF SUSAN MOORE.  SO, OBVIOUSLY, GIVEN THE EXTRAORDINARY RELIEF

8  SOUGHT AND THE EXPEDITED NATURE OF THE PROCEEDINGS, WE MOVED TO

9  PUT ADDITIONAL EVIDENCE THAT WE THOUGHT WAS RELEVANT BEFORE THIS

10  COURT.

11        AND IN YOUR HOLDING, I THINK, IN 2002 IN THE METRO

12  CASE, YOU CONSIDERED A SUPPLEMENTAL MEMORANDUM THAT HAD BEEN

13  FILED AFTER THE HEARING EVEN THOUGH IT DIDN'T COMPLY WITH RULE

14  7-3D, AND JUST GIVEN THE EXTRAORDINARY RELIEF HERE AND THE FACT

15  THAT THEY MOVED TO STRIKE, WE'RE ENTITLED TO OPPOSE A MOTION TO

16  STRIKE, AND WE PUT IN EVIDENCE --

17        **THE COURT:**  I DON'T WANT TO FIGHT ABOUT WHAT EVIDENCE

18  IS WHAT.  I'VE READ EVERYTHING, AND I'M GOING TO DO THE BEST I

19  CAN WITH WHATEVER I SEE, TAKING INTO ACCOUNT HOW LONG PEOPLE HAD

20  TO OPPOSE IT AND WHAT IT'S BASED ON AND ALL OF THAT.  I'M NOT

21  GOING TO PARSE OUT EVERY LINE OF EVERY PIECE OF PAPER I GOT.

22        **MS. GRANT:**  AND WITH REGARD TO THE DISCOVERY, I

23  THINK -- I UNDERSTAND THE NEED FOR EXPEDITED DISCOVERY IN TERMS

24  OF GETTING TO THE BOTTOM OF WHO DID THIS.  AND I AM MORE THAN

25  HAPPY TO WORK WITH THEM TO TRY -- AND WE HAVE NOT -- WE HAVE NOT

1    OPPOSED ANY OF THEIR SUBPOENAS.  WE'VE WORKED -- WE WORKED ALL

2    LAST WEEKEND TRYING TO COME UP WITH PROTECTIVE ORDERS AND

3    EVERYTHING.  WE'VE BEEN WORKING WITH THEM, AND I WILL CONTINUE

4    TO DO SO BECAUSE I DO THINK THAT THAT'S RELEVANT, NOT JUST FOR

5    THE COURT BUT FOR US, TOO.

6          BUT THIS BROADER MERITS DISCOVERY, ABOUT, YOU KNOW,

7    HOW DID THE DOCUMENT GET CREATED -- 'CAUSE REALLY THE ISSUE HERE

8    IS DISSEMINATION.  WHO DISSEMINATED THIS DOCUMENT?  HOW IT WAS

9    CREATED?  AND WHO HE TALKED TO AT SEARS AND ALL OF THESE KIND OF

10   THINGS I THINK ARE REALLY NOT THINGS THAT SHOULD BE ON AN

11   EXPEDITED BASIS EVEN BEFORE WE'VE ANSWERED.

12         SO I WOULD JUST ASK THAT IF WE'RE GOING TO EXPEDITE

13   THE INITIAL DISCLOSURES AND THE 26F CONFERENCE, THAT WE JUST AT

14   LEAST HAVE AN OPPORTUNITY TO RESPOND TO THE COMPLAINT, WHICHEVER

15   WAY WE DECIDE TO RESPOND.  AND THEN SHORTLY THEREAFTER, FOR

16   MERITS-TYPE DISCOVERY, WE COULD MOVE THAT --

17         **THE COURT:**  WELL, HOW THE DOCUMENT WAS CREATED AND

18   WHO WAS RESPONSIBLE FOR IT IS ALSO SOMETHING THAT COULD

19   DISSIPATE.  ACCESS TO THEIR WEBSITE, WHO HAD ACCESS, HOW WAS IT

20   ACCESSED, WHICH PAGES WERE ACCESSED, AND ALL THOSE SORTS OF

21   THINGS ARE THINGS THAT COULD BE EPHEMERAL.

22         **MS. GRANT:**  THEN MAYBE THE SOLUTION WOULD BE RATHER

23   THAN SOME -- I'M REALLY THINKING THE DIFFERENCE BETWEEN, LIKE, A

24   30(B)(6) DEPOSITION, WHICH I THINK WOULD ANSWER A LOT OF THESE

25   QUESTIONS, VERSUS, YOU KNOW, A PRODUCTION OF A VOLUMINOUS AMOUNT

1  OF DOCUMENTS FROM MANY PEOPLE INCLUDING INITIAL DISCLOSURES.

2          SO MAYBE WE COULD DO IT FIRST BY DEPOSITION AND THEN

3  SAVE THE DOCUMENTS, WHICH I THINK IS GOING TO BE A LOT MORE

4  CUMBERSOME TO DO THAT ON AN EXPEDITED BASIS BEFORE EVEN

5  RESPONDING TO THE COMPLAINT, WHEN REALLY THAT DEALS WITH MOSTLY

6  MERITS.

7          THERE'S NO THREAT THAT THAT'S GOING TO BE DESTROYED.

8  AS I REPRESENTED TO THE COURT, THE BACKUP TAPES ARE BEING --

9  WELL, THAT'S ACTUALLY A DECLARATION.

10         THE BACKUP TAPES HAVE BEEN PULLED OUT OF RECYCLING,

11  AND THE -- ANYONE WHO HELPED CREATE THAT DOCUMENT, THEIR

12  COMPUTERS HAVE BEEN IMAGED, AND THOSE IMAGES ARE UNDER LOCK AND

13  KEY.  SO THERE'S NO DANGER THAT THAT DATA IS GOING TO BE LOSS.

14         **THE COURT:**  OKAY.

15         WELL, WHAT I'M DEBATING HERE IS WHETHER TO DO INITIAL

16  DISCLOSURES AND MAYBE -- MAYBE WE SHOULD JUST NOT EXPEDITE THE

17  INITIAL DISCLOSURES BUT JUST OPEN UP REGULAR DISCOVERY.  AND

18  THAT WAY YOU COULD DO MORE FOCUSED REGULAR DISCOVERY RATHER THAN

19  THE BROADER INITIAL DISCLOSURES.  THAT MIGHT BE BETTER FOR THIS

20  SITUATION.

21         **MR. PULGRAM:**  YOUR HONOR, WE WOULD -- WE WOULD BE

22  OKAY WITH THAT IDEA, AS LONG AS IT WAS UNDERSTOOD THAT THOSE

23  CATEGORIES THAT WE DISCUSSED BEFORE, THOSE THREE OR FOUR

24  CATEGORIES, ARE THINGS THAT ARE GOING TO BE PRODUCED FORTHWITH

25  AND THAT --

1          **THE COURT:**  YOU CAN PUT IN A DOCUMENT REQUEST, AND

2    WHAT'S THE TURNAROUND ON THAT?  USUALLY 30 DAYS?

3          **MR. PULGRAM:**  WELL, USUALLY 30 DAYS TO GET YOUR

4    OBJECTIONS TO GET NOTHING.

5          **MS. GRANT:**  WELL --

6          **MR. PULGRAM:**  NOW, LET ME TALK FOR A SECOND -- LET ME

7    TALK FOR A SECOND ABOUT PURPORTED COOPERATION HERE.

8          WE'VE BEEN ASKING SINCE THE DAY WE FILED THIS

9    COMPLAINT FOR AN EARLY MEETING TO TALK ABOUT DISCOVERY.  WE'VE

10   BEEN TOLD WE WILL NOT MOVE -- WE WILL NOT MOVE THE EARLY MEETING

11   OF COUNSEL FULL STOP, PERIOD, NO DISCUSSION.  AND THAT IS WHERE

12   WE HAVE BEEN.

13         WE HAVE GOTTEN NO COOPERATION TO TRY TO NARROW IT, TO

14   DO EXPEDITED IN ANY KIND OF WAY.  AND UNTIL THE DISCOURSE HERE

15   TODAY ABOUT WHAT MATERIALS HAVE BEEN PRESERVED AND A RESPONSE TO

16   ONE LETTER THAT I WROTE ABOUT DAVE WATKINS, WE HADN'T RECEIVED

17   ANY INFORMATION ABOUT WHAT HAD OR HAD NOT BEEN PRESERVED.

18         **THE COURT:**  OKAY.  WELL, MAYBE WHAT WE SHOULD DO IS

19   HAVE YOU STAY AFTER COURT RIGHT NOW WITH -- AND TALK TO EACH

20   OTHER ABOUT A DISCOVERY PLAN; HAVE YOU MEET TOMORROW IN A MEET

21   AND CONFER WITH YOUR TOP I.T. PERSON, AND YOU CAN BRING SOME

22   EXPERT WHO KNOWS WHAT HUMMINGBIRDS AND THINGS ARE.

23         **MR. PULGRAM:**  YEP.

24         **THE COURT:**  AND YOU CAN HAVE AN INFORMAL DISCUSSION

25   WHERE YOUR PERSON DESCRIBES HOW THE WHOLE THING WORKS SO THAT

1    YOU CAN PERHAPS COME UP WITH SOME JOINT PLAN FOR PRESERVING OR

2    DISCOVERING WHAT MIGHT BE EPHEMERAL ON YOUR PEOPLE'S COMPUTERS.

3              AND IF YOU AREN'T ABLE TO AGREE ON SOMETHING, THEN

4    YOU'D AT LEAST BE IN A BETTER POSITION TO KNOW WHAT TO ASK FOR

5    IN TERMS OF PRESERVING WHAT MIGHT BE ON THE VARIOUS COMPUTERS.

6              **MR. PULGRAM:**  I THINK THAT WOULD BE A VERY

7    WORTHWHILE --

8                   (SIMULTANEOUS COLLOQUY.)

9              **THE COURT:**  AND THEN NEXT UP WILL BE -- WE'LL HAVE

10   OUR -- THE REAL MEET-AND-CONFER, A MORE -- MORE FULSOME

11   MEET-AND-CONFER INITIAL MEETING, OR WHATEVER IT IS WE CALL IT.

12   I THINK APRIL 10TH THE PLAINTIFF SUGGESTED IS A PERFECTLY GOOD

13   DATE FOR THAT.

14             AND THE GOAL THERE WOULD BE TO COME UP WITH SOME

15   EARLY DOCUMENT PRODUCTION, MAYBE NOT EVERY LAST DOCUMENT FROM

16   EVERY OUTPOST OF THE COMPANY IN THE WORLD BUT THINGS THAT YOU

17   KNOW ARE GOING TO BE TURNED OVER SOMETIME.

18             YOU MIGHT AS WELL JUST BITE THE BULLET AND TURN THEM

19   OVER NOW, AND THEN SOME EARLY 30(B)(6) DEPOSITIONS OF WATKINS

20   AND ELY AND MAYBE THE I.T. PERSON.

21             **MS. GRANT:**  AND THIS DISCOVERY GOES BOTH WAYS, 'CAUSE

22   I MEAN, OBVIOUSLY, IT'S CRITICAL TO US TO PROVE THE TRUTH OF

23   SOME OF THIS TO GET SOME DISCOVERY FROM THE OTHER SIDE.

24             **THE COURT:**  YOU -- DISCOVERY IS OPEN AS OF NOW.  YOU

25   CAN BOTH TAKE --

1        **MS. GRANT:**  YES.

2        **THE COURT:**  -- DISCOVERY.

3        **MR. PULGRAM:**  SO TO RECAP, DISCOVERY'S NOW OPEN, MEET

4    AFTERWARDS TO BEGIN THE DISCUSSIONS OF A DISCOVERY PLAN,

5    TOMORROW WITH I.T. PEOPLE TO UNDERSTAND HOW THE DOCUMENT IS

6    PRESERVED AND AVAILABLE ON THEIR NETWORK AND WHAT RECORDS MAY

7    EXIST AROUND THAT; APRIL 10TH FOR THE FULL 26F CONFERENCE.  AND

8    AT THAT TIME TO TRY TO IDENTIFY PROMPT AREAS THAT WILL BE

9    PRODUCED IMMEDIATELY AND 30(B)(6) AREAS.

10        **THE COURT:**  RIGHT.

11        **MR. PULGRAM:**  OKAY.

12        **THE COURT:**  AND IF SOMEBODY FEELS LIKE THEY'RE

13    GETTING STONEWALLED AT THAT POINT, THEN YOU CAN -- I USUALLY

14    SEND THE DISCOVERY TO A MAGISTRATE JUDGE, BUT I SUPPOSE SINCE I

15    KNOW ABOUT IT, I'D BETTER JUST DO IT MYSELF, SO --

16        **MR. PULGRAM:**  AS YOU WISH.

17        **THE COURT:**  -- WHY DON'T EACH OF YOU SUBMIT A

18    FIVE-PAGE BRIEF EXPLAINING WHY YOU WEREN'T ABLE TO REACH A

19    DISCOVERY PLAN, WHAT YOU DID AGREE TO, AND WHAT YOU DIDN'T AGREE

20    TO, THAT YOU THINK YOU ABSOLUTELY NEED ON SOME EXPEDITED BASIS.

21        **MS. GRANT:**  AND WHEN WOULD YOU LIKE TO HAVE THAT TO

22    BE SUBMITTED?

23        **THE COURT:**  OH, TWO DAYS AFTER APRIL 10TH.

24        **MS. GRANT:**  OKAY.

25        I DON'T HAVE A CALENDAR.  IS THAT STILL IN THE

1  WEEKDAY OR --

2          **MR. PULGRAM:**  THAT'S A MONDAY PROBABLY.

3          **MS. GRANT:**  YES.

4          **MR. PULGRAM:**  ACTUALLY, THE 10TH WILL BE A THURSDAY.

5          **THE COURT:**  SO YOU CAN SUBMIT IT BY MONDAY THE 14TH.

6          **MS. GRANT:**  OKAY.

7          **THE COURT:**  AND WHEN I SAY DISCOVERY'S OPEN, I DON'T

8  MEAN LET'S ALL DUMP EACH OTHER WITH THE MOST BURDENSOME THINGS

9  WE CAN THINK OF TO STOP EVERYBODY IN THEIR TRACKS.

10         I'M SAYING BOTH OF YOU START DOING THE THINGS THAT

11  YOU NEED TO DO TO SOLVE THE MOST PRESSING PROBLEMS --

12         **MS. GRANT:**  RIGHT.

13         **THE COURT:**  -- WHICH ISN'T TO SAY WE'RE GOING TO

14  SLICE AND DICE AND SAY, OH, THERE IS MERITS, IF SOMEBODY'S THERE

15  BEING ASKED ABOUT SOMETHING, YOU KNOW, WE'RE NOT GOING TO

16  START -- WE DON'T NEED TO START TRYING TO PARSE IT OUT TOO

17  QUICKLY, BUT -- OR TOO FINELY.

18         **MS. GRANT:**  YES.

19         AND I JUST -- 'CAUSE I WANT THE RECORD TO BE CLEAR IN

20  TERMS OF THE WAY THAT I PRACTICE AND OUR FIRM PRACTICES, WE HAVE

21  BEEN TRYING TO WORK WITH THEM.  ALL I SAID ABOUT THE RULE 26F IS

22  I WANTED TO SEE WHAT THE COURT'S POSITION WAS, AND I THOUGHT

23  WE'D BE IN A BETTER POSITION AFTER THIS HEARING.  THAT WAS WHAT

24  I PUT IN MY LETTER.

25         I ALSO PROPOSED THAT WE SIT DOWN AND TALK ABOUT A

```
 1    MUTUAL DOCUMENT PRESERVATION.  IT GOES BOTH WAYS.  AND WE SIT

 2    DOWN -- AND I NEVER GOT A RESPONSE BACK TO THAT LETTER.  SO WHAT

 3    I THINK IS EXACTLY WHAT WE'RE WILLING TO DO, WHICH IS TO SIT

 4    DOWN WITH THEM AND WORK OUT A SENSIBLE PLAN, OBVIOUSLY WITH THE

 5    PRIORITY BEING, YOU KNOW, WHAT WE'VE ALL TALKED ABOUT, IS TRYING

 6    TO GET TO THE BOTTOM OF DISCOVERING HOW THIS EMANATED FROM --

 7    FROM THE COMPANY, IF IT DID.

 8              WE WANT TO KNOW THAT, TOO.  AND WE WILL WORK WITH

 9    THEM TO TRY AND PRODUCE, WHETHER IT'S A 30(B)(6) DEPO OR

10    DOCUMENTS, TO COME UP WITH THAT DISCOVERY FIRST, BECAUSE I THINK

11    THAT'S THE MOST PRESSING.

12              THE COURT:  OKAY.

13              MR. PULGRAM:  WELL --

14              THE COURT:  THE OTHER THING YOU MIGHT CONSIDER DOING

15    WITH EACH OTHER IS TALKING ABOUT SETTLING THE CASE IN GENERAL.

16    I MEAN, THIS HAPPENED.  IT'S OVER.  YOU KNOW, I DON'T KNOW THAT

17    YOU NECESSARILY NEED TO SPEND TWO YEARS AND HUNDREDS OF

18    THOUSANDS OF DOLLARS LITIGATING ABOUT THIS PIECE OF PAPER.

19    MAYBE YOU COULD SETTLE IT EARLY AND FIGURE OUT SOME WAY OF

20    RESOLVING IT.

21              MS. GRANT:  THAT'S A GOOD IDEA.

22              MR. PULGRAM:  WE APPRECIATE THAT INFORMATION.  I JUST

23    WANT TO BE CLEAR ON ONE THING.

24              THE COURT:  I ACTUALLY REALLY HAVE TO GO, SO YOU CAN

25    ORDER A TRANSCRIPT.
```

1          MR. PULGRAM:  THANK YOU, YOUR HONOR.

2          MS. GRANT:  THANK YOU, YOUR HONOR.

3          THE COURT:  OKAY.

4          (PROCEEDINGS WERE CONCLUDED AT 3:09 P.M.)

5                        --oOo--

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4            I, RAYNEE H. MERCADO, OFFICIAL REPORTER FOR THE UNITED

5    STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY

6    THAT THE FOREGOING PROCEEDINGS IN C08-1376CW, SUCCESSFACTORS,

7    INC., V. SOFTSCAPE, INC., WERE REPORTED BY ME, A CERTIFIED

8    SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY

9    DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL,

10   COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT

11   THE TIME OF FILING.

12           THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

13   TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

14   COURT FILE.

15

16   _____

17   RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

18            FRIDAY, APRIL 4, 2008

19

20

21

22

23

24

25

# EXHIBIT 5

# FENWICK & WEST LLP

SILICON VALLEY CENTER   801 CALIFORNIA STREET   MOUNTAIN VIEW, CA 94041
TEL 650.988.8500   FAX 650.938.5200   WWW.FENWICK.COM

March 28, 2008

PATRICK E. PREMO

EMAIL PPREMO@FENWICK.COM
DIRECT DIAL 650.335.7963

VIA E-MAIL & U.S. MAIL

Jessica L. Grant, Esq.
Jonathan A. Patchen, Esq.
Taylor & Company Law Offices, LLP
One Ferry Building, Suite 355
San Francisco, CA 94111

     Re:    *SuccessFactors, Inc. v. Softscape, Inc.* Case No. C-08-1376 (CW)

Dear Counsel:

     Per our meeting yesterday and in preparation for today's conference call at noon, here are the questions we have regarding Softscape's electronic data.

     (1)    Who within Softscape's headquarters in Wayland, Massachusetts, is responsible for maintaining computer systems and servers? How many employees in each of Softscape's offices? Is different hardware and software being run at separate offices? Who is responsible for IT at Softscape's London office?

     (2)    What applications does Softscape use, *e.g.,* Microsoft Word, Excel, PowerPoint, any custom-developed applications?

     (3)    What type of email service does Softscape use? How long have they used that system? If it uses Microsoft Exchange, does it maintain the email logs? If it uses SMTP, are those email logs similarly maintained?

     (4)    Identify all electronic storage options used by Softscape executives and sales personnel? To what extent have the following been preserved: hard drives of individual users and back-up tapes? What removable media does Softscape generally use, *e.g.,* Zip, Jaz, Syquest disks, floppies, CD's, PDA's? How is email stored for Softscape employees?

     (5)    We would like an export of each person's email box for Softscape's executives, including Mr. Watkins and Ms. Mohr, sales teams, and anyone else who had access to the Presentation? Let's discuss today how to handle any privilege issues.

Jessica L. Grant, Esq.
Jonathan A. Patchen, Esq.
March 28, 2008
Page 2

(6)    Does Softscape allow or support obtaining a .pst file for each of its local computers?  We can provide a script to facilitate this.

(7)    What are Softscape's assigned IP addresses?  How are Softscape's IP addresses assigned, for example, via DHCP?

(8)    Identify all recipients on the sales@softscape.com email distribution list.  Identify any internal distribution of the Presentation.

(9)    In Paragraph 10(b) of the Declaration of David Watkins in Opposition to Plaintiff's Motion to Strike and in Response to Order to Show Cause, Mr. Watkins states that all of Softscape's servers were scanned for any version of the Presentation.  Precisely how were the servers searched?  What search terms were used?  Have you searched for emails, documents or other information exchanged with:  Ely Valls, New Millenium Shoe, Javier Cruz, Courtyard by Marriott Hotel?

(10)    Is there a specific location on Softscape's network where sales documents are kept?  If so, we will request an extract of that location.

(11)    Are home directories assigned for each individual at Softscape?

(12)    Are laptops issued to Softscape employees?  To whom?  Have they been reviewed and electronic data preserved?  Have any home PC's of persons who may have had access been reviewed and preserved?

(13)    When was the Presentation first shown to Softscape employees?  Were hard or soft copies distributed?  Where was the Presentation originally stored?  Where is it currently stored?

(14)    Please be prepared to provide a forensic image of hard drives for the computers used by Softscape executives, sales personnel and anyone else who had access to the Presentation.

We will use the following dial-in information for our call today.

**Dial-in:**  1.800.930.8737
**Passcode:**  8985672

Jessica L. Grant, Esq.
Jonathan A. Patchen, Esq.
March 28, 2008
Page 3

     I look forward to talking with you at noon.  If I have additional questions, I will raise
during our call

                          Sincerely,

                          Patrick E. Premo

cc:  Laurence Pulgram, Esq.

1282955

# EXHIBIT 6

## FENWICK & WEST LLP

555 CALIFORNIA STREET, 12TH FLOOR    SAN FRANCISCO, CA 94104
TEL 415.875.2300    FAX 415.281.1350    WWW.FENWICK.COM

April 2, 2008

PATRICK E. PREMO

EMAIL PPREMO@FENWICK.COM
DIRECT DIAL (650) 335-7963

**VIA ELECTRONIC MAIL & U.S. MAIL**

Jessica L. Grant, Esq.
Jonathan Patchen, Esq.
Taylor & Company Law Offices, LLP
One Ferry Building, Suite 355
San Francisco, California 94111

Re:    *SuccessFactors, Inc. v. Softscape, Inc.*
       US District Court Case No. CV 08 1376 CW

Dear Counsel:

As you know, we had our conference call on Friday, March 28, 2008, as ordered by the Court. There was a series of questions that you and Softscape's IT person were unable to answer at that time. You agreed to look into the matters and get back to us. Although I received Jonathan's email of yesterday indicating that he was following up, we still do not have any further information. This letter, therefore, sets forth the additional information that we need and also confirms what was discussed on March 28. If you disagree with any information included, please confirm in writing.

(1)    **Who within Softscape's headquarters in Wayland, Massachusetts, is responsible for maintaining computer systems and servers? How many employees in each of Softscape's offices? Is different hardware and software being run at separate offices? Who is responsible for IT at Softscape's London office?**

(2)    **What applications does Softscape use, *e.g.*, Microsoft Word, Excel, PowerPoint, any custom-developed applications?**

April 2, 2008
Page 2

(3)    **What type of email service does Softscape use? How long have they used that system? If it uses Microsoft Exchange, does it maintain the email logs? Does Softscape have an email retention policy? Do you have auto-delete email? Is there a policy like that in place? If it uses SMTP, are those email logs similarly maintained? What did Softscape do for its investigation? What is Softscape's backup rotation scheme?**

Mr. Fougere does not know whether Softscape maintains logs, but by default they exist and usually are retained from 7-30 days.

You confirmed that there were probably five or six Softscape employees' computer hard drives that were mirror-imaged. Other than Dave Watkins, you were not able to identify the other people. Please provide that information as soon as possible.

•    Does Softscape have an email retention policy? If so, what is that policy? Would you please provide a copy. ? ==Was a litigation== ==hold to prevent routine purging requested? If so, when?==

(4)    **Identify all electronic storage options used by Softscape executives and sales personnel? To what extent have the following been preserved: hard drives of individual users and back-up tapes? What removable media does Softscape generally use, e.g., Zip, Jaz, Syquest disks, floppies, CD's, PDA's? How is email stored for Softscape employees?**

==Please identify all persons that assisted with or received the Presentation, including those persons who assisted with collecting the information, participated in the "New Millenium Shoe Company" demos, and prepared the PowerPoint Presentation. Please confirm whether board members received a copy of the Presentation and when.==

April 2, 2008
Page 3

Mr. Fougere does not know whether hard drives were searched from desktop PCs or laptops. Please confirm that a bit-by-bit copy of the hard drives for Softscape-issued PCs and laptops as well as any home computers has been or will be made.

(5)     We would like an export of each person's email box for Softscape's executives, including Mr. Watkins and Ms. Mohr, sales teams, and anyone else who had access to the Presentation?

Our IT Director, Kevin Moore, asked if Softscape can re-create email boxes from the back-up tapes. You did not know the answer. Please confirm.

(6)     Does Softscape allow or support utilizing a .pst file for each of its local computers.

(7)     What are Softscape's assigned IP addresses? How are Softscape's IP addresses assigned [internally], for example, via DHCP?

Mr. Fougere said he would provide a list of Softscape's assigned IP addresses.

(8)     Identify all recipients on the sales@softscape.com email distribution list. Identify any internal distribution of the Presentation.

You did not know the recipients of the sales@softscape.com email distribution list. We need to know this information to confirm that: (a) they have been interviewed for responsive documents, including electronic data; and (b) their records are being properly preserved.

(9)     In Paragraph 10(b) of the Declaration of David Watkins in Opposition to Plaintiff's Motion to Strike and in Response to Order to Show Cause, Mr. Watkins states that all of Softscape's servers were scanned for any version of the Presentation. Precisely how were the servers searched? What search terms were used? Have you searched for emails, documents or other information exchanged with: Ely Valls, New Millenium Shoe, Javier Cruz, Courtyard by Marriott Hotel?

April 2, 2008
Page 4

On Friday, March 28, you confirmed that three versions still reside on the Intranet and that any employee could access. Despite my requests, you originally refused on Friday to remove or lock down the documents in a manner that might preclude further distribution either internally or externally. On Tuesday, April 1, Jonathan confirmed by email that "the Presentation has been taken off the server and Intranet." Please confirm that all meta data was preserved and identify all steps taken to ensure electronic data was preserved.

Mr. Fougere does not know when the Presentation was first created or first shown. Please confirm when the presentation was first created. When was it first shown to Softscape personnel?

Mr. Fougere did not write down what he did in terms of his investigation. Mr. Fougere did not search for emails, documents or other information exchanged with Ely Valls, New Millenium Shoe, Javier Cruz, or Courtyard by Marriott Hotel. We object to the very limited search that has been done to date. We do not believe adequate steps were taken to identify sources of information or reasonably preserve documents, including electronic records. Please identify what additional steps have been or will be taken to preserve the relevant information. We also need confirmation that information and records relating to New Millenium Shoe Company, Ely Valls and Javier Cruz have been preserved.

(10)    Is there a specific location on Softscape's network where sales documents are kept? Is there a Network share specific to sales? If so, we will request an extract of that location.

Please confirm whether there is a Network share specific to Softscape's sales documents.

April 2, 2008
Page 5

**(11)    Are home directories assigned for each individual at Softscape?**

Please confirm if this is true for Dave Watkins, Susan Mohr, Dennis Martinek, the Softscape employee using the email address mwest@softscape.com, other members of executive and sales teams, and any one else that had access to the Presentation.

**(12)    Are laptops issued to Softscape employees? To whom? Have they been reviewed and electronic data preserved? Have any home PC's of persons who may have had access been reviewed and preserved?**

Mr. Fougere confirmed that he did not search any laptops. He is not aware of anyone else at Softscape that may have done such a search. Mr. Fougere is not aware of any home PCs that were searched or imaged. Mr. Fougere has not asked if any Softscape employees are Comcast subscribers. SuccessFactors has provided evidence that Comcast subscribers located near Softscape's headquarters accessed SuccessFactors' password-protected environment, so this is highly relevant information.

During the hearing and our call, Jessica indicated that Dave Watkins was given access to SuccessFactors' ACE275 sales demo account. Please confirm how he received access, who else received access, and when ACE275 was accessed by Softscape and/or New Millenium Shoe employees.

You indicated that Dave Watkins uses the same computer both at home and at work. I assume that this is a laptop, but you were not able to confirm. You could not confirm if he had any other computers, for example a PC at home. Please provide this information and confirm in writing that you have made a bit-by-bit copy of the data storage media for Mr. Watkins' computers.

**(13)    When was the Presentation first shown to Softscape employees? Were hard or soft copies distributed? Where was the Presentation originally stored? Where is it currently stored?**

You were unable to provide answers to the questions in Item No. 13, including whether hard or soft copies of the Presentation were distributed to Softscape employees. Please provide the information as soon as possible

**(14)    Please be prepared to provide a forensic image of hard drives for the computers used by Softscape executives, sales personnel and anyone else who had access to the Presentation.**

Again, you have only indicated that for some employees, you have imaged their hard drives. You have identified Dave Watkins, please identify the others. Please confirm in writing that you have made a bit-for-bit copy of the data storage media for each of the persons that

April 2, 2008
Page 6

assisted with or received the Presentation, including but not limited to Dave Watkins, Susan Mohr, Dennis Martinek, and "mwest@softscape.com."

Since it has now been five days since we talked, I would appreciate if Softscape would provide this information **by noon tomorrow**. Thank you in advance for your cooperation.

Very truly yours,

Patrick E. Premo

PEP:mg

cc:    Laurence Pulgram, Esq.

*1282996*

# EXHIBIT 7

**FENWICK & WEST LLP**

SILICON VALLEY CENTER    801 CALIFORNIA STREET    MOUNTAIN VIEW, CA 94041
TEL 650.988.8500    FAX 650.938.5200    WWW.FENWICK.COM

April 2, 2008

PATRICK E. PREMO            -

EMAIL PPREMO@FENWICK.COM
DIRECT DIAL (650) 335-7963

**VIA ELECTRONIC & U.S. MAIL**

Jessica L. Grant, Esq.
Jonathan Patchen, Esq.
Taylor & Company Law Offices, LLP
One Ferry Building, Suite 355
San Francisco, California 94111

Re:    *SuccessFactors, Inc. v. Softscape, Inc.*
          US District Court Case No. CV 08 1376 CW

Dear Counsel:

After speaking with Jonathan again this afternoon, we are still lacking basic information about document preservation that the Court expected Softscape ("SS") to provide last Friday at the latest. SS has been on notice since March 11, 2008, of this lawsuit and thus has had an obligation to take all necessary steps to preserve its records, including all electronic data. As of this afternoon, however, Softscape and its counsel are still unable to confirm or deny that it has preserved key evidence, including but not limited to access logs that might lead to the identity of the anonymous sender.

Tomorrow is the 30th day since the distribution of the Presentation. To the extent that materials have not already been preserved as they should have been, a 30-day deletion cycle may therefore result in deletion of critical information tomorrow.

In this regard, it is essential that SS act immediately to ensure that at least the following records are preserved. (The items highlighted here not to be seen as excluding the other matters we have discussed or that SS should be aware of.)

1)    All logs of access to SS intranets or other locations where the Presentation ever resided, and in particular, to the Presentation itself on such intranet or other location.

2)    All logs of external communications from SS's computers over the internet (which would include logs that could allow tracing of communications to gmail IP addresses).

3)    All logs of dynamically (or otherwise) assigned internal IP addresses within SS.

April 2, 2008
Page 2

4)      All home computers (bit for bit) of any person that participated in
        communications regarding the Presentation, including in particular those of
        Watkins, Martinek, and Mwest.

5)      All hard drives or other storage media of any person at SS who ever accessed the
        Presentation on the intranet or otherwise received a copy of the Presentation,
        including all logs on such computers reflecting such access. If, as Mr. Watkins'
        declaration stated, the intranet does not record access, then the local computers
        will. The fact that a particular local computer has or had the Presentation on it
        should have been ascertained by competent searches over the network of the local
        hard drives.

6)      A forensically accurate bit-for-bit mirror image of the server(s) that hosted the
        intranet where the presentation was found, or any other server upon which the
        Presentation was located.

    As mentioned above, this is not to diminish Softscape's obligations to preserve all the
other information requested. But, given the lack of searching and preserving that has been
explained to us thus far, it is imperative that these particular resources be immediately captured.

                                    Very truly yours,



                                    Patrick E. Premo

PEP:mg

cc:    Laurence Pulgram, Esq.

                                                                    *1283202*

# EXHIBIT 8

**Patrick Premo**

| | |
|---|---|
| **From:** | Jonathan Patchen [jpatchen@tcolaw.com] |
| **Sent:** | Friday, April 04, 2008 1:35 PM |
| **To:** | Patrick Premo |
| **Cc:** | Jessica Grant; Jonathan Patchen |
| **Subject:** | RE: Today's call |

Patrick:

According to the IT people:

-There are no logs of Intranet access.
-There are no logs for outbound Internet traffic.
-There are some logs for inbound Internet traffic.  Those logs are created for internet traffic to specific servers.  These servers are the servers for customer websites and customer staging tools.  All of these logs have been preserved.
-There are no logs for the DHCP (dynamic internal) assignment.

Please let me know if you have any further questions,

Jonathan

-----Original Message-----
From: Jonathan Patchen
Sent: Thursday, April 03, 2008 5:50 PM
To: Patrick Premo
Cc: Jessica Grant
Subject: RE: Today's call

Patrick:

We take evidence preservation issues seriously, and our client has worked diligently to provide information in response to your original and follow up requests.  As I mentioned in my earlier email, given the three hour time difference, it is unlikely that our client will be able to provide you with an answer today regarding the access logs.  As soon as I hear back from the IT representative regarding this issue, I will immediately provide you with the requested information.

Best regards,

Jonathan


-----Original Message-----
From: Patrick Premo [mailto:PPremo@fenwick.com]
Sent: Thu 4/3/2008 5:01 PM
To: Jonathan Patchen
Cc: Jessica Grant
Subject: RE: Today's call

Jonathan:

        This is not true, and you know it.  Yesterday, I asked you about access logs.  You got off the phone to ask your client about it.  This also should have been something you and your client looked for immediately once you received notice of the suit on March 11, 2008.  It does not appear that either you or your client is taking any of this very seriously.  Please ask your client to supply this information today.  Thank you.

-Patrick

-----Original Message-----
From: Jonathan Patchen [mailto:jpatchen@tcolaw.com]
Sent: Thursday, April 03, 2008 4:31 PM

1

To: Patrick Premo
Cc: Jessica Grant
Subject: RE: Today's call

Patrick:

Thank you for following up on these two questions. My notes do not reflect that either of these specific questions were asked either on Friday or in your April 2, 2008 letter, but I have immediately relayed them to Softscape's IT department and requested an answer as soon as possible.

As you know, my client is located on the East Coast and, given that time difference, I am not confident that I will have the answer to your question by close of business today.

Jonathan

-----Original Message-----
From: Patrick Premo [mailto:PPremo@fenwick.com]
Sent: Thursday, April 03, 2008 3:09 PM
To: Jonathan Patchen
Cc: Jessica Grant
Subject: RE: Today's call

Jonathan:

    Thank you for the additional information. We are still waiting to hear back on the other information discussed last Friday. In particular, please confirm what type of server was used with the intranet? SharePoint? Something else? Also, does Softscape have logs showing access to the intranet where Presentation was located? Are these records being preserved? Please advise by close of business today.

Patrick

-----Original Message-----
From: Jonathan Patchen [mailto:jpatchen@tcolaw.com]
Sent: Thursday, April 03, 2008 12:04 PM
To: Patrick Premo
Cc: Jessica Grant
Subject: RE: Today's call

Patrick:

Please find below additional follow-up information I just received from the IT group.

Jonathan

* The year, version, and release date of the Exchange Server.

Exchange 2003, Service pack 2

* The scope and nature of the document retention policy as it applied to electronic information.

Softscape doesn't have a policy in place specifically for document retention where emails or electronic documents are auto deleted, however, we have sent an email to all employees regarding retention of all documents. We have also archived corporate back up tapes back to 2/8 which include the email exchange server. E-mails are stored indefinitely until a user affirmatively deletes them.

* Does Softscape keep e-mail or SMTP logs?

Yes we have SMTP logs -( logs of mail coming in and out with very limited information).- time and date stamp and who is sending and receiving party is the only information (i.e. no subject line or message body). These are not routinely deleted - right now they go back to May 2007. None will be deleted until after the litigation complete.

\* Can Joe provide a description of the backup tape system - the rotation, the material contained therein, and a confirmation of what we have saved.

Our corporate backups for the mail server is scheduled to be done 3 days a week with a 5 week tape rotation.  Corporate backup (includes some file servers, e-mail, client databases, accounting system, source code repositories) is scheduled to be done at least once a week with a 5 week rotation.  We have monthly a backup permanently held.  We're permanently saving our mail (core) and corporate backups from 2/8.

\* The number of laptops and desktops (and, further, the number held by the sales and executive team).

WW Sales: 33 laptops and 8 desktops; Executives 9 laptops and 1 desktop.

\* Whether an individual can create their own .pst folder on their machine.

Individuals can create PST folders but it's not policy or standard practice.


-----Original Message-----
From: Patrick Premo [mailto:PPremo@fenwick.com]
Sent: Wednesday, April 02, 2008 5:16 PM
To: Jonathan Patchen
Cc: Jessica Grant
Subject: RE: Today's call

Jonathan:

    You indicated in our very brief telephone call today at approximately 3:40 pm that you would attempt to call Softscape's IT person to determine a very basic question:  have the access logs been accessed and preserved.  I asked you to call me back.  You didn't do that, instead you respond after close of business  with an email that again includes no meaningful information.  It has been extremely difficult to obtain answers to our questions from your client; it has also been very difficult to connect by phone with either you or Jessica over the past week or so.  We need this information.  We are concerned that your client will not preserve the records we need and then claim they lost it somehow or didn't know they needed to retain.  I have been getting the feeling for sometime now that I am being stonewalled by your client.

    We will prepare a document preservation order.  If Softscape is unwilling to provide, we will submit to the Court tomorrow and request that it be entered immediately.

-Patrick

-----Original Message-----
From: Jonathan Patchen [mailto:jpatchen@tcolaw.com]
Sent: Wednesday, April 02, 2008 5:07 PM
To: Patrick Premo
Cc: Jessica Grant
Subject: RE: Today's call

Patrick:

Following up on our call this afternoon, I will be confirming tomorrow the information in the topics listed in my April 1 e-mail below.  To the extent that your letter today asks for additional information beyond those listed in my April 1 e-mail, I will discuss the questions with the IT people and provide appropriate answers.

Additionally, as we discussed on the phone, I attempted to speak to the IT staff at Softscape regarding your questions about e-mail and SMTP logs.  The Senior IT Engineer responsible for that information is out today.  I will have an early morning call with him to follow up on your questions about logs.

I think we agree that a stipulated document preservation plan would be the correct approach in this case.  I also think that putting pen to paper and proposing a plan would

help iron out any difference we may have.  We would be happy to propose a plan, unless you would like to take the first crack.

Please let me know,

Jonathan


-----Original Message-----
From: Patrick Premo [mailto:PPremo@fenwick.com]
Sent: Wednesday, April 02, 2008 1:51 PM
To: Jonathan Patchen
Cc: Jessica Grant
Subject: RE: Today's call

Jonathan, I am available at 3:30 pm.  Please call me. Thanks.

Patrick

-----Original Message-----
From: Jonathan Patchen [mailto:jpatchen@tcolaw.com]
Sent: Wednesday, April 02, 2008 1:49 PM
To: Patrick Premo
Cc: Jessica Grant
Subject: RE: Today's call

Patrick:

Thanks for your message.  I don't know Jessica's schedule, but my schedule frees up after 3:30.  Would a 3:30 call work for you?  If so, please let me know, and I'll give you a ring at that time.  If not, please let me know what time after 3:30 works for you.

Thanks,

Jonathan

-----Original Message-----
From: Patrick Premo [mailto:PPremo@fenwick.com]
Sent: Wednesday, April 02, 2008 10:42 AM
To: Patrick Premo; Jonathan Patchen
Cc: Jessica Grant
Subject: RE: Today's call

Jessica and Jonathan:

    I wanted to follow up on my calls of yesterday and today, as well as the email below.  Would one or both of you please call me once your conference call ends.  Thanks.

-Patrick

-----Original Message-----
From: Patrick Premo
Sent: Wednesday, April 02, 2008 9:25 AM
To: 'Jonathan Patchen'
Cc: Jessica Grant
Subject: RE: Today's call

Jonathan:

    Thank you for your email.  It has now been five days since we participated in our court-ordered conference.  We still do not have answers to the questions below.  These questions should have been answered on Friday.  It is not clear why there is delay.  When you please provide the information as soon as possible today.  I appreciate the cooperation.

-Patrick

-----Original Message-----
From: Jonathan Patchen [mailto:jpatchen@tcolaw.com]
Sent: Tuesday, April 01, 2008 2:16 PM
To: Patrick Premo
Cc: Jessica Grant
Subject: RE: Today's call


Patrick:


Following up on my message below, I've asked the IT folks at Softscape to provide an answer to these follow-up questions:

*      The year, version, and release date of the Exchange Server.
*      The scope and nature of the document retention policy as it applied to electronic information.
*      Does Softscape keep e-mail or SMTP logs?
*      A description of the backup tape system – the rotation and the material contained therein.
*      The number of laptops and desktops (and, further, the number held by the sales and executive team).
*      Whether an individual can create their own .pst folder on their machine.

Additionally, I have confirmed that the Presentation has been taken off the server and Intranet.  Moreover, while I believe that every person who worked on the Presentation has had their computer imaged, I am re-confirming that none of these people have forgotten about an extra computer.  Of course, should such a computer be found, that computer will be immediately imaged.


Please let me know if you need any further information from Softscape's IT group. Additionally, please let me know when is a good time for us to begin discussing the contours of an acceptable mutual evidence preservation plan.  I am also hopeful we can agree to a general protective order in short order.


Jonathan


-----Original Message-----
From: Jonathan Patchen
Sent: Friday, March 28, 2008 4:22 PM
To: 'PPremo@fenwick.com'
Subject: Today's call


Patrick:


As I mentioned in my voicemail this afternoon, I had to leave at 4 for my son's birthday. And Jessica is unavailable with another call.

As I suggested in my voicemail, I think it makes sense for you to send us a letter or e-mail with the specific follow-up questions for the IT guy as well as any of the other issues that were raised on the call.

I am confident we can reach an agreeable mutal evidence preservation arrangement in short order.


Have a good weekend,


Jonathan
--------------------------------------------
IRS Circular 230 Disclosure:  To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Fenwick & West LLP to be used, and cannot be used, for the purpose of
(i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.
--------------------------------------------
ATTENTION:

The information contained in this message may be legally privileged and confidential.  It is intended to be read only by the individual or entity to whom it is addressed or by their designee. If the reader of this message is not the intended recipient, you are on notice that any distribution of this message, in any form, is strictly prohibited.

If you have received this message in error, please immediately notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and delete or destroy any copy of this message.

# EXHIBIT 9

JESSICA L. GRANT
PARTNER
jgrant@tcolaw.com

# TAYLOR & COMPANY
### LAW OFFICES, LLP

April 8, 2008

**VIA FACSIMILE & E-MAIL**

Patrick Premo, Esq.
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104

Re:    *SuccessFactors, Inc. v. Softscape, Inc.*,
        United States District Court, Northern District
        of California, Case No. CV-08-1376 (CW)

Dear Patrick:

This letter responds to the emails you have sent me over the past few days in which you have asked Softscape, Inc. to answer questions on a variety of topics, as well as your April 2, 2008 letter (that you resent with highlights to indicate questions you believe have not yet been answered). Because the information requested in the emails are, to a large extent, duplicative of what is requested in your April 2, 2008 letter, we will address them collectively here.

April 2, 2008 Letter

Question 3:

On April 4 and 7, 2008, we provided you with a proposed stipulation and order for evidence preservation that we are prepared to sign as counsel for Softscape. Paragraphs 4 and 5 of Softscape's proposed stipulation and order address the preservation of evidence, which would necessarily include a "litigation hold" to prevent routine purging. The content of what was communicated to our client is privileged, but such a communication did take place and we are prepared to file a statement to that effect, in accordance with Softscape's proposed evidence preservation stipulation and order.

TAYLOR & COMPANY
LAW OFFICES, LLP

Mr. Patrick Premo
April 8, 2008
Page 2

Question 4:

As we have previously explained (indeed, twice yesterday), Softscape's computers that are
reasonably known to have been used to access SuccessFactors' ACE Demo environment, or
to create/modify the Presentation have been imaged. The nature, scope and methodologies
of the searches that are being undertaken at the direction of counsel are privileged.

Question 5:

Softscape's obligation under federal law is not to create data, but rather to *preserve* relevant
data and electronically stored information that is reasonably known to exist. It is doing so.

Question 9:

On April 1, 2008, the Court instructed the parties to engage in discussions to formulate an
evidence preservation plan and to answer questions regarding IT infrastructure. The
information you seek regarding the Presentation and the circumstances surrounding its
creation and internal distribution to Softscape employees constitutes discovery that is
appropriate for interrogatories or depositions, which the Court authorized the parties to serve
in its April 1, 2008 Order.

With regard to your request that Softscape provide SuccessFactors with progress reports to
allay your concern that adequate steps to preserve relevant evidence are not being taken, that
type of reporting is not required by the FRCP or pursuant to the Court's orders. Moreover,
such information is privileged.

Question 10:

As we have previously advised, it is our present understanding that the Presentation resided
on Softscape's Intranet server, which has been imaged.

Question 11:

We are still in the process of investigating this issue.

Question 12:

Your questions regarding Softscape's access of SuccessFactors' ACE Demo constitute
discovery and fall outside the scope of the Court's orders regarding the issues about which
the parties were instructed to meet and confer (*e.g.*, IT infrastructure and the formation of an
evidence preservation plan for all parties).

TAYLOR & COMPANY
LAW OFFICES, LLP

Mr. Patrick Premo
April 8, 2008
Page 3

Question 13:

The questions posed are essentially the same as those in Question 9. Therefore, please refer to our response to Question 9, above.

Question 14:

Although these questions constitute discovery, it is our present understanding that the following Softscape employees were involved in the creation/modification of the Presentation, or accessed SuccessFactors' ACE Demo: Dave Watkins, Alex Bartfeld, Matt Park, Mike Brandt, Christopher Faust, Dennis Martinek, Rick Watkins and Michelle Davis. It is also our understanding that the computers used by these individuals in connection with the foregoing activities have been imaged.

Finally, while your questions pertaining to Lillian Watkins also constitute discovery, we confirm that she is Dave Watkins' wife.

Best regards,

Jessica L. Grant

cc: Laurence Pulgram, Esq.
    Jonathan A. Patchen, Esq.

# EXHIBIT 10

Comprehensive Report

**REDACTED** 

**Important:** The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified. For Secretary of State documents, the following data is for information purposes only and is not an official record. Certified copies may be obtained from that individual state's Department of State.

REPORT FOLLOWS

**Comprehensive Report**
Date: 04/09/08
Reference Code: 24024–00404 Mah

**Report processed by:**
Fenwick And West LLP
801 California Street
Mountain View, CA 940411990
(650) 335–7968 Main Phone
(650) 938–5200 Fax

**Report Legend:**
**S** – Shared Address
**D** – Deceased
✔ – Probable Current Address

**Subject Information**
Name: DAVID V WATKINS
Date of Birth: ████/1966
Age: 41
SSN: █████–xxxx issued in
**Massachusetts** between 01/01/1983 and 12/31/1984

**AKAs (Names Associated with Subject)**
**DAVID W WATKINS**
  DOB: ████1966 Age: 41 SSN: █████–xxxx
**DAVID V WATKINS**
  DOB: ████1966 Age: 41 SSN:
**DAVID D WATKINS**
  SSN: █████–xxxx
**DAVID W WATKINS**
  SSN:

**Indicators**
Bankruptcy: **No**
Property: **Yes**
Corporate Affiliations: **Yes**

**Address Summary**

✔**20 FORTY ACRES DR, WAYLAND MA 01778–2702, MIDDLESEX COUNTY** (Feb 2000 – Mar 2008)
  Phone at address:  (508) 358–2663  WATKINS DAVID
              (508) 358–0212  WATKINS L
  Neighborhood Profile (2000 Census)
  Average Age: **44**   Median Household Income: **$102,700**   Median Home Value: **$397,300**   Average Years of Education: **16**

**67 EDGEWOOD RD, WAYLAND MA 01778–4336, MIDDLESEX COUNTY** (Dec 2003 – 2007)
  Neighborhood Profile (2000 Census)
  Average Age: **37**   Median Household Income: **$77,840**   Median Home Value: **$318,900**   Average Years of Education: **15**

**51 MOORE RD # 0, WAYLAND MA 01778–1420, MIDDLESEX COUNTY** (Oct 1994 – Jul 2005)
  Phone at address:  (508) 358–2711  WITTENBERG E
  Neighborhood Profile (2000 Census)
  Average Age: **38**   Median Household Income: **$138,315**   Median Home Value: **$492,900**   Average Years of Education: **17**

**3606 STEARNS HILL RD, WALTHAM MA 02451–7115, MIDDLESEX COUNTY** (Jun 1994 – Jan 2004)
  Phone at address:  (781) 609–2138  FOUGERE MARIANNE
  Neighborhood Profile (2000 Census)
  Average Age: **34**   Median Household Income: **$63,047**   Median Home Value: **$172,400**   Average Years of Education: **16**

**30 BOSTON RD, WAYLAND MA 01778, MIDDLESEX COUNTY** (Jul 1999)
  Neighborhood Profile (2000 Census)
  Average Age: **44**   Median Household Income: **$102,700**   Median Home Value: **$397,300**   Average Years of Education: **16**

**4 MINOT AVE, ACTON MA 01720–4507, MIDDLESEX COUNTY** (Oct 1985 – Jan 1999)
  Phone at address:  (978) 263–6381  DONAHUE DAN & SUE
  Neighborhood Profile (2000 Census)
  Average Age: **42**   Median Household Income: **$121,113**   Median Home Value: **$328,400**   Average Years of Education: **16**

**2500 N POINSETTIA AVE, MANHATTAN BEACH CA 90266–2666, LOS ANGELES COUNTY** (Jul 1994 – Jan 1999)
  Phone at address:  (310) 545–2626  CUNNIFF PAUL & MAUREEN
  Neighborhood Profile (2000 Census)
  Average Age: **35**   Median Household Income: **$112,685**   Median Home Value: **$654,900**   Average Years of Education: **16**

1

Comprehensive Report

**85 E INDIA ROW APT 25D, BOSTON MA 02110–3395, SUFFOLK COUNTY** (Apr 1991 – Jul 1996)
Neighborhood Profile (2000 Census)
Average Age: **46**    Median Household Income: **$69,792**    Median Home Value: **$464,300**    Average Years of Education: **16**

**268 GOLDEN GATE LN, HUNTINGTON BEACH CA 92649, ORANGE COUNTY** (Nov 1989)
Neighborhood Profile (2000 Census)
Average Age: **30**    Median Household Income: **$56,792**    Median Home Value: **$160,000**    Average Years of Education: **14**

**5 6TH # 72, ACTON MA 01720, MIDDLESEX COUNTY**
Neighborhood Profile (2000 Census)
Average Age: **33**    Median Household Income: **$109,265**    Median Home Value: **$341,500**    Average Years of Education: **16**

**4 M A, ACTON MA 01720, MIDDLESEX COUNTY**
Neighborhood Profile (2000 Census)
Average Age: **33**    Median Household Income: **$109,265**    Median Home Value: **$341,500**    Average Years of Education: **16**

**85 E I R # 25D, BOSTON MA 02124, SUFFOLK COUNTY**
Neighborhood Profile (2000 Census)
Average Age: **29**    Median Household Income: **$26,667**    Median Home Value: **$186,900**    Average Years of Education: **11**

**300 CONTINENTAL BLVD STE 190, EL SEGUNDO CA 90245–5045, LOS ANGELES COUNTY**
Neighborhood Profile (2000 Census)
Average Age: **0**    Median Household Income: **$0**    Median Home Value: **$0**    Average Years of Education: **0**

**3606 STEARNS HILL RD, MANHATTAN BEACH CA 90266, LOS ANGELES COUNTY**
Neighborhood Profile (2000 Census)
Average Age: **37**    Median Household Income: **$114,452**    Median Home Value: **$716,700**    Average Years of Education: **16**

**Others Associated With Subjects SSN:**
(DOES NOT usually indicate any type of fraud or deception)
    [None Found]

**Comprehensive Report Summary:**
    Bankruptcies:
        None Found
    Liens and Judgments:
        None Found
    UCC Filings:
        None Found
    Phones Plus:
        None Found
    People at Work:
        18 Found
    Driver's License:
        1 Found
    Address(es) Found:
        1 Verified and 13 Non–Verified Found
    Possible Properties Owned:
        6 Found
    Motor Vehicles Registered:
        2 Found
    Watercraft:
        None Found
    FAA Certifications:
        None Found
    FAA Aircrafts:
        None Found
    Possible Criminal Records:
        None Found
    Sexual Offenses:
        None Found
    Professional Licenses:
        None Found
    Voter Registration:
        None Found
    Hunting/Fishing Permit:

Comprehensive Report

> None Found
> Concealed Weapons Permit:
> > None Found
> Possible Associates:
> > 4 Found

**Bankruptcies:**
> [None Found]

**Liens and Judgments:**
> [None Found]

**UCC Filings:**
> [None Found]

**Phones Plus:**
> [None Found]

**People at Work:**
> Name: DAVID V WATKINS
> Title: VICE PRESIDENT
> SSN: ███████-xxxx
> Company: SOFTSCAPE, INC.
> Address: 333 E RIVER DR STE 400, EAST HARTFORD CT 06108-4201
> Phone: ✓(860) 528-2545
>
> FEIN:
> Dates: Oct 03, 2002 – Oct 26, 2007
> Confidence: High
>
> Name: DAVID V WATKINS
> Title: VICE PRESIDENT
> SSN: ███████-xxxx
> Company: SOFTSCAPE, INC.
> Address: 20 WESTBROOK ST, EAST HARTFORD CT 06108-3400
> Phone: ✓(860) 528-2545
>
> FEIN:
> Dates: Mar 14, 2003 – Sep 12, 2007
> Confidence: High
>
> Name: DAVID V WATKINS
> Title: VICE PRESIDENT
> SSN: ███████-xxxx
> Company: SOFTSCAPE, INC.
> Address: 333 E RIVER DR STE 400, EAST HARTFORD CT 06108-4201
> Phone: ✓(860) 528-2545
>
> FEIN:
> Dates: Mar 14, 2003 – Aug 13, 2007
> Confidence: High
>
> Name: DAVID V WATKINS
> Title: DIRECTOR
> SSN: ███████-xxxx
> Company: SOFTSCAPE, INC.
> Address: 30 BOSTON POST RD, WAYLAND MA 01778-2400
> Phone: (508) 358-1072
> FEIN:
> Dates: Oct 11, 2007 – Feb 06, 2008
> Confidence: High
>
> Name: DAVID V WATKINS
> Title: TREASURER
> SSN: ███████-xxxx
> Company: SOFTSCAPE, INC.
> Address: 30 BOSTON POST RD, WAYLAND MA 01778-2400
> Phone: (508) 358-1072
> FEIN:
> Dates: May 26, 2003 – Feb 06, 2008
> Confidence: High

3

Comprehensive Report

Name: DAVID V WATKINS
Title: VICE PRESIDENT
SSN: ████████-xxxx
Company: SOFTSCAPE, INC
Address: 526 BOSTON POST RD, WAYLAND MA 01778-1835
Phone: (508) 358-1072
FEIN: ████████
Dates: Oct 03, 2002 - Feb 04, 2008
Confidence: High

Name: DAVID V WATKINS
Title: TREASURER
SSN: ████████-xxxx
Company: SOFTSCAPE, INC.
Address: 526 BOSTON POST RD, WAYLAND MA 01778-1835
Phone: (508) 358-1072
FEIN:
Dates: Oct 03, 2002 - Jan 22, 2008
Confidence: High

Name: DAVID V WATKINS
Title: DIRECTOR
SSN: ████████-xxxx
Company: SOFTSCAPE (MASSACHUSETTS), INC.
Address: 526 BOSTON POST RD, WAYLAND MA 01778-1835
Phone: (508) 358-1072
FEIN: ████████
Dates: Jan 01, 1900 - Jan 22, 2008
Confidence: High

Name: DAVID V WATKINS
Title: TREASURER
SSN: ████████-xxxx
Company: SOFTSCAPE (MASSACHUSETTS), INC.
Address: 526 BOSTON POST RD, WAYLAND MA 01778-1835
Phone: (508) 358-1072
FEIN: ████████
Dates: Jan 01, 1900 - Jan 22, 2008
Confidence: High

Name: DAVID V WATKINS
Title: VICE PRESIDENT
SSN: ████████-xxxx
Company: SOFTSCAPE (MASSACHUSETTS), INC.
Address: 333 E RIVER DR STE 400, EAST HARTFORD CT 06108-4201
Phone:
FEIN:
Dates: Jun 19, 2006 - Jan 11, 2008
Confidence: High

Name: DAVID V WATKINS
Title: VICE PRESIDENT
SSN: ████████-xxxx
Company: SOFTSCAPE (MASSACHUSETTS), INC.
Address: 333 E RIVER DR STE 400, EAST HARTFORD CT 06108-4201
Phone:
FEIN:
Dates: Jun 19, 2006 - Oct 09, 2007
Confidence: High

Name: DAVID V WATKINS
Title: TREASURER
SSN: ████████-xxxx
Company: SOFTSCAPE, INC.
Address: 526 BOSTON POST RD, WAYLAND MA 01778-1835
Phone: (508) 358-1072
FEIN:
Dates: Jul 26, 2004 - Sep 14, 2007
Confidence: High

4

Comprehensive Report

Name: DAVID V WATKINS
Title: DIRECTOR3
SSN: ████████-xxxx
Company: SOFTSCAPE, INC.
Address: 30 BOSTON POST RD, WAYLAND MA 01778-2400
Phone: (508) 358-1072
FEIN:
Dates: May 26, 2003 - Jul 09, 2007
Confidence: High

Name: DAVID V WATKINS
Title: VICE PRESIDENT
SSN: ████████-xxxx
Company: SOFTSCAPE, INC.
Address: 526 BOSTON POST RD, WAYLAND MA 01778-1835
Phone: (508) 358-1072
FEIN:
Dates: Mar 14, 2003 - Mar 15, 2007
Confidence: High

Name: DAVID V WATKINS
Title: VICE
SSN: ████████-xxxx
Company: SOFTSCAPE INC
Address: 526 BOSTON POST RD, WAYLAND MA 01778-1835
Phone: (508) 358-1072
FEIN:
Dates: Jun 01, 2006
Confidence: High

Name: DAVID V WATKINS
Title: CEO
SSN: ████████-xxxx
Company: SOFTSCAPE
Address: 30 BOSTON POST RD, WAYLAND MA 01778-2400
Phone: (508) 358-1072
FEIN:
Dates: Jul, 2004
Confidence: High

Name: DAVID V WATKINS
Title: VICE PRESIDENT
SSN: ████████-xxxx
Company: SOFTSCAPE, INC.
Address: 30 BOSTON POST RD, WAYLAND MA 01778-2400
Phone: (508) 358-1072
FEIN:
Dates: Nov 19, 2001 - Nov 26, 2002
Confidence: High

Name: DAVID V WATKINS
SSN: ████████-xxxx
Company: ANDERSON & CO
Address:
Phone:
FEIN:
Dates: Sep 01, 2000 - Jun 01, 2001
Confidence: Medium

**Driver's License Information:**
Name: DAVID V WATKINS
DL Number: xxxxxxxxx
State: Massachusetts
License Address: 20 FORTY ACRES DR, WAYLAND MA 01778-2702, MIDDLESEX COUNTY
DOB: ████/1966
Gender: M
Expiration Date: ████/2005
License Type: Operator
Height: 6´00

Comprehensive Report

**Address Summary:**
✔ 20 FORTY ACRES DR, WAYLAND MA 01778–2702, MIDDLESEX COUNTY (Feb 2000 – Mar 2008)

67 EDGEWOOD RD, WAYLAND MA 01778–4336, MIDDLESEX COUNTY (Dec 2003 – 2007)
51 MOORE RD # 0, WAYLAND MA 01778–1420, MIDDLESEX COUNTY (Oct 1994 – Jul 2005)
3606 STEARNS HILL RD, WALTHAM MA 02451–7115, MIDDLESEX COUNTY (Jun 1994 – Jan 2004)
30 BOSTON RD, WAYLAND MA 01778, MIDDLESEX COUNTY (Jul 1999)
4 MINOT AVE, ACTON MA 01720–4507, MIDDLESEX COUNTY (Oct 1985 – Jan 1999)
2500 N POINSETTIA AVE, MANHATTAN BEACH CA 90266–2666, LOS ANGELES COUNTY (Jul 1994 – Jan 1999)
85 E INDIA ROW APT 25D, BOSTON MA 02110–3395, SUFFOLK COUNTY (Apr 1991 – Jul 1996)
268 GOLDEN GATE LN, HUNTINGTON BEACH CA 92649, ORANGE COUNTY (Nov 1989)
5 6TH # 72, ACTON MA 01720, MIDDLESEX COUNTY
4 M A, ACTON MA 02124, MIDDLESEX COUNTY
85 E I R # 25D, BOSTON MA 02124, SUFFOLK COUNTY
300 CONTINENTAL BLVD STE 190, EL SEGUNDO CA 90245–5045, LOS ANGELES COUNTY
3606 STEARNS HILL RD, MANHATTAN BEACH CA 90266, LOS ANGELES COUNTY

**Active Address(es):**
DAVID D WATKINS  –  ✔ 20 FORTY ACRES DR, WAYLAND MA 01778–2702, MIDDLESEX COUNTY (Feb 2000 – Mar 2008)
    **Current phones listed at this address:**
        WATKINS DAVID   (508) 358–2663
        WATKINS L   (508) 358–0212
    **Property Ownership Information for this Address**
        **Property:**
            Parcel Number – 000029 – 000000 – 000008
            Book – 46842
            Page – 336
            Owner Name 1 – WATKINS, DAVID V & DAVID W
            Address – 20 FORTY ACRES DR, WAYLAND MA 01778–2702, MIDDLESEX COUNTY
            Land Usage – SINGLE FAMILY RESIDENCE
            Loan Amount – $8,835,000
            Loan Type – CONVENTIONAL
            Lender Name – DIGITAL FCU
            Data Source – A
    **Neighborhood Profile (2000 Census)**
        Average Age: 44
        Median Household Income: $102,700
        Median Owner Occupied Home Value: $397,300
        Average Years of Education: 16

**Previous And Non–Verified Address(es):**
DAVID V WATKINS  – 67 EDGEWOOD RD, WAYLAND MA 01778–4336, MIDDLESEX COUNTY (Dec 2003 – 2007)
    **Property Ownership Information for this Address**
        **Property:**
            Parcel Number – 000050 – 000000 – 000081
            Owner Name 1 – WATKINS DAVID V
            Owner Name 2 – WATKINS LILLIAN V
            Address – 67 EDGEWOOD RD, WAYLAND MA 01778–4336, MIDDLESEX COUNTY
            Owner´s Address – 20 FORTY ACRES DR, WAYLAND MA 01778–2702, MIDDLESEX COUNTY
            Land Usage – SFR
            Total Value – $526,000
            Land Value – $419,800
            Improvement Value – $106,200
            Land Size – 13,939
            Year Built – 1915
            Exterior Walls – WOOD SIDING/SHINGLE
            Roof Type – ASPHALT SHINGLE
            Heating – FORCED AIR
            Fireplace – 1
            Garage – DETACHED
            Sale Price – $535,000
            Sellers Name 1 – WALCH JOSEPH G
            Lender Name – FIRST FED´L SVGS BK
            Data Source – A
    **Neighborhood Profile (2000 Census)**
        Average Age: 37
        Median Household Income: $77,840
        Median Owner Occupied Home Value: $318,900
        Average Years of Education: 15

Comprehensive Report

DAVID V WATKINS  – 51 MOORE RD # 0, WAYLAND MA 01778–1420, MIDDLESEX COUNTY (Oct 1994 – Jul 2005)
   WITTENBERG E  (508) 358–2711
   **Property Ownership Information for this Address**
      **Property:**
         Parcel Number – 000010 – 000000 – 000007
         Owner Name 1 – WITTENBERG EVE
         Address – 51 MOORE RD, WAYLAND MA 01778–1420, MIDDLESEX COUNTY
         Owner´s Address – 51 MOORE RD, WAYLAND MA 01778–1420, MIDDLESEX COUNTY
         Land Usage – SFR
         Total Value – $577,300
         Land Value – $392,900
         Improvement Value – $184,400
         Land Size – 68,389
         Year Built – 1954
         Exterior Walls – WOOD SIDING/SHINGLE
         Roof Type – ASPHALT SHINGLE
         Heating – FORCED HOT WATER
         Fireplace – 1
         Garage – BASEMENT
         Sale Price – $389,000
         Sellers Name 1 – WATKINS DAVID V & LILLIAN V
         Lender Name – BANK OF AMERICA
         Data Source – A
   **Neighborhood Profile (2000 Census)**
      Average Age: 38
      Median Household Income: $138,315
      Median Owner Occupied Home Value: $492,900
      Average Years of Education: 17

DAVID V WATKINS  – 3606 STEARNS HILL RD, WALTHAM MA 02451–7115, MIDDLESEX COUNTY (Jun 1994 – Jan 2004)
   FOUGERE MARIANNE  (781) 609–2138
   **Neighborhood Profile (2000 Census)**
      Average Age: 34
      Median Household Income: $63,047
      Median Owner Occupied Home Value: $172,400
      Average Years of Education: 16

DAVID V WATKINS  – 30 BOSTON RD, WAYLAND MA 01778, MIDDLESEX COUNTY (Jul 1999)
   **Neighborhood Profile (2000 Census)**
      Average Age: 44
      Median Household Income: $102,700
      Median Owner Occupied Home Value: $397,300
      Average Years of Education: 16

DAVID V WATKINS  – 4 MINOT AVE, ACTON MA 01720–4507, MIDDLESEX COUNTY (Oct 1985 – Jan 1999)
   DONAHUE DAN & SUE  (978) 263–6381
   **Property Ownership Information for this Address**
      **Property:**
         Parcel Number – 000004F – 000049
         Owner Name 1 – DONAHUE DANIEL C
         Address – 4 MINOT AVE, ACTON MA 01720–4507, MIDDLESEX COUNTY
         Owner´s Address – 4 MINOT AVE, ACTON MA 01720–4507, MIDDLESEX COUNTY
         Land Usage – SFR
         Total Value – $539,800
         Land Value – $248,600
         Improvement Value – $291,200
         Land Size – 30,028
         Year Built – 1966
         Exterior Walls – WOOD SIDING/SHINGLE
         Roof Type – ASPHALT SHINGLE
         Air Conditioning – TYPE UNKNOWN
         Heating – FORCED HOT WATER
         Sale Price – $570,000
         Sellers Name 1 – WATKINS HENRY C & JACQUELINE
         Lender Name – MIDDLESEX SVGS BK
         Data Source – A
   **Neighborhood Profile (2000 Census)**
      Average Age: 42
      Median Household Income: $121,113
      Median Owner Occupied Home Value: $328,400

Comprehensive Report

Average Years of Education: 16

DAVID V WATKINS  – 2500 N POINSETTIA AVE, MANHATTAN BEACH CA 90266–2666, LOS ANGELES COUNTY (Jul 1994 – Jan 1999)
 CUNNIFF PAUL & MAUREEN  (310) 545–2626
 **Property Ownership Information for this Address**
  Property:
   Parcel Number – 4173–024–030
   Lot Number – 10
   Owner Name 1 – CUNNIFF PAUL J JR
   Owner Name 2 – CUNNIFF MAUREEN J
   Address – 2500 N POINSETTIA AVE, MANHATTAN BCH CA 90266–2666, LOS ANGELES COUNTY
   Owner's Address – 2500 N POINSETTIA AVE, MANHATTAN BCH CA 90266–2666, LOS ANGELES COUNTY
   Land Usage – SFR
   Total Value – $507,034
   Land Value – $72,979
   Improvement Value – $434,055
   Land Size – 4,452
   Year Built – 2002
   Homestead Exemption – YES
   Exterior Walls – STUCCO
   Roof Type – COMPOSITION SHINGLE
   Heating – FLOOR FURNACE
   Fireplace – 1
   Garage – DETACHED
    Other Characteristic 1 – CORNER
   Sellers Name 1 – RANDAZZO WILLIAM
   Legal Description – TRACT NO 1638 LOT 10
   Lender Name – AKT AMERICAN CAP CORP
   Interest Rate Type – ADJ
   Data Source – A
 **Neighborhood Profile (2000 Census)**
  Average Age: 35
  Median Household Income: $112,685
  Median Owner Occupied Home Value: $654,900
  Average Years of Education: 16

DAVID V WATKINS – 85 E INDIA ROW APT 25D, BOSTON MA 02110–3395, SUFFOLK COUNTY (Apr 1991 – Jul 1996)
 **Current phones listed at this address:**
  AMERICAN CONSUMER AND CONSULTING SERVICES CORP  (617) 722–0103
  BARSTOW ENGINEERING CELLULAR  (617) 262–0420
  BOSTON INFORMER THE  (617) 723–7030
  G & N ROBINSON  (617) 986–1484
  HARBOR TOWERS CONDOMINIUMS  (617) 723–2090
  HARBOR TOWER I  (617) 227–0783
  KATHLEEN SULLIVAN ELLIOTT INTERIOR DESIGNS  (617) 742–1339
  ROBINSON GARY  (617) 986–1484
 **Property Ownership Information for this Address**
  Property:
   Parcel Number – CBOS–000000–000003–002975–000378
   Book – 22859
   Page – 143
   Owner Name 1 – MALICKI JAREMA
   Address – 85 E INDIA ROW APT 25D, BOSTON MA 02110–3395, SUFFOLK COUNTY
   Owner's Address – 85 E INDIA ROW APT 25D, BOSTON MA 02110–3395, SUFFOLK COUNTY
   Land Usage – CONDOMINIUM
   Subdivision Name – HARBOR TOWERS I
   Total Value – $397,500
   Improvement Value – $397,500
   Year Built – 1972
   Exterior Walls – CONCRETE BLOCK
   Air Conditioning – TYPE UNKNOWN
   Heating – FORCED HOT WATER
   Sale Price – $225,000
   Sellers Name 1 – RICHARDS JANICE M
   Lender Name – GMAC MTG CORP/PA
   Data Source – A
 **Neighborhood Profile (2000 Census)**
  Average Age: 46
  Median Household Income: $69,792
  Median Owner Occupied Home Value: $464,300

8

Comprehensive Report

Average Years of Education: 16

DAVID V WATKINS  – 268 GOLDEN GATE LN, HUNTINGTON BEACH CA 92649, ORANGE COUNTY (Nov 1989)
**Neighborhood Profile (2000 Census)**
Average Age: 30
Median Household Income: $56,792
Median Owner Occupied Home Value: $160,000
Average Years of Education: 14

DAVID V WATKINS  – 5 6TH # 72, ACTON MA 01720, MIDDLESEX COUNTY
**Neighborhood Profile (2000 Census)**
Average Age: 33
Median Household Income: $109,265
Median Owner Occupied Home Value: $341,500
Average Years of Education: 16

DAVID V WATKINS  – 4 M A, ACTON MA 01720, MIDDLESEX COUNTY
**Neighborhood Profile (2000 Census)**
Average Age: 33
Median Household Income: $109,265
Median Owner Occupied Home Value: $341,500
Average Years of Education: 16

DAVID V WATKINS  – 85 E I R # 25D, BOSTON MA 02124, SUFFOLK COUNTY
**Neighborhood Profile (2000 Census)**
Average Age: 29
Median Household Income: $26,667
Median Owner Occupied Home Value: $186,900
Average Years of Education: 11

DAVID V WATKINS  – 300 CONTINENTAL BLVD STE 190, EL SEGUNDO CA 90245–5045, LOS ANGELES COUNTY
**Neighborhood Profile (2000 Census)**
Average Age: 0
Median Household Income: $0
Median Owner Occupied Home Value: $0
Average Years of Education: 0

DAVID V WATKINS  – 3606 STEARNS HILL RD, MANHATTAN BEACH CA 90266, LOS ANGELES COUNTY
**Neighborhood Profile (2000 Census)**
Average Age: 37
Median Household Income: $114,452
Median Owner Occupied Home Value: $716,700
Average Years of Education: 16

**Possible Properties Owned by Subject:**
**Property:**
Parcel Number – 000050 – 000000 – 000081
Owner Name 1 – WATKINS DAVID V
Owner Name 2 – WATKINS LILLIAN V
Address – 67 EDGEWOOD RD, WAYLAND MA 01778–4336, MIDDLESEX COUNTY
Owner's Address – 20 FORTY ACRES DR, WAYLAND MA 01778–2702, MIDDLESEX COUNTY
Land Usage – SFR
Total Value – $526,000
Land Value – $419,800
Improvement Value – $106,200
Land Size – 13,939
Year Built – 1915
Exterior Walls – WOOD SIDING/SHINGLE
Roof Type – ASPHALT SHINGLE
Heating – FORCED AIR
Fireplace – 1
Garage – DETACHED
Sale Price – $535,000
Sellers Name 1 – WALCH JOSEPH G
Data Source – A

**Property:**
Parcel Number – 000010 – 000000 – 000007
Owner Name 1 – WATKINS LILLIAN V
Owner Name 2 – WATKINS DAVID V

9

Comprehensive Report

Address – 51 MOORE RD, WAYLAND MA 01778–1420, MIDDLESEX COUNTY
Owner's Address – 51 MOORE RD, WAYLAND MA 01778–1420, MIDDLESEX COUNTY
Land Usage – SFR
Total Value – $267,200
Land Value – $165,000
Improvement Value – $102,200
Land Size – 68,389
Year Built – 1954
Exterior Walls – WOOD SIDING/SHINGLE
Heating – FORCED HOT WATER
Fireplace – 2
Garage – ATTACHED
Sale Price – $389,000
Sellers Name 1 – WATKINS DAVID V & LILLIAN V
Data Source – A

**Property:**
Parcel Number – 000010 – 000000 – 000007
Owner Name 1 – WITTENBERG EVE
Address – 51 MOORE RD, WAYLAND MA 01778–1420, MIDDLESEX COUNTY
Owner's Address – 51 MOORE RD, WAYLAND MA 01778–1420, MIDDLESEX COUNTY
Land Usage – SFR
Total Value – $577,300
Land Value – $392,900
Improvement Value – $184,400
Land Size – 68,389
Year Built – 1954
Exterior Walls – WOOD SIDING/SHINGLE
Roof Type – ASPHALT SHINGLE
Heating – FORCED HOT WATER
Fireplace – 1
Garage – BASEMENT
Sale Price – $389,000
Sellers Name 1 – WATKINS DAVID V & LILLIAN V
Data Source – A

**Property:**
Parcel Number – 000029 – 000000 – 000008
Owner Name 1 – WATKINS DAVID W
Owner Name 2 – WATKINS LILLIAN V
Address – 20 FORTY ACRES DR, WAYLAND MA 01778–2702, MIDDLESEX COUNTY
Owner's Address – 20 FORTY ACRES DR, WAYLAND MA 01778–2702, MIDDLESEX COUNTY
Land Usage – SFR
Total Value – $1,272,100
Land Value – $371,900
Improvement Value – $900,200
Land Size – 42,253
Year Built – 1964
Exterior Walls – WOOD SIDING/SHINGLE
Roof Type – ASPHALT SHINGLE
Air Conditioning – TYPE UNKNOWN
Heating – BASEBOARD
Fireplace – 1
Garage – BASEMENT
Sale Price – $425,000
Sellers Name 1 – GILLESPIE MARY E
Data Source – A

**Property:**
Parcel Number – CBOS00001900000030029750000378
Owner Name 1 – RICHARDS, JANICE
Address – 85 E INDIA ROW APT 25D, BOSTON MA 02110–3395, SUFFOLK COUNTY
Owner's Address – 85 E INDIA ROW, BOSTON MA 02110–3320, SUFFOLK COUNTY
Land Usage – CONDOMINIUM (RESIDENTIAL)
Sale Price – $156,500
Sellers Name 1 – WATKINS DAVID V & LILLIAN V
Loan Amount – $140,850
Loan Type – CONVENTIONAL
Lender Name – GMAC MTG CORP/PA
Data Source – A

Comprehensive Report

**Property:**
Parcel Number –
Owner Name 1 – WATKINS, DAVID
Owner's Address – 85 E INDIA ROW, BOSTON MA 02110–3320, SUFFOLK COUNTY
Land Usage – CONDOMINIUM (RESIDENTIAL)
Sellers Name 1 – WATKINS DAVID V
Loan Amount – $93,000
Loan Type – CONVENTIONAL
Lender Name – ABBEY FIN'L CORP
Data Source – A

**Motor Vehicles Registered To Subject:**
**Vehicle:**
Description: Black 2002 GMC Denali XL K1500 – 4 Dr Wagon Sport Utility
License Plate: ████
VIN: ████████████
State of Origin: Massachusetts
Engine Size: 364
Number of Cylinders: 8
Body: 4 Dr Wagon Sport Utility
Record Type: Current
Expiration Date: 10/31/2009
*Registrant(s)*
Name: DAVID V. WATKINS DOB: ████/1966 Age: 41 Sex: Male
Address: 20 FORTY ACRES DR, WAYLAND MA 01778, MIDDLESEX COUNTY

*Lien Holder*
None

**Vehicle:**
Description: Red 1997 Lexus SC 400 – Coupe
License Plate: ████
VIN: ████████████
State of Origin: Massachusetts
Engine Size: 242
Number of Cylinders: 8
Body: Coupe
Record Type: Current
Expiration Date: 08/31/2008
*Registrant(s)*
Name: DAVID V. WATKINS DOB: ████/1966 Age: 41 Sex: Male
Address: 20 FORTY ACRES DR, WAYLAND MA 01778, MIDDLESEX COUNTY

*Lien Holder*
None

**Watercraft:**
[None Found]

**FAA Certifications:**
[None Found]

**FAA Aircrafts:**
[None Found]

**Possible Criminal Records:**
[None Found]

**Sexual Offenses:**
[None Found]

**Professional License(s):**
[None Found]

**Voter Registration:**
[None Found]

**Hunting/Fishing Permit:**
[None Found]

11

Comprehensive Report

**Concealed Weapons Permit:**
   [None Found]

**Possible Associates:**
   PERRY M BORJESON  Age:
      ██████-xxxx issued in Connecticut between 01/01/1965 and 12/31/1966
      **Names Associated with Associate:**
      TEFFENCE M BORJESON  Age:
      TERENCE M BORJESON  Age:
      TERRANCE M BORJESON  █████/1949 Age: 59
      TERRENCE BORJESON  Age:
      TERRENCE M BORJESON  Age:
      ██████-xxxx issued in Connecticut between 01/01/1965 and 12/31/1966
      TERRY BORJESON  Age:
      ██████-xxxx issued in Connecticut between 01/01/1965 and 12/31/1966
      TERRY M BORJESON  DOB: ████/1949 Age: 59
      TERRENCE M BORJPSON  Age:
      **Active Address(es):**
      ✓ 45 GLENVIEW DR, NEWINGTON CT 06111-3817, HARTFORD COUNTY (Jan 1988 – Mar 2008)

          **Current phones listed at this address:**
          BORJESON TERRY & CECELIA  (860) 436-4096
          BORJESON TERRY & CECELIA  (860) 665-7149

      **Previous And Non-Verified Address(es):**
      145 SALMON BROOK DR B, GLASTONBURY CT 06033-2154, HARTFORD COUNTY (Jan 1990 – Aug 2004)
      46 WEBSTER ST, HARTFORD CT 06114-1281, HARTFORD COUNTY (Jun 2004 – Aug 2004)
      45 GLENVIEW DR, NEWINGTON CT 06111-3817, HARTFORD COUNTY (Oct 2000)
      46 WEBSTER ST, HARTFORD CT 06114-1281, HARTFORD COUNTY (Jan 1990)
      46 WEBSTER ST APT 66, HARTFORD CT 06114-1281, HARTFORD COUNTY (Jun 1987)
      46 WEBSTER ST # 66, HARTFORD CT 06114-1281, HARTFORD COUNTY (Mar 1985 – Apr 1986)
      145 EATON AVE, MERIDEN CT 06451-2609, NEW HAVEN COUNTY
      145 SALMON BROOK DR, GLASTONBURY CT 06033-2154, HARTFORD COUNTY

   RAFAEL A VALLS  Age:
      ██████-xxxx issued in Maryland between 01/01/1936 and 12/31/1951
      **Previous And Non-Verified Address(es):**
      **S** 20 FORTY ACRES DR, WAYLAND MA 01778-2702, MIDDLESEX COUNTY (Nov 2001 – Jan 2007)
      103 LAWTON ST APT 1, BROOKLINE MA 02446-5843, NORFOLK COUNTY (Dec 2000 – Aug 2005)
      **S** 51 MOORE RD, WAYLAND MA 01778-1420, MIDDLESEX COUNTY

   ELY A EMANUELLI  Age:
      ██████-xxxx issued in Puerto Rico between 01/01/1987 and 12/31/1987
      **Names Associated with Associate:**
      ELY ANNE EMANUELLI  Age:
      ██████-xxxx issued in Puerto Rico between 01/01/1987 and 12/31/1987
      ELLY A VALLS  DOB: ████/1979 Age: 29
      ██████-xxxx issued in Puerto Rico between 01/01/1987 and 12/31/1987
      ELLY ANNE VALLS  Age:
      ██████-xxxx issued in Puerto Rico between 01/01/1987 and 12/31/1987
      ELY A VALLS  Age:
      ██████-xxxx issued in Puerto Rico between 01/01/1987 and 12/31/1987
      ELY ANNE VALLS  DOB: ████/1979 Age: 29
      ELLY A VALLSELY  Age:
      ██████-xxxx issued in Puerto Rico between 01/01/1987 and 12/31/1987
      ELY A VALLSEMANUELLI  Age:
      ██████-xxxx issued in Puerto Rico between 01/01/1987 and 12/31/1987
      **Previous And Non-Verified Address(es):**
      902 AVE PONCE DE LEON, SAN JUAN PR 00907-3367 (Feb 2008 – Mar 2008)
      902 AVE PONCE DE LEON APT 906, SAN JUAN PR 00907-3352 (Jul 2007 – Mar 2008)
      137 CALLE EBRO, SAN JUAN PR 00926-2807 (Aug 2000 – Mar 2008)
      PO BOX 363152, SAN JUAN PR 00936-3152 (Oct 2003 – Mar 2008)
      1560 CALLE PARANA APT 1A, SAN JUAN PR 00926-2937 (Dec 2005 – Jun 2006)
      137C CALLE EBRO, SAN JUAN PR 00926-2807 (Mar 2005 – May 2005)
      **S** 20 FORTY ACRES DR, WAYLAND MA 01778-2702, MIDDLESEX COUNTY (Sep 2001 – Apr 2005)
      103 LAWTON ST APT 1, BROOKLINE MA 02446-5843, NORFOLK COUNTY (Dec 2000 – Aug 2003)
      RIO PIEDRAS PR 00926 (Jan 1999 – Sep 2001)
      EBRO 137 EL PARAISO, SAN JUAN PR 00926 (Jan 1998 – Jan 1999)
      512 BEACON ST # 4116, BOSTON MA 02215-2303, SUFFOLK COUNTY

Comprehensive Report

700 COMMONWEALTH AVE BOX 22, BOSTON MA 02215–2496, SUFFOLK COUNTY
728 COMMONWEALTH AVE APT 05T, BOSTON MA 02215–2439, SUFFOLK COUNTY
728 COMMONWEALTH AVE APT 005T, BOSTON MA 02215–2439, SUFFOLK COUNTY
**S** 51 MOORE RD, WAYLAND MA 01778–1420, MIDDLESEX COUNTY

P SLEVENS      Age:
**Names Associated with Associate:**
**D** PAULINE SLEVENS  DOB: ████ 1917 DOD:02/17/2004  (MIDDLESEX, MA)  Age at Death: 86 (Born 90 years ago) – Verified
████–xxxx issued in New York  between  01/01/1936  and  12/31/1951
**D** PAULINE E SLEVENS  DOB: ████ 1917 DOD:02/17/2004  (MIDDLESEX, MA)  Age at Death: 86 (Born 90 years ago) – Verified
████–xxxx issued in New York  between  01/01/1936  and  12/31/1951
**D** PAULINE J SLEVENS  DOB: ████ 1917 DOD:02/17/2004  (MIDDLESEX, MA)  Age at Death: 86 (Born 90 years ago) – Verified
████–xxxx issued in New York  between  01/01/1936  and  12/31/1951
PAULINE S SLEVENS  DOB: ██ 1917 Age: 90
████–xxxx issued in New York  between  01/01/1936  and  12/31/1951
**D** PAULINE STEVENS  DOB: ████ 1917 DOD:02/17/2004  (MIDDLESEX, MA)  Age at Death: 86 (Born 90 years ago) – Verified
████–xxxx issued in New York  between  01/01/1936  and  12/31/1951
**Previous And Non–Verified Address(es):**
11 FOX HOLLOW RD, EAST SETAUKET NY 11733–1861, SUFFOLK COUNTY (Jan 1990 – Mar 2008)
19 FOX HOLLOW RD, EAST SETAUKET NY 11733–1861, SUFFOLK COUNTY (Jan 1983 – Jun 2007)
16 FORTY ACRES DR, WAYLAND MA 01778–2702, MIDDLESEX COUNTY (Aug 2005 – Aug 2006)
01778 (Feb 2004)
4 SPLIT RAIL LN, EAST SETAUKET NY 11733–1835, SUFFOLK COUNTY (May 1987 – Jan 2003)
**S** 4 MINOT AVE, ACTON MA 01720–4507, MIDDLESEX COUNTY (Jun 1998)

1425 THIERIOT AVE, BRONX NY 10460–3811, BRONX COUNTY

13

# EXHIBIT 11

# Patrick Premo

| | |
|---|---|
| **From:** | Jonathan Patchen [jpatchen@tcolaw.com] |
| **Sent:** | Tuesday, April 08, 2008 10:50 AM |
| **To:** | Patrick Premo |
| **Cc:** | Jessica Grant |
| **Subject:** | RE: Revised Draft Protective Order |
| **Attachments:** | Proposed Protective Order (Redline).doc |

Patrick:

Our client had a few changes to the proposed protective order. I've attached a redline showing changes. Some of the changes are very helpful – such as the additions to the definitions of AEO and AEO-Outside Counsel. There is also a definition of "consultant" to ensure that neither party can circumvent AEO protection by use of a "consultant" who is in reality the functional equivalent of an employee of the Party. The last change is the exclusion of Matheson from seeing AEO material. While our client understands the inclination for your inclusion of that provision (the negotiations related to the Verizon subpoena) Softscape does not agree there is now a compelling reason for including Matheson for review of material that is, in good faith, designated AEO. There is no more rush to analyze information in advance of the Preliminary Injunction hearing and, given that Matheson has already filed declarations describing all of his investigative steps, he will not be hard to replace. That said, if there is some compelling reason to include Matheson, let us know and we will consider it.

Please let me know if these changes are acceptable to you.

Jonathan

---

**From:** Patrick Premo [mailto:PPremo@fenwick.com]
**Sent:** Monday, April 07, 2008 3:33 PM
**To:** Jessica Grant; Jonathan Patchen
**Subject:** FW: Revised Draft Protective Order

Jessica and Jonathan, would you please confirm that the current version is acceptable? Thanks.

---

**From:** Patrick Premo
**Sent:** Monday, April 07, 2008 11:54 AM
**To:** 'Jessica Grant'; Jonathan Patchen
**Cc:** Laurence Pulgram; Albert Sieber; Liwen Mah
**Subject:** Revised Draft Protective Order

Jessica and Jonathan:

Attached please find the revised draft Protective Order. It includes the changes that we discussed today. Please let me know if this is acceptable and I will submit to the Court. Thank you.

-Patrick

Patrick E. Premo
Fenwick & West LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041

4/13/2008

Direct: 650.335.7963
Cell: 408.315.1321
Fax: 650.938.5200

---------------------------------------------

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Fenwick & West LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

---------------------------------------------

ATTENTION:
The information contained in this message may be legally privileged and confidential. It is intended to be read only by the individual or entity to whom it is addressed or by their designee. If the reader of this message is not the intended recipient, you are on notice that any distribution of this message, in any form, is strictly prohibited.

If you have received this message in error, please immediately notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and delete or destroy any copy of this message.

4/13/2008