# EXHIBIT 1

1   JESSICA L. GRANT (SBN 178138)
    JONATHAN A. PATCHEN (SBN 237346)
2   TAYLOR & COMPANY LAW OFFICES, LLP
    One Ferry Building, Suite 355
3   San Francisco, California  94111
    Telephone:  (415) 788-8200
4   Facsimile:  (415) 788-8208
    E-mail: jgrant@tcolaw.com
5   E-mail: jpatchen@tcolaw.com

6   Attorneys for Defendant SOFTSCAPE, INC.

7

8               UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                 OAKLAND DIVISION

11

12   SUCCESSFACTORS, INC.,            Case No.: C-08-1376 (CW)

13        Plaintiff,               **DECLARATION OF DAVID WATKINS**
                             **IN OPPOSITION TO PLAINTIFF'S**
14   v.                            **MOTION TO STRIKE AND IN**
                             **RESPONSE TO ORDER TO SHOW**
15   SOFTSCAPE, INC.,               **CAUSE**

16        Defendant.              Date:     March 27, 2008
                             Time:     2:00 p.m.
17                              Dept.:    Courtroom 2

18                              Honorable Claudia Wilken

19

20

21

22                **REDACTED – PUBLICY FILED VERSION**

23       **[ORIGINAL FILED UNDER SEAL PURSUANT TO COURT ORDER]**

24

25

26

27

28

TAYLOR & CO.
LAW OFFICES, LLP

SUPPLEMENTAL DECLARATION OF DAVID WATKINS IN OPPOSITION TO PLAINTIFF'S MOTION TO
STRIKE AND IN RESPONSE TO ORDER TO SHOW CAUSE: CASE NO.  C-08-1376 (CW)

1    I, DAVID WATKINS, declare as follows:

2        1.    I am the Founder and Chief Executive Officer of Softscape, Inc. ("Softscape"), the

3    defendant in this matter. I make this declaration of my own personal knowledge, unless otherwise

4    stated, and if called as a witness, I could and would testify competently to the facts stated herein.

5        2.    Softscape and plaintiff SuccessFactors, Inc. ("SuccessFactors") are direct

6    competitors engaged in the business of developing and selling human resource software systems.

7    I myself have been involved in the human resource software industry since 1995.

8        3.    Because of the limited time in which to respond to the plaintiff's request for a

9    preliminary injunction, and my role and responsibilities as the Chief Executive Officer of

10    Softscape, I have only recently been able to fully analyze the claims made by Robert Bernshteyn

11    in his March 11, 2008 declaration filed in support of SuccessFactors' TRO and OSC Re

12    Preliminary Injunction. I also submit this declaration in an effort to cure any alleged evidentiary

13    infirmities that may be contained in the two declarations filed in this action by the General

14    Counsel of Softscape, Susan Mohr, on March 12 and 17, 2008.

15        4.    I am one of the authors of the internal Softscape PowerPoint presentation attached

16    as Exhibit 1 to the Bernshteyn Declaration titled "The Naked Truth" that is the subject of

17    SuccessFactors' motion for preliminary injunction (the "Presentation"). As discussed below, I

18    believe that each statement in that Presentation that is claimed to be false by Mr. Bernshteyn in his

19    March 11, 2008 declaration is, in fact, true.

20        5.    I am personally aware of, and have reviewed, all of the research that formed the

21    basis of the statements contained in the Presentation. Most of information contained in the

22    Presentation was derived from publically available sources, such as (a) information posted on

23    SuccessFactors' website, (b) information presented by SuccessFactors in public webinars, and (c)

24    information presented by SuccessFactors at public trade shows or other similar venues. Other

25    sources of information include information I and other Softscape employees received from current

26    and former SuccessFactors customers, some of whom have switched to using Softscape's software

27    products and others who have engaged us as a potential vendor. For reasons of business

28    confidentiality, at this stage in the proceedings I am not at liberty to reveal the name and identity

TAYLOR & CO.
LAW OFFICES, LLP

2.

SUPPLEMENTAL DECLARATION OF DAVID WATKINS IN OPPOSITION TO PLAINTIFF'S MOTION TO
STRIKE AND IN RESPONSE TO ORDER TO SHOW CAUSE: CASE NO. C-08-1376 (CW)

1 | of these sources of information. In my professional judgment and experience, however, I believe

2 | the information I received from these customers is truthful and accurate.

3 |       6.      More specifically, I have the following response to the statements made in Mr.

4 | Bernshteyn's March 11, 2008 declaration:

5 |       a.      Mr. Bernshteyn claims, in paragraph 15(a) of his declaration, that the

6 | statement the Presentation is "a compilation of the facts from Successsfactors customers" in Slide 2

7 | of the Presentation is false. Slides 9-12 in the Presentation are based on the information I received

8 | ████████████████████████████████████████████████████████████████

9 | ████████████████████████████████████████████████████████████

10 | ████████████████████████████████████ Thus, I believe the statements

11 | contained in Slide 2 of the Presentation to be true.

12 |       b.      Mr. Bernshteyn claims, in paragraph 15(c) of his declaration, that the

13 | statements that "63% of their 2005 Customers left [SuccessFactors] by 2008" and that one out of

14 | every two of its customers leave SuccessFactors within 2-3 years (Slide 3) are false. I believe this

15 | statement to be true, and I based it on publically available information that SuccessFactors posts

16 | and displays on its website. I have seen at least 231 customer names that have appeared on

17 | SuccessFactors' website and/or webinars and then disappeared within the 2-3 year period. When

18 | compared to their current customer base, this yields the retention figure that was used in the

19 | Presentation. Mr. Bernshteyn's "proof" that the above statements are false cites a claimed 90%

20 | *annual* retention rate; this does not address the *three-year* retention rate discussed in the slide. In

21 | his declaration Mr. Bernshteyn *does agree* that there are multiple "methodology[ies]" that could

22 | be used to calculate customer retention data.

23 |       c.      In paragraph 9 of his declaration, Mr. Bernshteyn objects to the

24 | methodology employed in determining whether SuccessFactors' customers have left. Based on

25 | my personal observations, SuccessFactors lists each and every one of its customers on its website

26 | without exception. Based on my experience then, the logical inference that can be drawn when a

27 | customer name is removed from the SuccessFactors website is that the company is no longer a

28 | SuccessFactors customer. Thus, I believe that the calculation that was used to compute the

TAYLOR & CO.
LAW OFFICES, LLP

3.

SUPPLEMENTAL DECLARATION OF DAVID WATKINS IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE AND IN RESPONSE TO ORDER TO SHOW CAUSE: CASE NO. C-08-1376 (CW)

1  number of SuccessFactors' lost customers for use in the Presentation is accurate.  In fact, Mr.

2  Bernshteyn does not claim that any of the companies identified in paragraphs 10–13 of his

3  declaration as no longer listed on the SuccessFactors website are in fact *current* SuccessFactors

4  customers.  For example, Merrill Lynch and Apple are both claimed to have purchased stand-alone

5  software in the past.  At least one of those two companies is a current Softscape customer.  In

6  direct contradiction to Mr. Bernshteyn's claim in paragraph 11(a), I have personal knowledge that

7  SuccessFactors maintains on its website the names of companies *after* they have been merged into

8  or acquired by other companies.

9         d.       In paragraph 15(f), Mr. Bernshteyn claims that the Presentation was false in

10  its claim that Sears "pulled the plug on the entire project" (Slide 8), stating that Sears remains "a

11  valued and important customer."  I have direct knowledge that ███████████████████

12  ████████████████████████████████████████████████████████████████

13         e.       In paragraph 16(a), Mr. Bernshteyn claims that the statement that

14  SuccessFactors' product cannot "handle a situation where an employee changes their position and

15  manager during the year," is false (Slide 11).  This statement is true. ███████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ██████████████████████████████

19         f.       In paragraphs 12-13 of his declaration, Mr. Bernshteyn claims that

20  statements regarding Mastercard, Bank of America and Reebok are false because they are still

21  "highly referenceable customers" of SuccessFactors.  I believe the statements contained in the

22  slides in the Presentation regarding those companies are true.  Mr. Bernshteyn does not dispute

23  that these companies are "No Longer Reference[d]" on SuccessFactors' website – the only claim

24  that is made about each specific company in Slides 16, 17, and 22.  For example, I have observed

25  that Mastercard was listed by SuccessFactors as a customer in July 2005.  They are no longer

26  listed or referenced on the SuccessFactors website.  Similarly, Reebok used to be listed on

27  SuccessFactors' website. ████████████████████████████████████

28  ████████████████████████████████████████████████

TAYLOR & CO.
LAW OFFICES, LLP

4.

SUPPLEMENTAL DECLARATION OF DAVID WATKINS IN OPPOSITION TO PLAINTIFF'S MOTION TO
STRIKE AND IN RESPONSE TO ORDER TO SHOW CAUSE: CASE NO. C-08-1376 (CW)

1 ▮▮▮▮▮▮▮▮▮

2          g.          In paragraph 16(b) of his declaration, Mr. Bernshteyn claims the statement

3 that SuccessFactors employs "440 consultants" in 2008 is false.  I believe the statement to be true

4 because I know SuccessFactors' approximate ratio of consultants to total workforce, and I

5 extrapolated that information based upon information published in SuccessFactors S-1/A

6 prospectus.  Mr. Bernshteyn does not dispute any of the other numbers of consultants listed on

7 Slide 23 of the Presentation.

8          h.          In paragraph 16(e), Mr. Bernshteyn claims that the statement in Slide 24

9 that customer data "is mixed with others" is untrue.  It is not.  Mr. Bernshteyn concedes that all

10 customer data is stored in *one database* separated by secure "table schemas."  In my experience, a

11 "table schema" refers to the fact that while all data is stored in one database, different customer

12 data is stored in different parts of the same database.  Moreover, in its public S-1/A prospectus,

13 SuccessFactors stated that it used a non-industry standard "hybrid approach to [their] *multi-tenant*

14 database architecture . . . the core of the approach is *multi*-tenant with identical database table

15 schemas for each customer." (emphasis added).  Accordingly, the statements in Slide 24 are

16 accurate.

17          i.          In paragraph 16(c), Mr. Bernshteyn claims the statement that

18 SuccessFactors adds new features "without asking you if you want it" is false, stating that 95% of

19 "enhancements" are delivered on an "opt-in" basis.  In my experience, I believe the number is

20 substantially lower than 95%, but his statement concedes that at least 5% of "enhancements" are

21 added on a non-opt-in basis.  Moreover, even if only 5% of the upgrades qualify, SuccessFactors

22 sends these upgrades out *monthly* (in fact, they have 71 releases of their software) resulting in

23 substantial and frequent changes to the software.

24          j.          In paragraph 16(f), Mr. Bernshteyn claims as false the statement that a

25 SuccessFactors' product – Ultra – is a "scam" (Slide 31).  That is not true.  Based on my

26 experience ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

TAYLOR & CO.
LAW OFFICES, LLP

5.
SUPPLEMENTAL DECLARATION OF DAVID WATKINS IN OPPOSITION TO PLAINTIFF'S MOTION TO
STRIKE AND IN RESPONSE TO ORDER TO SHOW CAUSE: CASE NO.  C-08-1376 (CW)

1         k.    In paragraph 16(g), Mr. Bernshteyn claims that the "suggest[ion] that users

2    are required to scroll through long forms" is false because there is a feature that allows users to tab

3    through pages (Slide 41). The statements made in Slide 41 are true. █████████████

4    ████████████████████████████████████████████████████████

5    Instead, he only says that a customer need not scroll because they can tab. In my experience

6    clicking on a tab does not mitigate the need to "scroll."

7        7.    SuccessFactors does not claim that any of the following information described in

8    the Presentation, all of which I believe to be true of my personal knowledge, is false:

9        a.    ███████████████████████████;

10       b.    ████████████████████████████

11   ████████████████;

12       c.    ████████████████████████████

13   ███████;

14       d.    ████████████████████████████████

15   ███████;

16       e.    ███████████████████████████████

17   ███████;

18       f.    █████████████████████████████████

19   ███████;

20       g.    ██████████████████████████████

21   ██████████████████████████████████████; and

22       h.    ███████████████████████████████████

23   ████████████████.

24       8.    I have personal knowledge that the Presentation was intended for Softscape's

internal use only. It was so marked and saved electronically on the company's server, and this

treatment of the Presentation was repeatedly emphasized to the Softscape sales force both orally

and in writing. No distribution of the Presentation outside the company was ever authorized by

Softscape, and such distribution would be in direct contravention and violation of Softscape's

employment and business policies.

TAYLOR & CO.
LAW OFFICES, LLP

6.

SUPPLEMENTAL DECLARATION OF DAVID WATKINS IN OPPOSITION TO PLAINTIFF'S MOTION TO
STRIKE AND IN RESPONSE TO ORDER TO SHOW CAUSE: CASE NO. C-08-1376 (CW)

1       9.     After I learned the Presentation had been disseminated publicly, I took two actions.

2  First, I sent the e-mail attached to this declaration as <u>Exhibit A</u> to all Softscape employees.

3  Second, I authorized an internal investigation into the "leak" of the Presentation.

4       10.   As part of our internal investigation, Softscape took the following steps:

5         a.  ■■■■■■■■■■■■■

6  ■■■■■■■■■■■■■■■■■■■■■■■■■■■■

7  ■■■■■■■■■■■■■■■■■■■■■

8         b.  ■■■■■■■■■■■■■

9  ■■■■■■■■■■■■■■■■■■■■■■■■■

10  ■■■■■■■■■■■■■■■■■■■■■■■

11  ■■■.

12         c.  ■■■■■■■■■■■■■

13  ■■■■■■■■■■■■■■■■■■■■■■■■■

14  ■■■■■■■■■■■■■■■■■■■■■■■■■■■

15  ■■■■

16         d.  ■■■■■■■■■■■■■

17  ■■■■■■■■■■■■■■■■■■■■■■■■

18  ■■■■■■■■■■■■■■■■■■■■■■

19  ■■■■■■■■■■■■■■■■■■■■■■

20  ■■■■■■■■■■■■■■■■■■■■■■

21  ■■■■■■■■■■■■■■■■■■■■■

22  ■■■■■■■■■■■■■■■■

23         e.  ■■■■■■■■■■■■■

24  ■■■■■■■■■■■■■■■■■■■■■■■■

25  ■■■■■■■■■■■■■■■■■■■■■■■

26  ■■■■■■■■■■■■■■■■■■■■■■

27  ■■■■■■■■■■■■■■■■■■■■■■

28  ■■■■■■■■■■■■■■■■■■■■■■■■

SUPPLEMENTAL DECLARATION OF DAVID WATKINS IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE AND IN RESPONSE TO ORDER TO SHOW CAUSE: CASE NO.  C-08-1376 (CW)

■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■

        f.      I believe that Softscape has to date taken all the steps it can reasonably take to identify the person(s) and the methods they used to disseminate the Presentation in violation of Softscape's policies.

      11.     On March 24, 2008, I again informed all Softscape employees that "the Presentation was created for internal use only and is not, under any circumstances, to be circulated outside of Softscape." A true and correct copy of my March 24 e-mail is attached as <u>Exhibit B</u>.

      12.     At no time has Softscape authorized, allowed, permitted, condoned, or otherwise ratified the distribution of the Presentation outside our company.

      I declare under penalty of perjury under the law of the United States of America, that the foregoing is true and correct. Executed this 26th day of March 2008 in Wayland, Massachusetts.

          /s/David Watkins
          DAVID WATKINS

SUPPLEMENTAL DECLARATION OF DAVID WATKINS IN OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE AND IN RESPONSE TO ORDER TO SHOW CAUSE: CASE NO. C-08-1376 (CW)

# EXHIBIT A

**From:** Dave Watkins
**Sent:** Wednesday, March 12, 2008 5:45 PM
**To:** *Sales Group
**Cc:** Susan Mohr
**Subject:** CONFIDENTIAL
Team:

Our Internal Naked Truth Document somehow made it to the outside world. It is a Softscape confidential document that should be used only for internal use by sales. Information contained in the document should be used judiciously in competitive situation as required.

If anyone knows how this was distributed please let me or Susan know. All discussions will be kept confidential.

The Naked truth is based on publicly available information.

_____

**Dave Watkins**
Founder, CEO
Softscape, Incorporated
Softscape ConferenceManager
One Softscape Place
526 Boston Post Road
Wayland, MA 01778
( + 1 508 358 1072 x1300 (Office)
( + 1 617 835 8835 (Cell)
7 + 1 508 358 3072
( 07824646245 (UK Local Cell)
* dave@softscape.com
7 www.softscape.com
Atlanta | Bangkok | Boston | Chicago | Connecticut | Dallas | Hong Kong | Johannesburg | London |
New York | San Francisco | Sydney | Washington DC |
**Softscape Recognized by Forrester as one of the only vendors that can claim to have the "four pillars"
of Strategic HCM - Performance, Learning, Rewards and Recruitment and "Softscape has done a good
job in assembling a full strategic HCM suite"**
**For more, please see the press release at** http://www.softscape.com/us/pr2007/pr_07_04-16_forrester-tm.htm

3/17/2008 3:51 PM

# EXHIBIT B

## Laura Secor

**From:** Dave Watkins

**Sent:** Monday, March 24, 2008 5:14 PM

**To:** *All Softscape Employees

**Cc:** Jessica Grant; Susan Mohr

**Subject:** Team Announcement

All:

As you know, SuccessFactors has filed a lawsuit against Softscape as a result of the inadvertent and anonymous disclosure of the PowerPoint presentation entitled "The Naked Truth" (the "Presentation"). Although the information contained in the Presentation is compiled from publicly available sources, I want to re-emphasize that the Presentation was created for internal use only and is not, under any circumstances, to be circulated outside of Softscape.

If you have any questions, please contact me or Susan Mohr.

**Dave Watkins**
Founder, CEO
Softscape, Incorporated



One Softscape Place
526 Boston Post Road
Wayland, MA 01778
☎  + 1 508 358 1072 x1300 (Office)
☎  + 1 617 835 8835 (Cell)
🖨  + 1 508 358 3072
☎   07824646245 (UK Local Cell)
✉  dave@softscape.com
🌐  www.softscape.com
Atlanta | Bangkok | Boston | Chicago | Connecticut | Dallas | Hong Kong | Johannesburg | London |
New York | San Francisco | Sydney | Washington DC |
**Softscape Exceeds 3.4 Million Users, Dominates Strategic Human Capital Management Market for Global
Enterprises, Increased Demand From Large Multi-National Enterprises and Ongoing Profitable Operations
Close Out Stellar Year**
For more, please see the press release at http://www.softscape.com/us/pr2008/pr_08_0310_dominates.htm

# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


--------------------------------x

SUCCESSFACTORS, INC., a Delaware

corporation,

                    Plaintiff,

                                        Case No.

vs.                                     CV 08 1376 CW (BZ)


SOFTSCAPE, INC., a Delaware             Vol. II

corporation; DOES 1-10, inclusive,

                    Defendants.

--------------------------------x



        VIDEOTAPED DEPOSITION OF DAVID V. WATKINS, a

    witness called by and on behalf of the Plaintiff,

    taken pursuant to Rule 30 of the Federal Rules of

    Civil Procedure, before James A. Scally, RMR, CRR, a

    Notary Public in and for the Commonwealth of

    Massachusetts, at the offices of Bromberg & Sunstein

    LLP, 125 Summer Street, Boston, Massachusetts, on

    Friday, May 30, 2008, commencing at 9:16 a.m.

1   Q.   And in that e-mail, ▮▮▮ writes in response to "How

2   has your ▮▮▮▮ trial been going," "Thomas:  Yes, I would

3   like to proceed.  Is the ▮▮▮▮▮▮▮▮▮▮ function

4   available as well?"  Correct?

5   A.   Yes.

6   Q.   Did you write that?

7   A.   Yes.

8   Q.   And you were asking him to show you a▮▮▮▮▮

9   ▮▮▮▮▮▮▮▮▮▮ that was available only for ▮▮▮

10  ▮▮▮▮▮▮▮▮▮ correct?

11  A.   I don't know.

12  Q.   Look at his response to you.  Did you receive that

13  response dated March 3rd, 2008 the day before the John

14  Anonymous e-mail in which he wrote, that is, ▮▮▮▮ rep

15  wrote, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮ Did you receive that e-mail?

19  A.   I did.

20  Q.   Were you asking him to send you or to give you

21  access to a function that is not available to small

22  businesses and he refused?

23  A.   I think if you look at the order of this, the

24  first one that you asked me to read says March 3rd, 2008 at

25  3:16 a.m., where I asked for access to ▮▮▮▮▮▮▮▮

1    ███████████    The next one is at 10:56 a.m., which I

2    believe is after that e-mail, where he declines the request

3    for -- actually, he says it's only available in the ███████

4    ████████████████    I think he also goes on to say, talks

5    about the business, business system itself.  And I said --

6    and that's what he says.

7        Q.    So you were asking him for access to additional

8    space -- additional functionality after the trial was

9    completed from████████correct?

10       A.    I think all I asked for was, "Is the ████████

11   ████████████████available as well?"

12       Q.    That was a functionality you hadn't seen during

13   your trial of ███████correct?

14       A.    That function was not turned on in the trial,

15   correct.

16       Q.    The top e-mail is your response back to him on

17   March 11th, and it says, eight days after he wrote you, "I

18   missed this e-mail.  The quotation is fine.  Is there any

19   possibility that they can turn the feature on for us?"  Is

20   that what I see you wrote?

21       A.    Yes.

22       Q.    And that was you who wrote that under ███████████

23       A.    That's correct.

24       Q.    And "The quotation is fine," that was a quotation

25   he had given you to buy software?

1    A.   I don't recall.

2    Q.   Did you buy software from █████

3    A.   I don't recall.  I don't believe we did.

4    Q.   Did you buy software from any of your competitors

5    under the name of New Millennium Shoe?

6    A.   I don't believe we did.

7    Q.   Have you had trials with anyone other than █████

8    and SuccessFactors?

9    A.   No, I don't believe I have.

10   Q.   Has New Millennium Shoe?

11   A.   To the best of my knowledge.

12   Q.   Has New Millennium Shoe?

13   A.   What?

14   Q.   Had trials from any other of Softscape's

15   competitors besides █████ and SuccessFactors?

16   A.   I don't recall specifically.

17   Q.   What's your best recollection, sir?

18   A.   That is my best recollection.

19   Q.   And on March 11th, you asked Mr. Ricks again to

20   turn the feature on for you and he declined again, correct?

21   A.   That's correct.

22   Q.   Were you visiting the █████ trial because you

23   thought that they were misappropriating your intellectual

24   property?

25   A.   Yes.

1    Q.   And had you consulted with counsel about this
2  intellectual property misappropriation by ████████
3    A.   No, not specifically.
4    Q.   Have you ever?
5    A.   Yes.
6    Q.   After visiting their website, after visiting their
7  trial?
8    A.   No.  Prior to that.
9    Q.   Did you consult with -- when did you consult with
10  counsel about ████████ purported misappropriation of your
11  IP?
12    A.   To the best of my knowledge, when I learned that a
13  product manager got hired by them.
14    Q.   When was that?
15    A.   Somewhere in the 2007 time frame.
16    Q.   Can you be more specific, please?
17    A.   No.
18    Q.   Did you consult with them subsequently about the
19  potential misappropriation of your IP other than at that
20  time that the product manager was hired?
21    A.   To the best of my ability, no.
22    Q.   And you previously testified that you had
23  consulted at some point with counsel about SuccessFactors'
24  potential misappropriation of your IP, correct?
25         MR. DAVIDS:  Objection.

1      A.   I don't think we know who the potential customers

2   of SuccessFactors are.  But customers of SuccessFactors the

3   typically ongoing campaigns.

4      Q.   Could you identify for me any other campaign that

5   was in place at that time?

6      A.   Not specifically, no.

7      Q.   So there was the client campaign to approach

8   former customers, and then there was the campaign that

9   first -- that Pearson refers to of conversing with current

10  clients, correct?

11     A.   I don't know, actually, what Linda meant by those

12  terms.  I'm assuming -- I don't know.  I mean the -- you

13  could read them in the e-mails.

14     Q.   Well, the SPIFF, the $100 per head, was being paid

15  for contacting former customers, correct?

16     A.   I don't know specifically if it was just former or

17  the rest.  I don't know the context.  Certainly the

18  description says that.

19     Q.   And Ms. Pearson says that she's conversing with

20  current clients, correct?

21     A.   That's what she says in her e-mail, correct.

22     Q.   And didn't you also obtain in late February or

23  early March a list of prospective customers of

24  SuccessFactors?

25     A.   I don't recall.

1  Q.  Did you learn of a dinner that SuccessFactors held

2  for prospective customers?

3  A.  To the best of my knowledge, yes.

4  Q.  And what was that dinner?

5  A.  It was a dinner where a person by the name of

6  Larry Kurzner participated.

7  Q.  Who is Larry Kurzner?

8  A.  Larry is a person in the organization who was

9  responsible for strategic accounts.

10  Q.  What organization?

11  A.  Softscape.

12  Q.  And when he attended this dinner, was it in New

13  York?

14  A.  I believe so, correct.

15  Q.  Was it called a people connect dinner?

16  A.  I don't remember.

17  Q.  What do you understand happened at that dinner?

18  A.  I don't, actually.

19  Q.  What do you know about Larry Kurzner's attendance

20  of it?

21  A.  That he went to it.

22  Q.  Was this for prospective customers?

23  A.  I don't know why Larry was there.

24  Q.  How did he manage to get into the people connect

25  dinner for SuccessFactors?

1       A.    He was part of Accenture.

2       Q.    Accenture?

3       A.    At the time.

4       Q.    He was part of Accenture at the time, and he is

5    now?

6       A.    He's part of Softscape.

7       Q.    When was he hired?

8             MR. DAVIDS:  Objection.

9       A.    Don't recall a specific date.

10      Q.    Was it in March of 2008?

11      A.    I don't remember.

12      Q.    Was he -- well, it was after he attended the

13   people connect event, correct?

14      A.    I don't recall when that event was, and I don't

15   remember when he was hired, so I don't know.

16             MR. DAVIDS:  Did you give us the date

17          of that dinner?

18             MR. PULGRAM:  I did not give you the

19          date of that dinner.

20      Q.    But I wanted to know from you whether Mr. Kurzner

21   went before or after he was employed by Softscape.

22      A.    I don't know.

23      Q.    He could have gone while he was a Softscape

24   employee pretending to still be at Accenture?

25             MR. DAVIDS:  Objection.

1    A.    I don't have the dates.

2    Q.    I understand you don't have the dates.

3    A.    So I can't respond.

4    Q.    It's possible that that happened; you can't --

5          MR. DAVIDS:  Objection.

6    Q.    -- deny that that's a possibility?

7          MR. DAVIDS:  Objection.

8    A.    I don't have the dates.

9    Q.    Did you communicate with Larry Kurzner about that

10   dinner before he attended it?

11   A.    I don't remember.

12   Q.    Did you communicate with anybody in your team

13   about his attendance at that dinner?

14   A.    I don't recall.

15   Q.    Prior to that dinner, was Larry Kurzner in

16   negotiations or discussions with Softscape to become an

17   employee?

18         MR. DAVIDS:  Objection.

19   A.    I don't remember.

20   Q.    What was his job at Accenture?

21   A.    Actually, I don't know the official role that he

22   had at Accenture.

23   Q.    What is your best understanding, sir?

24   A.    At one point he negotiated our contract with

25   Accenture.

1    Q.    So he was a purchaser of software at least in

2    part?

3    A.    I don't know.

4    Q.    Was he in charge of implementation there?

5    A.    I don't know.

6    Q.    What is his role now at Softscape?  Tell me again.

7    A.    He's responsible for strategic territory

8    development.

9    Q.    What does that mean?

10   A.    It means he's working on strategic territories.

11   Q.    What territories are those?

12         MR. DAVIDS:  Objection.  Do you want

13         to know the specific territories or just

14         generally what his job entails?

15   Q.    Are there specific territories?

16         MR. DAVIDS:  Objection.

17   A.    The strategic ones.

18   Q.    Which ones?

19         MR. DAVIDS:  Objection.

20   A.    The ones that are strategic.

21   Q.    Can you tell me, please, what he's working on now?

22         MR. DAVIDS:  Objection.

23   A.    What I call strategic.

24   Q.    Does he have the New York area?

25         MR. DAVIDS:  Wait a second.  Before

1    he answers these questions, can you tell me

2    where in the deposition notice what their

3    strategic planning for the future in terms

4    of territories has to do with any of your

5    categories?

6        MR. PULGRAM:  It has to do with

7    dissemination of the presentation.

8    Q.   What were the strategic territories that Mr.

9  Kurzner is responsible for?

10       MR. DAVIDS:  Are you talking about

11   now?

12       MR. PULGRAM:  I'm talking about now

13   at Softscape.

14       MR. DAVIDS:  I'm going to object to

15   that.  I'm not going to let him answer

16   that.  I'll take that up with the judge.

17   If you want to know what Softscape's

18   strategy is out in the field about what

19   areas they deem to be important or not,

20   that has absolutely nothing to do with this

21   notice.

22       MR. PULGRAM:  I don't.  But I -- I do

23   want to know whether Mr. Kurzner's

24   territories include New York, the place

25   that he attended the SuccessFactors

1            meeting.

2                 MR. DAVIDS:  I'll object.  I'll let

3            you answer that one question to move on.

4       A.   To the best of my knowledge, no.

5       Q.   New York is not part of his mission in strategic

6  territory development?

7                 MR. DAVIDS:  Objection.

8       A.   Is that the question you're asking me?

9       Q.   That's what I just asked you.

10      A.   If it's part of his mission.  What's his mission

11  mean?

12      Q.   Is New York and strategy for growing New York part

13  of Larry Kurzner's job at Softscape?

14                 MR. DAVIDS:  I'll object.  I'll let

15            you answer that one question, and then

16            that's it on this topic, if you can answer

17            that.

18      A.   I don't believe that that's specifically called

19  out.

20      Q.   Did Mr. Kurzner provide the list of the attendees

21  at the dinner?

22      A.   I don't recall specifically.

23      Q.   What's your most -- your best recollection, sir?

24      A.   I believe he did.

25      Q.   And to whom?

1    A.    I don't know.

2    Q.    Did you get a copy of it?

3    A.    I may have.

4    Q.    Do you have a copy still?

5    A.    I don't know.

6    Q.    When you say you may have, are you uncertain about

7    that?

8    A.    I get things from people all the time.  It's quite

9    possible that I've gotten it.

10    Q.    Are you uncertain about that?

11    A.    It's quite possible.  I actually don't know.

12    Q.    What did you do with it?

13    A.    I don't recall what I did with it.

14    Q.    Who besides Mr. Kurzner at Softscape had the list?

15         MR. DAVIDS:  Objection.

16    A.    I don't know.

17    Q.    How big was the list?

18    A.    I don't recall.

19    Q.    Did you have discussions internally about how to

20    use the list?

21    A.    I don't remember.

22    Q.    Did you have e-mails about how to use the list?

23    A.    How to use the list?

24    Q.    Yes.

25    A.    I don't know.

1           Yes, if you'd take a break.

2                MR. DAVIDS:  We'll call you back into

3       the room.

4    BY MR. PULGRAM:

5       Q.   We've marked as Exhibit 21 the document production

6    by Google.  You had it last night to look at, correct?

7       A.   I did.

8       Q.   If you look at -- did you notice last night that

9    the addressees from John Anonymous were broken up into two

10   big chunks?

11      A.   No.

12      Q.   Well, there are so many, you couldn't get them all

13   in the first -- in the address line.  If you look, the

14   first chunk is from page 1661 to 1664.  Do you see that?

15      A.   Correct.  Do you mean the page numbers, the Bates

16   stamps?

17      Q.   Yes.

18      A.   Yes.  Yep.

19      Q.   And that stops with jennifer_e_jones@national.com,

20   alphabetical order, essentially, by name of domain or

21   company?

22      A.   Correct.

23      Q.   The second big chunk begins on page 1724 and runs

24   to page 1727.  Again, primarily alphabetical order.  Do you

25   see that?

1    A.    I do.

2    Q.    And do you see at the end of the alphabetical

3    order --

4    A.    That's the part starting on page 1725, do you

5    mean?

6    Q.    Well --

7    A.    Sorry, 1724?

8    Q.    Go through 1724, 1725, 1726, at the end of 1726,

9    there is a transition from alphabetical to non-

10   alphabetical.  Do you see that?  Where about ten lines up

11   there's an addressee, mbaldwin@yankeecandle.com, and then

12   nlewis@ymcamiami.org.

13   A.    What page are you on?

14   Q.    1726.

15   A.    Okay.

16   Q.    And then it's not alphabetical after nlewis@

17   ymcamiami.org.

18   A.    I'll take your word for it.

19   Q.    Isn't what comes after that in primary part the

20   list from SuccessFactors' people connect dinner?

21   A.    I have no idea.

22            MR. DAVIDS:  Wait.  Just so I'm

23            clear, are you talking about all the way to

24            the end of the list on 1727?

25            MR. PULGRAM:  Well, obviously, there

1          are the sales addresses.  I don't think

2          those people attended the SuccessFactors

3          dinner.

4                 THE WITNESS:  You'd be surprised.

5                 MR. PULGRAM:  I was talking about --

6          and I said primarily.

7      BY MR. PULGRAM:

8          Q.   So as the corporate designee of Softscape --

9          A.   Yep.

10         Q.   -- you can't tell me yes or no whether or not this

11     list includes the SuccessFactors people connect dinner

12     list?

13         A.   I don't know.

14         Q.   Was the people connect dinner list posted on your

15     internal website?

16         A.   I don't know.

17                 MR. DAVIDS:  Objection.

18         Q.   Was it obtained immediately after the dinner?

19                 MR. DAVIDS:  Objection.

20         A.   I have no idea.

21         Q.   Did Mr. Kurzner send it right over as soon as he

22     got it?

23         A.   I don't know what Mr. Kurzner did.

24         Q.   Who did he send it to in the first instance?

25         A.   I don't know specifically who he may have sent it

1    information?  A person?

2              MR. DAVIDS:  Who could be.

3        A.   Who could be, a person?  Is that the question?

4              MR. DAVIDS:  He'll ask again.

5              THE WITNESS:  Sorry.

6    BY MR. PULGRAM:

7        Q.   No.  My question was:  Would obtaining competitive

8    information from SuccessFactors' employees be within Mr.

9    Faust's responsibilities?

10             MR. DAVIDS:  Objection.

11       A.   No, I don't believe anybody's got those

12   responsibilities.

13       Q.   Prior to January 1, 2008, has Softscape had a

14   contact with any person within SuccessFactors who provided

15   information about SuccessFactors' prospects or customers?

16             MR. DAVIDS:  Objection.

17       A.   Have we had a contact.  To the best of my

18   knowledge, no.

19       Q.   Was there any person prior to January 1, 2008

20   within SuccessFactors who was feeding Softscape information

21   about SuccessFactors' customers?

22             MR. DAVIDS:  Objection.

23       A.   Feeding information about customers.  Prior to

24   2008?

25       Q.   Yes.

1       A.    I believe there was one person who was.

2       Q.    Who was that?

3       A.    A woman by the name of Lori McNally.

4       Q.    What did she do?

5       A.    I know she was friends with Softscape employees.

6       Q.    Is she still at SuccessFactors?

7       A.    I believe so.

8       Q.    And has she provided any information to Softscape

9    employees about SuccessFactors' customers since January 1,

10   2008?

11      A.    I don't know.

12      Q.    Is there any other -- well, what information was

13   she providing?

14            MR. DAVIDS:  Objection.

15      A.    I don't recall specifically, but the context was

16   that she was -- she'd keep people -- keep certain people

17   informed.

18      Q.    Which people?

19      A.    A woman by the name of Laura Duffy.

20      Q.    And who else?

21      A.    To the best of my knowledge, that was who.

22      Q.    You said that she was friends with Softscape

23   employees before.  Who else was she friends with?

24            MR. DAVIDS:  Objection.

25      A.    I'm trying to think if there was another person,

1    but I can't recall.  There was a person Tom Sain that

2    worked for us for a period of time.

3        Q.   Last name?

4        A.   Sain.  S-a-i-n.

5        Q.   Anyone else?

6        A.   No, to the best of my knowledge.

7        Q.   Was there any person subsequent to January 1,

8    2008, within SuccessFactors that was feeding Softscape

9    information about SuccessFactors' customers?

10       A.   To the best of my knowledge, I don't know.

11       Q.   Was there any person subsequent to January 1, 2008

12   within SuccessFactors that was feeding Softscape

13   information about SuccessFactors' prospects?

14       A.   I don't know.  There was a firm in Malaysia that

15   we had gotten some prospect leads from.

16       Q.   What was that firm?

17       A.   I don't recall a specific name.

18       Q.   Anyone else?

19       A.   No.  To the best of my knowledge, that's it.

20       Q.   What were the prospect leads generated by this

21   firm in Malaysia or provided by them?

22               MR. DAVIDS:  Objection.

23       A.   I don't recall specifically.

24       Q.   What did they give you by way of information about

25   SuccessFactors' prospects?

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


--------------------------------x

SUCCESSFACTORS, INC., a Delaware

corporation,

                Plaintiff,

                              Case No.

vs.                             CV 08 1376 CW (BZ)


SOFTSCAPE, INC., a Delaware

corporation; DOES 1-10, inclusive,

                Defendants.

--------------------------------x



        VIDEOTAPED DEPOSITION OF DAVID V. WATKINS, a

    witness called by and on behalf of the Plaintiff,

    taken pursuant to Rule 30 of the Federal Rules of

    Civil Procedure, before James A. Scally, RMR, CRR, a

    Notary Public in and for the Commonwealth of

    Massachusetts, at the offices of Bromberg & Sunstein

    LLP, 125 Summer Street, Boston, Massachusetts, on

    Thursday, May 29, 2008, commencing at 9:16 a.m.

1     A.    I had a PowerPoint presentation I would have

2   printed to pdf.

3     Q.    Okay.  So this PowerPoint, where did it exist on

4   the computers at Softscape?

5     A.    The PowerPoint existed on our sales resource

6   center.  It existed probably on my administrator's

7   machines -- machine.  And our corporate intra -- well, it's

8   a corporate file server.  To the best of my knowledge.

9     Q.    So, and within the sales resource center, was this

10  PowerPoint within any particular category?

11    A.    Yes, it was.

12    Q.    And what was that?

13    A.    Competitor information.

14    Q.    Is it still there?

15    A.    Yes.

16    Q.    Is it still available in the format that you had

17  at 8:12 p.m. on March 3rd?

18    A.    To the best of my knowledge, I think we've hidden

19  it so that it can't be referenced, but we've left it and

20  preserved it.

21    Q.    And does that --

22    A.    But I don't recall if it was -- I mean I don't

23  know if was exactly -- if it's exactly this version that's

24  on that sales resource center, but I know that there is a

25  version there, whatever was there at the time we were

1    Q.    You can't point to any?

2    A.    Not specifically.

3    Q.    And where did you get the logo?

4    A.    I believe it was e-mailed to me in a PowerPoint

5    deck by the sales organization.

6    Q.    Who in the sales organization?

7    A.    To the best of my knowledge, it was either Matt

8    Park or Matt Sager.

9    Q.    And who is Matt Sager?

10   A.    He's a regional sales representative at Softscape.

11   Q.    Where did Softscape get the PowerPoint template

12   that was used for The Naked Truth with the SuccessFactors

13   logo?

14   A.    The original PowerPoint deck was from a woman by

15   the name of Kim Swendowski (phon sp), who is an ex-

16   SuccessFactors employee.

17   Q.    Can you spell her name, please?

18   A.    I don't know specifically, but it's phonetic,

19   Swendowski.

20   Q.    Is she still an employee --

21   A.    To the best of my knowledge, that's her.

22   Q.    Is she still an employee of Softscape?

23   A.    No, she's not.

24   Q.    How did she come to give a PowerPoint on that

25   template to Softscape?

1    A.    To the best of my knowledge, I am -- I am actually

2    not sure if it's been produced, but I know it has been

3    produced.  I don't know whether it's been distributed.

4    Q.    Produced meaning given to your lawyers?

5    A.    Correct.

6    Q.    Distributed being given to us?

7    A.    Correct.  I do not know that specifically.

8    Q.    Did you receive that presentation soon before

9    generating The Naked Truth document or at some

10    substantially earlier time?

11    A.    To the best of my knowledge, it was earlier that I

12    would have -- would have received that.

13    Q.    So you had it in your files?

14    A.    Correct.

15    Q.    Did you yourself take that template and load copy

16    on to it?

17                MR. DAVIDS:  Objection.

18    A.    I took -- what did I do with the template?  Is

19    that what you're asking?

20    Q.    Well, you had a presentation.

21    A.    Right.

22    Q.    And the presentation was on a template.

23    A.    Right.

24    Q.    And that was SuccessFactors' work.

25    A.    Correct.

1    Q.    -- in Exhibit 5.

2    A.    Yes.

3    Q.    Okay.  What is that page, 6272001?

4    A.    I don't know specifically how that relates, but I

5    believe it's probably -- it's probably a copy of the

6    information on their -- on their website.

7    Q.    As of that date?

8    A.    As of that date.  Would have been the date that it

9    would have been captured.

10    Q.    Did you collect that information?

11    A.    To the best of my knowledge, yes.  It could have

12    also come out of an e-mail; I don't recall specifically.

13    Q.    Did you use this in your calculation of retention

14    numbers?

15    A.    Yes, I did.

16    Q.    For The Naked Truth presentation?

17    A.    I used that for the retention numbers that are in

18    this Excel file spreadsheet, which is what I'm talking

19    about, which was also, parts of that were copied and pasted

20    in the PowerPoint.

21    Q.    Okay.  What is the tab referred to as original?

22    What does that mean?  That's a multipage excerpt of this

23    spreadsheet within Exhibit 5 labeled "Original" at the

24    bottom.

25                MR. DAVIDS:  Where is that located in

1           the package?

2                MR. PULGRAM:   It's about 15 pages

3           from the end, roughly.

4      A.    This would have come from a combination of Kim

5  Swendowski's PowerPoint as well as a webinar that was

6  produced off of a public website.

7      Q.    When was it gathered?

8      A.    When was what gathered?

9      Q.    This information.

10     A.    Probably this year.

11     Q.    By whom?

12     A.    Actually, gathered -- from a gathering

13 perspective, I don't actually know when it was physically

14 gathered from their customers, but I know that when I

15 looked at it from their PowerPoint, from their webinar, as

16 well as their website, would have been this year.  And it

17 would have been me.  But I don't know actually the genesis

18 of how they gathered it, whomever authored this.

19     Q.    You don't know who authored the original tab?

20     A.    Actually, the person who presented this, portions

21 of it at least, were Robert, because that was who had the

22 public webinar that was available on the Internet.  The Kim

23 Swendowski, he was also listed as part of their -- as part

24 of the properties of that document.  And it's also where

25 that information would have come from.

1    Q.    What I'm trying to understand specifically --

2    A.    Uh-huh.

3    Q.    -- is the source of the entries in this original

4    file, and I understand you to say there are two places.

5    One is the PowerPoint that Kim had brought.

6    A.    Correct.

7    Q.    And the other is one particular webinar; is that

8    correct?

9    A.    Correct.

10   Q.    Okay.  And what was the date of that webinar?

11   A.    I don't know specifically.

12   Q.    Was it in 2004?

13   A.    I don't know.

14   Q.    This --

15   A.    I'm assuming that it was probably 2004, because

16   that's what I used as a date.

17   Q.    Can you explain to me -- okay.  Who collected the

18   names from that webinar?

19   A.    I did.

20   Q.    Did you attend the webinar?

21   A.    This was an online recorded webinar that you can

22   get in the public domain.  It's just watching it.  So it's

23   not -- it wasn't a live one.  It's just out there on the

24   Internet.

25   Q.    Right.  And did you have to log in to watch it?

1      A.    No.

2      Q.    Did you have to give any name or information?

3      A.    Nope.

4      Q.    The -- so you watched it, and then did you make

5  this list or did you assign someone else to make this list?

6  Did you make a screen shot?  How did you make the list?

7      A.    This list, I made the list.

8      Q.    By hand?

9      A.    Correct.

10     Q.    Just wrote down the names of all the companies

11  that were in there?

12     A.    Every single one on the PowerPoint slide.

13     Q.    You froze the frame --

14     A.    And webinar.

15     Q.    -- and then --

16     A.    No.  Just literally just paused it.

17     Q.    Okay.  What does the column on this tab

18  "Original," the column labeled "Time to Implement" mean?

19     A.    Just other information that we could gather and

20  find.

21     Q.    About?

22     A.    They actually had on this -- on this webinar, they

23  had literally a slide that would say "Time to Implement,"

24  and they would brag about how fast or how slow it took them

25  to actually implement things.  And all it was was recording

1   correct.

2        Q.   Were you comparing it to the 2005 column?

3        A.   No, because there was obviously nothing in the

4   2005 column in this particular example.

5                  MR. PULGRAM:   Those are my questions

6             before the lunch break.

7                  THE VIDEOGRAPHER:   Going off the

8             record.   This marks the end of videotape

9             number 3 in the deposition of Softscape,

10            Inc., Rule 30(b)(6) designee David V.

11            Watkins.   We're going off the record.   The

12            time is 1:10.

13                 (Recess.)

14                 THE VIDEOGRAPHER:   We're back on the

15            record.   This marks the beginning of

16            videotape number 4 in the deposition of

17            Softscape, Inc., Rule 30(b)(6) designee

18            David V. Watkins.   The time is 2:10.

19   BY MR. PULGRAM:

20        Q.   Good afternoon.

21        A.   Hello.

22        Q.   Do you have today at Softscape actual copies of

23   the PowerPoints, web sites, and webinars that were used to

24   compile your list of 2005 customers for SuccessFactors?

25        A.   I -- what I have at my disposal is the content

1    that's in the spreadsheet, the -- the various tabs.  I

2    believe I've got a webinar, I've got the Kim Swendowski

3    PowerPoint, I've got the Austin Hayne PowerPoint, and we've

4    got copies of the website, the list of customers from

5    October, and then the Q1 '08 at some point in time.

6         Q.   October of what year?

7         A.   2007.

8         Q.   Do you have copies of the website that was used

9    for compiling the list of 2005 customers, or are you just

10   relying on the preexisting versions of the spreadsheet that

11   were rolled up into the summary?

12        A.   Let's see.  The -- I have the -- I have one page

13   of -- of the website from previous years, I believe, that

14   is in the actual html file, the actual -- I'm sorry -- it

15   is in the Excel file.  But I actually don't have full

16   copies of any website that they have.

17        Q.   The copy of the webinar that you have, that's a

18   webinar from 2004 or 2005 or when?

19        A.   I don't know what date that webinar is actually

20   from.  I've got -- I've got several examples of webinar

21   information, but one of them, which is the talking one with

22   Robert, that would have come -- that would have just been a

23   multimedia one.  I don't know an exact date.

24        Q.   Was it in 2004 or 2005 or some other time?

25        A.   I don't know.

1      Q.   Mr. Kutik says, "Great if you could preempt it by

2   discovering the rogue first.  Do you have an SF --

3   ex-FS" -- let me start over.

4           Mr. Kutik in the second paragraph of the e-mail

5   writes, "But just as they dropped a bomb on you yesterday

6   and another this morning, I suspect that will be their next

7   ordinance.  Great if you could preempt it by discovering

8   the rogue first.  Do you have any ex-SF person working for

9   you?  Hire someone from Guantanamo Bay to question all your

10  salespeople," question mark, exclamation point, question

11  mark.  Do you see that?

12     A.   I do.

13     Q.   And had you not discussed with -- with Mr. Kutik

14  that this appeared to be a rogue employee who had sent out

15  the presentation?

16     A.   I don't recall having that conversation.

17     Q.   Do you recall that he had that point of view, that

18  it had to be a rogue employee?

19     A.   I don't.

20     Q.   Was -- do you have any recollection of any person

21  other than Dave Watkins, Christopher Faust, and Bill Kutik

22  being involved in a conversation before this date?  I

23  assume not, since you don't recall any conversation before

24  this date about this subject.

25     A.   With Bill Kutik?

1    March time frame.

2        Q.    Can you be more specific, please?

3        A.    No, I can't.

4                    MR. PULGRAM:  I don't have time to

5              address all of that right now, so I want to

6              shift for a moment to New Millennium Shoe.

7              We will come back to the customer campaign

8              either tomorrow or when we have the rest of

9              the documents about it.

10       Q.    What is New Millenium Shoe?

11       A.    It's a shoe store.

12       Q.    Store?

13       A.    Correct.

14       Q.    One store?

15       A.    It was three retail stores.  Two and a half retail

16    stores.

17       Q.    Where is it located?

18       A.    It's located -- it was located in Puerto Rico.

19       Q.    It's now one store?

20       A.    It's actually now -- we've closed the retail

21    operations.

22       Q.    Is there any operation remaining?

23       A.    There's still -- there's still a legal entity.

24       Q.    There's a legal entity without operations?

25       A.    Correct.  Without the retail stores.

1  Q. When were the retail stores closed?

2  A. Sometime in 2007.

3  Q. When you say "we," what's your relationship with

4 New Millenium Shoe?

5  A. I'm the owner of it.

6  Q. Is it a corporation?

7  A. It is a corporation.

8  Q. You're 100 percent owner?

9  A. I own 100 percent of the stock.

10  Q. Does it have a board?

11  A. No, it does not have a board.

12  Q. Does Ely Valls have any affiliation with it?

13  A. Ely Valls does have affiliation.

14  Q. What is it?

15  A. What is her affiliation?

16  Q. Correct.

17  A. During which time period?

18  Q. During 2008.

19  A. She is responsible for any operations that

20 existed.

21  Q. There were no operations, correct?

22  A. She was selling off shoes.

23  Q. Was there inventory?

24  A. Equipment.  Correct.

25  Q. And where was the inventory located?

1         A.    The residual inventory was located at her home.

2    Her mom's home.

3         Q.    Excuse me?

4         A.    Her mother's home.

5         Q.    And her mother is?

6         A.    Lillian Valls.

7         Q.    And Lillian is related to you as?

8         A.    My mother-in-law.

9         Q.    Who is Lillian married to?

10        A.    Lillian was married to Rafael Valls.

11        Q.    Okay.  So there are two Lillian Vallses?

12        A.    There are two Lillian Vallses.

13        Q.    There's your wife and your mother-in-law?

14        A.    That is correct.

15        Q.    And Ely Valls is your sister-in-law?

16        A.    That is correct.

17        Q.    Has the New Millennium Shoe business had any sales

18   in 2008 other than liquidating inventory?

19        A.    Don't recall specifically, but I don't believe so.

20        Q.    Does it engage in Internet sales?

21        A.    It did.

22        Q.    When?

23        A.    In the two -- in the probably mid-2000 time frame.

24   It's quite some time ago they tried to do it.

25        Q.    Now, there were modifications made to the New

1    A.    In 2008?

2    Q.    Correct.

3    A.    I do not recall what I may have done in 2008.

4    Q.    Were there changes made to the appearance of the

5    website?

6    A.    I don't --

7              MR. DAVIDS:  In that login?

8    Q.    During 2008.

9    A.    I don't recall specifically logging in and making

10   changes to the appearance.  I don't recall.

11   Q.    Were there changes to the appearance of the

12   website?

13             MR. DAVIDS:  Objection.

14   A.    I don't recall.

15   Q.    Did you log in to the New Millennium Shoe website

16   account at NSI from your home?

17   A.    During what time period?

18   Q.    During January of 2008.

19   A.    I don't recall specifically logging in in January

20   2008.  But if there would be -- if there was a potential

21   login, it most probably it was from me.

22   Q.    Does anyone other than you have responsibility for

23   the New Millennium Shoe website?

24   A.    No.

25   Q.    Okay.  How did it come about that New Millennium

1    Shoe contacted SuccessFactors?

2        A.    I asked Ely Ann, Ely, to actually make an e-mail

3    inquiry and a phone call to gain access to their -- to

4    actually get -- to have the ability to actually participate

5    in their trial program.

6        Q.    When did you ask her to do that?

7        A.    Probably in the November time frame, maybe in

8    October.  Somewhere in that vicinity.

9        Q.    And when did she do so?

10              MR. DAVIDS:  Objection.

11       A.    Do so what?

12       Q.    Did she contact SuccessFactors?

13       A.    I believe she attempted to contact them in the

14   winter of 2007.

15       Q.    Do you have an understanding of when she

16   succeeded?

17       A.    Somewhere between December and I think February.

18       Q.    Do you have any reason to disbelieve Mr.

19   Corrales's declaration that Ely Valls contacted

20   SuccessFactors on January 29th, 2008?

21       A.    Do I have what?

22       Q.    Any reason to disbelieve that.

23       A.    Disbelieve that she contacted him in January of

24   2008.

25       Q.    January 29th, 2008.

1      A.    For the trial?

2      Q.    For the trial version, as you call it.

3      A.    I don't recall specifically.

4      Q.    Did you all get trial versions of any of your

5   other competitors' software?

6      A.    We've attempted to.

7      Q.    In fact, you did a trial of ███████ did you not?

8      A.    We did.

9      Q.    Anybody else's?

10     A.    To the best of my knowledge, no.

11     Q.    Did you do the same setup for ██████████████

12   ██████████████████████ under the name of New

13   Millennium Shoe that you actually used?

14     A.    Yes.

15     Q.    Now, when -- do you differentiate the trial

16   version from the ACE demo site?

17     A.    I -- I don't differentiate anything.  I've got a

18   password and user ID to a trial version.

19     Q.    Was the password and user ID e-mailed to you?

20     A.    It was e-mailed to Ely at New Millennium Shoe.

21     Q.    Was the trial version password sent in response to

22   an e-mail request or after some oral communications?

23     A.    You know, the e-mail requests were back in 2007.

24   So I think the final -- the final information was sent via

25   e-mail.  And I'm sure that they -- there was

1    Q.   Did you discuss this plan with Hank Watkins?

2    A.   What plan?

3    Q.   What plan.  The plan to use New Millennium as a

4    shell to gain access to a trial version of your

5    competitor's software.

6              MR. DAVIDS:  Objection.

7    A.   I didn't have a discussion about a shell with Hank

8    Watkins.

9    Q.   Did you have a discussion with Hank Watkins about

10   using New Millennium Shoe as a means for you, as the CEO of

11   SuccessFactors' competitor, to gain access to its trial

12   version?

13   A.   No, I did not.

14   Q.   Did you have a discussion with any of the other

15   shareholders of the company?

16   A.   No, I did not.

17   Q.   Did you, sir, believe that if you had disclosed

18   that it was you, the CEO of Softscape, who was asking for a

19   trial version, that SuccessFactors would have given it to

20   you?

21   A.   They would not have given it to me, correct.

22   Q.   Did Ely Valls ever log in with you?

23   A.   No.

24   Q.   She just gave you the information and off you

25   went?

1    A.    No.

2    Q.    Don't know that term?

3    A.    I do not know that term.

4    Q.    You weren't familiar with that from the HP

5    pretexting scandal?

6    A.    I don't know what that is.

7    Q.    Okay.  Now, did you obtain -- attend two

8    demonstrations by Jorge Corrales of the software, one in

9    Spanish and one in English?

10    A.    Yes, I did.

11    Q.    Was anyone else present for those presentations?

12    A.    My wife.

13    Q.    Anyone else?

14    A.    No.

15    Q.    So did your wife pretend to be Ely?

16    A.    Yes.

17    Q.    And for both presentations?

18    A.    Yes.

19    Q.    Did your wife also pretend to be Ely for other

20    telephone calls with SuccessFactors?

21    A.    No, I don't believe so.

22    Q.    Did Ely herself ever contact SuccessFactors

23    orally?

24    A.    I believe so, yes.

25    Q.    What occasions are you aware of?

1      A.   I don't recall.  I believe I was, yes.

2      Q.   And your wife pretended to be Ely pretending to be

3  interested in buying the software?

4      A.   That's correct.

5      Q.   And then your wife -- you were sitting there in

6  the room with them?

7      A.   Yes, I was.

8      Q.   Watching the same screen?

9      A.   Yes.

10      Q.   And was that from your house?

11      A.   That was from my house.

12      Q.   Then the next occasion, did your wife come down to

13  the office?

14      A.   She came into the office, correct.

15      Q.   And you guys sat there and you pretended to be

16  who?

17      A.   Jorge, I don't remember what we used as his last

18  name.

19      Q.   Cruz?

20      A.   I believe that was what it was.

21      Q.   Actually, it was Javier Cruz, correct?

22      A.   Correct.

23      Q.   And you told Mr. Corrales that you were what?

24      A.   I don't recall specifically what I told him I was.

25      Q.   How did you explain to him that there was a man on

1    the phone with Ely?

2        A.    Just that it was another employee at New

3    Millennium Shoe.

4        Q.    Weren't you represented to have been a consultant

5    for New Millennium Shoe?

6        A.    I don't recall specifically.

7        Q.    And wasn't that the way by which you could have

8    such detailed knowledge and ask such detailed questions?

9        A.    No, I don't believe that was the reason.

10        Q.    Were you on the website -- strike that.

11            Were you in the password-protected account the day

12    before the first demonstration?

13        A.    I don't remember the specific days, but the odds

14    are if somebody entered the account, it would have been me.

15        Q.    And were you reviewing it to prepare questions to

16    be presented to Mr. Corrales?

17        A.    I was reviewing it for intellectual property.

18        Q.    For intellectual property.

19        A.    Correct.

20        Q.    What do you mean by that, sir?

21        A.    Because I believed SuccessFactors misappropriated

22    my IP.

23        Q.    So that was before the first demo, correct?

24        A.    What was before the first demo?

25        Q.    This review, because you thought that

1        A.    No.

2        Q.    Did you go on the password-protected site again

3   after Mr. Corrales's second presentation?

4        A.    I attempted to.

5        Q.    In fact, you were successful, weren't you?

6        A.    No, I was not.  Not to the best of my knowledge.

7   At some point after that demonstration, I was prevented

8   from going in.

9              MR. PULGRAM:  We're going to change

10             the tape, go for a few more minutes, and

11             then we'll call it a day.

12             THE VIDEOGRAPHER:  Going off the

13             record.  This marks the end of tape number

14             5 in the deposition of Softscape, Inc.,

15             Rule 30(b)(6) designee David V. Watkins.

16             We're going off the record.  The time is

17             5:10 p.m.

18             (Recess.)

19             THE VIDEOGRAPHER:  We're back on the

20             record.  This marks the beginning of

21             videotape number 6 in the deposition of

22             Softscape Inc., Rule 30(b)(6) designee

23             David V. Watkins.  The time is 5:12.

24   BY MR. PULGRAM:

25       Q.    Would you look at the declaration of Mr. Matheson

1    which we've marked as Exhibit 13.  Turn to page 5, please.

2    It describes logins to the ACE sales demo on February 19th

3    at 8:00 a.m., 9:00 a.m., 2:00 p.m., and 3:00 p.m.  Was that

4    you?

5        A.    Most likely, yes.

6        Q.    That's from the Softscape headquarters.  He

7    describes access on February 21st for most of the day

8    starting at 8:00 a.m.  That was you also?

9                MR. DAVIDS:  You said it was from the

10               Softscape headquarters?

11               MR. PULGRAM:  Yes.

12       A.    It was accessed by the Softscape headquarters for

13   most of the day starting at 8:00 a.m. EST.

14       Q.    Yes.  Was that you?

15       A.    On February 21?  I don't recall specifically, but

16   most likely it was.

17       Q.    The next entry -- well, let me stick with that one

18   for a second.

19               That was the same day as the second demo, correct?

20       A.    I don't recall, but it was about that same day.

21       Q.    Well, you were on pretty much the whole day before

22   the second demo started, correct?

23       A.    I don't remember specifically, but it sounds about

24   right.

25       Q.    Okay.  And the record reflects the second demo was

1    on February 21st.

2            Let's go down to paragraph 15.   That IP address,

3    24.34.56.79, that is your brother Rick's house, correct?

4        A.    I believe so.

5        Q.    And this reflects that the password-protected

6    account was accessed at 7:00 p.m. on February 18, the night

7    before the first demo, correct?

8        A.    It says on February 18th it was accessed -- it was

9    accessed at 7:00 p.m. EST.

10       Q.    Was that you?

11       A.    I -- I am not understanding -- I'm just trying to

12   answer your question specifically.   Most -- most likely it

13   was me, but I'm trying to understand what your specific

14   question -- you've got a couple of IP addresses here.

15   You've got the 98 one and the 24 one, and you've got dates.

16   So what are you specifically asking?

17       Q.    I'm looking at paragraph 15.   Are you?

18       A.    Yes, I am.

19       Q.    Okay.   Paragraph 15 refers to the .79 IP address,

20   correct?

21       A.    It does.

22       Q.    Which we established was Rick Watkins.   And it

23   refers to access at 7:00 p.m. on the 18th, the day before

24   the first demo.   And my question is:  Was that you?

25       A.    To the best of my knowledge, yes.

1     Q.    Why were you accessing it from Rick Watkins'?

2     A.    I was showing him.

3     Q.    And did you make notes at that time?

4     A.    No.

5     Q.    Do you have any notes from any of the times that

6  you accessed?

7     A.    No.

8     Q.    Immediately after one of your accesses, you sent

9  around a batch of information to be included in the knock-

10  off sheet, didn't you?

11     A.    I did.

12     Q.    And that was based on what you had seen?

13     A.    That was based on what I had seen.

14     Q.    That was right after the second demonstration; is

15  that correct?

16     A.    I don't recall specifically, but it was somewhere

17  around there.

18     Q.    And it was at about 2:00 in the morning, wasn't

19  it?

20     A.    I don't recall the specific time, but that may

21  have been the case.

22     Q.    The access from Rick Watkins on February 20th at

23  2:00 a.m. Eastern Standard Time, described in paragraph 15,

24  were you there at 2:00 a.m.?

25     A.    Most probably, yes.

1    Q.   You think he might have said, "Sure.  Fine.  Let

2    me give you the tour"?

3             MR. DAVIDS:  Objection.

4    A.   I don't know what Jorge Corrales would have said.

5    Q.   As you sat there at that time on the phone with

6    him, you understood completely well that he would never

7    have given you one demonstration, let alone two, had he

8    known you were the CEO.  Wasn't that your understanding?

9             MR. DAVIDS:  Objection.

10   A.   Can you please repeat the question.

11            MR. PULGRAM:  Read it back, please.

12            (Question read.)

13   A.   The CEO of Softscape?

14   Q.   Yes.

15   A.   If I told him I was the CEO of Softscape, he

16   probably would not have given me a demonstration.

17   Q.   You understood that at the time?

18   A.   I understood that at the time.  I didn't ask Jorge

19   Corrales that, so I didn't understand what he would have

20   thought.

21   Q.   Well, at that time, as you sat there using a fake

22   name, you understood that had you given your real name, you

23   wouldn't have gotten the demo?

24            MR. DAVIDS:  Objection.

25   A.   I do not know if Jorge Corrales knew who I was.

1    Faust.

2        Q.    Anyone else?

3        A.    No.  I don't recall anybody else.

4        Q.    Was this posted to the SRC?

5        A.    No, I don't even think I -- I gave this to

6    Christopher.  I actually don't think I should -- I gave it

7    to anybody.  I -- I don't recall giving this -- this to

8    anybody.

9        Q.    Two of the pages from this proposal appear in the

10   presentation, correct?

11       A.    Correct.

12       Q.    Did you cut and paste them into The Naked Truth

13   document?

14       A.    Yes, I did.

15       Q.    Were there any discussions on the phone between

16   you and Mr. -- strike that.

17             Were there any discussions on the phone with Mr.

18   Corrales about the possibility of getting a proposal?

19       A.    I don't recall specifically, but I -- I don't

20   remember.

21             (Discussion off the record.)

22       Q.    Mr. Corrales has submitted a declaration in this

23   action that this proposal was delivered because Ely Valls

24   told him -- the person he thought to be Ely Valls told him

25   that she was making her decision in the next two days.  Was

# EXHIBIT 11

ROBERT P. TAYLOR (SBN 46046)
Email: rptaylor@mintz.com
BRYAN J. SINCLAIR (SBN 205885)
Email: bsinclair@mintz.com
JEFFREY M. RATINOFF (SBN 197241)
Email: jratinoff@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY AND
POPEO, PC
1400 Page Mill Road
Palo Alto, California 94304-1124
Telephone: (650) 251-7700
Facsimile: (650) 251-7739


Attorneys for Defendant,
SOFTSCAPE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SUCCESSFACTORS, INC, a Delaware corporation,<br><br>              Plaintiff,<br><br>vs.<br><br>SOFTSCAPE, INC., a Delaware corporation, and DOES 1-10, inclusive,<br><br>              Defendants. | Case No. CV 08-1376 CW (BZx)<br><br>**DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (NOS. 1-19)** |

PROPOUNDING PARTY:    Plaintiff SUCCESSFACTORS, INC.

RESPONDING PARTY:    Defendant SOFTSCAPE, INC.

SET NO.:    One (1) [Interrogatories Nos. 1-19]

Defendant Softscape, Inc. ("Softscape" or "Defendant"), through its attorneys, hereby objects and responds to Plaintiff SuccessFactors, Inc.'s ("SuccessFactors" or "Plaintiff") First Set of Interrogatories (Nos. 1-19) as follows:

**PRELIMINARY STATEMENT**

Defendant responds to these interrogatories on the basis of the best information available to it at the time of gathering responsive materials, within the limits of the Federal Rules of Civil

- 1 -

1   Procedure ("FRCP"), and subject to the objections described below.  Further investigation may

2   reveal additional information that is responsive to these interrogatories.  Defendant reserves the

3   right to continue discovery and investigation into this matter and to present, during the trial period

4   and otherwise, additional information discovered after the date of the present responses.  Defendant

5   reserves the right where appropriate, to supplement and/or correct the disclosures and responses

6   contained herein.

7   **GENERAL OBJECTIONS**

8        The following General Objections apply to the interrogatories and shall have the same force

9   and effect as if set forth in response to each individually numbered interrogatory.

10       1.     Defendant objects to the definitions of "YOU," "YOUR," "DEFENDANT," or

11   "SOFTSCAPE" because the terms mean and include, collectively and/or individually, Softscape,

12   Inc., and its parents, subsidiaries, affiliates, predecessors or successor companies, if any, and its

13   current and former officers, directors, employees, consultants, attorneys, authorized agents, sales

14   representatives, distributors, dealers, direct and indirect contractors, and/or all other PERSONS

15   acting or purporting to act on its behalf.  Such a broad definition seeks information from all of

16   Defendant's predecessors-in-interest, its subsidiaries, related companies, licensees, their officers,

17   directors and managing agents of those companies, which is neither possible nor reasonable.

18   Defendant will answer each interrogatory on behalf of Softscape including the knowledge of

19   members of its current management team deemed most likely to have such knowledge.  Defendant

20   further objects to this definition to the extent that it imposes any obligation beyond what it required

21   by the FRCP.

22       2.     Defendant objects to Plaintiff's instructions in paragraph number 4, pp. 2-3 of its

23   First Set of Interrogatories to the extent that it requires Defendant to perform a search and/or the

24   production of source code, computer files, archival computer records, computer disks, and

25   electronic files.  Defendant will meet and confer in good faith with Plaintiff to reach a mutually

26   acceptable resolution regarding the discovery of electronic files, and the costs associated with

27   producing them.

28       3.     Defendant objects to the definitions of "PLAINTIFF" or "SUCCESFACTORS" on

- 2 -

1  the grounds that the definitions are vague and ambiguous, overbroad, compound and overly

2  complex, unduly burdensome and oppressive, and call for information that is neither relevant nor

3  reasonably calculated to lead to the discovery of admissible evidence.  Defendant further objects to

4  these definitions to the extent that they impose any obligation beyond what is required by the FRCP.

5      4.     Defendant objects to the definitions of "PERSON" or "PERSONS" on the grounds

6  that the definitions are vague and ambiguous, overbroad, compound and overly complex, unduly

7  burdensome and oppressive, and call for information that is neither relevant nor reasonably

8  calculated to lead to the discovery of admissible evidence.  Defendant further objects to these

9  definitions to the extent that they impose any obligation beyond what is required by the FRCP.

10     5.     Defendant objects to the definitions of "DOCUMENT" or "DOCUMENTS" on the

11  grounds that the definitions are vague and ambiguous, overbroad, compound and overly complex,

12  unduly burdensome and oppressive, and call for information that is neither relevant nor reasonably

13  calculated to lead to the discovery of admissible evidence.  Defendant further objects to these

14  definitions to the extent that they impose any obligation beyond what is required by the FRCP.

15     6.     Defendant objects to the definitions of "COMMUNICATION" or

16  "COMMUNICATIONS" on the grounds that the definitions are vague and ambiguous, overbroad,

17  compound and overly complex, unduly burdensome and oppressive, and call for information that is

18  neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

19  Defendant further objects to these definitions to the extent that they impose any obligation beyond

20  what is required by the FRCP.

21     7.     Defendant objects to the definition of "PRESENTATION" on the grounds that the

22  definition is vague and ambiguous, overbroad, compound and overly complex, unduly burdensome

23  and oppressive, and calls for information that is neither relevant nor reasonably calculated to lead to

24  the discovery of admissible evidence.  Defendant further objects to this definition to the extent that

25  it imposes any obligation beyond what is required by the FRCP.

26     8.     Defendant objects to the definition of "SUCCESSFACTORS' EVENTS" on the

27  grounds that the definition is vague and ambiguous, overbroad, compound and overly complex,

28  unduly burdensome and oppressive, and calls for information that is neither relevant nor reasonably

- 3 -

DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF
INTERROGATORIES (NOS. 1-19)          Case No. CV 08-1376 CW (BZx)

1  calculated to lead to the discovery of admissible evidence.  Defendant further objects to this

2  definition to the extent that it imposes any obligation beyond what is required by the FRCP.

3      9.      Defendant objects to the definition of "CONCERNING" on the grounds that the

4  definition is vague and ambiguous, overbroad, compound and overly complex, unduly burdensome

5  and oppressive, and calls for information that is neither relevant nor reasonably calculated to lead to

6  the discovery of admissible evidence.  Defendant further objects to this definition to the extent that

7  it imposes any obligation beyond what is required by the FRCP.

8      10.     Defendant objects to the definition of "IDENTIFY" on the grounds that the

9  definition is vague and ambiguous, overbroad, compound and overly complex, unduly burdensome

10  and oppressive, and calls for information that is neither relevant nor reasonably calculated to lead to

11  the discovery of admissible evidence.  Defendant further objects to this definition to the extent that

12  it imposes any obligation beyond what is required by the FRCP.

13      11.     Defendant objects to Plaintiff's purported instructions for responding to Plaintiff's

14  interrogatories where information will be withheld on a claim of privilege.  Defendant is unaware of

15  any such requirement with respect to interrogatories.  Defendant further objects to Plaintiff's

16  purported instructions for form and content as overbroad, unduly burdensome, and beyond the

17  scope of the FRCP.  If a privilege log is appropriate, Defendant will provide one that complies with

18  the FRCP and the practice of this district.

19      12.     In addition, Softscape objects as it has very recently engaged new lead counsel in

20  this matter who has requested the professional courtesy of a two week extension to respond to these

21  interrogatories.  Counsel for SuccessFactors has not agreed to an unconditional extension of time to

22  respond.  As new lead counsel for Softscape requires the requested extension of time to adequately

23  investigate the underlying facts of the case and prepare appropriate responses, counsel is currently

24  unable to provide substantive responses and will do so following a second meet and confer on the

25  topic of a short extension of the response date and, if necessary, will move the Court to order a brief

26  extension.

27      13.     Defendant objects to Plaintiff's instructions in their entirety to the extent it imposes

28  any obligation beyond what is required by the FRCP and is not otherwise burdensome and

- 4 -

1  oppressive.

2  **RESPONSES AND OBJECTIONS**

3  **INTERROGATORY NO. 1:**

4      Describe in detail, separately, all facts CONCERNING the participation of each and every

5  PERSON who assisted in the planning, creation, design, review, revision, transmission, or use of

6  the PRESENTATION.

7  **RESPONSE TO INTERROGATORY NO. 1:**

8      Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

9  and overly broad as to time and scope, particularly insofar as it refers to "…all facts

10  CONCERNING the participation of each and every PERSON who assisted in the planning,

11  creation, design, review, revision, transmission, or use of the PRESENTATION." Defendant also

12  objects to this request to the extent that it seeks information protected from discovery by the

13  attorney-client privilege, the attorney work product doctrine or any other applicable privilege

14  recognized by law. Defendant further objects to this request on the grounds that it seeks documents

15  and information that may contain and constitute private, business confidential, proprietary, trade

16  secret, or other information of Defendant or third parties that is protected by law or contract.

17  Defendant also objects to this interrogatory to the extent it seeks information that may be equally

18  accessible or available to the requesting party. Defendant also objects to this interrogatory to the

19  extent it seeks information that are neither relevant to any issue in the case, or reasonably calculated

20  to lead to the discovery of admissible evidence. Defendant objects to this interrogatory on the

21  grounds that it is overly burdensome and oppressive to the extent it requires Defendant to provide

22  all facts regarding a particular event and submits that interrogatories may not be the most efficient

23  method of discovery to elicit such information. Defendant also objects to this interrogatory on the

24  grounds that it contains subparts, which violates the FRCP's limitations on number of permitted

25  interrogatories.

26  **INTERROGATORY NO. 2:**

27      Describe in detail all facts CONCERNING YOUR claim that the PRESENTATION was

28  intended for SOFTSCAPE's "*internal* use only," as described in Paragraph 8 of the Declaration of

- 5 -

1  David Watkins in Opposition to Plaintiff's Motion to Strike, Docket No. 58, including but not

2  limited to how it was so designated for internal use and when, and what specific "employment and

3  business policies" forbade the dissemination or use of the PRESENTATION and the information

4  therein.

5  **RESPONSE TO INTERROGATORY NO. 2:**

6         Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

7  and overly broad as to time and scope, particularly insofar as it refers to "all facts,"

8  "CONCERNING," "YOUR," "PRESENTATION," "SOFTSCAPE," "use," and "forbade."

9  Defendant also objects to this request to the extent that it seeks information protected from

10  discovery by the attorney-client privilege, the attorney work product doctrine or any other

11  applicable privilege recognized by law. Defendant further objects to this request on the grounds

12  that it seeks documents and information that may contain and constitute private, business

13  confidential, proprietary, trade secret, or other information of Defendant or third parties that is

14  protected by law or contract. Defendant also objects to this interrogatory to the extent it seeks

15  information that may be equally accessible or available to the requesting party. Defendant further

16  objects to this interrogatory to the extent it seeks information that are neither relevant to any issue in

17  the case, or reasonably calculated to lead to the discovery of admissible evidence. Defendant also

18  objects to this interrogatory on the grounds that it is overly burdensome and oppressive to the extent

19  it requires Defendant to provide all facts regarding a particular event and submits that

20  interrogatories may not be the most efficient method of discovery to elicit such information.

21  Defendant objects to this interrogatory on the grounds that it contains subparts, which violates the

22  FRCP's limitations on number of permitted interrogatories.

23  **INTERROGATORY NO. 3:**

24         IDENTIFY all PERSONS who received a copy of the PRESENTATION, including whether

25  each PERSON is or was YOUR employee, agent, partner, reseller, customer or prospect.

26  **RESPONSE TO INTERROGATORY NO. 3:**

27         Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

28  and overly broad as to time and scope, particularly insofar as it refers to "all facts," "IDENTIFY,"

- 6 -

1 "YOUR," "PRESENTATION," "PERSONS," "prospect," "partner," "reseller" and "agent."

2 Defendant also objects to this request to the extent that it seeks information protected from

3 discovery by the attorney-client privilege, the attorney work product doctrine or any other

4 applicable privilege recognized by law. Defendant further objects to this request on the grounds

5 that it seeks documents and information that may contain and constitute private, business

6 confidential, proprietary, trade secret, or other information of Defendant or third parties that is

7 protected by law or contract. Defendant also objects to this interrogatory to the extent it seeks

8 information that may be equally accessible or available to the requesting party. Defendant further

9 objects to this interrogatory to the extent it seeks information that are neither relevant to any issue in

10 the case, or reasonably calculated to lead to the discovery of admissible evidence. Defendant also

11 objects to this interrogatory on the grounds that it is overly burdensome and oppressive to the extent

12 it requires Defendant to provide all facts regarding a particular event and submits that

13 interrogatories may not be the most efficient method of discovery to elicit such information.

14 Defendant objects to this interrogatory on the grounds that it contains subparts, which violates the

15 FRCP's limitations on number of permitted interrogatories.

16 **INTERROGATORY NO. 4:**

17      Describe in detail all facts CONCERNING YOUR claim that each Softscape employee who

18 received a copy of the PRESENTATION "credibly denied disseminating the PRESENTATION

19 outside the company," as described in Paragraph 10(c) of the Declaration of David Watkins in

20 Opposition to Plaintiff's Motion to Strike, Docket No. 58.

21 **RESPONSE TO INTERROGATORY NO. 4:**

22      Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

23 and overly broad as to time and scope, particularly insofar as it refers to "all facts,"

24 "CONCERNING," "YOUR," "PRESENTATION," "PERSONS," "prospect," "partner," "reseller,"

25 and "agent." Defendant also objects to this request to the extent that it seeks information protected

26 from discovery by the attorney-client privilege, the attorney work product doctrine or any other

27 applicable privilege recognized by law. Defendant further objects to this request on the grounds

28 that it seeks documents and information that may contain and constitute private, business

- 7 -

1    confidential, proprietary, trade secret, or other information of Defendant or third parties that is

2    protected by law or contract. Defendant also objects to this interrogatory to the extent it seeks

3    information that may be equally accessible or available to the requesting party. Defendant further

4    objects to this interrogatory to the extent it seeks information that are neither relevant to any issue in

5    the case, or reasonably calculated to lead to the discovery of admissible evidence. Defendant also

6    objects to this interrogatory on the grounds that it is overly burdensome and oppressive to the extent

7    it requires Defendant to provide all facts regarding a particular event and submits that

8    interrogatories may not be the most efficient method of discovery to elicit such information.

9    Defendant objects to this interrogatory on the grounds that it contains subparts, which violates the

10   FRCP's limitations on number of permitted interrogatories.

11   **INTERROGATORY NO. 5:**

12        Describe all COMMUNICATIONS between SOFTSCAPE, on the one hand, and New

13   Millenium Shoe or Ely Valls, on the other hand, regarding SUCCESSFACTORS, any sales demos

14   performed by SUCCESSFACTORS for New Millenium Shoe, and/or the PRESENTATION.

15   **RESPONSE TO INTERROGATORY NO. 5:**

16        Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

17   and overly broad as to time and scope, particularly insofar as it refers to "all,"

18   "COMMUNICATIONS," "SOFTSCAPE," "SUCCESSFACTORS," "PRESENTATION," "New

19   Millenium Shoe," "Ely Valls," and "performed." Defendant also objects to this request to the

20   extent that it seeks information protected from discovery by the attorney-client privilege, the

21   attorney work product doctrine or any other applicable privilege recognized by law. Defendant

22   further objects to this request on the grounds that it seeks documents and information that may

23   contain and constitute private, business confidential, proprietary, trade secret, or other information

24   of Defendant or third parties that is protected by law or contract. Defendant also objects to this

25   interrogatory to the extent it seeks information that may be equally accessible or available to the

26   requesting party. Defendant further objects to this interrogatory to the extent it seeks information

27   that are neither relevant to any issue in the case, or reasonably calculated to lead to the discovery of

28   admissible evidence. Defendant also objects to this interrogatory on the grounds that it is overly

- 8 -

1  burdensome and oppressive to the extent it requires Defendant to provide all facts regarding a

2  particular event and submits that interrogatories may not be the most efficient method of discovery

3  to elicit such information.  Defendant objects to this interrogatory on the grounds that it contains

4  subparts, which violates the FRCP's limitations on number of permitted interrogatories.

5  **INTERROGATORY NO. 6:**

6      IDENTIFY all facts regarding Javier Cruz's relationship to SOFTSCAPE,

7  SUCCESSFACTORS, and/or New Millenium Shoe Company.

8  **RESPONSE TO INTERROGATORY NO. 6:**

9      Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

10  and overly broad as to time and scope, particularly insofar as it refers to "all facts," "IDENTIFY,"

11  "SOFTSCAPE," "SUCCESSFACTORS," "Javier Cruz," "New Millenium Shoe," and

12  "relationship."  Defendant also objects to this request to the extent that it seeks information

13  protected from discovery by the attorney-client privilege, the attorney work product doctrine or any

14  other applicable privilege recognized by law.  Defendant further objects to this request on the

15  grounds that it seeks documents and information that may contain and constitute private, business

16  confidential, proprietary, trade secret, or other information of Defendant or third parties that is

17  protected by law or contract.  Defendant also objects to this interrogatory to the extent it seeks

18  information that may be equally accessible or available to the requesting party.  Defendant further

19  objects to this interrogatory to the extent it seeks information that are neither relevant to any issue in

20  the case, or reasonably calculated to lead to the discovery of admissible evidence.  Defendant also

21  objects to this interrogatory on the grounds that it is overly burdensome and oppressive to the extent

22  it requires Defendant to provide all facts regarding a particular event and submits that

23  interrogatories may not be the most efficient method of discovery to elicit such information.

24  Defendant objects to this interrogatory on the grounds that it contains subparts, which violates the

25  FRCP's limitations on number of permitted interrogatories.

26  **INTERROGATORY NO. 7:**

27      IDENTIFY all PERSONS (within Softscape and externally) who accessed a

28  SUCCESSFACTORS' sales demo account, including but not limited to ACE275.

- 9 -

**RESPONSE TO INTERROGATORY NO. 7:**

Defendant objects to this request on the ground that it is vague and ambiguous, indefinite and overly broad as to time and scope, particularly insofar as it refers to "all," "PERSONS," "ACE275," "SUCCESSFACTORS," "externally," "accessed," and "sales demo account." Defendant also objects to this request to the extent that it seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other applicable privilege recognized by law. Defendant further objects to this request on the grounds that it seeks documents and information that may contain and constitute private, business confidential, proprietary, trade secret, or other information of Defendant or third parties that is protected by law or contract. Defendant also objects to this interrogatory to the extent it seeks information that may be equally accessible or available to the requesting party. Defendant further objects to this interrogatory to the extent it seeks information that are neither relevant to any issue in the case, or reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this interrogatory on the grounds that it is overly burdensome and oppressive to the extent it requires Defendant to provide all facts regarding a particular event and submits that interrogatories may not be the most efficient method of discovery to elicit such information. Defendant objects to this interrogatory on the grounds that it contains subparts, which violates the FRCP's limitations on number of permitted interrogatories.

**INTERROGATORY NO. 8:**

Describe in detail all facts CONCERNING how any PERSON identified in response to Interrogatory No. 7, learned or acquired the user name and password for any SUCCESSFACTORS sales demo account, including but not limited to ACE275.

**RESPONSE TO INTERROGATORY NO. 8:**

Defendant objects to this request on the ground that it is vague and ambiguous, indefinite and overly broad as to time and scope, particularly insofar as it refers to "all facts," "CONCERNING," "PERSON," "SUCCESSFACTORS," "learned or acquired," "sales demo account" and "ACE275." Defendant also objects to this request to the extent that it seeks information protected from discovery by the attorney-client privilege, the attorney work product

- 10 -

1 doctrine or any other applicable privilege recognized by law. Defendant further objects to this

2 request on the grounds that it seeks documents and information that may contain and constitute

3 private, business confidential, proprietary, trade secret, or other information of Defendant or third

4 parties that is protected by law or contract. Defendant also objects to this interrogatory to the extent

5 it seeks information that may be equally accessible or available to the requesting party. Defendant

6 further objects to this interrogatory to the extent it seeks information that are neither relevant to any

7 issue in the case, or reasonably calculated to lead to the discovery of admissible evidence.

8 Defendant also objects to this interrogatory on the grounds that it is overly burdensome and

9 oppressive to the extent it requires Defendant to provide all facts regarding a particular event and

10 submits that interrogatories may not be the most efficient method of discovery to elicit such

11 information. Defendant objects to this interrogatory on the grounds that it contains subparts, which

12 violates the FRCP's limitations on number of permitted interrogatories.

13 **INTERROGATORY NO. 9:**

14       IDENTIFY and describe all SUCCESSFACTORS EVENTS or demonstrations YOU

15 attended, heard, or viewed since January 2006, including but not limited to a description of who

16 attended, dates of attendance and what information was obtained by YOU.

17 **RESPONSE TO INTERROGATORY NO. 9:**

18       Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

19 and overly broad as to time and scope, particularly insofar as it refers to "all," "IDENTIFY,"

20 "YOU," "SUCCESSFACTORS EVENTS," "demonstrations," "viewed," "information" and

21 "obtained." Defendant also objects to this request to the extent that it seeks information protected

22 from discovery by the attorney-client privilege, the attorney work product doctrine or any other

23 applicable privilege recognized by law. Defendant further objects to this request on the grounds

24 that it seeks documents and information that may contain and constitute private, business

25 confidential, proprietary, trade secret, or other information of Defendant or third parties that is

26 protected by law or contract. Defendant also objects to this interrogatory to the extent it seeks

27 information that may be equally accessible or available to the requesting party. Defendant further

28 objects to this interrogatory to the extent it seeks information that are neither relevant to any issue in

- 11 -

1  the case, or reasonably calculated to lead to the discovery of admissible evidence. Defendant also

2  objects to this interrogatory on the grounds that it is overly burdensome and oppressive to the extent

3  it requires Defendant to provide all facts regarding a particular event and submits that

4  interrogatories may not be the most efficient method of discovery to elicit such information.

5  Defendant objects to this interrogatory on the grounds that it contains subparts, which violates the

6  FRCP's limitations on number of permitted interrogatories.

7  **INTERROGATORY NO. 10:**

8      Other than the PRESENTATION, IDENTIFY any other presentation, white papers,

9  competitive analyses or assessments, positioning papers, marketing or business plans, that YOU

10  have created since January 2006 that describe, analyze, or critique YOUR competitor's products or

11  services.

12  **RESPONSE TO INTERROGATORY NO. 10:**

13      Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

14  and overly broad as to time and scope, particularly insofar as it refers to "IDENTIFY,"

15  "presentation," "competitive analyses or assessments," "white papers," "positioning papers,"

16  "PRESENTATION," "YOUR" and "competitors." Defendant also objects to this request to the

17  extent that it seeks information protected from discovery by the attorney-client privilege, the

18  attorney work product doctrine or any other applicable privilege recognized by law. Defendant

19  further objects to this request on the grounds that it seeks documents and information that may

20  contain and constitute private, business confidential, proprietary, trade secret, or other information

21  of Defendant or third parties that is protected by law or contract. Defendant also objects to this

22  interrogatory to the extent it seeks information that may be equally accessible or available to the

23  requesting party. Defendant further objects to this interrogatory to the extent it seeks information

24  that are neither relevant to any issue in the case, or reasonably calculated to lead to the discovery of

25  admissible evidence. Defendant also objects to this interrogatory on the grounds that it is overly

26  burdensome and oppressive to the extent it requires Defendant to provide all facts regarding a

27  particular event and submits that interrogatories may not be the most efficient method of discovery

28  to elicit such information. Defendant objects to this interrogatory on the grounds that it contains

- 12 -

1    subparts, which violates the FRCP's limitations on number of permitted interrogatories.

2    **INTERROGATORY NO. 11:**

3    IDENTIFY all "current and former SuccessFactors customers" that were the "sources of

4    information" for statements made in the PRESENTATION, as claimed in Paragraph 5 of the

5    Declaration of David Watkins in Opposition to Plaintiff's Motion to Strike, Docket No. 58.

6    **RESPONSE TO INTERROGATORY NO. 11:**

7    Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

8    and overly broad as to time and scope, particularly insofar as it refers to "all," "IDENTIFY" and

9    "PRESENTATION." Defendant also objects to this request to the extent that it seeks information

10    protected from discovery by the attorney-client privilege, the attorney work product doctrine or any

11    other applicable privilege recognized by law. Defendant further objects to this request on the

12    grounds that it seeks documents and information that may contain and constitute private, business

13    confidential, proprietary, trade secret, or other information of Defendant or third parties that is

14    protected by law or contract. Defendant also objects to this interrogatory to the extent it seeks

15    information that may be equally accessible or available to the requesting party. Defendant further

16    objects to this interrogatory to the extent it seeks information that are neither relevant to any issue in

17    the case, or reasonably calculated to lead to the discovery of admissible evidence. Defendant also

18    objects to this interrogatory on the grounds that it is overly burdensome and oppressive to the extent

19    it requires Defendant to provide all facts regarding a particular event and submits that

20    interrogatories may not be the most efficient method of discovery to elicit such information.

21    Defendant objects to this interrogatory on the grounds that it contains subparts, which violates the

22    FRCP's limitations on number of permitted interrogatories.

23    **INTERROGATORY NO. 12:**

24    For each of the PRESENTATION's facts that YOU contend YOU received or inferred from

25    SUCCESSFACTORS' current or former customers, describe in detail how YOU received or

26    inferred the fact, including but not limited to a description of which customer was the source of the

27    fact and when.

28    / / /

- 13 -

1   **RESPONSE TO INTERROGATORY NO. 12:**

2       Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

3 and overly broad as to time and scope, particularly insofar as it refers to "YOU,"

4 "SUCCESSFACTORS," "PRESENTATION's facts" and "inferred." Defendant also objects to this

5 request to the extent that it seeks information protected from discovery by the attorney-client

6 privilege, the attorney work product doctrine or any other applicable privilege recognized by law.

7 Defendant further objects to this request on the grounds that it seeks documents and information

8 that may contain and constitute private, business confidential, proprietary, trade secret, or other

9 information of Defendant or third parties that is protected by law or contract. Defendant also

10 objects to this interrogatory to the extent it seeks information that may be equally accessible or

11 available to the requesting party. Defendant further objects to this interrogatory to the extent it

12 seeks information that are neither relevant to any issue in the case, or reasonably calculated to lead

13 to the discovery of admissible evidence. Defendant also objects to this interrogatory on the grounds

14 that it is overly burdensome and oppressive to the extent it requires Defendant to provide all facts

15 regarding a particular event and submits that interrogatories may not be the most efficient method of

16 discovery to elicit such information. Defendant objects to this interrogatory on the grounds that it

17 contains subparts, which violates the FRCP's limitations on number of permitted interrogatories.

18   **INTERROGATORY NO. 13:**

19       State all facts in support of YOUR claim that "63% of their Customers left [SuccessFactors]

20 by 2008," as claimed in slide 3 of the PRESENTATION.

21   **RESPONSE TO INTERROGATORY NO. 13:**

22       Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

23 and overly broad as to time and scope, particularly insofar as it refers to "all facts," "YOUR,"

24 "their," "SUCCESSFACTORS," "PRESENTATION," "Customers" and "claim." Defendant also

25 objects to this request to the extent that it seeks information protected from discovery by the

26 attorney-client privilege, the attorney work product doctrine or any other applicable privilege

27 recognized by law. Defendant further objects to this request on the grounds that it seeks documents

28 and information that may contain and constitute private, business confidential, proprietary, trade

- 14 -

1  secret, or other information of Defendant or third parties that is protected by law or contract.

2  Defendant also objects to this interrogatory to the extent it seeks information that may be equally

3  accessible or available to the requesting party. Defendant further objects to this interrogatory to the

4  extent it seeks information that are neither relevant to any issue in the case, or reasonably calculated

5  to lead to the discovery of admissible evidence. Defendant also objects to this interrogatory on the

6  grounds that it is overly burdensome and oppressive to the extent it requires Defendant to provide

7  all facts regarding a particular event and submits that interrogatories may not be the most efficient

8  method of discovery to elicit such information. Defendant objects to this interrogatory on the

9  grounds that it contains subparts, which violates the FRCP's limitations on number of permitted

10  interrogatories.

11  **INTERROGATORY NO. 14:**

12  State all facts in support of YOUR claim regarding "failed implementations" and

13  purportedly "lost customers" as set forth in slides 5-6 and 8-12 of the PRESENTATION.

14  **RESPONSE TO INTERROGATORY NO. 14:**

15  Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

16  and overly broad as to time and scope, particularly insofar as it refers to "all facts," "YOUR,"

17  "claim," "lost customers" and "PRESENTATION." Defendant also objects to this request to the

18  extent that it seeks information protected from discovery by the attorney-client privilege, the

19  attorney work product doctrine or any other applicable privilege recognized by law. Defendant

20  further objects to this request on the grounds that it seeks documents and information that may

21  contain and constitute private, business confidential, proprietary, trade secret, or other information

22  of Defendant or third parties that is protected by law or contract. Defendant also objects to this

23  interrogatory to the extent it seeks information that may be equally accessible or available to the

24  requesting party. Defendant further objects to this interrogatory to the extent it seeks information

25  that are neither relevant to any issue in the case, or reasonably calculated to lead to the discovery of

26  admissible evidence. Defendant also objects to this interrogatory on the grounds that it is overly

27  burdensome and oppressive to the extent it requires Defendant to provide all facts regarding a

28  particular event and submits that interrogatories may not be the most efficient method of discovery

- 15 -

1  to elicit such information.  Defendant objects to this interrogatory on the grounds that it contains

2  subparts, which violates the FRCP's limitations on number of permitted interrogatories.

3  **INTERROGATORY NO. 15:**

4        Describe in detail all computers or data storage media, including home computers of

5  SOFTSCAPE employees or consultants, that YOU have sought to preserve, including but not

6  limited to a description of the owners, possessors, or users of such computers or data storage media,

7  and whether it has been successfully and completely preserved.

8  **RESPONSE TO INTERROGATORY NO. 15:**

9        Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

10  and overly broad as to time and scope, particularly insofar as it refers to "all," "YOU,"

11  "completely," "successfully," "preserved," and "SOFTSCAPE."  Defendant also objects to this

12  request to the extent that it seeks information protected from discovery by the attorney-client

13  privilege, the attorney work product doctrine or any other applicable privilege recognized by law.

14  Defendant further objects to this request on the grounds that it seeks documents and information

15  that may contain and constitute private, business confidential, proprietary, trade secret, or other

16  information of Defendant or third parties that is protected by law or contract.  Defendant also

17  objects to this interrogatory to the extent it seeks information that may be equally accessible or

18  available to the requesting party.  Defendant further objects to this interrogatory to the extent it

19  seeks information that are neither relevant to any issue in the case, or reasonably calculated to lead

20  to the discovery of admissible evidence.  Defendant also objects to this interrogatory on the grounds

21  that it is overly burdensome and oppressive to the extent it requires Defendant to provide all facts

22  regarding a particular event and submits that interrogatories may not be the most efficient method of

23  discovery to elicit such information.  Defendant objects to this interrogatory on the grounds that it

24  contains subparts, which violates the FRCP's limitations on number of permitted interrogatories.

25  **INTERROGATORY NO. 16:**

26        IDENTIFY all known computers or data storage media that have at any time had a copy of

27  the PRESENTATION, whether in whole or in part, including any copy only in volatile memory.

28  / / /

- 16 -

**RESPONSE TO INTERROGATORY NO. 16:**

Defendant objects to this request on the ground that it is vague and ambiguous, indefinite and overly broad as to time and scope, particularly insofar as it refers to "all," "PRESENTATION" and "IDENTIFY." Defendant also objects to this request to the extent that it seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other applicable privilege recognized by law. Defendant further objects to this request on the grounds that it seeks documents and information that may contain and constitute private, business confidential, proprietary, trade secret, or other information of Defendant or third parties that is protected by law or contract. Defendant also objects to this interrogatory to the extent it seeks information that may be equally accessible or available to the requesting party. Defendant further objects to this interrogatory to the extent it seeks information that are neither relevant to any issue in the case, or reasonably calculated to lead to the discovery of admissible evidence. Defendant also objects to this interrogatory on the grounds that it is overly burdensome and oppressive to the extent it requires Defendant to provide all facts regarding a particular event and submits that interrogatories may not be the most efficient method of discovery to elicit such information. Defendant objects to this interrogatory on the grounds that it contains subparts, which violates the FRCP's limitations on number of permitted interrogatories.

**INTERROGATORY NO. 17:**

IDENTIFY all facts CONCERNING YOUR allegation that SUCCESSFACTORS "consented to and acquiesced" to conduct at issue in SUCCESSFACTORS' COMPLAINT, as alleged in YOUR Second Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 17:**

Defendant objects to this request on the ground that it is vague and ambiguous, indefinite and overly broad as to time and scope, particularly insofar as it refers to "all facts," "IDENTIFY," "CONCERNING," "SUCCESSFACTORS," "COMPLAINT" and "YOUR." Defendant also objects to this request to the extent that it seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other applicable privilege recognized by law. Defendant further objects to this request on the grounds that it seeks documents

- 17 -

1  and information that may contain and constitute private, business confidential, proprietary, trade

2  secret, or other information of Defendant or third parties that is protected by law or contract.

3  Defendant also objects to this interrogatory to the extent it seeks information that may be equally

4  accessible or available to the requesting party. Defendant further objects to this interrogatory to the

5  extent it seeks information that are neither relevant to any issue in the case, or reasonably calculated

6  to lead to the discovery of admissible evidence. Defendant also objects to this interrogatory on the

7  grounds that it is overly burdensome and oppressive to the extent it requires Defendant to provide

8  all facts regarding a particular event and submits that interrogatories may not be the most efficient

9  method of discovery to elicit such information. Defendant objects to this interrogatory on the

10  grounds that it contains subparts, which violates the FRCP's limitations on number of permitted

11  interrogatories.

12  **INTERROGATORY NO. 18:**

13      IDENTIFY all facts CONCERNING YOUR Fourteenth Affirmative Defense that

14  SOFTSCAPE is not liable "for any act or omission of any subordinate," including the name and

15  identify of any such subordinate.

16  **RESPONSE TO INTERROGATORY NO. 18:**

17      Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

18  and overly broad as to time and scope, particularly insofar as it refers to "all facts," "IDENTIFY,"

19  "YOUR" and "SOFTSCAPE." Defendant also objects to this request to the extent that it seeks

20  information protected from discovery by the attorney-client privilege, the attorney work product

21  doctrine or any other applicable privilege recognized by law. Defendant further objects to this

22  request on the grounds that it seeks documents and information that may contain and constitute

23  private, business confidential, proprietary, trade secret, or other information of Defendant or third

24  parties that is protected by law or contract. Defendant also objects to this interrogatory to the extent

25  it seeks information that may be equally accessible or available to the requesting party. Defendant

26  further objects to this interrogatory to the extent it seeks information that are neither relevant to any

27  issue in the case, or reasonably calculated to lead to the discovery of admissible evidence.

28  Defendant also objects to this interrogatory on the grounds that it is overly burdensome and

- 18 -

1 oppressive to the extent it requires Defendant to provide all facts regarding a particular event and

2 submits that interrogatories may not be the most efficient method of discovery to elicit such

3 information. Defendant objects to this interrogatory on the grounds that it contains subparts, which

4 violates the FRCP's limitations on number of permitted interrogatories.

5 **INTERROGATORY NO. 19:**

6      IDENTIFY all facts CONCERNING YOUR Sixteenth Affirmative Defense that "any non-

7 truthful statement in the Presentation was not material."

8 **RESPONSE TO INTERROGATORY NO. 19:**

9      Defendant objects to this request on the ground that it is vague and ambiguous, indefinite

10 and overly broad as to time and scope, particularly insofar as it refers to "all facts," "IDENTIFY,"

11 "YOUR" and "SOFTSCAPE." Defendant also objects to this request to the extent that it seeks

12 information protected from discovery by the attorney-client privilege, the attorney work product

13 doctrine or any other applicable privilege recognized by law. Defendant further objects to this

14 request on the grounds that it seeks documents and information that may contain and constitute

15 private, business confidential, proprietary, trade secret, or other information of Defendant or third

16 parties that is protected by law or contract. Defendant also objects to this interrogatory to the extent

17 it seeks information that may be equally accessible or available to the requesting party. Defendant

18 further objects to this interrogatory to the extent it seeks information that are neither relevant to any

19 issue in the case, or reasonably calculated to lead to the discovery of admissible evidence.

20 Defendant also objects to this interrogatory on the grounds that it is overly burdensome and

21 oppressive to the extent it requires Defendant to provide all facts regarding a particular event and

22 submits that interrogatories may not be the most efficient method of discovery to elicit such

23 information.

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

1  Defendant objects to this interrogatory on the grounds that it contains subparts, which

2  violates the FRCP's limitations on number of permitted interrogatories.

3  Dated:  May 12, 2008           MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, PC

4

5                                By: ROBERT F. TAYLOR

6                                    BRYAN J. SINCLAIR
                                     JEFFREY M. RATINOFF
7

8                                Attorneys for Defendant,
                                 SOFTSCAPE, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4326214v.1

DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF
INTERROGATORIES (NOS. 1-19)           Case No. CV 08-1376 CW (BZx)

# EXHIBIT 12

1   ROBERT P. TAYLOR (SBN 46046)
    Email: rptaylor@mintz.com
2   BRYAN J. SINCLAIR (SBN 205885)
    Email: bsinclair@mintz.com
3   JEFFREY M. RATINOFF (SBN 197241)
    Email: jratinoff@mintz.com
4   MINTZ LEVIN COHN FERRIS GLOVSKY AND
    POPEO, PC
5   1400 Page Mill Road
    Palo Alto, California  94304-1124
6   Telephone:  (650) 251-7700
    Facsimile:   (650) 251-7739
7

8   Attorneys for Defendant,
    SOFTSCAPE, INC.
9

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                        OAKLAND DIVISION

13   SUCCESSFACTORS, INC, a Delaware          Case No. CV 08-1376 CW (BZx)
     corporation,
14                                            **DEFENDANT'S AMENDED**
                    Plaintiff,                **RESPONSES AND OBJECTIONS TO**
15                                            **PLAINTIFF'S FIRST SET OF**
           vs.                                **INTERROGATORIES (NOS. 1-19)**
16
     SOFTSCAPE, INC., a Delaware corporation,
17   and DOES 1-10, inclusive,

18                  Defendants.

19

20         PROPOUNDING PARTY:   Plaintiff SUCCESSFACTORS, INC.

21         RESPONDING PARTY:    Defendant SOFTSCAPE, INC.

22         SET NO.:             One (1) [Interrogatories Nos. 1-19] - Amended Responses

23         Defendant Softscape, Inc. ("Softscape" or "Defendant"), through its attorneys, hereby

24   objects and responds to Plaintiff SuccessFactors, Inc.'s ("SuccessFactors" or "Plaintiff") First Set of

25   Interrogatories (Nos. 1-19) as follows:

26                        **PRELIMINARY STATEMENT**

27         Defendant responds to these interrogatories on the basis of the best information available to

28   it at the time of gathering responsive materials, within the limits of the Federal Rules of Civil

                                        - 1 -

1   Procedure ("FRCP"), and subject to the objections described below. Further investigation may

2   reveal additional information that is responsive to these interrogatories. Defendant reserves the

3   right to continue discovery and investigation into this matter and to present, during the trial period

4   and otherwise, additional information discovered after the date of the present amended responses.

5   Defendant reserves the right where appropriate, to supplement and/or correct the disclosures and

6   amended responses contained herein.

7                               **GENERAL OBJECTIONS**

8          The following General Objections apply to the interrogatories and shall have the same force

9   and effect as if set forth in response to each individually numbered interrogatory.

10         1.       Defendant objects to the definitions of "YOU," "YOUR," "DEFENDANT," or

11  "SOFTSCAPE" because the terms mean and include, collectively and/or individually, Softscape,

12  Inc., and its parents, subsidiaries, affiliates, predecessors or successor companies, if any, and its

13  current and former officers, directors, employees, consultants, attorneys, authorized agents, sales

14  representatives, distributors, dealers, direct and indirect contractors, and/or all other PERSONS

15  acting or purporting to act on its behalf. Such a broad definition seeks information from all of

16  Defendant's predecessors-in-interest, its subsidiaries, related companies, licensees, their officers,

17  directors and managing agents of those companies, which is neither possible nor reasonable.

18  Defendant will answer each interrogatory on behalf of Softscape including the knowledge of

19  members of its current management team deemed most likely to have such knowledge. Defendant

20  further objects to this definition to the extent that it imposes any obligation beyond what it required

21  by the FRCP.

22         2.       Defendant objects to Plaintiff's instructions in paragraph number 4, pp. 2-3 of its

23  First Set of Interrogatories to the extent that it requires Defendant to perform a search and/or the

24  production of source code, computer files, archival computer records, computer disks, and

25  electronic files. Defendant will meet and confer in good faith with Plaintiff to reach a mutually

26  acceptable resolution regarding the discovery of electronic files, and the costs associated with

27  producing them.

28         3.       Defendant objects to the definitions of "PLAINTIFF" or "SUCCESFACTORS" on

                                              - 2 -

1 the grounds that the definitions are vague and ambiguous, overbroad, compound and overly

2 complex, unduly burdensome and oppressive, and call for information that is neither relevant nor

3 reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to

4 these definitions to the extent that they impose any obligation beyond what is required by the FRCP.

5     4.    Defendant objects to the definitions of "PERSON" or "PERSONS" on the grounds

6 that the definitions are vague and ambiguous, overbroad, compound and overly complex, unduly

7 burdensome and oppressive, and call for information that is neither relevant nor reasonably

8 calculated to lead to the discovery of admissible evidence. Defendant further objects to these

9 definitions to the extent that they impose any obligation beyond what is required by the FRCP.

10     5.    Defendant objects to the definitions of "DOCUMENT" or "DOCUMENTS" on the

11 grounds that the definitions are vague and ambiguous, overbroad, compound and overly complex,

12 unduly burdensome and oppressive, and call for information that is neither relevant nor reasonably

13 calculated to lead to the discovery of admissible evidence. Defendant further objects to these

14 definitions to the extent that they impose any obligation beyond what is required by the FRCP.

15     6.    Defendant objects to the definitions of "COMMUNICATION" or

16 "COMMUNICATIONS" on the grounds that the definitions are vague and ambiguous, overbroad,

17 compound and overly complex, unduly burdensome and oppressive, and call for information that is

18 neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

19 Defendant further objects to these definitions to the extent that they impose any obligation beyond

20 what is required by the FRCP.

21     7.    Defendant objects to the definition of "PRESENTATION" on the grounds that the

22 definition is vague and ambiguous, overbroad, compound and overly complex, unduly burdensome

23 and oppressive, and calls for information that is neither relevant nor reasonably calculated to lead to

24 the discovery of admissible evidence. Defendant further objects to this definition to the extent that

25 it imposes any obligation beyond what is required by the FRCP.

26     8.    Defendant objects to the definition of "SUCCESSFACTORS' EVENTS" on the

27 grounds that the definition is vague and ambiguous, overbroad, compound and overly complex,

28 unduly burdensome and oppressive, and calls for information that is neither relevant nor reasonably

- 3 -

1  calculated to lead to the discovery of admissible evidence. Defendant further objects to this

2  definition to the extent that it imposes any obligation beyond what is required by the FRCP.

3      9.    Defendant objects to the definition of "CONCERNING" on the grounds that the

4  definition is vague and ambiguous, overbroad, compound and overly complex, unduly burdensome

5  and oppressive, and calls for information that is neither relevant nor reasonably calculated to lead to

6  the discovery of admissible evidence. Defendant further objects to this definition to the extent that

7  it imposes any obligation beyond what is required by the FRCP.

8      10.   Defendant objects to the definition of "IDENTIFY" on the grounds that the

9  definition is vague and ambiguous, overbroad, compound and overly complex, unduly burdensome

10 and oppressive, and calls for information that is neither relevant nor reasonably calculated to lead to

11 the discovery of admissible evidence. Defendant further objects to this definition to the extent that

12 it imposes any obligation beyond what is required by the FRCP.

13     11.   Defendant objects to Plaintiff's purported instructions for responding to Plaintiff's

14 interrogatories where information will be withheld on a claim of privilege. Defendant is unaware of

15 any such requirement with respect to interrogatories. Defendant further objects to Plaintiff's

16 purported instructions for form and content as overbroad, unduly burdensome, and beyond the

17 scope of the FRCP. If a privilege log is appropriate, Defendant will provide one that complies with

18 the FRCP and the practice of this district.

19     12.   Defendant objects to Plaintiff's instructions in their entirety to the extent it imposes

20 any obligation beyond what is required by the FRCP and is not otherwise burdensome and

21 oppressive.

22     13.   Defendant objects to Plaintiff's interrogatories to the extent they purport to require

23 Defendant to provide information duplicating that which has already been detailed in the

24 Declaration of David Watkins, dated March 26, 2008, to which the interrogatories make numerous

25 reference. That information has already been provided under a sworn declaration.

26                    **AMENDED RESPONSES AND OBJECTIONS**

27 **INTERROGATORY NO. 1:**

28     Describe in detail, separately, all facts CONCERNING the participation of each and every

- 4 -

DEFENDANT'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET
OF INTERROGATORIES (NOS. 1-19)          Case No. CV 08-1376 CW (BZx)

1  PERSON who assisted in the planning, creation, design, review, revision, transmission, or use of

2  the PRESENTATION.

3  **RESPONSE TO INTERROGATORY NO. 1:**

4      Defendant objects to this interrogatory as vague and ambiguous, indefinite and overly broad

5  as to time and scope.  Defendant further objects to the extent it requests information protected by

6  the attorney-client privilege, the attorney work-product doctrine or any other applicable privilege

7  recognized by law.  Defendant objects to this interrogatory on the grounds that it is overly

8  burdensome and oppressive to the extent it requires Defendant to provide all facts regarding a

9  particular event and submits that interrogatories may not be the most efficient method of discovery

10  to elicit such information.  Defendant also objects to this interrogatory on the grounds that it

11  contains subparts, which violates the FRCP's limitations on number of permitted interrogatories.

12  Without waiving any of these objections, Softscape responds that it has not withheld information

13  from the substantive response provided below on the basis of any such objection, although it

14  maintains such objections should future information obtained fall within such objectionable basis,

15  and hereby responds as follows:

16      Initially, it was David Watkins, Chief Executive Officer of Softscape, who conceived of the

17  internal PowerPoint (the "Softscape Internal PowerPoint" or "SIPP") that is very similar to the

18  PRESENTION.  Mr. Watkins then created a very basic version of the SIPP.  Matthew Park and

19  Christopher Faust met on at least two occasions with David Watkins and gave verbal input on the

20  SIPP.  During this process, Christopher Faust viewed an excel spreadsheet containing various

21  SuccessFactor data on David Watkins' computer screen, which was later e-mailed to Mr. Faust,

22  along with an early iteration of the SIPP.  The resulting version of the SIPP, which did not

23  incorporate any of the content obtained from the ACE 275 Demo accessed between February 19 and

24  22, 2008, was presented by David Watkins at a Softscape sales meeting in Wayland, Massachusetts,

25  held on February 3 through 5, 2008.

26      In late February 2008, David Watkins presented an updated version of the SIPP at a sales

27  meeting *via* Webex.  This version contained webshots of a SuccessFactors webinar demonstration ,

28  provided by Dennis Martinek and screen shots from their public website.  It also contained

- 5 -

1  information about Intelsat, which David Watkins obtained from Sean Tamami. In addition, Linda

2  Gagne provided information about two of the other customers specifically identified in that version

3  of the SIPP , ICMA and Harris Williams. The SIPP was available for internal use only on a

4  company server in a Sales folder and on the Sales Resource Center intranet site, which is password

5  protected.

6       Sometime in early March 2008, prior to March 4, Alex Bartfield received a copy of the SIPP

7  by e-mail, which he quickly reviewed and provided comments on. As a part of that review, he

8  accessed the ACE 275 demo at the direction of David Watkins. On March 3, 2007 at 8:04 a.m.

9  (Sydney time), Mike Brandt received a copy of the SIPP from David Watkins. This e-mail was also

10  sent to Alex Bartfield, and had already been sent to Matthew Park, Richard Watkins, and

11  Christopher Faust. Shortly thereafter, at 8:41 a.m. (Sydney time), Mr. Brandt e-mailed his

12  comments back to David Watkins, including the insertion of a slide at the end of the show. Also,

13  Matthew Park forwarded on a version of the SIPP to Michelle Davis. Additionally, Jayna Smith

14  was e-mailed a version of the SIPP by David Watkins. Christopher Faust emailed a copy to Steve

15  Bonadio. Michelle Davis forwarded the SIPP to Micki Pahl, an Account Development

16  Representative   Mike Brandt emailed it to Charles Camphin.

17       Defendant is still learning the facts, and has given a complete response based on the

18  information of which it is presently aware. Defendant reserves the right to supplement this response

19  as additional information is revealed in discovery.

20  **INTERROGATORY NO. 2:**

21       Describe in detail all facts CONCERNING YOUR claim that the PRESENTATION was

22  intended for SOFTSCAPE's "*internal* use only," as described in Paragraph 8 of the Declaration of

23  David Watkins in Opposition to Plaintiff's Motion to Strike, Docket No. 58, including but not

24  limited to how it was so designated for internal use and when, and what specific "employment and

25  business policies" forbade the dissemination or use of the PRESENTATION and the information

26  therein.

27  **RESPONSE TO INTERROGATORY NO. 2:**

28       The SIPP was intended for Softscape's internal use only. It was saved electronically on the

- 6 -

DEFENDANT'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET
OF INTERROGATORIES (NOS. 1-19)                    Case No. CV 08-1376 CW (BZx)

1  company's server, and the internal use only treatment of the SIPP was repeatedly emphasized to the

2  Softscape sales force both orally and in writing.  No distribution of the SIPP outside the company

3  was ever authorized by Softscape, and such distribution would be in direct contravention and

4  violation of Softscape's employment and business policies.  The Softscape Intranet site on which

5  the SIPP could be accessed expressly made this clear with such a warning (*see* SS0000232).

6  Further, the use of the information has been at all relevant times governed by several policies

7  including Sections 3.1.1, 3.1.4., and 3.1.7 of the Computer Control Guide.

8  **INTERROGATORY NO. 3:**

9      IDENTIFY all PERSONS who received a copy of the PRESENTATION, including whether

10  each PERSON is or was YOUR employee, agent, partner, reseller, customer or prospect.

11  **RESPONSE TO INTERROGATORY NO. 3:**

12      The following employees of Defendant received copies of at least one iteration of the SIPP:

13  David Watkins (CEO); Christopher Faust (VP, Marketing); Matt Park (VP, Sales (Worldwide)); Mike

14  Brandt (Practice Director); Alex Bartfeld (VP and Managing Director, Europe); Charles Camphin

15  (Regional Sales Manager); Michelle Davis (VP, Sales (West)); Jayna Smith (Regional Sales Manager),

16  Steve Banadio (Director of Marketing).  Additionally, the e-mail from John Anonymous was sent to

17  sales@softscape.com, which was received by at least Linda Gagne.  Additionally, the documents

18  already produced through Google identify the e-mail recipients of the John Anonymous e-mail and are

19  hereby referred to pursuant to F.R.C.P. 33(d).

20  **INTERROGATORY NO. 4:**

21      Describe in detail all facts CONCERNING YOUR claim that each Softscape employee who

22  received a copy of the PRESENTATION "credibly denied disseminating the PRESENTATION

23  outside the company," as described in Paragraph 10(c) of the Declaration of David Watkins in

24  Opposition to Plaintiff's Motion to Strike, Docket No. 58.

25  **RESPONSE TO INTERROGATORY NO. 4:**

26      Defendant objects to this request to the extent it seeks communications protected by the

27  attorney-client privilege and/or work product doctrine, and no waiver is intended or made hereby.

28  The following response is limited to the facts revealed in an internal investigation that was

- 7 -

1  conducted at the direction of counsel and is made with the express reservation of the substance of

2  all communications with counsel and shall not constitute a subject matter waiver of the attorney-

3  client privilege or work product doctrine.  Without waiving any of these objections, Softscape

4  responds that it has not withheld information from the substantive response provided below on the

5  basis of any such objection, although it maintains such objections should future information

6  obtained fall within such objectionable basis, and hereby responds as follows:  Immediately upon

7  service of the lawsuit, David Watkins instructed Softscape's legal staff to conduct an investigation

8  of all who were known to have received the SIPP to ascertain whether they were responsible in any

9  way for its distribution on March 4, 2008.  The inquiries were directed at all persons Softscape was

10  able to identify as having received a copy of the SIPP.  The investigation did not reveal the identity

11  of any person responsible for the dissemination of the SIPP or the PRESENTATION outside the

12  company.  Joe Fougere (Vice President of Technical Services) reviewed all the email boxes and

13  identified who reviewed the SIPP.  Softscape legal personnel spoke to Matt Park, Christopher Faust,

14  Alex Bartfeld and Michelle Davis.  In addition, Joe Fougere also checked the email server to try to

15  detect any emails with the presentation going to any third parties.

16  **INTERROGATORY NO. 5:**

17  Describe all COMMUNICATIONS between SOFTSCAPE, on the one hand, and New

18  Millenium Shoe or Ely Valls, on the other hand, regarding SUCCESSFACTORS, any sales demos

19  performed by SUCCESSFACTORS for New Millenium Shoe, and/or the PRESENTATION.

20  **RESPONSE TO INTERROGATORY NO. 5:**

21  David Watkins requested that Ely Valls, on behalf of Millenium Shoe, contact

22  SuccessFactors to request access to the ACE 275 Demo.  After Ely Valls obtained a password, she

23  supplied it to David Watkins who participated in interactive demos that SuccessFactors'

24  representatives set up for Millenium Shoe.

25  **INTERROGATORY NO. 6:**

26  IDENTIFY all facts regarding Javier Cruz's relationship to SOFTSCAPE,

27  SUCCESSFACTORS, and/or New Millenium Shoe Company.

28  / / /

- 8 -

DEFENDANT'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET
OF INTERROGATORIES (NOS. 1-19)                Case No. CV 08-1376 CW (BZx)

1  **RESPONSE TO INTERROGATORY NO. 6:**

2      The name Javier Cruz was a nom de plume used by David Watkins in setting up and

3  participating in the sales demonstration calls with SuccessFactors concerning the ACE 275 Demo.

4  **INTERROGATORY NO. 7:**

5      IDENTIFY all PERSONS (within Softscape and externally) who accessed a

6  SUCCESSFACTORS' sales demo account, including but not limited to ACE275.

7  **RESPONSE TO INTERROGATORY NO. 7:**

8      Defendant objects to the extent this interrogatory as overbroad, unduly burdensome, and

9  seeks information not within its possession or knowledge.  Subject to this objection, Softscape is

10 aware that the following individuals accessed a SuccessFactors' sales demo account in connection

11 with the preparation of the SIPP: David Watkins, and Alex Bartfeld.

12 **INTERROGATORY NO. 8:**

13     Describe in detail all facts CONCERNING how any PERSON identified in response to

14 Interrogatory No. 7, learned or acquired the user name and password for any SUCCESSFACTORS

15 sales demo account, including but not limited to ACE275.

16 **RESPONSE TO INTERROGATORY NO. 8:**

17     Ely Valls obtained a user name and password from SuccessFactors.  David Watkins

18 obtained the user name and password from Ely Valls.  David Watkins supplied Alex Bartfeld with

19 the user name and password information that he obtained from Ely Valls.

20 **INTERROGATORY NO. 9:**

21     IDENTIFY and describe all SUCCESSFACTORS EVENTS or demonstrations YOU

22 attended, heard, or viewed since January 2006, including but not limited to a description of who

23 attended, dates of attendance and what information was obtained by YOU.

24 **RESPONSE TO INTERROGATORY NO. 9:**

25     Defendant objects to the extent this interrogatory is overbroad as to time frame and scope,

26 unduly burdensome, not tied in any way to the PRESENTATION and therefore seeks information

27 that is not likely to lead to the discovery of admissible evidence.  Defendant further objects on the

28 basis that this information is equally accessible to Plaintiff.  Plaintiff set up these events and

- 9 -

DEFENDANT'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET
OF INTERROGATORIES (NOS. 1-19)                Case No. CV 08-1376 CW (BZx)

1  demonstrations and should possess records identifying which ones were attended under the

2  username already identified in this matter. Between January 2006 and the present, David Watkins

3  and other personnel from Softscape have attended multiple industry conferences and tradeshows,

4  and during such attendance viewed information and presentations made available by

5  SuccessFactors.

6  **INTERROGATORY NO. 10:**

7     Other than the PRESENTATION, IDENTIFY any other presentation, white papers,

8  competitive analyses or assessments, positioning papers, marketing or business plans, that YOU

9  have created since January 2006 that describe, analyze, or critique YOUR competitor's products or

10  services.

11  **RESPONSE TO INTERROGATORY NO. 10:**

12     Defendant objects to the extent this interrogatory is overbroad as to time frame and scope,

13  unduly burdensome, not tied in any way to the PRESENTATION and therefore seeks information

14  that is not likely to lead to the discovery of admissible evidence. Defendant objects to this

15  interrogatory on the grounds that it contains subparts, which violates the FRCP's limitations on

16  number of permitted interrogatories. Subject to, and without waiving any objections, Defendant

17  responds that it will read this interrogatory as requesting other presentations, white papers,

18  competitive analyses or assessments, positioning papers, marketing or business plans that Defendant

19  has created since January 2006 that have any tendency to support or refute any of the statements

20  made concerning SuccessFactors' products or services in the SIPP and/or the PRESENTATION.

21  Subject to this interpretation, Defendant will produce all such documents to Plaintiff as they are

22  obtained and references such documents pursuant to F.R.C.P. 33(d).

23  **INTERROGATORY NO. 11:**

24     IDENTIFY all "current and former SuccessFactors customers" that were the "sources of

25  information" for statements made in the PRESENTATION, as claimed in Paragraph 5 of the

26  Declaration of David Watkins in Opposition to Plaintiff's Motion to Strike, Docket No. 58.

27  **RESPONSE TO INTERROGATORY NO. 11:**

28     Defendant objects to this request to the extent it seeks information already supplied in the

- 10 -

DEFENDANT'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET
OF INTERROGATORIES (NOS. 1-19)          Case No. CV 08-1376 CW (BZx)

1    form of the sworn declaration of David Watkins, which is hereby referenced pursuant to FRCP

2    33(d). Subject to, and without waiving such objections, Defendant identifies Regions Bank,

3    Intelsat, ICMA Retirement, and Harris Williams.

4    **INTERROGATORY NO. 12:**

5        For each of the PRESENTATION's facts that YOU contend YOU received or inferred from

6    SUCCESSFACTORS' current or former customers, describe in detail how YOU received or

7    inferred the fact, including but not limited to a description of which customer was the source of the

8    fact and when.

9    **RESPONSE TO INTERROGATORY NO. 12:**

10        Defendant reads this interrogatory to pertain to facts which Defendant contends it obtained,

11    either explicitly or by inference, from communications with SuccessFactors' current or former

12    customers. Defendant objects to this interrogatory to the extent it seeks information already

13    provided by declaration. Defendant further objects to the extent it contains subparts, which violates

14    the FRCP numerical limit on interrogatories. The interrogatory is vague, ambiguous and undefined

15    to the extent it seeks information in addition to the customer and general time frame (e.g. "including

16    but not limited to"). Subject to, and without waiving such objections, Defendant responds as

17    follows:

18        Slide 10's claim of "failed implementation" was based, among others, upon information

19    received by Jeff Adams (Regional Sales Manager for Softscape) received from Regions Bank, and

20    information Ilene McCume (former employee of Sears) provided concerning Sears.

21        Slide 8's information concerning Sears was provided from two sources within Sears. Prior to

22    SuccessFactors being awarded the referenced contract, David Watkins of Softscape learned from a

23    senior person on the project for Sears that SuccessFactors had assured Sears that it had the tools to

24    deliver their compensation plans on time. Ilene McCune (former project manager for

25    SuccessFactors) told Softscape that Sears pulled the plug on the project after six months.

26        All of the information contained in Slide 9 concerning Regions Bank was communicated

27    from person(s) within Regions Bank to Jeff Adams (Regional Sales Manager for Softscape). The

28    information in Slide 10 concerning Intelsat was obtained by Sean Tamami of Softscape (C.I.O.)

- 11 -

1  directly from Dave Sinkfield, SVP of Operations at Intelsat. The information from Slide 11

2  concerning ICMA Retirement was provided to Linda Gagne of Softscape (Director of Business

3  Development) from person(s) at ICMA Retirement, who in turn provided this information to Kathy

4  Pearson (Business Development Representative for Softscape). The information contained in Slide

5  12 concerning Harris-Williams was provided from person(s) at Harris-Williams to Dennis Martinek

6  of Softscape, in turn to Linda Gagne (Mid-Market Sales Representative for Softscape), and in turn

7  to David Watkins.

8          Additionally, Reebok specifically requested a proposal from Softscape because of its

9  dissatisfaction with SuccessFactors. The title for Slide 31, to the effect that Ultra is a scam, was

10  based on the claim of interconnectivity which David Watkins learned was in reality only a

11  hyperlink.

12  **INTERROGATORY NO. 13:**

13          State all facts in support of YOUR claim that "63% of their Customers left [SuccessFactors]

14  by 2008," as claimed in slide 3 of the PRESENTATION.

15  **RESPONSE TO INTERROGATORY NO. 13:**

16          This information has already been provided in the form of a sworn declaration. It is based

17  on publicly available information that SuccessFactors posts and displays on its website. When

18  preparing the PRESENTATION, David Watkins observed 208 names listed on SuccessFactors'

19  website and/or webinars in Jan 2005 and looked to see what remained in January 2008, and found

20  that only 76 of the original names still remained. This meant that 63% left. is where the 63% – that

21  meant 63% left. To Softscape's knowledge, SuccessFactors has historically listed each and every

22  one of its customers on its website without exception. Therefore, when a customer name is

23  removed from the SuccessFactors website, the conclusion Softscape drew is that the removed

24  company was no longer a SuccessFactors customer. Thus, the percentage used in the SIPP and

25  reflected in the PRESENTATION was obtained by comparing the number of names that had

26  disappeared with SuccessFactors' current identified customer base.

27  **INTERROGATORY NO. 14:**

28          State all facts in support of YOUR claim regarding "failed implementations" and

- 12 -

1    purportedly "lost customers" as set forth in slides 5-6 and 8-12 of the PRESENTATION.

2    **RESPONSE TO INTERROGATORY NO. 14:**

3    Defendant objects on the basis that this interrogatory seeks information so voluminous and

4    cumulative as to be unduly burdensome. Defendant further objects to this interrogatory as it seeks

5    information concerning its own failed performance and customer attrition that is equally accessible

6    to it. Defendant also objects to this interrogatory on the grounds that it is overly burdensome and

7    oppressive to the extent it requires Defendant to provide all facts regarding a particular event and

8    submits that interrogatories may not be the most efficient method of discovery to elicit such

9    information. Defendant objects to this interrogatory on the grounds that it contains subparts, which

10   violates the FRCP's limitations on number of permitted interrogatories. Defendant will answer this

11   interrogatory subject to, and without waiving these objections.

12   The information concerning the "lost customers" has already been provided in the form of a

13   sworn declaration. It is based on publicly available information that SuccessFactors posts and

14   displays on its website. When preparing the PRESENTATION, David Watkins observed 208

15   names listed on SuccessFactors' website and/or webinars in Jan 2005 and looked to see what

16   remained in January 2008, and found that only 76 of the original names still remained. This meant

17   that 63% left. To Softscape's knowledge, SuccessFactors has historically listed each and every one

18   of its customers on its website without exception. Therefore, when a customer name is removed

19   from the SuccessFactors website, the conclusion Softscape drew is that the removed company was

20   no longer a SuccessFactors customer. Thus, the percentage used in the PRESENTATION was

21   obtained by comparing the number of names that had disappeared with SuccessFactors' current

22   customer base.

23   Further, concerning "failed implementations," SuccessFactors has traditionally claimed in its

24   sales tactics, materials and/or presentations that the disappearance of a customer name from

25   Softscape's website meant a failed implementation had occurred with respect to that customer.

26   Thus, Softscape simply applied this same assumption to names removed from SuccessFactors'

27   website. The amended response to Interrogatory 12 also lists details concerning further examples of

28   failed implementations

- 13 -

1    **INTERROGATORY NO. 15:**

2        Describe in detail all computers or data storage media, including home computers of

3    SOFTSCAPE employees or consultants, that YOU have sought to preserve, including but not

4    limited to a description of the owners, possessors, or users of such computers or data storage media,

5    and whether it has been successfully and completely preserved.

6    **RESPONSE TO INTERROGATORY NO. 15:**

7        Defendant objects to this request as unduly burdensome and not reasonably calculated to

8    lead to the discovery of relevant information.  Defendant further objects to the extent this

9    interrogatory seeks communications protected by the attorney-client privilege, attorney work-

10    product doctrine, or other privileged afforded by law.  Defendant further objects to the extent the

11    interrogatory seeks information not within its possession or control.  Subject to, and without

12    waiving these objections, Defendant responds that it has notified all employees of the pending

13    litigation and the necessity to preserve all documents and communication relevant or potentially

14    relevant to the SIPP and/or the PRESENTATION.  Further, there is a preservation order issued by

15    the Court by which Defendant has abided.  Additionally, the work computers of the following

16    employees of Defendant have been successfully imaged: David Watkins; Alex Bartfeld; Matt Park;

17    Mike Brandt; Christopher Faust; Dennis Martinek; Linda Gagne; Rick Watkins; Michelle Davis;

18    Jean DeRoche; Jayna Smith; Charles Camphin; Susan Mohr; and Rick Vatcher.  Further, the home

19    computers of David Watkins, Lillian Watkins, and Elly Valls have been imaged.  The exchange

20    server, SRC server, CRM server and file server were also imaged.

21    **INTERROGATORY NO. 16:**

22        IDENTIFY all known computers or data storage media that have at any time had a copy of

23    the PRESENTATION, whether in whole or in part, including any copy only in volatile memory.

24    **RESPONSE TO INTERROGATORY NO. 16:**

25        Defendant objects to this interrogatory to the extent it seeks information already provided to

26    Plaintiff by Google, and such produced documentation is hereby referred to pursuant to FRCP

27    33(d).  Without waiving such objection, Defendant responds that salespersons on the distribution

28    list for sales@softscape.com may have had a copy of the SIPP and/or the PRESENTATION as a

DEFENDANT'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET
OF INTERROGATORIES (NOS. 1-19)          Case No. CV 08-1376 CW (BZx)

1   result of the March 4, 2008 e-mail from John Anonymous being sent to sales@softscape.com. At

2   least the e-mail box of Linda Gagne obtained a copy of the PRESENTATION in this way.

3   Otherwise, the universe of computers or data storage that may have had a copy of the SIPP include

4   the following servers: SRC server, file server and exchange server, including the e-mail boxes

5   located on the exchange server of Dave Watkins; Christopher Faust; Matt Park; Mike Brandt; Alex

6   Bartfeld; Charles Camphin; Michelle Davis (receipt dated March 4 at 6:21 p.m.), Micki Pahl and

7   Jayna Smith. Jayna Smith also had a copy of the SIPP on her personal e-mail,

8   jaynab2003@yahoo.com.

9   **INTERROGATORY NO. 17:**

10       IDENTIFY all facts CONCERNING YOUR allegation that SUCCESSFACTORS

11   "consented to and acquiesced" to conduct at issue in SUCCESSFACTORS' COMPLAINT, as

12   alleged in YOUR Second Affirmative Defense.

13   **RESPONSE TO INTERROGATORY NO. 17:**

14       Defendant objects to the extent this interrogatory seeks conclusions and determinations of

15   legal questions. Defendant further objects to the extent the interrogatory is not sufficiently and

16   discretely tailored, referring to all "conduct at issue in SUCCESSFACTORS' COMPLAINT" --

17   references to an entire complaint such as this are impermissible in an interrogatory request. Thus,

18   Defendant further objects to this interrogatory on the grounds that it contains subparts, which

19   violates the FRCP's limitations on number of permitted interrogatories. Subject to, and without

20   waiving such objections, Defendant responds that SuccessFactors voluntarily supplied the user

21   name and password by which the ACE 275 Demo was accessed. On information and belief,

22   SuccessFactors itself obtains information *via* the same methods from its competitors.

23   **INTERROGATORY NO. 18:**

24       IDENTIFY all facts CONCERNING YOUR Fourteenth Affirmative Defense that

25   SOFTSCAPE is not liable "for any act or omission of any subordinate," including the name and

26   identify of any such subordinate.

27   **RESPONSE TO INTERROGATORY NO. 18:**

28       Defendant is unaware of any subordinate responsible for the sending of the

- 15 -

CONFIDENTIAL

1  PRESENTATION via e-mail from John Anonymous. There has been no demonstration that the

2  external distribution was carried out by any subordinate of Softscape. The Presentation was

3  intended for Softscape's internal use only. It was so marked and saved electronically on the

4  company's server, and this internal treatment of the Presentation was repeatedly emphasized to the

5  Softscape sales force both orally and in writing. No distribution of the Presentation outside the

6  company was ever authorized by Softscape, and such distribution would be in direct contravention

7  and violation of Softscape's employment and business policies. The Softscape Intranet site on

8  which the SIPP could be accessed expressly made this clear with such a warning (*see* SS0000232).

9  Further, the use of the information has been at all relevant times governed by several policies

10  including Sections 3.1.1, 3.1.4., and 3.1.7 of the Computer Control Guide.

11  **INTERROGATORY NO. 19:**

12       IDENTIFY all facts CONCERNING YOUR Sixteenth Affirmative Defense that "any non-

13  truthful statement in the Presentation was not material."

14  **RESPONSE TO INTERROGATORY NO. 19:**

15       Defendant objects to the extent that this information is within the possession and control of

16  Plaintiff, including the materiality of any damages incurred as a result of any individual allegedly

17  non-truthful statement. Defendant further objects to this interrogatory on the grounds that it

18  contains subparts, which violates the FRCP's limitations on number of permitted interrogatories.

19  Subject to, and without waiving such objection, Defendant responds that it is not presently aware of

20  any statements in the PRESENTATION which were non-truthful statements.

21  Dated: May 23, 2008      MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, PC

22

23

24       By:  JEFFREY M. RATINOFF

25       Attorneys for Defendant,
     SOFTSCAPE, INC.

26

27

28

- 16 -

DEFENDANT'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (NOS. 1-19)      Case No. CV 08-1376 CW (BZx)

**CONFIDENTIAL**

1  **VERIFICATION FOR SOFTSCAPE, INC.'S RESPONSES AND OBJECTIONS TO**

2  **SUCCESSFACTORS, INC.'S FIRST SET OF INTERROGATORIES**

3  I, David Watkins, declare:

4  I am the Chief Executive Officer of Softscape, Inc., Defendant in the above-entitled action,

5  and am authorized to make this verification for and on its behalf. I have read the information

6  provided in SOFTSCAPE, INC.'S RESPONSES AND OBJECTIONS TO SUCCESSFACTORS,

7  INC.'S FIRST SET OF INTERROGATORIES. The same is true of my own knowledge except as

8  to the matters which are based on information and belief, and, as to those matters, I believe them to

9  be true.

10  I declare under penalty of perjury under the laws of the United States of America that the

11  foregoing is true and correct.

12  Executed this 23rd day of May, 2008 at _____, Massachusetts.

13

14  _____

15  David Watkins

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | ROBERT P. TAYLOR (SBN 46046)
Email: rptaylor@mintz.com
2 | BRYAN J. SINCLAIR (SBN 205885)
Email: bsinclair@mintz.com
3 | JEFFREY M. RATINOFF (SBN 197241)
Email: jratinoff@mintz.com
4 | MINTZ LEVIN COHN FERRIS GLOVSKY AND
POPEO, PC
5 | 1400 Page Mill Road
Palo Alto, California 94304-1124
6 | Telephone: (650) 251-7700
Facsimile:   (650) 251-7739
7

8 | Attorneys for Defendant,
SOFTSCAPE, INC.
9

10      UNITED STATES DISTRICT COURT

11      NORTHERN DISTRICT OF CALIFORNIA

12      OAKLAND DIVISION

13 | SUCCESSFACTORS, INC, a Delaware corporation,          Case No. CV 08-1376 CW (BZx)

14 |                                                       **PROOF OF SERVICE**

                  Plaintiff,
15
         vs.
16
17 | SOFTSCAPE, INC., a Delaware corporation, and DOES 1-10, inclusive,

18 |                  Defendants.

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2      At the time of service, I was over 18 years of age and not a party to this action. I am

3 employed in the County of Santa Clara, State of California. My business address is 1400 Page Mill

4 Road, Palo Alto, California 94304.

5      On May 23, 2008, I served true copies of the following document(s) described as

6 **DEFENDANT'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST**

7 **SET OF INTERROGATORIES (NOS. 1-19)** on the interested parties in this action as follows:

8 **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be

9 sent from e-mail address akava@mintz.com to the person at the e-mail address listed below. I did

10 not receive, within a reasonable time after the transmission, any electronic message or other

11 indication that the transmission was unsuccessful.

12 **BY MAIL**: I caused a true and correct copy of the above to be placed in the United States Mail at

13 Palo Alto, California in sealed envelope(s) with postage prepaid, addressed as set forth below. I am

14 readily familiar with this law firm's practice for collection and processing of correspondence for

15 mailing with the United States Postal Service. Correspondence is deposited with the United States

16 Postal Service the same day it is left for collection and processing in the ordinary course of

17 business.

18          Mr. Patrick E. Premo
           Fenwick & West LLP
19          801 California Street
           Mountain View, CA 94041
20          E-Mail: ppremo@fenwick.com

21              **Counsel for SuccessFactors**

22      I declare under penalty of perjury, under the laws of the United States of America, that the

23 foregoing is true and correct and that I am employed in the office of a member of the bar of this

24 Court at whose direction the service was made.

25      Executed on May 23, 2008, at Palo Alto, California.

26                                    Alice P. Kava

27

28

# EXHIBIT 15





# EXHIBIT 16



# SUCCESSFACTORS

## Workforce Performance Management

*The Naked Truth*
*MARCH 1, 2008*

# EXHIBIT 17



*The Naked Truth about Successfactors by Softscape*
*UPDATE*
*MARCH 8, 2008*

# EXHIBIT 18





*The Naked Truth about Successfactors*
*UPDATE*
*MARCH 23, 2008*

CONFIDENTIAL – INTERNAL USE ONLY

March 24, 2008

# EXHIBIT 19

## Unknown

| | |
|---|---|
| **From:** | Ratinoff, Jeffrey [JRatinoff@mintz.com] |
| **Sent:** | Friday, July 25, 2008 5:01 PM |
| **To:** | Henry Carbajal |
| **Cc:** | Sinclair, Bryan; Taylor, Robert; Liwen Mah; Laurence Pulgram; Patrick Premo |
| **Subject:** | Re: SuccessFactors, Inc. v. Softscape, Inc.: Summary of Meet and Confer Agreements - Monday 7-21-08 Responses |

Henry,

Please see Softscape's responses and additional statements/questions in **RED** below.

Thanks,
Jeff

---

**From:** Henry Carbajal [mailto:HCarbajal@fenwick.com]
**Sent:** Tuesday, July 22, 2008 6:27 PM
**To:** Sinclair, Bryan; Ratinoff, Jeffrey; Taylor, Robert
**Cc:** Patrick Premo; Laurence Pulgram; Liwen Mah; Kalama Lui-Kwan; Sandy Sanford
**Subject:** SuccessFactors, Inc. v. Softscape, Inc.: Summary of Meet and Confer Agreements - Monday 7-21-08 Responses

Bryan,
Thank you for your responses. Please see my follow up questions following your responses in **BLUE** below. We request your responses by tomorrow.
Henry

---

**From:** Sinclair, Bryan [mailto:BSinclair@mintz.com]
**Sent:** Monday, July 21, 2008 5:58 PM
**To:** Henry Carbajal
**Cc:** Laurence Pulgram; Taylor, Robert; Patrick Premo; Liwen Mah; Sandy Sanford; Sinclair, Bryan; Ratinoff, Jeffrey
**Subject:** SuccessFactors, Inc. v. Softscape, Inc.: Summary of Meet and Confer Agreements - Monday 7-21-08 Responses

Henry, please see Softscape's responses to the Monday COB issues you raised. My responses are in **RED** below:

---

**From:** Henry Carbajal [mailto:HCarbajal@fenwick.com]
**Sent:** Thursday, July 17, 2008 8:19 PM
**To:** Ratinoff, Jeffrey
**Cc:** Laurence Pulgram; Sinclair, Bryan; Taylor, Robert; Patrick Premo; Liwen Mah; Sandy Sanford
**Subject:** SuccessFactors, Inc. v. Softscape, Inc.: Summary of Meet and Confer Agreements

Jeffrey,
As you requested, here is a list of items agreed upon by the parties at today's meet and confer session. Please let me know immediately if this does not conform to your understanding of the parties' communications today

**By close of business tomorrow:**

Softscape agreed to give us color coded redesignations of Mr. Watkins' deposition transcript, with explanations for the designations.

**By close of business Monday, July 21:**

Softscape agreed to the following:

1. Tell us whether Softscape has searched "my administrator's machine," the SRC, CRM and the "corporate file

server." **YES.** Thank you. Please also confirm that the CRM has been searched without limit by custodian. **YES.**

2. Tell us whether it will produce its log file and server "metadata" and when such will be delivered. **Softscape has requested further clarification of this question. Please explain exactly what "log file" and "server" metadata you are referring to. I can get an answer for you tomorrow if you can provide written clarification with the specifics of your question.** The log files and server metadata pertain to *inter alia* Softscape's RFP No. 1. We want any logs from the server showing access (including downloads, saves, check-ins, or check-outs) to the SIPP/Presentation. Generally, we are seeking information on who edited the document, what versions there might be, and similar information within whatever document management system Softscape uses, which may or may not exist apart from the document itself. We understand that Softscape has represented that it does not use a document management system. However, this does not foreclose the existence of the requested information we referenced. In this regard, we specifically request the following information: (1) Audit log files from Softscape's document collection: When Softscape began collecting documents for production, it should have generated a log showing the "chain of custody" or file path information showing where documents were found, where they are located and the overall file directory structure; (2) Information from shared network locations: Softscape likely has shared network locations such as repositories of sales documents with draft and final sales contract documents, or marketing files with marketing documents, including drafts and revisions, within reserved locations on the server. We request log and access information from these network locations. Moreover, we request access control information for these locations, meaning information showing that only certain employees or groups were given access to certain documents; (3) Local drive directory structures: Softscape should be able to extract this information from each custodians' imaged hard drive without great difficulty; (4) Local drive file histories: Document creation, last accessed and last written dates are written into the operating system on each imaged hard drive, as well as included within a produced native format document. We request this information from both sources.

**It is our understanding (and as Softscape has previously indicated in meet and confer, during SF's interview of its IT personnel and in discovery responses), no such "log files" or "repositories" exist that would track access to a particular document or generate "metadata" of such access. The SIPP simply resided in a folder on the server and therefore only the normal file-associated metadata (create date, last access and last modified dates) exists and has (or will be produced) with the various versions of the SIPP and other responsive documents.**

**With respect to the balance of what you are seeking, it falls within the category of litigation work product, is not within the legitimate bounds of discovery, is unduly burdensome and/or is not what Softscape is required to produce under the Federal Rules or by SF's particular document requests. Before raising the issue with the Court, however, we advise that SF wait until after August 1st to determine whether what Softscape is produced is sufficient and we would be happy to further discuss the issue with respect to *specific* documents/files that you believe are insufficient as produced. With respect to individual custodians' media, this does not fall within the bounds of "server" information and is the first time SF has raised the issue. However, it appears entirely inappropriate for the same reasons stated above.**

3. Advise us whether the current version in CRM, or elsewhere, of the Presentation has been produced, along with metadata. **Several versions of the SIPP have been produced. The most recent version will be produced on or before August 1, 2008.** You did not mention metadata. We assume that the server file records and metadata for the current version of the Presentation will be produced. Please confirm.

**It is our understanding that the post-litigation version of the SIPP, dated March 24, 2008, was already produced this week and that the available "metadata" was produced with it. At this point, SuccessFactors should go back and examine the productions to date before asserting that Softscape has not produced all versions of the Presentation.**

4. Will let us know by Monday whether it will disclose information on backup tapes, including type, how many, dates of tapes, and estimate of cost to restore, and whether or not there are different tapes for different custodians. **No. SS has expended substantial sums to image and preserve multiple servers and computers and has searched and continues to search those images for responsive documents. SS has complied with the Court's preservation order and there is no reason to provide the additional information.** This seems very counterproductive. To not even tell us what tapes exist and other information relative to restoring them is

7/31/2008

disappointing, especially where we are focused on a particular issue. Given the Magistrate Judge's statements to counsel during yesterday's deposition, this failure to cooperate is not constructive, and may require us to go to him with a letter. We request you reconsider by tomorrow.

**Given Judge Zimmerman's comments at the July 3 and July 21 conferences, I disagree with your assessment and believe raising this issue with the Court would be premature and counter-productive. The Court made quite clear that issues concerning sufficiency of production, which is what your request for back-up tapes appears to based on, should be brought after August 1. In that regard, he also warned the parties of manufacturing discovery disputes, which is exactly what SF is doing by requesting the back-up tapes before Softscape has completed its review and production. There is simply no legitimate basis at this time to require Softscape to produce or restore back up tapes.**

**Even after Softscape completes it production, the burden to Softscape heavily outweighs the value of the exercise given that the images were taken immediately after the period of the alleged misconduct. More importantly, the cost, time and effort required to restore and search the tapes would far exceed any likely benefit. Softscape would effectively have to restore its entire company computer system in a separate environment at an extremely high cost in man-hours and money, and then conduct (and pay for) the same search and review that its attorneys are currently conducting on images taken weeks after the lawsuit was filed.**

5. Will look at, and tell us, whether Softscape can and will run Kutik (and William Hurley) search terms across Softscape's exchange server   **The 22 custodians are being searched for both names. SS will not search every custodian within the company (numbering in the hundreds) with a box on the exchange server. If future document production gives rise to the need to isolate one or more custodians and search their boxes with these names as search terms, SS will take any necessary steps at that time.**

6. Will check, and tell us, whether Softscape examined each hard drive for Instant Messages. **Yes it has.** May we take this as an indication that no such IMs have been found, or if found, they have been searched and produced? As with our prior questions about efforts to restore IMs, please advise whether this has been attempted for any of the hard drives.

**We do not believe any have been found, which is consistent with the logging feature being turned off on computers with an instant messaging feature. However, if there are any messaging logs and there are any search terms within such logs, it is our understanding that they will captured in the search and responsive ones will be produced. In an effort to put an end to this inquiry, once the current search and production is complete, Softscape will go back and reconfirm that the logging feature was turned off for each of the 22 custodians.**

7. Tell us whether Softscape will give us CRM search results (of communications) for companies within the overlaps between the CRM list and Gmail account. **SS will produce responsive communications relating to any companies SF has specifically identified as being a lost customer or lost prospect.** We disagree on which companies are to be produced, but assume that you are saying that records from the CRM are being collected as to those you agree to produce. Please confirm.

**It is not entirely clear what you are asking or the remaining issue is with respect to the CRM. As we discussed during meet and confer, Softscape will discuss the possibility of targeted searches with respect to specific companies after Softscape produces the cross-reference chart.**

8. Give us information regarding "mwest" Is there an mwest account? Softscape will confirm it has looked for emails to such account (including bounced emails). If so, Softscape will tell us who/what "mwest" is. **SS has confirmed that there is no "mwest" e-mail account within the company and does not know who "mwest" is.** Can you confirm that there has never been an "mwest" email account, please? Also, this does not confirm whether Softscape has looked for emails to such an account that may have been collected elsewhere when bounced, and for what period such collection might be retained. Please give us your response to this inquiry.

**It is our understanding that there has never been an "mwest" account at Softscape. We are currently looking into whether there is any way to determine whether there is a record of a "bounce back". However, it may not be technically feasible to due this before August 1. In the interim, as we previously suggested, SF should subpoena MSN/Hotmail for information concerning William Hurley to confirm this and what Mr. Hurley may have communicated to John Anonymous. In that regard, I note that the communication between Hurley and John Anonymous occurred on March 12, the day after the lawsuit was filed. Since SF disclosed John Anonymous' email address in its publicly filed complaint, it is likely that Mr. Hurley is a random third party.**

9. Regarding Document Request Nos. 34-36: Softscape will tell us whether it will agree to advise us as to who logged into

7/31/2008

the NMS webserver account from the specified IP addresses. No date was specified by the parties for this agreement, but we request a deadline of Monday for the answer. **SS will identify the IP addresses who logged into the NMS webserver account for any IP addresses that SS is able to identify as a result of the information being within its knowledge, custody, or control.** Thank you for agreeing to identify the IP addresses. We are concerned, however, with the qualification "identify as a result of the information being within its knowledge, custody, or control." It sounds like the information may be available to Softscape from individuals, perhaps Dave Watkins, but could only be provided based on knowledge it obtained, or originating, from Softscape employees' affiliation with NMS. Please confirm if Softscape is using this artificial construct to eliminate sources by which it will seek to identify the IP addresses.

**Softscape is not attempting to artificially restrict sources and will comply with its obligations under the Federal Rules.**

10. Regarding your narrowing proposal for Document Request No. 26, we will accept your proposal to construe the request as calling for: All communications between the "wildgracks" email address and Softscape relating to the Presentation or facts therein or between the "wildgracks" email address and SuccessFactors. **YES.**

**By close of business Tuesday, July 22:**

Softscape agreed to the following:

1. Advise us whether Softscape will give us names of customers and "friends" on produced redacted phone records.

2. Amend its privilege log on produced phone records to give the time of Dave Watkins' phone calls on the privilege log. Please also give us the accurate time zone for all times on the privilege log, as we see those are missing from the log.

3. Regarding Document Request No. 17: Softscape will give us an answer on the proposed compromise, which would delete the phrase "not limited to" from the request.

4. Regarding Document Request No. 42: Softscape will give us an answer as to whether it will produce emails with Ely Valls' hotmail account and Softscape, limited to those relating in any way to Softscape's business, including any competition or competitors of Softscape, or the NMS website.

**By the end of next week, Friday, July 25:**

Softscape agreed to the following:

1. Will produce Lillian Watkins' mobile and Mike Brandt's mobile and corporate phone records. **These are being produced today.**

2. Will find out if any documents exist with respect to the "steel company" or between Duffy and Sain and McNally, as identified in my letter dated June 12. **Mr. Watkins testified that these communications about the "steel company" were oral. However, if there are any emails with customers or prospects about the Presentation or the facts contained therein, they have or will be produced. The same holds true with communications with SuccessFactors employees. Please confirm that SF has or will be conducting its own searches and produced or will produce such communications between its employees and Softscape.**

Further Softscape Agreements:

Although no date was specified by the parties, SuccessFactors requests action as soon as possible on the following Softscape agreements:

1. Softscape will produce all versions of the alleged SIPP and Presentation.

2. Softscape agreed that it was running, and will run, all agreed search terms across all its media.

3. Regarding Document Request Nos. 19-20: Softscape will provide us with a cross reference chart regarding its CRM server/database and the Gmail list. SuccessFactors will then decide whether it needs more information.

4. Regarding Dave Watkins' deposition transcript, Softscape will tell us whether it will stand on its instructions not to answer or will give its agreement to a stipulated shortened time for a motion to compel. **Consistent with Judge Zimmerman's advisory rulings, Softscape does not intend to instruct the witness not to answer other than as**

**permitted by Rule 30(c)(2). Thus, no motion to compel should be necessary.**

5. Regarding Document Request Nos. 30 and 33-39: Softscape agreed to extend its search of logs to March 11, 2008.

**SuccessFactors Agreements:**

SuccessFactors agreed to the following:

1. Tell Softscape who will be addressing the IT issues Softscape has raised with us. **We are still awaiting this information, which is long over due. Please advise.**

2. We will check whether it is possible to look for logs (including IM logs) while at the same time running searches.

3. We will answer your July 14, 2008 letter regarding our interrogatory responses by noon on Monday, July 21, 2008.

4. We agree to meet and confer on SuccessFactors' interrogatory responses on Monday, July 21, 2008 at 5:30 p.m. in Palo Alto.

Thank you,

**FENWICK & WEST LLP**
**HENRY Z. CARBAJAL III**
Fenwick & West LLP
Associate, Litigation Group
📞 (650) 335-7193
📠 (650) 938-5200
✉ hcarbajal@fenwick.com

-------------------------------------------

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Fenwick & West LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

-------------------------------------------

ATTENTION:

The information contained in this message may be legally privileged and confidential. It is intended to be read only by the individual or entity to whom it is addressed or by their designee. If the reader of this message is not the intended recipient, you are on notice that any distribution of this message, in any form, is strictly prohibited.

If you have received this message in error, please immediately notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and delete or destroy any copy of this message.

-----------------------------------------------------------------

IRS CIRCULAR 230 NOTICE

In compliance with IRS requirements, we inform you that any U.S. tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of avoiding tax penalties or in connection with marketing or promotional materials.

-----------------------------------------------------------------

STATEMENT OF CONFIDENTIALITY:

The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at ISDirector@Mintz.com, and destroy all copies of this message and any attachments. You will be reimbursed for reasonable costs incurred in notifying us.

7/31/2008

-----------------------------------------------------------------

IRS CIRCULAR 230 NOTICE

In compliance with IRS requirements, we inform you that any U.S. tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of avoiding tax penalties or in connection with marketing or promotional materials.

-----------------------------------------------------------------

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at ISDirector@Mintz.com, and destroy all copies of this message and any attachments. You will be reimbursed for reasonable costs incurred in notifying us.

-----------------------------------------------------------------

IRS CIRCULAR 230 NOTICE

In compliance with IRS requirements, we inform you that any U.S. tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of avoiding tax penalties or in connection with marketing or promotional materials.

-----------------------------------------------------------------

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at ISDirector@Mintz.com, and destroy all copies of this message and any attachments. You will be reimbursed for reasonable costs incurred in notifying us.

7/31/2008

# EXHIBIT 21

# MINTZ LEVIN

1400 Page Mill Road
Palo Alto, California  94304-1124
650-251-7700
650-251-7739 fax
www.mintz.com

Jeffrey Ratinoff | 650 251 7755 | jratinoff@mintz.com

## HIGHLY CONFIDENTIAL -ATTORNEYS' EYES ONLY

June 20, 2008

**VIA ELECTRONIC MAIL**

Henry Z. Carbajal III, Esq.
Fenwick & West LLP
801 California Street
Mountain View, CA  94041

Re:     *SuccessFactors, Inc. v. Softscape, Inc.*; Case No.: C08-1376 CW (BZ)

Dear Mr. Carbajal:

I am writing to follow-up on the agreed-upon search term list with a couple of proposed changes that we believe will help expedite the ESI search process.

First, we propose to eliminate certain compound term strings where a single term will capture the same documents.  For example, if we use "SuccessFactor(s)" as a stand-alone term, it would obviate the need to use "SuccessFactor(s)" in conjunction with "demo," "website" and "webinar."

Second, we propose to eliminate the terms "Ilene McCune" and "McCune" since she has been a Softscape employee for quite some time.  As a stand-alone term, it captures every email that she has sent to another listed custodian, including those that have no relevance to the present litigation.  Instead, we propose to add her to the custodian list and will run the search term list against her exchange server file.

Please let me know by 1:00 p.m. on June 23, 2008 whether the forgoing is acceptable and I will immediately send a revised term list for your review and approval.

Thank you for your anticipated cooperation with the foregoing matter.

Sincerely,

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Jeffrey M. Ratinoff

JR/sb

# EXHIBIT 22

## Unknown

| | |
|---|---|
| **From:** | Sinclair, Bryan [BSinclair@mintz.com] |
| **Sent:** | Tuesday, July 22, 2008 6:48 PM |
| **To:** | Henry Carbajal |
| **Cc:** | Laurence Pulgram; Taylor, Robert; Patrick Premo; Liwen Mah; Sandy Sanford; Ratinoff, Jeffrey; Sinclair, Bryan |
| **Subject:** | RE: SuccessFactors, Inc. v. Softscape, Inc.: Summary of Meet and Confer Agreements - Monday 7-21-08 Responses |
| **Importance:** | High |

Henry, please see Softscape's responses to the Tuesday COB issues that you raised.  My responses are in **RED** below.

---

**From:** Sinclair, Bryan
**Sent:** Monday, July 21, 2008 5:58 PM
**To:** 'Henry Carbajal'
**Cc:** Laurence Pulgram; Taylor, Robert; Patrick Premo; Liwen Mah; Sandy Sanford; Sinclair, Bryan; Ratinoff, Jeffrey
**Subject:** SuccessFactors, Inc. v. Softscape, Inc.: Summary of Meet and Confer Agreements - Monday 7-21-08 Responses

Henry, please see Softscape's responses to the Monday COB issues you raised.  My responses are in **RED** below:

---

**From:** Henry Carbajal [mailto:HCarbajal@fenwick.com]
**Sent:** Thursday, July 17, 2008 8:19 PM
**To:** Ratinoff, Jeffrey
**Cc:** Laurence Pulgram; Sinclair, Bryan; Taylor, Robert; Patrick Premo; Liwen Mah; Sandy Sanford
**Subject:** SuccessFactors, Inc. v. Softscape, Inc.: Summary of Meet and Confer Agreements

Jeffrey,
As you requested, here is a list of items agreed upon by the parties at today's meet and confer session.  Please let me know immediately if this does not conform to your understanding of the parties' communications today.

**By close of business tomorrow:**

Softscape agreed to give us color coded redesignations of Mr. Watkins' deposition transcript, with explanations for the designations.

**By close of business Monday, July 21:**

Softscape agreed to the following:

1. Tell us whether Softscape has searched "my administrator's machine," the SRC, CRM and the "corporate file server."  **YES.**

2. Tell us whether it will produce its log file and server "metadata" and when such will be delivered.  **Softscape has requested further clarification of this question.  Please explain exactly what "log file" and "server" metadata you are referring to.  I can get an answer for you tomorrow if you can provide written clarification with the specifics of your question.**

3. Advise us whether the current version in CRM, or elsewhere, of the Presentation has been produced, along with metadata.  **Several versions of the SIPP have been produced.  The most recent version will be produced on or before August 1, 2008.**

4. Will let us know by Monday whether it will disclose information on backup tapes, including type, how many, dates of tapes, and estimate of cost to restore, and whether or not there are different tapes for different custodians.  **No. SS has expended substantial sums to image and preserve multiple servers and computers and has searched and**

continues to search those images for responsive documents. **SS has complied with the Court's preservation order and there is no reason to provide the additional information.**

5. Will look at, and tell us, whether Softscape can and will run Kutik (and William Hurley) search terms across Softscape's exchange server. **The 22 custodians are being searched for both names. SS will not search every custodian within the company (numbering in the hundreds) with a box on the exchange server. If future document production gives rise to the need to isolate one or more custodians and search their boxes with these names as search terms, SS will take any necessary steps at that time.**

6. Will check, and tell us, whether Softscape examined each hard drive for Instant Messages. **Yes it has.**

7. Tell us whether Softscape will give us CRM search results (of communications) for companies within the overlaps between the CRM list and Gmail account. **SS will produce responsive communications relating to any companies SF has specifically identified as being a lost customer or lost prospect.**

8. Give us information regarding "mwest": Is there an mwest account? Softscape will confirm it has looked for emails to such account (including bounced emails). If so, Softscape will tell us who/what "mwest" is. **SS has confirmed that there is no "mwest" e-mail account within the company and does not know who "mwest" is.**

9. Regarding Document Request Nos. 34-36: Softscape will tell us whether it will agree to advise us as to who logged into the NMS webserver account from the specified IP addresses. No date was specified by the parties for this agreement, but we request a deadline of Monday for the answer. **SS will identify the IP addresses who logged into the NMS webserver account for any IP addresses that SS is able to identify as a result of the information being within its knowledge, custody, or control.**

10. Regarding your narrowing proposal for Document Request No. 26, we will accept your proposal to construe the request as calling for: All communications between the "wildgracks" email address and Softscape relating to the Presentation or facts therein or between the "wildgracks" email address and SuccessFactors. **YES.**

**By close of business Tuesday, July 22:**

Softscape agreed to the following:

1. Advise us whether Softscape will give us names of customers and "friends" on produced redacted phone records. **Softscape will not provide names of "friends" on the redacted phone records. I will have a final answer in the morning as to the customer names question.**

2. Amend its privilege log on produced phone records to give the time of Dave Watkins' phone calls on the privilege log. Please also give us the accurate time zone for all times on the privilege log, as we see those are missing from the log. **Softscape will either: (a) amend the privilege logs to identify the accurate time zone information; or (b) produce the records with the information visible.**

3. Regarding Document Request No. 17: Softscape will give us an answer on the proposed compromise, which would delete the phrase "not limited to" from the request.

**Softscape will produce all non-privileged documents concerning actual or planned press releases by Softscape regarding this action, including any version, portion, edits, memoranda, notes and e-mails between March 4, 2008 through the date of the Preliminary Injunction hearing.**

4. Regarding Document Request No. 42: Softscape will give us an answer as to whether it will produce emails with Ely Valls' hotmail account and Softscape, limited to those relating in any way to Softscape's business, including any competition or competitors of Softscape, or the NMS website.

**Softscape will produce Ely Valls' e-mails relating to: (1) facts contained or statements made in the Presentation; (2) access to the ACE 275 sales demo at any time; and (3) SuccessFactors.**

**By the end of next week, Friday, July 25:**

Softscape agreed to the following:

1. Will produce Lillian Watkins' mobile and Mike Brandt's mobile and corporate phone records.

7/31/2008

2. Will find out if any documents exist with respect to the "steel company" or between Duffy and Sain and McNally, as identified in my letter dated June 12.

**Further Softscape Agreements:**

Although no date was specified by the parties, SuccessFactors requests action as soon as possible on the following Softscape agreements:

1. Softscape will produce all versions of the alleged SIPP and Presentation.

2. Softscape agreed that it was running, and will run, all agreed search terms across all its media.

3. Regarding Document Request Nos. 19-20: Softscape will provide us with a cross reference chart regarding its CRM server/database and the Gmail list. SuccessFactors will then decide whether it needs more information.

4. Regarding Dave Watkins' deposition transcript, Softscape will tell us whether it will stand on its instructions not to answer or will give its agreement to a stipulated shortened time for a motion to compel.

5. Regarding Document Request Nos. 30 and 33-39: Softscape agreed to extend its search of logs to March 11, 2008.

**SuccessFactors Agreements:**

SuccessFactors agreed to the following:

1. Tell Softscape who will be addressing the IT issues Softscape has raised with us.

2. We will check whether it is possible to look for logs (including IM logs) while at the same time running searches.

3. We will answer your July 14, 2008 letter regarding our interrogatory responses by noon on Monday, July 21, 2008.

4. We agree to meet and confer on SuccessFactors' interrogatory responses on Monday, July 21, 2008 at 5:30 p.m. in Palo Alto.

Thank you,

FENWICK & WEST LLP
**HENRY Z. CARBAJAL III**
Fenwick & West LLP
Associate, Litigation Group
(650) 335-7193
(650) 938-5200
hcarbajal@fenwick.com

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Fenwick & West LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

ATTENTION:
The information contained in this message may be legally privileged and confidential. It is intended to be read only by the individual or entity to whom it is addressed or by their designee. If the reader of this message is not the intended recipient, you are on notice that any distribution of this message, in any form, is strictly prohibited.

If you have received this message in error, please immediately notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and delete or destroy any copy of this message.

7/31/2008

IRS CIRCULAR 230 NOTICE

In compliance with IRS requirements, we inform you that any U.S. tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of avoiding tax penalties or in connection with marketing or promotional materials.

--------------------------------------------------------------

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at ISDirector@Mintz.com, and destroy all copies of this message and any attachments. You will be reimbursed for reasonable costs incurred in notifying us.

# EXHIBIT 28

| Date | Orig Name | Dest Name | Start Time | Duration | Call Date | Notes | Root Call # | Parent Call # | Applications |
|---|---|---|---|---|---|---|---|---|---|
| 3/4/2008 0:00 | TRUNK B-2 | Matthew Park | 5:01 PM | 881 | | Incoming | 884 | -1 | From Mike Brandt |
| 3/4/2008 0:00 | TRUNK B-3 | Susanne McFee | 5:04 PM | 0 | | Incoming | 860 | -1 | Confidential Marketing Call |
| 3/4/2008 0:00 | Rick Watkins | TRUNK B-22 | 5:11 PM | 92 | | LongDistance | 877 | -1 | To Dave Watkins |
| 3/4/2008 0:00 | TRUNK B-2 | Dennis Martinek | 5:31 PM | 0 | | Incoming | 908 | -1 | From Dennis Martinek's Cell Phone |
| 3/4/2008 0:00 | TRUNK B-1 | Matthew Park | 5:51 PM | 1130 | | Incoming | 937 | -1 | From Jeff Adams |
| 3/4/2008 0:00 | TRUNK B-2 | Rick Watkins | 6:01 PM | 315 | | Incoming | 935 | -1 | From Rick Watkins' home |
| 3/4/2008 0:00 | TRUNK B-3 | Dennis Martinek | 6:05 PM | 0 | | Incoming | 933 | -1 | From Dennis Martinek's Cell Phone |
| 3/4/2008 0:00 | Rick Watkins | TRUNK B-23 | 6:07 PM | 2 | | LongDistance | 936 | -1 | To Dave Watkins |
| 3/4/2008 0:00 | Matthew Park | TRUNK B-23 | 6:10 PM | 456 | | LongDistance | 944 | -1 | To Jeff Adams |
| 3/4/2008 0:00 | Matthew Park | TRUNK B-23 | 6:32 PM | 2 | | International | 948 | -1 | To Mike Brandt/Charlie Camphin |
| 3/4/2008 0:00 | Matthew Park | TRUNK B-23 | 6:32 PM | 1318 | | International | 955 | -1 | To Mike Brandt/Charlie Camphin |
| 3/4/2008 | TRUNK B-1 | Dennis Martinek | 8:17 PM | 0 | | Incoming | 966 | -1 | From Dennis Martinek's Cell Phone |
| 3/5/2008 | TRUNK B-1 | Linda Gagne | 7:35 AM | 0 | | Incoming | 1 | -1 | Confidential Customer Call |

Highly Confidential - Outside Attorney's Eyes Only
SSHC000654